

1    STEPHEN P. BERZON (#46540)
     sberzon@altshulerberzon.com
2    LINDA LYE (#215584)
     llye@altshulerberzon.com
3    CLAIRE P. PRESTEL (#235649)
     cprestel@altshulerberzon.com
4    Altshuler Berzon LLP
     177 Post Street, Suite 300
5    San Francisco, CA 94108
     Telephone: (415) 421-7151
6    Facsimile:  (415) 362-8064

7    ELIZABETH GINSBURG
     (Application for Admission *Pro Hac Vice* Pending)
8    elizabeth.ginsburg@alpa.org
     Air Line Pilots Association, International
9    535 Herndon Parkway
     Herndon, VA 20172-1169
10   Telephone: (703) 481-2424
     Facsimile:  (703) 481-2478

11                              E-filing

12   Attorneys for Plaintiffs

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15   SKYWEST PILOTS ALPA ORGANIZING      C 07      2688
     COMMITTEE, *et al.*,                CASE NO.:
16
                      Plaintiffs,        MEMORANDUM IN SUPPORT OF
17                                       MOTION FOR TEMPORARY
          vs.                            RESTRAINING ORDER AND
18                                       PRELIMINARY INJUNCTION
     SKYWEST AIRLINES, INC.,
19
                      Defendant.
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II.   FACTUAL BACKGROUND ............................................................................. 3

    A.   DEFENDANT HAS PREVENTED PLAINTIFFS FROM ENGAGING IN EXPRESSIVE AND ASSOCIATIONAL ACTIVITY IN CONNECTION WITH THE ALPA ORGANIZING CAMPAIGN ................. 3

        1.   Lanyards ....................................................................................... 4

        2.   Bulletin boards ............................................................................. 5

        3.   Literature placed in crew lounges ................................................ 5

        4.   Mailboxes ..................................................................................... 6

        5.   Email . ........................................................................................... 6

        6.   Presentations to newly-hired pilot class ...................................... 6

        7.   Impact on organizing campaign .................................................... 6

    B.   DEFENDANT RECOGNIZES AND PURPORTS TO BARGAIN WITH AN ENTITY THAT IT CREATED AND FULLY FUNDS ................. 8

III.  STATUTORY BACKGROUND .......................................................................... 9

IV.   LEGAL STANDARD FOR ISSUANCE OF INTERIM INJUNCTIVE RELIEF ......... 11

V.    ARGUMENT .............................................................................................. 11

    A.   PLAINTIFFS HAVE AN OVERWHELMING LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS THAT SKYWEST'S CONDUCT VIOLATES RLA SECTION 2, THIRD AND FOURTH ............................................................................. 11

        1.   SKYWEST INTERFERES WITH PILOTS' RLA-PROTECTED RIGHT TO ENGAGE IN EXPRESSIVE AND ASSOCIATIONAL ACTIVITY RELATED TO ORGANIZING ......... 12

        2.   SKYWEST'S SUPPORT FOR SAPA VIOLATES PILOTS' RIGHT TO CHOOSE THEIR OWN BARGAINING REPRESENTATIVE ................................................................. 15

            (a)   THE RLA EXPLICITLY PROHIBITS COMPANY UNIONS ................................................................... 15

            (b)   SKYWEST'S SUPPORT FOR SAPA VIOLATES THE RLA'S BAN ON COMPANY UNIONS .......................... 16

    B.   THE BALANCE OF HARMS OVERWHELMINGLY FAVORS ENJOINING SKYWEST FROM INTERFERING WITH PLAINTIFFS' ORGANIZATIONAL AND REPRESENTATIONAL ACTIVITIES PENDING A DECISION ON THE MERITS ................. 18

1.  PLAINTIFFS WILL SUFFER SEVERE, IMMEDIATE, AND IRREPARABLE HARM FROM THE LOSS OF THEIR STATUTORILY PROTECTED RIGHT TO EXERCISE FREE CHOICE ........................................................................ 18

2.  THE BALANCE OF HARDSHIPS TRIPS STRONGLY IN PLAINTIFFS' FAVOR AND AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST BY ENSURING THAT DEFENDANT'S COERCIVE CONDUCT WILL NOT COME TO FRUITION ............. 21

VI.    CONCLUSION ............................................................................ 22

# TABLE OF AUTHORITIES

## CASES

*Adams v. Fed. Express Corp.*,
  470 F.Supp. 1356 (W.D. Tenn. 1979) .................................................................. 12, 13

*Arcamuzi v. Continental Air Lines, Inc.*,
  819 F.2d 935 (9th Cir. 1987) .................................................................. 10, 12, 18

*Beth Israel Hosp. v. NLRB*,
  437 U.S. 483 (1978) .................................................................. 12

*Bhd. of Railway & Steamship Clerks v. Virginian Ry. Co.*,
  125 F.2d 853 (4th Cir. 1942) .................................................................. 16, 17

*Brown v. Pac. Tel. & Telegraph Co.*,
  218 F.2d 542 (9th Cir. 1955) .................................................................. 19, 20

*Consol. Diesel Co. v. NLRB*,
  263 F.3d 345 (4th Cir. 2001) .................................................................. 13

*Eastex, Inc. v. NLRB*,
  437 U.S. 556 (1978) .................................................................. 13

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................. 19, 20

*Horizon Air Indus. v. Nat'l Mediation Bd.*,
  232 F.3d 1126 (9th Cir. 2000) .................................................................. 16, 17, 18

*International Assn. Of Machinists v. Street*,
  367 U.S. 740 (1961) .................................................................. 9, 10

*Jones v. Trans World Airlines, Inc.*,
  495 F.2d 790 (2d Cir. 1974) .................................................................. 17

*Jorgensen v. Cassiday*,
  320 F.3d 906 (9th Cir. 1996) .................................................................. 22

*Konop v. Hawaiian Airlines, Inc.*,
  302 F.3d 868 (9th Cir. 2002) .................................................................. 12, 15, 17

*Lands Council v. Martin*,
  479 F.3d 636 (9th Cir. 2007) .................................................................. 11

*Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*,
  887 F.Supp. 1320 (N.D. Cal. 1995) .................................................................. 11

*Miller v. Calif. Pac. Med. Ctr.*,
  19 F.3d 449 (9th Cir. 1994) .................................................................. 21

*NLRB v. Electro-Voice, Inc.*,
  83 F.3d 1559 (9th Cir. 1996) .................................................................. 19, 20, 21, 22

*NLRB v. Lummus Industries, Inc.*,
   679 F.2d 229 (11th Cir. 1982) ............................................................................ 14

*Norelli v. SFO Good-Nite Inn*,
   2007 WL 662477 (N.D. Cal. Mar.1, 2007) ...................................... 19, 20, 22

*Pay N Save Corp. v. NLRB*,
   641 F.2d 697 (9th Cir. 1981) ............................................................................ 13

*Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*,
   204 F.3d 867 (9th Cir.2000) ............................................................................ 11

*Railway Labor Executives' Ass'n v. National Mediation Bd.*,
   29 F.3d 655 (D.C. Cir. 1994) .......................................................................... 16

*Reichard v. Foster Poultry Farms*,
   425 F. Supp.2d 1090 (E.D. Cal. 2006) ...................................................... 19, 22

*In re Representation of Fleet Serv. Employees of USAir*,
   1990 WL 504772 (NMB 1990) ........................................................................ 14

*Republic Aviation Corp. v. NLRB*,
   324 U.S. 793 (1945) .......................................................................................... 13

*S.O.C., Inc. v. County of Clark*,
   152 F.3d 1136 (9th Cir. 1998) ........................................................................ 19

*Sammartano v. First Jud. Dist. Court*,
   303 F.3d 959 (9th Cir. 2002) .......................................................................... 19

*Scherr v. Volpe*,
   466 F.2d 1027 (7th Cir. 1972) ........................................................................ 22

*Scott ex re. NLRB v. Stephen Dunn & Assocs.*,
   241 F.3d 652 (9th Cir. 2001) .......................................................................... 19

*Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*,
   240 F.3d 832 (9th Cir. 2001) .......................................................................... 11

*Temple Univ. v. White*,
   941 F.2d 201 (3d Cir. 1991) ............................................................................ 22

*Texas & N.O.R. Co. v. Bhd. of Ry. & Steamship Clerks*,
   281 U.S. 548 (1930) ...................................................................... 10, 12, 15, 16

*Textile Unlimited, Inc. v. A..BMH & Co., Inc.*,
   240 F.3d 781 (9th Cir. 2001) .......................................................................... 11

*Trans World Airlines, Inc. v. Indep. Fed. Of Flight Attendants*,
   489 U.S. 426 (1989) .......................................................................................... 10

*Union of Professional Airmen v. Alaska Aeronautical Indus., Inc.*,
   1977 WL 1714 (D. Ala. Apr. 26, 1977) ........................................................ 19

*United States v. Nutri-cology, Inc.*,
   982 F.2d 394 (9th Cir. 1992) .......................................................................... 18

*Virginian Ry. Co. v. System Fed. No. 40,*
    300 U.S. 515 (1937) ................................................................................*passim*

*Webco Indus. v. NLRB,*
    217 F.3d 1306 (10th Cir. 2000) ...................................................................... 14

**STATUTES**

29 U.S.C.
    §§151-169 .................................................................................................... 9
    §157 ........................................................................................................... 12

42 U.S.C. §184 ............................................................................................. 10

45 U.S.C.
    §§151-188 .................................................................................................... 9
    §151a ........................................................................................................... 9
    §152 ......................................................................................................*passim*

**OTHER AUTHORITIES**

Merriam Webster's Collegiate Dictionary (10th ed. 1997) ................................4-5

**MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs are engaged in a union organizing campaign. Their goal is to elect the Air Line Pilots Association, International ("ALPA") as the bargaining representative under the Railway Labor Act ("RLA" or "the Act") of the pilot group at Defendant SkyWest Airlines, Inc. ("SkyWest"). Since the inception of the organizing campaign, Defendant has attempted to stamp out support for the union. Defendant has interfered with pilots' RLA-protected rights to select a bargaining representative of their own choosing and to engage in related expressive and associational activity. Under controlling Ninth Circuit authority, interference with these RLA-protected rights constitutes irreparable harm. Plaintiffs bring this motion for a temporary restraining order and preliminary injunction to protect their statutory rights and to ensure that Defendant's coercive course of conduct does not come to fruition and render meaningless an ultimate remedy in this case.

Defendant is violating Plaintiffs' RLA-protected rights in two ways. First, Defendant is preventing Plaintiffs from communicating with their fellow pilots about the organizing campaign, while simultaneously permitting speech through the identical channels, as long as it is either unrelated to ALPA and unionization, or performed by the SkyWest Airlines Pilot Association ("SAPA") – an entity that purports to represent employees, when, in fact, it was created by and is entirely funded by Defendant. Defendant has even gone so far as to prevent Plaintiffs from engaging in the most basic and common methods of showing support for a union in the course of an organizing campaign – wearing union insignia – while permitting pilots to wear insignia unrelated to ALPA, including SAPA insignia. Defendant's conduct violates pilots' fundamental right to engage in expressive and associational activity related to collective bargaining. 45 U.S.C. §152, Third and Fourth.

Second, Defendant supports SAPA. Although SAPA claims to represent employees, it is a company-created and -funded entity that has never been designated by the SkyWest pilot group as its representative of choice. The RLA prohibits support for "company unions," like SAPA,

1 because Congress determined more than 70 years ago that company domination of entities that

2 purport to represent employees are inherently coercive and destructive of employee free choice.

3 *Virginian Ry. Co. v. System Fed. No.* 40, 300 U.S. 515, 543-44 (1937). Defendant's support for

4 SAPA effectively imposes *Defendant's* choice of bargaining representative on the SkyWest pilot

5 group – and thus undermines pilots' basic RLA right to choose their *own* bargaining

6 representative. *See* 45 U.S.C. §152, Third and Fourth.

7         Interim injunctive relief from this Court is necessary to protect pilots' statutory rights to

8 organize and to elect a bargaining representative of their own choosing. Plaintiffs suffer

9 immediate and irreparable harm each additional day that they are chilled from engaging in

10 expressive and associational activities in connection with their organizing campaign. Plaintiffs

11 also suffer immediate and irreparable harm because each additional day that the Company's

12 unlawful, coercive practices persist, the danger grows that support for their organizing campaign

13 will irreversibly wane.

14         Plaintiffs believe it is necessary to sponsor as soon as possible a carrier-wide action,

15 pursuant to which pilots would wear union insignia in a show of solidarity, to energize the

16 organizing campaign. It is critical that this action occur at the earliest possible date, to maintain

17 the campaign's momentum and visibility and to invigorate the campaign before pilots become

18 unavailable due to their summer schedules. Organizing campaigns must maintain visibility and

19 excitement to succeed, and when a campaign loses momentum, it is extremely difficult to restore

20 interest and intensity in the campaign and support for the union. Plaintiffs are unable to sponsor

21 such a solidarity-building action, however, because Defendant has doggedly prohibited pilots

22 from wearing union insignia, or even distributing ALPA-related information to their co-workers

23 in crew lounges between flights, *i.e.*, on non-work time and in non-work areas. Interim

24 injunctive relief is necessary to prevent Defendant from silencing Plaintiffs. Any delay in the

25 issuance of relief will allow Defendant's unlawful interference with Plaintiffs' free choice to

26 come to fruition and render the protections of the Act and an ultimate remedy in this case utterly

27 meaningless.

28

MEMORANDUM ISO MOTION FOR TRO & PRELIMINARY INJUNCTION, Case No. _____

## II.    FACTUAL BACKGROUND

The individual Plaintiffs consist of nine pilots employed by Defendant SkyWest who wish to designate ALPA as their exclusive bargaining representative under the RLA.  Steve Dow Decl. at ¶7; Diletta Martirano Decl. at ¶1; Boehm Decl. at ¶2; Marc Johnson Decl. at ¶2; Frank Bowlin Decl. at ¶ 2; Andy Bharath Decl. at ¶2; Riad Mansur Decl. at ¶2; Charles Alford Decl. at ¶2; Tracy Shrier Decl. at ¶2.  The organizational Plaintiffs consist of the SkyWest Pilots ALPA Organizing Committee ("SkyWest Pilots OC"), whose members are pilots employed by SkyWest and who wish to elect ALPA as their bargaining representative (Dow Decl. at ¶7), as well as ALPA, which is certified or recognized to represent pilots at commercial airlines in the United States pursuant to the Act and is seeking to organize and represent the pilots employed by SkyWest.  Jeff MacDonald Decl. at ¶4.

Since the inception of Plaintiffs' organizing campaign, Defendant (1) has prevented Plaintiffs from communicating and associating with their fellow pilots about ALPA and the campaign and (2) has funded, promoted, recognized, and purported to bargain with SAPA, a company-created and -dominated entity that purports to represent employees, but has never been designated by the SkyWest pilot group as its chosen representative.  Martirano Decl. at ¶2.

Defendant has expressly and repeatedly stated that it does not want a union at SkyWest. Bharath Decl. at ¶13; Dow Decl. at ¶11.

### A.    DEFENDANT HAS PREVENTED PLAINTIFFS FROM ENGAGING IN EXPRESSIVE AND ASSOCIATIONAL ACTIVITY IN CONNECTION WITH THE ALPA ORGANIZING CAMPAIGN

Defendant is preventing Plaintiffs from engaging in expressive and associational activities, as follows:

- wearing lanyards with ALPA insignia, even though Defendant permits pilots to wear lanyards with non-SkyWest insignia and to wear SAPA pins;
- posting ALPA fliers on bulletin boards in crew lounges, even though Defendant permits commercial advertisements and charitable solicitations in the same locations;
- leaving ALPA materials elsewhere in crew lounges, even though Defendant permits general interest materials in these same areas;
- placing ALPA materials in pilot mailboxes in crew lounges, even though Defendant permits SAPA to do so;
- sending ALPA information to SkyWest pilots through the company email, even though Defendant permits SAPA to do so;
- making presentations about ALPA to newly-hired pilot classes, even though Defendant permits SAPA to do so.

1.     *Lanyards.*  SkyWest pilots often wear lanyards to hold their identification cards. Dow Decl. at ¶12.[1]  Although SkyWest makes available lanyards with the company's logo, many pilots wear non-SkyWest lanyards with logos of, for example, sports teams or colleges. *Id.*; Bharath Decl. at ¶4; Mansur Decl. at ¶5.

As part of the organizing campaign, SkyWest Pilots OC distributed dark blue lanyards with the ALPA logo. Dow Decl. at ¶12.  The lanyards serve as a means for pilots outwardly to express their support for SkyWest Pilots OC and to identify like-minded pilots. Boehm Decl. at ¶3; Bharath Decl. at ¶3; Mansur Decl. at ¶3.  The wearing of union insignia on lanyards or pins is a highly effective method of demonstrating support for an organizing campaign and building solidarity. MacDonald Decl. at ¶8.  A photograph of an ALPA lanyard is attached as Exhibit 2 to the Declaration of Linda Lye.

When pilots have worn their ALPA lanyards, SkyWest management has ordered them to remove the lanyards, threatened them with discipline, and stated that pilots will "get in trouble" for wearing them. Dow Decl at ¶12; Shrier Decl. at ¶¶4-10; Bowlin at ¶4; Bharath Decl. at ¶4; Boehm Decl. at ¶¶4-8; Mansur Decl. at ¶4.  While Defendant regularly confronts ALPA supporters for wearing ALPA lanyards, it routinely permits pilots to wear lanyards with other non-SkyWest logos.  Boehm Decl. at ¶9; Dow Decl. at ¶12; Bharath Decl. at ¶3-5; Mansur Decl. at ¶5.  It also permits pilots to wear pins bearing the insignia of SAPA, an organization developed and completely financed by Defendant SkyWest that purports to speak on behalf of SkyWest's pilots, but has never been designated by the pilot group as its representative.  Dow Decl. at ¶¶5-6; Martirano Decl. at ¶2.

Because Plaintiffs do not want to "get in trouble," they have refrained from wearing their ALPA lanyards, even though they would like to show their support for the organizing campaign. Dow Decl. at ¶12; Bowlin Decl. at ¶5; Mansur Decl. at ¶5; Shrier Decl. at ¶13; Bharath  Decl. at ¶4; MacDonald Decl. at ¶8.  In light of Defendant's tolerance of lanyards with non-ALPA

---

[1] A lanyard is "a cord or strap to hold something . . . and usu[ally] worn around the neck." (continued)

1   insignia, Plaintiffs feel singled out and targeted for wearing their ALPA lanyards. Bharath Decl.

2   at ¶¶4-5; Shrier Decl. at ¶9.

3       2.    *Bulletin boards.*  Defendant maintains crew lounges at airports in which the

4   company has pilot domiciles.  Crew lounges are available for pilots as a location to eat, relax,

5   take breaks, and engage in non-work activities between flights. Dow Decl. at ¶3; Alford Decl. at

6   ¶3; Bharath at ¶6.

7       Crew lounges contain bulletin boards for general, non-operational purposes.  These

8   bulletin boards are covered with notices about a wide-variety of topics, including advertisements

9   and solicitations for charitable organizations and service providers. Dow Decl. at ¶4; Alford

10  Decl. at ¶4; Martirano Decl. at ¶3.  Defendant also maintains a bulletin board at most bases that

11  is dedicated exclusively for use by SAPA.  Dow Decl. at ¶4; Martirano Decl. at ¶3.

12      Defendant has prevented Plaintiffs from posting fliers related to ALPA on the bulletin

13  boards used for general, non-operational purposes.  Johnson Decl. at ¶3; Bharath Decl. at ¶¶6-7.

14  Whenever Plaintiffs have actually posted ALPA fliers on bulletin boards, SkyWest management

15  has promptly removed them, while leaving undisturbed fliers unrelated to ALPA, including those

16  posted by SAPA.  Bharath Decl. at ¶¶8-9Dow Decl. at ¶8; Mansur Decl. at ¶6.  Defendant has

17  confronted Plaintiffs for posting ALPA fliers, and as a result of these confrontations, Plaintiffs

18  have refrained from posting further ALPA fliers.  Johnson Decl. at ¶3-6.  Pilots are not

19  confronted for posting non-ALPA related items.  *Id.* at ¶5.

20      3.    *Literature placed in crew lounges.*  Plaintiffs have also attempted to leave ALPA

21  materials elsewhere in crew lounges to be read by pilots.  Martirano Decl. at ¶4.  Such material,

22  like ALPA fliers posted on bulletin boards, has been promptly removed by SkyWest, even

23  though SkyWest permits SAPA to leave written materials for pilots in crew lounges and even

24  though other non-work related materials, such as newspapers, are frequently left undisturbed.

25  Martirano Decl. at ¶¶3-4; Alford Decl. at ¶5; Mansur Decl. at ¶3; Bharath Decl. at ¶6.

26

27  _____

                                                            (continued)

28  Merriam Webster's Collegiate Dictionary (10th ed. 1997) at 655.

MEMORANDUM ISO MOTION FOR TRO & PRELIMINARY INJUNCTION, Case No. _____

1        *4.    Mailboxes.*  Crew lounges also contain mailboxes for pilots.  Defendant permits

2    SAPA to place notices in these mailboxes, but promptly removes ALPA-related materials.  Dow

3    Decl. at ¶9.

4        *5.    Email.*  SkyWest permits SAPA to use the company email system to communicate

5    electronically with the pilot group, but prohibits Plaintiffs from doing so.  Bharath Decl. at ¶14.

6        *6.    Presentations to newly-hired pilot class.*  SkyWest routinely invites SAPA to

7    speak to training classes for newly-hired pilots.  Dow Decl. at ¶6.  During these presentations,

8    SAPA discusses the "representation" that it provides and urges pilots not to support outside

9    unions such as ALPA.  Martirano Decl. at ¶2.  Plaintiffs have requested the opportunity to speak

10   to newly-hired pilots classes, but Defendant SkyWest has refused Plaintiffs' request.  Bharath

11   Decl. at ¶¶9-11.

12       On April 2, 2007, Plaintiffs stood on the sidewalk outside the training center where

13   SkyWest conducts trainings for newly-hired pilots classes and distributed fliers advertising an

14   ALPA information session being held that evening to pilots as they exited the building.

15   Approximately 45 minutes after Plaintiffs began distributing fliers on the sidewalk outside the

16   training center, Defendant ordered Plaintiffs to leave.  Shrier Decl. at ¶¶14-15; Alford Decl. at

17   ¶¶6-7.

18       *7.    Impact on organizing campaign.*  SkyWest has created a climate of fear and

19   intimidation.  Members of Plaintiff SkyWest Pilots OC are concerned that their active

20   involvement in the ALPA organizing campaign will lead to discipline and adversely affect their

21   long-term career prospects.  MacDonald Decl. at ¶11; Alford Decl. at ¶8 ("combined effect" of

22   management's actions "has been to prevent me from freely expressing my view that the pilots of

23   SkyWest would benefit from electing ALPA as their collective bargaining representative, and to

24   discourage me from attempting to provide information to other pilots or encourage them to

25   inquire about the benefits of representation").  Plaintiffs' free expression has been chilled, and

26   they have been deterred from outwardly supporting the organizing campaign and associating

27   with others who support the organizing campaign.  Alford Decl. at ¶8; Dow Decl. at ¶12; Bowlin

28   Decl. at ¶5; Mansur Decl. at ¶5; Shrier Decl. at ¶13; Bharath Decl. at ¶4.

1    As a result of SkyWest's practices of preventing Plaintiffs from expressing support for
2  and distributing information about their organizing campaign using lanyards, bulletin boards,
3  crew lounges, pilot mailboxes, email, and presentations to newly-hired pilot classes, Plaintiffs
4  have encountered tremendous logistical difficulty in communicating with their fellow pilots and
5  have effectively been denied the ability to present their message.  Bharath Decl. at ¶15; Dow
6  Decl. at ¶7, 10.  At the same time, SkyWest grants SAPA free access to the same channels of
7  communication it denies Plaintffs.  Bharath Decl. at ¶15.

8    The very nature of pilots' jobs means that they rarely congregate in a single location,
9  except during periodic intensive training.  Face-to-face contact normally occurs only if pilots'
10 schedules serendipitously overlap, and they find themselves in the same airport at the same time.
11 Dow Decl. at ¶10; MacDonald Decl. at ¶9.  Even then, members of Plaintiff SkyWest Pilots OC
12 have been reluctant to engage their fellow pilots in conversation about the organizing campaign
13 out of fear of disciplinary consequences.  MacDonald Decl. at ¶11.  As a result, written materials
14 are the only practical means for reaching out to the entire pilot group.  MacDonald Decl. at ¶9,
15 10, 12.

16   Defendant's training center is one of the only locations where it is possible to make
17 personal contact with a large number of pilots.  As noted above, Defendant has prevented
18 Plaintiffs from even distributing ALPA-related materials *outside* its training center.  The
19 informational session conducted on the evening Plaintiffs distributed materials outside the center
20 had very high attendance.  Plaintiffs' inability to distribute materials outside the training center
21 has lowered attendance at their subsequent informational sessions.  Shrier Decl. at ¶¶14-15.

22   Free and open exchanges among employees are essential to any organizing drive.
23 Employees advocating for the election of a bargaining representative must feel comfortable
24 expressing their support for the union, informing interested employees about the union, and
25 engaging in frank discussions with their co-workers.  When management interferes with the
26 efforts of union supporters to communicate with their co-workers, employee organizers are not
27 only prevented from educating their co-workers, but also begin to feel intimidated and isolated,
28 and the energy and momentum of the organizing campaign begins to dwindle.  Once lost, a

MEMORANDUM ISO MOTION FOR TRO & PRELIMINARY INJUNCTION, Case No. _____

1   campaign's energy and momentum are extremely difficult to restore.  Each day SkyWest's

2   interference with pilots' organizing activities persists, the danger grows that support for the

3   campaign will irreversibly wane.  MacDonald Decl. at ¶¶5-6, 12.

4          Concerned about the negative impact on the organizing campaign if Plaintiffs are unable

5   to keep up visibility and engage in a solidarity-building event, Plaintiff SkyWest Pilots OC

6   determined on May 17, 2007 that it was necessary to sponsor a carrier-wide action as soon as

7   possible.  The purpose of the event is to build excitement for the campaign and to show that it

8   has strong support – despite SkyWest's opposition.  It is essential to hold the event at the earliest

9   possible date to maintain the campaign's momentum and visibility, and to reenergize the

10  campaign before pilots become unavailable due to their summer schedules.  Where a union

11  organizing campaign proceeds for too long without maintaining visibility, it is extremely

12  difficult to restore momentum.  The planned action would involve pilots wearing their ALPA

13  lanyards.  But because SkyWest has prohibited its pilots from wearing their ALPA lanyards,

14  Plaintiffs cannot mount this action and are thus chilled in their ability to conduct a normal

15  organizing campaign and build support among SkyWest pilots.  Dow Decl. at ¶¶13-14;

16  MacDonald Decl. at ¶6.

17

**B.     DEFENDANT RECOGNIZES AND PURPORTS TO BARGAIN WITH AN
18          ENTITY THAT IT CREATED AND FULLY FUNDS**

19         Defendant SkyWest created SAPA, an entity that claims to represent pilot interests in

20  discussions with the company regarding rates of pay, rules, and working conditions.  Dow Decl.

21  at ¶5 and Exh. 1 at ¶3.  SkyWest recognizes SAPA as the "true and only representative body of

22  the SkyWest Airlines pilot group," even though SAPA has never been certified by the National

23  Mediation Board as the representative of the pilot group at SkyWest and SAPA has never

24  presented SkyWest with a showing of majority support.  Dow Decl. at ¶5 & Exhibit 1 at ¶4;

25  Alford Decl. at ¶5.

26         SAPA has no dues or membership requirements, other than employment as a non-

27  management pilot at SkyWest.  Dow Decl. at ¶5 & Exhibit 1.  Its activities are wholly financed

28

1   by SkyWest, which pays SAPA officers to serve full time.  SAPA has no financial or functional

2   independence from SkyWest.  Dow Decl. at ¶5.

3        Defendant SkyWest has engaged in discussions with SAPA that have the appearance of

4   bargaining over terms and conditions of employment.  Specifically, SkyWest and SAPA have

5   met to discuss rates of pay, rules, and working conditions, and reached an agreement which was

6   eventually presented to the pilots employed by SkyWest for a vote.  During the course of these

7   discussions, SAPA representatives were allowed to discuss SkyWest's offer, take suggestions for

8   a possible counter offer, and describe the terms of the eventual agreement in crew lounges and

9   on Company property.  Martirano Decl. at ¶3.

10        As noted above, SkyWest has also granted SAPA access to channels of communication

11   that it denies to ALPA, including bulletin boards and crew lounges, mailboxes, email, and

12   presentations to newly-hired pilot classes.  *See supra* Part II-A-2-6.  SkyWest also permits pilots

13   to wear SAPA insignia, but not ALPA insignia, while in uniform.  *See supra* Part II-A-1.

14   **III.    STATUTORY BACKGROUND**

15        The RLA, 45 U.S.C. §§151-188, governs labor relations between employers and

16   employees in the rail and airline industries.  Like the National Labor Relations Act ("NLRA"),

17   which governs labor relations in other private-sector industries, the RLA provides a framework

18   for protecting the rights of employees to organize for the purpose of collective bargaining and to

19   designate a representative of their own choosing.  Both statutes also impose an obligation on the

20   part of employers to bargain in good faith with a representative chosen by a majority of

21   employees.  *Cf.* 29 U.S.C. §§151-169.

22        Congress enacted and subsequently amended the RLA to "strengthen the position of the

23   labor organizations *vis-à-vis* the carriers." *International Assn. Of Machinists v. Street*, 367 U.S.

24   740, 759 (1961); *see also Virginian Ry. Co.*, 300 U.S. at 543.  Congress' express purposes in

25   enacting and amending the RLA included "forbid[ding] any limitation upon freedom of

26   association among employees" and "provid[ing] for the complete independence of carriers and of

27   employees in the matter of self-organization."  45 U.S.C. §151a.  Congress also sought to

28   eliminate the carriers' practice of forming "company unions," *i.e.*, employer-funded

9

1 | "committees" or "associations," because it recognized that such entities have an inherently

2 | coercive effect on employee free choice and were used by carriers to undermine support for truly

3 | independent labor representation. *See Machinists*, 367 U.S. at 759; *Virginian Ry. Co.*, 300 U.S.

4 | at 543; *Texas & N.O.R. Co. v. Bhd. of Ry. & Steamship Clerks*, 281 U.S. 548 (1930).

5 |    Two provisions of the RLA are particularly relevant to this case. Section 2, Third,

6 | protects employees' right to select their own collective bargaining representative without carrier

7 | interference. 45 U.S.C. §152, Third ("neither party shall in any way interfere with, influence, or

8 | coerce the other in its choice of representatives"). And RLA Section 2, Fourth, broadly protects

9 | employees' "right to organize and bargain collectively through representatives of their own

10 | choosing," without carrier interference "in any way," and specifically prohibits carriers from

11 | using their funds to aid or assist any labor organization, representative, or bargaining agent that

12 | the carriers might prefer. 45 U.S.C. §152, Fourth.

13 |    These statutory protections are specifically intended to apply in pre-certification

14 | situations like this one, before any labor organization has been certified by the National

15 | Mediation Board as an exclusive bargaining representative. *See Trans World Airlines, Inc. v.*

16 | *Indep. Fed. Of Flight Attendants,* 489 U.S. 426, 440 (1989).

17 |    As the Supreme Court has made clear, employees' "[f]reedom of choice in the selection

18 | of representatives . . . is the essential foundation of the [RLA's] statutory scheme." *Texas &*

19 | *N.O.R. Co.*, 281 U.S. at 569. Although the RLA establishes a broad framework governing the

20 | certification of bargaining representatives, negotiation of agreements, and the resolution of

21 | disputes between air carriers and labor representatives, *see* 45 U.S.C. §152, Ninth, 42 U.S.C.

22 | §184, the effectiveness of all of these procedures depends on employees' initial right to free,

23 | uncoerced organizing. *Texas & N.O.R. Co.*, 281 U.S. at 569.

24 |    In light of the centrality of employee free choice to the entire framework of the RLA, the

25 | Supreme Court has recognized a private right of action to enforce the RLA's protections for

26 | employee free choice, *see, e.g., id.* at 554-58, 569-70. And "injunctive relief is available to

27 | protect employees' organizational rights under the RLA." *Arcamuzi v. Continental Air Lines,*

28 | *Inc.*, 819 F.2d 935, 937 (9th Cir. 1987).

10

1    **IV.    LEGAL STANDARD FOR ISSUANCE OF INTERIM INJUNCTIVE RELIEF**

2         A preliminary injunction is appropriate when a plaintiff demonstrates "either: (1) a

3    likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious

4    questions going to the merits were raised and the balance of hardships tips sharply in [the

5    plaintiff's] favor." *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007) (internal

6    quotation marks omitted). "These two formulations represent two points on a sliding scale in

7    which the required degree of irreparable harm increases as the probability of success decreases."

8    *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir.2000).

9    "[A]dvancement of the public interest" is also a factor that weighs in favor of granting a

10   preliminary injunction. *Textile Unlimited, Inc. v. A..BMH & Co., Inc.*, 240 F.3d 781, 786 (9th

11   Cir. 2001).

12        The standard for issuing a temporary restraining order is identical to the standard for

13   issuing a preliminary injunction. *See Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co.,*

14   *Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) ("our analysis is substantially identical for the

15   injunction and the TRO"); *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887

16   F.Supp. 1320, 1323 (N.D. Cal. 1995).

17   **V.    ARGUMENT**

18        **A.    PLAINTIFFS HAVE AN OVERWHELMING LIKELIHOOD OF
               SUCCESS ON THE MERITS OF THEIR CLAIMS THAT SKYWEST'S**
19             **CONDUCT VIOLATES RLA SECTION 2, THIRD AND FOURTH**

20        SkyWest's conduct violates Plaintiffs' RLA-protected rights to organize and to choose

21   their own bargaining representative in two, interrelated ways.

22        First, SkyWest unlawfully prevents Plaintiffs from engaging in statutorily protected

23   expressive and associational activity. Specifically, SkyWest prevents Plaintiffs from wearing

24   ALPA lanyards, from distributing ALPA-related materials in non-work areas, and from

25   communicating with their fellow pilots through the identical channels that SkyWest permits

26   other pilots and SAPA to use. Second, SkyWest improperly interferes with its employees' free

27   choice by funding, promoting, recognizing, and appearing to bargain with SAPA. Such creation

28   and support of a "company union" is inherently coercive and constitutes *per se* interference with

11

1    employees' RLA-protected right to choose their own representative. *See Texas & N.O.R. Co.*,

2    281 U.S. at 557-560; *see also Virginian Ry. Co.*, 300 U.S. at 543-44; 45 U.S.C. §152, Fourth.

**1.    SKYWEST INTERFERES WITH PILOTS' RLA-PROTECTED RIGHT TO ENGAGE IN EXPRESSIVE AND ASSOCIATIONAL ACTIVITY RELATED TO ORGANIZING**

5        RLA Section 2, Third and Fourth, protect employees' fundamental rights to organize and

6    to designate a collective bargaining representative *of their own choosing.* 45 U.S.C. §152, Third

7    and Fourth. It is well-established that these provisions of the RLA "protect[] the right of

8    association and expression in union activities from interference by employers." *Arcamuzi*, 819

9    F.2d at 937; *see also Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491-92 & n.9 (1978) ("the right

10   of employees to self-organize and bargain collectively . . . necessarily encompasses the right

11   effectively to communicate with one another regarding self-organization at the jobsite");[2] *see*

12   *also* MacDonald Decl. ¶5 ("free and open exchanges among employees are essential to an

13   organizing drive").

14       SkyWest's conduct violates Plaintiffs' RLA-protected right to engage in expressive and

15   associational activities in three ways.

16       First, by prohibiting Plaintiffs from wearing ALPA lanyards, SkyWest prevents Plaintiffs

17   from outwardly expressing their support for ALPA and from identifying and associating with

18   like-minded co-workers. In addition, because SkyWest's permits pilots to wear lanyards with

19   other insignia, SkyWest impermissibly discriminates against Plaintiffs *because of* their support

20   for ALPA. *See supra* Part II-A-1.

21       The courts have long recognized employees' "right to visibly demonstrate their support"

22   for a union organizing campaign by wearing union insignia. *Adams v. Fed. Express Corp.*, 470

23   F.Supp. 1356, 1362, 1371 (W.D. Tenn. 1979) (granting injunction under RLA to protect

24   employees' right to wear union insignia in course of organizing campaign; employee entitled to

_____

26   [2] *Beth Israel* arose under the NLRA. *See* 29 U.S.C. §157 . Because the RLA and NLRA both
27   protect employees' organizational rights, and do so in nearly identical language, courts routinely
     rely on NLRA case law when interpreting and applying the RLA. *See, e.g., Konop v. Hawaiian*
28   *Airlines, Inc.*, 302 F.3d 868, 882 n.10 (9th Cir. 2002).

1    reinstatement after being discharged for wearing union insignia); *see also Eastex, Inc. v. NLRB*,

2    437 U.S. 556, 581 (1978) ("right[] of self-organization" under NLRA encompasses "the right[]

3    of employees . . . to wear union insignia"); *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-

4    03 (1945) (same).

5        The right to wear union insignia may *only* be limited where an employer has an

6    "exceptional reason for curtailing such expression." *Adams*, 470 F.Supp. at 1362; *see also Pay*

7    *'N Save Corp. v. NLRB*, 641 F.2d 697, 700 (9th Cir. 1981) ("absent 'special considerations,' an

8    employee has a right [under the NLRA] to wear union buttons and insignia at work"). There is

9    no such exceptional reason in this case. SkyWest's tolerance of lanyards with other insignia

10   belies any conceivable operational concern, safety or otherwise, that SkyWest may seek to

11   invoke to justify its prohibition. *Adams*, 470 F.Supp. at 1362-63 (rejecting purported safety

12   reason for banning union buttons where other similar items were permitted). In light of

13   SkyWest's discriminatory enforcement, "any reason given [by SkyWest] for banning such

14   insignia" is clearly "a pretext for stifling expressions of union support." *Id.* at 1371.

15       Indeed, SkyWest's discriminatory enforcement of any purported uniform policy provides

16   a separate and independent basis for invalidating its prohibition against ALPA lanyards.

17   SkyWest singles out pilots who wear ALPA lanyards, while permitting pilots to wear lanyards

18   with other insignia and to wear pins bearing the insignia of SAPA, the company's own creation

19   and preferred entity. *Pay 'N Save,* 641 F.2d at 701 (employer's disparate application of rule

20   against wearing of political or controversial buttons violated NLRA).

21       Second, SkyWest violates Plaintiffs' RLA-protected right to engage in expressive and

22   associational organizing activities by preventing them from distributing ALPA-related material

23   in non-work areas like crew lounges and bulletin boards. *See supra* Part II-A-2-3. Courts have

24   repeatedly held that employees must be permitted to distribute union literature in non-work

25   areas, including in break rooms like the crew lounges at issue here. *See, e.g., Consol. Diesel Co.*

26   *v. NLRB*, 263 F.3d 345, 354 (4th Cir. 2001) ("an employer may not confiscate union literature

27   left for distribution to employees in nonwork areas during nonwork time"; employer violated this

28   rule by confiscating materials left in "team room" where employees took breaks and ate meals);

13

1  *NLRB v. Lummus Industries, Inc.*, 679 F.2d 229, 233 (11th Cir. 1982) ("attempts to prohibit

2  [union literature] in nonwork areas or on nonwork time are presumptively invalid").

3       Without access to these critical means of communication, Plaintiffs are denied a

4  meaningful opportunity to communicate with their co-workers about ALPA and the ALPA

5  organizing campaign. This is so because pilots, by the very nature of their jobs, are widely

6  dispersed and rarely in the same location. As a result, written materials are one of the few

7  practical means for communicating with the entire pilot group. *See* Dow Decl. at ¶10;

8  MacDonald Decl. at ¶¶9-10, 12.

9       Third, SkyWest also violates Plaintiffs' rights by *discriminatorily* preventing them from

10 engaging in expressive and associational organizing activity when – and only when – the subject

11 of Plaintiffs' speech is ALPA and the ALPA organizing campaign. SkyWest permits pilots to

12 engage in speech through the identical channels of communication when the topic is not ALPA

13 related and, even worse, provides SAPA – SkyWest's preferred entity – with privileges to

14 communicate through special channels.

15       In particular, SkyWest allows postings on a wide variety of topics on the general bulletin

16 board contained in each crew lounge, but prevents Plaintiffs from posting ALPA-related

17 materials in the same location. SkyWest also permits SAPA to send emails to pilots through the

18 company email system and grants SAPA dedicated time to speak to orientation classes for

19 newly-hired pilots, but prevents Plaintiffs from doing so. SkyWest allows SAPA to distribute

20 materials in crew lounges and pilot mailboxes, but promptly removes ALPA-related literature in

21 those same places. Indeed, SkyWest even provides SAPA with a dedicated bulletin board in

22 most crew lounges, while preventing Plaintiffs from even posting materials on general purpose

23 bulletin boards. *See supra* Part II-A-2-6. Such discriminatory treatment is not permitted *even in*

24 *work areas* or *during work time*, and it constitutes a separate and additional basis for invalidating

25 Defendant's conduct under the RLA. *See, e.g., Webco Indus. v. NLRB*, 217 F.3d 1306, 1311-12

26 (10th Cir. 2000) (employer violated NLRA by discriminatorily enforcing no-solicitation policy);

27 *In re Representation of Fleet Serv. Employees of USAir*, 1990 WL 504772 (NMB 1990)

28

1  (discriminatory policy of prohibiting distribution of Teamsters literature in breakrooms and on

2  bulletin boards, "influenced . . . employees in derogation of their Railway Labor Act rights").

### 2.  SKYWEST'S SUPPORT FOR SAPA VIOLATES PILOTS' RIGHT TO CHOOSE THEIR OWN BARGAINING REPRESENTATIVE

5  SkyWest impermissibly funds SAPA, provides SAPA with preferred access to SkyWest

6  pilots, and recognizes and purports to bargain with SAPA, even though the pilot group has never

7  chosen SAPA as its bargaining representative. *See supra* Part II-B.  Indeed, SkyWest has

8  declared this entity of its own creation as the "true and only representative" of the pilot group.  It

9  is well-established that carrier support for such a company-created and -dominated entity is

10  inherently destructive of employee free choice and therefore violates Section Two, Third and

11  Fourth of the Act.

### (a)  THE RLA EXPLICITLY PROHIBITS COMPANY UNIONS

13  In enacting the RLA, Congress articulated a broad prohibition against *any* carrier activity

14  that interferes with the right of employees to organize and to choose a bargaining representative,

15  and singled out carrier support for a "company union" as a particularly insidious method of

16  interference warranting *per se* prohibition.

17  The RLA makes it unlawful for a carrier to interfere "in any way" with employee

18  organizing efforts and affirmatively protects employees' right to select a collective bargaining

19  representative without any carrier "interference, influence, or coercion."  45 U.S.C. §152, Third

20  and Fourth.  The RLA also expressly prohibits carriers from using its "funds . . . [to] maintain[]

21  or assist[] or contribut[e] to any labor organization, labor representative, or other agency of

22  collective bargaining."  45 U.S.C. §152, Fourth.  The Supreme Court has interpreted these

23  provisions to prohibit carrier support for a company union.  *See, e.g., Virginian Ry. Co.*, 300 U.S.

24  at 543-44 (support for company union is unlawful interference in violation of RLA Section 2,

25  Third and Fourth); *Texas & N.O.R. Co.*, 281 U.S. at 557-60 (same, under RLA Section 2, Third).

26  The Act has also been interpreted broadly to prohibit any conduct by a carrier that "improperly

27  assist[s] one union faction over another."  *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 885

28  (9th Cir. 2002).

MEMORANDUM ISO MOTION FOR TRO & PRELIMINARY INJUNCTION, Case No. _____

1    The Act's specific prohibition against carrier support for "company unions" reflects

2    Congress' recognition that company-dominated unions, which often take the form of employee

3    "committees" or "associations," are by their nature coercive and interfere with employees' right

4    to organize and select a labor representative. *See, e.g., Virginian Ry. Co.*, 300 U.S. at 543-44;

5    *see also Railway Labor Executives' Ass'n v. National Mediation Bd.*, 29 F.3d 655, 668 (D.C. Cir.

6    1994) ("the problem of company unions" was a "concern animating the 1934 amendments";

7    Congress intended that "carriers were to be screened out of any active role in the representation-

8    selection process, in order to avoid any possible tainting of employees' free choice of

9    representatives"). "Company unions" are not true labor unions because they have no existence

10    independent of the carrier and accordingly cannot provide employees with independent

11    representation. Company unions, like SAPA, are organized by employers, funded by employers,

12    and held out by employers as alternatives to unions – all with the purpose of undermining

13    support for truly independent labor representation. *See, e.g., Virginian Ry. Co.*, 300 U.S. at 538-

14    39, 543-44; *Texas & N.O.R. Co.*, 281 U.S. at 554-55, 559. As SkyWest has done here, carriers

15    often make a show of "bargaining" with employer-dominated associations. *See, e.g., Virginian

16    Ry. Co.*, 300 U.S. at 539; *Horizon Air Indus. v. Nat'l Mediation Bd.*, 232 F.3d 1126, 1128-31,

17    1135-37 (9th Cir. 2000); *Bhd. of Railway & Steamship Clerks v. Virginia Ry. Co.*, 125 F.2d

18    853, 859 (4th Cir. 1942).

19    **(b) SKYWEST'S SUPPORT FOR SAPA VIOLATES THE
         RLA'S BAN ON COMPANY UNIONS**

20    SkyWest has violated and continues to violate these provisions of the RLA through its

21    funding of, granting of preferred access to, recognition of, and purported bargaining with SAPA.

22    First, SkyWest provides all of the financial support that allows SAPA to exist and

23    operate. *See supra* Part II-B. This financial assistance violates the express prohibition in Section

24    2, Fourth, against a carrier's use of its funds to "maintain[] or assist[] or contribut[e] to any labor

25    labor organization, labor representative, or other agency of collective bargaining." 45 U.S.C.

26    §152, Fourth; *see also Virginian Ry. Co.*, 300 U.S. at 539 (unlawful interference where employer

27    paid expenses of employee "Association"); *Texas & N.O.R. Co.*, 281 U.S. at 560 (same); *see also*

28

16

*Bhd. of Ry. & Steamship Clerks*, 125 F.2d at 859 (unlawful interference where dues not collected from members).

Second, SkyWest provides SAPA preferred access to bulletin boards, crew lounges, pilot mailboxes, email, and mandatory training classes for newly hired pilots, while preventing Plaintiffs from communicating with their fellow pilots through these identical channels. *See supra* Part II-A-2-6. This use of carrier resources to favor SAPA violates the RLA because it "improperly assist[s] one union faction over another." *Konop*, 302 F.3d at 885.

Third, even though the pilot group at SkyWest has never chosen SAPA as its designated representative, SkyWest unlawfully "recognizes" SAPA as the "true and only" representative of SkyWest pilots, treats all SkyWest pilots as *de facto* members of SAPA, and "bargains" with SAPA over terms and conditions of employment. *See supra* Part II-B. In so recognizing and bargaining with SAPA, SkyWest has coercively and unilaterally imposed *its own* choice of bargaining representative on Plaintiffs. This conduct violates the RLA's express provisions, making it unlawful to "interfere with, influence, or coerce the other [party] in *its choice* of representatives," 45 U.S.C. §152, Third (emphasis added), and protecting employees' right to "bargain collectively through representatives *of their own choosing*." 45 U.S.C. §152, Fourth (emphasis added);[3] *see also Horizon Air Indus., Inc.*, 232 F.3d at 1135 (use of a pre-existing employee committee to expand benefits, material changes in the activities of such a committee, and carrier campaigns indicating that a committee is a substitute for a collective bargaining representative as evidence of unlawful interference); *Jones v. Trans World Airlines, Inc.*, 495 F.2d 790, 797 (2d Cir. 1974) (it would be illegal for airline to bargain with union before it had been chosen as representative by a majority of employees).[4]

---

[3] Of course, SkyWest cannot evade the prohibition against bargaining with unrecognized labor representatives by "recognizing" SAPA. Such a transparent ruse merely compounds SkyWest's unilateral and coercive effort to deny SkyWest pilots their own choice of bargaining representative.

[4] SkyWest has also made clear in SAPA's bylaws that the negotiation of a collective bargaining agreement with a truly independent labor representative would lead to the elimination of SAPA as a separate entity. *See* Dow Decl. at Exh. 1, ¶ 16. The NMB has relied upon a similar factor in concluding that a carrier had interfered with employee free choice. *See Horizon Air Indus., Inc.*, (continued)

**B.**    **THE BALANCE OF HARMS OVERWHELMINGLY FAVORS ENJOINING SKYWEST FROM INTERFERING WITH PLAINTIFFS' ORGANIZATIONAL AND REPRESENTATIONAL ACTIVITIES PENDING A DECISION ON THE MERITS**

**1.**    **PLAINTIFFS WILL SUFFER SEVERE, IMMEDIATE, AND IRREPARABLE HARM FROM THE LOSS OF THEIR STATUTORILY PROTECTED RIGHT TO EXERCISE FREE CHOICE**

Plaintiffs will clearly suffer immediate and irreparable harm from the irretrievable loss of their statutory rights to organize and to elect ALPA as their designated representative, free of employer interference and coercion. No amount of damages at a future juncture could remedy this loss.

It is well-established that "coercive and inhibitory effects upon . . . employees' organizational rights secured by the RLA . . . [are] irreparable." *Arcamuzi*, 819 F.2d at 938. As the Ninth Circuit explained in *Arcamuzi*, "the RLA statutorily protects the right of association and expression in union activities from interference by employers. It is the duty of the courts to give effect to that purpose when called upon to do so." *Id.* at 939 (reversing district court's denial of preliminary injunction sought by pilots against carrier's interference with protected union activity); *cf. United States v. Nutri-cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992) ("In statutory enforcement cases," the court must "presume it has met the 'possibility of irreparable injury' prong because the passage of the statute is itself an implied finding by Congress that violations will harm the public.").

Where a carrier interferes with employees' right to free choice, two distinct types of harm occur, both irreparable. First, employees are chilled in the exercise of their statutory right to express their support for unionization and to associate with like-minded employees. The RLA-protected right to engage in expressive and associational activity is much like the freedom of expression and association guaranteed by the First Amendment, and the parallel statutory right of employees covered by the NLRA to organize for the purpose of collective bargaining. The loss

---

(continued)
232 F.3d at 1135 ("Carrier campaigns which indicate that the certification of a labor organization as the representative of the employees will lead to the termination of a pre-existing committee" (continued)

MEMORANDUM ISO MOTION FOR TRO & PRELIMINARY INJUNCTION, Case No. _____

1    of these rights, "for even minimal periods of time, unquestionably constitutes irreparable injury."

2    *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (First Amendment); *see also Sammartano v. First Jud.*

3    *Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002) (same); *S.O.C., Inc. v. County of Clark*, 152 F.3d

4    1136, 1148 (9th Cir. 1998) (same); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1572 (9th Cir.

5    1996) (reversing district court's denial of motion for preliminary injunction to protect NLRA

6    rights; harm irreparable where employer's conduct "had a remarkable chilling effect on the

7    employees' efforts to organize"); *Reichard v. Foster Poultry Farms*, 425 F. Supp.2d 1090, 1100

8    (E.D. Cal. 2006) (issuing preliminary injunction to protect employees' NLRA rights; employer's

9    conduct "deters [employees'] organizational activities[] and discourages their membership in

10    unions").

11        Second, carrier interference with employees' statutory rights also causes irreparable harm

12    by eroding support for the organizing campaign. *See Union of Professional Airmen v. Alaska*

13    *Aeronautical Indus., Inc.*, 1977 WL 1714, *2 (D. Ala. Apr. 26, 1977) (in RLA case, issuing

14    injunction against carrier's interference with organizing campaign:  union organizing campaign

15    "in its formative stages and possibly will suffer irreparable harm if these employees are not

16    allowed to continue their close association").  "The value of the right to enjoy the benefits of

17    union representation is immeasurable in dollar terms once it is delayed or lost." *Scott ex re.*

18    *NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 667 (9th Cir. 2001) (internal quotation marks,

19    citation omitted) (waning of support for union constitutes irreparable harm); *Brown v. Pac. Tel.*

20    *& Telegraph Co.*, 218 F.2d 542, 544 (9th Cir. 1955) (reversing district court's denial of

21    temporary restraining order; "drifting away" of supporters from union "to the union favored by

22    the employers" constitutes irreparable harm).

23        "As time passes, the likelihood of union formation diminishes, and the likelihood that the

24    employees will be irreparably deprived of union representation increases." *Electro-Voice*, 83

25    F.3d at 1573 ("The deprivation to employees from . . . the diminution of union support is

26    immeasurable" and establishes irreparable harm).  Interim injunctive relief is therefore necessary

27

(continued)

28    are evidence of unlawful interference).

1   to "ensur[e] the alleged unlawful conduct will not succeed in destroying a union before"

2   permanent injunctive relief can be issued. *Norelli v. SFO Good-Nite Inn,* 2007 WL 662477, *14

3   (N.D. Cal. Mar.1, 2007) (issuing interim injunctive relief where employer "engaged in a series of

4   coercive acts that would severely harm future union efforts" and "impair the employees' rights

5   under the Act by causing an erosion of support [for] the Union").

6        Here, Plaintiffs wish to engage in protected expressive and associational activities by

7   wearing ALPA lanyards and by otherwise communicating with their co-workers about the

8   organizing campaign.  As a result of Defendant's conduct, Plaintiffs no longer wear ALPA

9   lanyards while in uniform out of fear of retaliation and have been denied effective means of

10  communicating with other SkyWest pilots about ALPA.  Indeed, the climate of fear and

11  intimidation created by Defendant has deterred most members of Plaintiff SkyWest Pilots OC

12  from engaging in conversations with their fellow pilots on the subject of union organizing.

13  MacDonald Decl. at ¶ 11.  Plaintiffs' expressive and associational activities have been chilled.

14  The loss of these freedoms "for even minimal periods of time" constitutes irreparable injury.

15  *Elrod,* 427 U.S. at 373 .

16       In addition, if Defendant's inherently coercive support for SAPA and interference with

17  Plaintiffs' expressive and associational activities are permitted to persist, pilots supporting

18  unionization are less likely to be "vocal in their support" and "the energy and momentum of the

19  campaign begin to dwindle.  It is extremely difficult to restore the same level of interest and

20  intensity."  MacDonald Decl. at ¶6.  Indeed, support may "drift[] away" from ALPA to SAPA,

21  the entity created and funded by Defendant SkyWest. *Brown,* 218 F.2d at 544.  The loss to

22  Plaintiffs stemming from "diminution of union support is immeasurable" and irreparable.

23  *Electro-Voice,* 83 F.3d at 1573; *see also id.* at 1575 ("[A]lleged unfair labor practices can have

24  an enormously destructive effect on organizational efforts.").

25       Indeed, concerned about the negative impact on the organizing campaign if Plaintiffs are

26  unable to keep up visibility and engage in a solidarity-building event, Plaintiff SkyWest Pilots

27  OC determined at its recent meeting on May 17, 2007 that it is necessary to sponsor a carrier-

28  wide action as soon as possible to build excitement for the campaign and to show that, despite

20

1   SkyWest's opposition, it has strong support.  It is absolutely essential to hold the event at the

2   earliest possible date to maintain the campaign's momentum and visibility, and to reenergize the

3   campaign before pilots become unavailable due to their summer schedules.  Dow Decl. at ¶13.

4   Where a union organizing campaign proceeds for too long without maintaining visibility, it is

5   extremely difficult to restore momentum.  MacDonald Decl. at ¶6.  The planned action would

6   involve pilots wearing their ALPA lanyards.  But because SkyWest has prohibited its pilots from

7   doing so, Plaintiffs cannot mount this action.  Dow Decl. at ¶14.  SkyWest's interference with

8   Plaintiffs' planned action thus brings into sharp focus both types of irreparable harm suffered by

9   Plaintiffs:  They are chilled in their ability to express support for the organizing campaign and

10  engage in a solidarity-building event.  And Defendant's conduct prevents them from engaging in

11  the types of activity necessary to maintain support and momentum for the organizing campaign,

12  and without which support for their union organizing campaign may irreversibly wane.

13         **2.      THE BALANCE OF HARDSHIPS TRIPS STRONGLY IN
                     PLAINTIFFS' FAVOR AND AN INJUNCTION WOULD SERVE
14                   THE PUBLIC INTEREST BY ENSURING THAT DEFENDANT'S
                     COERCIVE CONDUCT WILL NOT COME TO FRUITION**

15         The balance of hardships also tips strongly in Plaintiffs' favor.  In balancing the

16  hardships, courts "must take into account the probability that declining to issue the injunction

17  will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless"

18  an ultimate remedy in the case.  *Miller v. Calif. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994)

19  (NLRA).  Absent interim injunctive relief, Plaintiffs will continue to suffer a deprivation of their

20  statutory rights and face the very real danger that SkyWest's ongoing course of conduct will

21  destroy support for the organizing campaign and thus effectively deny Plaintiffs their right to

22  organize and designate a representative of their own choosing.[5]

23

24

25  _____

26  [5] It bears emphasis that "the status quo which deserves protection . . . is not the illegal status quo
    which has come into being as a result of the unfair labor practices being litigated." *Electro-*

27  *Voice*, 83 F.3d at 1575 (internal quotation marks, citation omitted).  Rather, interim injunctive
    relief is a "means of preserving or restoring the status quo as it existed before the onset of unfair

28  labor practices." *Id.*

MEMORANDUM ISO MOTION FOR TRO & PRELIMINARY INJUNCTION, Case No. _____

1    Nor would any conceivable harm befall SkyWest if it is enjoined from interfering with

2    Plaintiffs' expressive and associational activities or providing unlawful support to SAPA.  Any

3    such contention is belied by SkyWest's acquiescence in and indeed affirmative support of

4    expressive and associational activities not involving ALPA.

5    Issuance of an injunction in this case strongly serves the public interest by preventing

6    Defendant's unlawful interference with Plaintiffs' statutory rights from succeeding and that the

7    underlying purposes of the Act – to protect employees' rights to organize and elect a

8    representative of their own choosing – are not frustrated by any delay in obtaining permanent

9    injunctive relief.  *See Electro-Voice*, 83 F.3d at 1574 (holding in NLRA context that the public

10   interest is furthered "by ensuring that 'an unfair labor practice will not succeed because'" of

11   delay in obtaining final relief) (citation omitted); *Reichard*, 425 F.Supp.2d at 1103 (same);

12   *Norelli*, 2007 WL 662477 at *15 (same).[6]

13   **VI.    CONCLUSION**

14   For the foregoing reasons, Plaintiffs respectfully request that their motion for temporary

15   restraining order and preliminary injunction be granted.

16   Dated: May 22, 2007                    Respectfully submitted,

17                                          STEPHEN P. BERZON
                                            LINDA LYE
18                                          CLAIRE P. PRESTEL
                                            Altshuler Berzon LLP
19
                                            ELIZABETH GINSBURG
20                                          Air Line Pilots Association, International

21

22   By: _____
                                            Linda Lye
23                                          Attorneys for Plaintiffs

24   _____

25   [6] No bond is necessary in this case for each of the following separate and independent reasons.
     First, Plaintiffs have a strong likelihood of success on the merits. *Scherr v. Volpe*, 466 F.2d
     1027, 1035 (7th Cir. 1972).  Second, there is no realistic likelihood of harm to Defendant from
26   enjoining its conduct. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 1996).  And third, the
     "equities of potential hardships to the parties" weighs in favor of Plaintiffs. *Temple Univ. v.*
27   *White*, 941 F.2d 201, 220 (3d Cir. 1991).  In any event, there is no risk of monetary loss to
     Defendant from enjoining the conduct at issue.  Indeed, Defendant will save money once it
28   discontinues financial support for SAPA.