1  Douglas W. Hall (Admitted *Pro Hac Vice*)
   Ford & Harrison LLP
2  1300 Nineteenth Street, N.W., Suite 700
   Washington, DC 20036
3  Telephone:    202.719.2065
   Facsimile:    202.719.2077
4  Email:  dhall@fordharrison.com

5  Robert Spagat (SBN:  157388)
   WINSTON & STRAWN LLP
6  101 California Street
   San Francisco, CA  94111-5894
7  Telephone:    415-591-1000
   Facsimile:    415-591-1400
8  Email:  rspagat@winston.com

9  Attorneys for Defendant
   SKYWEST AIRLINES, INC.

10                    **UNITED STATES DISTRICT COURT**

11                   **NORTHERN DISTRICT OF CALIFORNIA**

12                        **SAN FRANCISCO DIVISION**

13

14  SKYWEST PILOTS ALPA ORGANIZING          **Case No. C-07-2688 CRB**
    COMMITTEE, et al.,
15                                          **DEFENDANT'S OPPOSITION TO**
              Plaintiffs,                   **MOTION FOR PRELIMINARY**
16                                          **INJUNCTION**
         vs.
17                                          Preliminary Injunction Hearing:  May 31, 2007
    SKYWEST AIRLINES, INC.,
18
              Defendant.
19

20

21

22

23

24

25

26

27

28

*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA  94111-5894*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...............................................................................................1

II.  STATEMENT OF FACTS .................................................................................2

    A.   Background.................................................................................................2

    B.   ALPA's Latest Organizing Campaign – And The Company's Lack of Any
        Counter-Campaign......................................................................................3

    **C.**   Shortly Before Filing Suit, ALPA Announces It Has Enough Cards To File
        For An NMB Election ................................................................................5

III. ARGUMENT......................................................................................................6

    A.   Plaintiffs Are Not Entitled To The Extraordinary Remedy Of Preliminary
        Injunctive Relief ........................................................................................6

    B.   Plaintiffs Cannot Show A Substantial Likelihood Of Success On Its Claims...............7

        1.   There Is Nothing Inappropriate About The Access That SAPA Has
            Been Provided To The SkyWest Pilots ...........................................10

            a.   Section 2, Fourth Prohibits Employer Domination Of Labor
                Unions, Not Cooperative Alternatives To The Adversarial
                Model Of Labor Relations ...................................................11

            b.   SAPA Independently Represents The SkyWest Pilots In A
                Cooperative Relationship That Is An Alternative To The
                Traditional Adversarial Model Of Labor Relations ...........................12

            c.   Plaintiffs Cannot Establish Unlawful Domination Of SAPA By
                SkyWest...............................................................................14

            d.   Plaintiffs' True Dispute Over SkyWest's Relationship With
                 SAPA Is A Representational Dispute Within The Exclusive
                Primary Jurisdiction Of The NMB ......................................16

            e.   Regardless Of SAPA's Status, Plaintiffs Have No Legal Right
                To The Same Access As SAPA Has Had...........................19

        2.   Plaintiffs Cannot Show That The Facts And Law Clearly Favor Their
            Claim That SkyWest Has Discriminated Against Them Based On
            Their Views About ALPA Representation.........................................22

            a.   SkyWest Has Properly Enforced Its Uniform Policy .........................22

            b.   SkyWest Has Not Discriminated Against Plaintiffs With
                 Respect To General Bulletin Board Postings .....................................26

    C.   Plaintiffs Have Not Established The Required Irreparable Harm Or That The
        Balance Of Hardships Tips Sharply In Their Favor ....................................26

i

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1          1.    Plaintiffs Have Not Established That They Have Been Irreparably
Harmed ...........................................................................................................26

2.    SkyWest And Its Pilots Would Suffer Substantial Countervailing
Harm In The Event Of A Mandatory Preliminary Injunction .........................28

IV.    CONCLUSION ..................................................................................................................30

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

ii

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. Federal Express Corp.*,
  470 F. Supp. 1356 (W.D. Tenn. 1979), *aff'd*, 654 F.2d 452 (6th Cir. 1981) ...................... 7, 21

*Adams v. Federal Express Corp.*,
  1975 U.S. Dist. LEXIS 16267 (W.D. Tenn. 1975), *aff'd*, 547 F.2d 319 (6th Cir. 1976) ..... 7, 8

*Air Line Pilots Associates, International v. Texas International Airlines, Inc.*,
  656 F.2d 16 (2d Cir. 1981) ................................................................................................. 16

*Air Lines Employees Associate, International v. Republic Airlines, Inc.*,
  798 F.2d 967 (7th Cir. 1986), *cert. denied*, 479 U.S. 962 (1986) ......................................... 16

*Aluminum Workers International Union v. Consolidated Aluminum Corp.*,
  696 F.2d 437 (6th Cir. 1982) ........................................................................................... 6, 27

*Anderson v. United States*,
  612 F.2d 1112 (9th Cir. 1979) ............................................................................................ 5, 6

*Angotti v. Rexam, Inc.*,
  2006 U.S. Dist. LEXIS 42104 (N.D. Cal. June 14, 2006) ..................................................... 5

*BASF Wyandotte Corp. v. International Chemical Union*,
  791 F.2d 1046 (2d Cir. 1986) ............................................................................................... 14

*Barthelemey v. Air Lines Pilots Association*,
  897 F.2d 999 (9th Cir. 1990) ................................................................................. 10, 11, 13

*Brotherhood of Railway, Airline & S.S. Clerks v. Philadelphia, B. & N.E. R.R. Co.*,
  428 F. Supp. 1308 (E.D. Penn. 1977) .................................................................................... 9

*Brotherhood Of Railway & S.S. Clerks v. Virginian Railway Co.*,
  125 F.2d 853 (4th Cir. 1942) ............................................................................................... 18

*Burger King Corp. v. NLRB*,
  725 F.2d 1053 (6th Cir. 1984) ............................................................................................. 22

*Caribbean Marine Svcs and Garcia v. Baldridge et al.*,
  844 F.2d 668 (9th Cir. 1988) ............................................................................................... 25

*Coppus Engineering Corp. v. N.L.R.B.*,
  240 F.2d 564 (1st Cir. 1957) ............................................................................................... 14

*EEOC v. Howard University*,
  1983 U.S. Dist. LEXIS 16246 (D.D.C. June 14, 1983), *quoting EEOC v. Anchor
  Hocking Corp.*, 666 F.2d 1037 (6th Cir. 1981) ................................................................... 28

*General Committee Of Adjustment v. Missouri-Kansas-Texas R. Co.*,
  320 U.S. 323 (1943) ............................................................................................................ 15

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. C 07-2688 CRB

*Hertz Corp.*,
305 N.L.R.B. 487 (1991)..................................................................................24, 25

*Hertzka & Knowles v. NLRB*,
503 F.2d 625 (9th Cir. 1974), *cert. denied*, 423 U.S. 875 (1975) ....................................10, 11

*Honeywell, Inc.*,
262 N.L.R.B. 1402 (1982)......................................................................................25

*Horizon Air Industrial v. National Mediation Board*,
232 F.3d 1126 (9th Cir. 2000), *cert. denied*, 533 U.S. 915 (2001) ...............................9, 15, 18

*ITT Automobile v. NLRB*,
188 F.3d 375 (6th Cir. 1999)....................................................................................8

*Immigration & Naturalization Serv. v. Federal Labor Relations Authority ("INS v. FLRA")*,
855 F.2d 1454 (9th Cir. 1988)........................................................................21, 22, 23

*International Association of Machinists v. Alitalia Airlines*,
600 F. Supp. 268 (S.D.N.Y. 1984), *aff'd*, 753 F.2d (2d Cir. 1985)......................................15

*International Brotherhood of Teamsters v. Texas International Airlines Inc.*,
717 F.2d 157 (5th Cir. 1983)..................................................................................16

*International Federal of Flight Attendants v. Cooper*,
141 F.3d 900 (8th Cir. 1998)..................................................................................16

*Johnson v. Express One*,
944 F.2d 247 (5th Cir. 1991)..................................................................................21

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002), *cert. denied*, 537 U.S. 1193 (2003) ........................................18

*Lake City Foundry Co.. v. N.L.R.B.*,
432 F.2d 1162 (7th Cir. 1970)..................................................................................13

*Miller v. Norfolk S. R. Co.*,
183 F. Supp. 2d 996 (N.D. Ohio 2002) .........................................................................16

*Modern Plastics Corp. v. N.L.R.B.*,
379 F.2d 201 (6th Cir. 1967)..............................................................................11, 14

*N.L.R.B. v. BASF Wyandotte Corp.*,
798 F.2d 849 (5th Cir. 1986)..............................................................................13, 14

*NLRB v. Harrah's Club*,
337 F.2d 177 (9th Cir. 1964)..................................................................................22

*N.L.R.B. v. Homemaker Shops, Inc.*,
724 F.2d 535 (6th Cir. 1984)..................................................................................13

*N.L.R.B. v. Post Publishing Co.*,
311 F.2d 565 (7th Cir. 1962)..................................................................................13

iv

*Northeastern University,*
   601 F.2d at 1213 .................................................................................................. 14

*Noscitur a sociis. Virginia v. Tennessee,*
   148 U.S. 503, 13 S. Ct. 728, 37 L. Ed. 537 ........................................................ 6

*People Express Pilot Merger Committee v. Texas Air Corp.,*
   1987 U.S. Dist. LEXIS 9293 (D. N.J. Oct. 14, 1987), *aff'd without pub. op* ........................ 15

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   2007 U.S. App. LEXIS 11420 (9th Cir. May 16, 2007) ...................................... 5

*Railway Labor Executives' Association v. NMB,*
   29 F.3d 655 (D.C. Cir. 1994) ............................................................................. 18

*Russell v. NMB,*
   714 F.2d 1332 (5th Cir. 1983), *cert. denied,* 467 U.S. 1204 (1984) ...................... 15

*Stanley v. University of S. Cal.,*
   13 F.3d 1313 (9th Cir. 1994), *cert. denied,* 528 U.S. 1022 (1999) ........................ 6

*Tanner Motor Livery, Ltd. v. Avis, Inc.,*
   316 F.2d 804 (9th Cir. 1963), *cert. denied,* 375 U.S. 821 (1963) ......................... 5

*Texas & N.O. R.R. v. Brotherhood of R.R. & S.S. Clerks,*
   281 U.S. 548 (1930) ................................................................................... 6, 7, 18

*Trans World Airlines v. IFFA,*
   489 U.S. 426 (1989) ........................................................................................... 21

*United Transport Union v. Gateway Western R. Co.,*
   78 F.3d 1208 (7th Cir. 1996) .............................................................................. 16

*United Transport Union v. United States,*
   987 F.2d 784 (D.C. Cir. 1993) ...................................................................... 16, 17

*Virginian Railway Co. v. System Federal No. 40,*
   300 U.S. 515 (1937) ........................................................................................... 18

**FEDERAL STATUTES**

45 U.S.C. § 151 .......................................................................................................... 14

45 U.S.C. § 152 .......................................................................................................... 15

45 U.S.C. § 2 ................................................................................................................ 8

National Labor Relations Act, 29 U.S.C. §§ 151 et seq .............................................. 8

Norris LaGuardia Act, 29 U.S.C. §§ 101 et seq ......................................................... 6

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

v

Section 7 of the NLRA, 29 U.S.C. § 157 ............................................................................21

Section 7102 of the Federal Service Labor-Management Relations Act, 5 U.S.C. § 7102...........22

**MISCELLANEOUS**

11 Wright and Miller, *Federal Practice and Procedure*, § 2947 at 424 (1972) ...........................28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. C 07-2688 CRB

## I.    **INTRODUCTION**

This is not so much a case about the right (or lack thereof) of individuals to sport Air Line Pilots Association ("ALPA") lanyards or post things on bulletin boards so much as it is about an effort to use the judicial process to interfere in a representation dispute.  Plaintiffs seek to use this lawsuit to eliminate or undercut a rival employee organization, the SkyWest Airline Pilots Association ("SAPA"), and to obtain the right to promote the union drive in a way that neither SAPA nor anyone else has ever had, including addressing captive audiences of newly-hired pilots during mandatory company training sessions and through SkyWest's internal e-mail system.  There is no basis in fact or law for this unprecedented relief.

Under clearly established election procedures under the Railway Labor Act ("RLA"), a union seeking to represent a craft or class of an air carrier applies for an election with the National Mediation Board ("NMB") upon making a sufficient showing of interest among the carrier's employees (in this case, pilots).  Under NMB procedures, the organization receives just a list of the potential eligible voters (without home addresses, telephone numbers or email addresses).[1]  The applicant is not entitled to obtain from the carrier or the NMB any further personal information about the eligible voters, nor does it have a right to demand that the carrier provide it with special access to the employees.  Any complaints the union has about employer conduct during the period prior to the election can be raised with the NMB, which has extensive experience and nearly unreviewable authority in resolving representation disputes.

ALPA already has claimed publicly that it has enough authorization cards to meet the NMB's showing of interest requirements.  If true, there is nothing preventing it from availing itself of the NMB's procedures, including its protections against alleged employer interference.  Instead, it chose

---

[1]    NMB Representation Manual (http://www.nmb.gov/representation/representation-manual.pdf), § 12.1.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

to file this suit in an attempt to preempt that established election process, usurp the power of the NMB to administer its election rules, and give ALPA an impermissible and cynical leg up in the process. The Court should not permit itself to be used for these ends.

Even apart from the representation dispute issue, Plaintiffs have no right to "equal access" with SAPA. Indeed, the timing of Plaintiffs' claims regarding SAPA is telling. SAPA has represented SkyWest pilots in their dealings with management for years. There has been no change in SAPA's role in response to the ALPA campaign, and no change regarding the two issues about which the Plaintiffs complain – its funding by SkyWest and the access SAPA has to the pilots. Plaintiffs could have challenged this relationship at any time; indeed, ALPA could have done so as a ground for election interference when it lost its last election among the SkyWest pilots in 1999. The only reason to file now is to try to gain an unfair advantage in the current ALPA organizing drive.

The Plaintiffs do not seek to level the playing field. They want the Court to impermissibly tip the scales in ALPA's favor by giving its supporters access to the pilots, on work property and during work time, for the sole purpose of trying to convince them to support ALPA's organizing efforts. No organization has ever had that right at SkyWest – and no court has ever ordered such relief in an RLA Section 2, Third and Fourth case. In fact, SkyWest is not aware of any case in which a court considered and rejected a request for that type of relief. Simply put, what Plaintiffs have asked this Court to do is unprecedented in RLA jurisprudence. For these and the many other reasons discussed herein, Plaintiffs are not entitled to the unprecedented relief they seek in their motion for a preliminary injunction.

## II.    STATEMENT OF FACTS

### A.    Background

SkyWest is a regional air carrier headquartered in St. George, Utah. It operates as Delta Connection, United Express and Midwest Connect and serves 140 cities, in 39 states, and 3

2

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   Canadian provinces.  SkyWest employs approximately 10,000 employees, including 2,651 pilots.

2   Declaration of Todd Emerson ("Emerson Dec."), ¶ 2.

3   **B.    ALPA's Latest Organizing Campaign – And The Company's Lack of Any**
4   **Counter-Campaign**

5       SkyWest's pilot group has long been an organizing target of ALPA.  In 1999, ALPA lost a

6   representation election in which it was trying to become the collective bargaining representative of

7   the SkyWest pilots.  *See SkyWest Airlines, Inc.*, 26 NMB 485 (1999).

8       The SkyWest Pilots ALPA Organizing Committee informed SkyWest in mid-2006 that

9   ALPA had launched yet another organizing drive.  Emerson Dec., ¶ 5.  SkyWest has not instituted

10  any "campaign" of any sort in response to the ALPA organizing effort.  It has not sent out <u>any</u>

11  communications to the pilots addressing the issue in any way, nor has it held any meetings with

12  pilots to discuss the ALPA drive or the company's views on it.  *Id.* ¶ 6.  Ironically, ALPA devoted

13  an entire "special edition" of its "SkyWest ALPA Update" newsletter telling the pilots what types of

14  things they could expect to hear in a company campaign – a campaign that never came.  Declaration

15  of Jeffrey T. Rickman ("Rickman Dec."), Exh. A, pp. 17-22.

16      ALPA, on the other hand, has engaged in a high-profile public campaign, and is even using

17  this lawsuit to draw more attention to itself.[2]   In the months since the latest campaign began, ALPA

18  developed numerous and varied ways of getting its message to SkyWest pilots.  ALPA created an

19  extensive website dedicated to its organizing efforts at SkyWest.  Among other things, the website

20  contains information about the campaign, including upcoming organizational meetings; it solicits

21  SkyWest pilots to provide their home addresses, telephone numbers, and email addresses; it lists the

22  54 members of the Organizing Committee and allows SkyWest pilots to email any committee

23  member with the click of a button; and it allows a SkyWest pilot to download a union authorization

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

---

[2]    A copy of ALPA's press release regarding this case is available on its website, alpa.org.

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. C 07-2688 CRB

card if desired. The site apparently is updated frequently; documents relating to this lawsuit appeared on the site shortly after they were filed. *See* www.skywestalpa.org.

The website also discloses several of the other methods ALPA has used to communicate with SkyWest pilots – and touts the effectiveness of these means of communication. There are 10 issues of the aforementioned SkyWest ALPA Update newsletter on the site, dating from May 2006 to April 2007. In the February 2007 issue, the Plaintiffs bragged that they had been able to contact 1,200 SkyWest pilots – almost half the entire workforce – by telephone in a single 24-hour period. Rickman Dec., Exh. A, p 10. Other avenues, noted on the website, that ALPA has employed to communicate with SkyWest pilots, include:

- A toll-free ALPA SkyWest telephone "hotline."

- "All pilot" telephone calls with ALPA national officers.

- The periodically-published "SkyWest ALPA Update."

- Telephonic and electronic surveys.

- Numerous pilot information meetings held at various locations.

Rickman Dec., Exh. A, pp. 3, 4, 5-7, 10, 12.

The website also shows all of the past and upcoming organizing events. Contrary to what the Plaintiffs have told the Court concerning their inability in the summer months to meet with SkyWest pilots, there are seven organizational meetings already scheduled for the month of June. Rickman Dec., Exh A, p. 4.

ALPA and its supporters have numerous other ways of communicating with SkyWest pilots. Ironically, one of these is through a website maintained by SAPA – the organization that the Plaintiffs berate as a "company union." SAPA maintains a site on the Internet called sapaforums.org, that is accessible only to non-management SkyWest pilots. That site is a hotbed of discussion regarding the ALPA organizing drive, and numerous members of the ALPA Organizing

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

4

Committee post pro-ALPA messages on that site. Declaration of David Livingston ("Livingston Dec."), at ¶ 5. Similarly, the SkyWest intranet system contains forums that have several union threads that have been up and running for two years, without the company removing them. Employees are free to post whatever they want about unions, pro or con. One thread is entitled "We Should Start A Union" which was posted by an employee in December 2005. According to the counter on the page, the thread has been viewed 11,709 times with 208 replies posted by other employees, one as recently as May 24. Emerson Dec. ¶ 8. Pilots also have been given free reign to discuss union issues in the crew lounges, and have done just that. Livingston Dec. ¶ 14, Emerson Dec. ¶ 9.

**C.** **Shortly Before Filing Suit, ALPA Announces It Has Enough Cards To File For An NMB Election**

The most recent SkyWest ALPA Update on the website, dated April 2007, contained an article entitled "Moving from Cards to Ballots: The Next Step in the National Mediation Board's Election and Certification Process." Rickman Dec., Exh. A, pp. 15-16. In that article, ALPA announced that it had obtained signed authorization cards from more than 35% of the SkyWest pilots, the threshold required by the NMB to obtain a representation election. *Id.* ALPA wanted more cards, it said, so that it could be "better prepared ... for the next phase: the secret ballot election." *Id.*

On May 22, 2007, Plaintiffs filed this suit. They allege that SkyWest has unlawfully supported SAPA, and that SkyWest interfered with their expressive activity by discriminating against Plaintiffs on the basis of their support for ALPA. Complaint, ¶¶ 42-50.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

5

## III.    ARGUMENT

### A.    Plaintiffs Are Not Entitled To The Extraordinary Remedy Of Preliminary Injunctive Relief

Preliminary injunctive relief is an "extraordinary remedy," whose purpose is to preserve the "status quo" between the parties pending final determination of the merits. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 2007 U.S. App. LEXIS 11420 at *15 (9th Cir. May 16, 2007) (the burden "is correctly placed on the party seeking to demonstrate entitlement to the extraordinary remedy of a preliminary injunction at an early stage of the litigation, before the defendant has had the opportunity to undertake extensive discovery or develop its defenses"); *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808-809 (9th Cir. 1963) ("It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo *ante litem* pending a determination of the action on the merits."), *cert. denied*, 375 U.S. 821 (1963). The "status quo," in this context, is the last uncontested status which preceded the pending controversy." *Id.* at 809.

Here, Plaintiffs do not seek to maintain the status quo *pendente lite*. On the contrary, they seek to dramatically <u>alter</u> the status quo and obtain something that neither they nor any other individual, group or organization at SkyWest has ever had. They seek an order giving them the right: (1) to speak to captive audiences of newly-hired SkyWest pilots during paid work time at required company training sessions; (2) to use SkyWest's internal company e-mail to send mass e-mails to pilots about the ALPA campaign; (3) to wear lanyards with the ALPA logo; (4) to post materials on SkyWest bulletin boards and in pilots' mailboxes without approval, in violation of SkyWest's policies; and (5) to leave ALPA literature in employee lounges without having it be cleaned up. Plaintiffs thus are seeking a mandatory injunction, which is "subject to a higher standard than prohibitory injunctions," *Angotti v. Rexam, Inc.*, 2006 U.S. Dist. LEXIS 42104, *20 (N.D. Cal. June 14, 2006), and which is "'particularly disfavored.'" *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979) (citation omitted). In such cases, the district court should deny the requested

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

6

injunctive relief "unless the facts and law clearly favor the moving party." *Id. Accord Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994), *cert. denied*, 528 U.S. 1022 (1999). As demonstrated herein, they do not.

Moreover, because Plaintiffs seek an injunction involving a labor dispute, the Court must consider whether the requested injunctive relief satisfies the requirements of the Norris LaGuardia Act, 29 U.S.C. §§ 101 *et seq.* ("NLGA"). Resort to equitable relief in this context "is an extraordinary step that courts must not take lightly." *Aluminum Workers Int'l Union v. Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982). Because of the extraordinary nature of injunctive relief, the NLGA requires that, where granted, it must be "strictly tailored to accomplish only that which the situation specifically requires." *Aluminum Workers*, 696 F.2d at 446 (citing NLGA Section 9). Plaintiffs have made no effort to "strictly tailor" their requested injunctive relief to their alleged imminent harm: their claimed inability to stage an effective showing of "solidarity" without being able to wear ALPA lanyards. Rather, they have attempted to obtain unprecedented (and legally unwarranted) access to SkyWest pilots without showing how that relates to the alleged "substantial and irreparable injury" that supports their requested injunctive relief.

**B.    Plaintiffs Cannot Show A Substantial Likelihood Of Success On Its Claims**

In *Texas & N.O. R.R. v. Bhd. of R.R. & S.S. Clerks*, 281 U.S. 548 (1930), the court described Congress' intent regarding election interference under the RLA:

> The intent of Congress is clear with respect to the sort of conduct that is prohibited. "Interference" with freedom of action and "coercion" refer to well-understood concepts of the law. The meaning of the word "influence" in this clause may be gathered from the context. *Noscitur a sociis. Virginia v. Tennessee*, 148 U. S. 503, 519, 13 S. Ct. 728, 37 L. Ed. 537. The use of the word is not to be taken as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. "Influence" in this context plainly means pressure, the use of the

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

7

authority or power of either party to induce action by the other in derogation of what the statute calls "self-organization." The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the purposes of this act than in relation to well-known applications of the law with respect to fraud, duress, and undue influence.

*Texas & N.O. R.R.* 281 U.S. at 568. Congress, in other words, did not intend to limit the normal communications, discussions and relationship between and among employer and employees, or to provide unions with unfettered access to prospective dues-paying members. The proscription in Sections 2, Third and Fourth against influence, coercion and interference was intended to bar an employer from exerting such overwhelming pressure "as to corrupt or override the will" of its employees with respect to their organizational efforts. Thus, to obtain preliminary injunctive relief, Plaintiffs must show a substantial likelihood of success (or serious questions going to the merits) that SkyWest's actions corrupted or overrode the will of the SkyWest pilots. Plaintiffs cannot meet this standard.

Tellingly, there are not many cases involving motions for preliminary injunctions to enjoin "interference," "influence" or "coercion" in violation of Sections 2, Third and Fourth of the RLA. The few cases that have been decided establish a high benchmark. In *Adams v. Federal Express Corp.*, 1975 U.S. Dist. LEXIS 16267 (W.D. Tenn. 1975), *aff'd*, 547 F.2d 319 (6th Cir. 1976), the plaintiffs alleged that Federal Express had terminated three employees and transferred another employee in retaliation for their union activities; engaged in coercive questioning, surveillance, solicitation of grievances; and made a variety of threats. *See Adams v. Federal Express Corp.*, 470 F. Supp 1356 (W.D. Tenn. 1979), *aff'd*, 654 F.2d 452 (6th Cir. 1981). After a hearing on plaintiffs' preliminary injunction motion, the court found that FedEx management "admittedly was not in favor of the union and communicated that disfavor to the employees." 1975 U.S. Dist. LEXIS 16267 at

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

8

*6. It also found that "it may appear that some or all of the individual plaintiffs were discharged because of their union activities." *Id.* The company did, however, advance "legitimate plausible reasons for their discharge." *Id.* at *6-7.

In <u>declining</u> to issue the preliminary injunction sought by the plaintiffs, the court described the standards it used in evaluating the traditional equitable requirements. There was not, the court observed, evidence of a "<u>practice of discharging employees</u> that were union advocates," nor did it "appear . . . that the defendant, its agents or employees were engaged in any <u>conscious concerted attempt to violate the . . . RLA.</u>" *Id.* (emphasis added). Yet, the court did find a "good possibility" of success on the merits. *Id.* at *5. On the issue of irreparable harm, the court was "not persuaded ... that the plaintiffs will suffer irreparable harm," but was convinced that Federal Express would suffer irreparable harm by the issuance of the requested relief. *Id.* at *6. Moreover, the court stated that "the public interest will not be served through granting the injunction sought by plaintiffs." *Id.*

After noting that a "District Court must exercise great care to prevent the employees' right to organize from becoming illusory," the Sixth Circuit affirmed without questioning the standards used by the district court. 547 F.2d at 322-33. Thus, while an unfair labor practice under the National Labor Relations Act, 29 U.S.C. §§ 151 <u>et seq.</u> ("NLRA"), may be shown if an employer's actions "reasonably tend to coerce," *ITT Auto. v. NLRB*, 188 F.3d 375, 385 (6th Cir. 1999), in *Federal Express* the plaintiffs properly were held to a higher standard. *See also Texas & N.O. R.R.* at 568 (equating the standard to common law fraud, duress and undue influence). This is because the RLA does not provide the same procedural mechanisms to bring "unfair labor practice" charges.

Moreover, the NMB, the federal agency tasked with administration of the RLA and protecting union representation elections against unlawful interference, influence or coercion, 45 U.S.C. § 2, Ninth, does not use a dogmatic approach to assess election interference claims. Rather, citing *Texas & N.O. R.R.*, it uses a "totality of the circumstances" standard. *Delta Air Lines*, 30 NMB

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

9

102, 114 (2002). *See also Horizon Air Indus*, 232 F.3d at 1137 ("It is established NMB practice to examine the 'totality of the circumstances' in order to determine whether a carrier has interfered with a representation election."). That standard has been adopted by a least one district court. *Bhd. of Ry., Airline & S.S. Clerks v. Philadelphia, B. & N.E. R.R. Co.*, 428 F. Supp. 1308, 1315 (E.D. Penn. 1977).

Plaintiffs allege three general types of activity that, they claim, violated Sections 2, Third and Fourth: (1) SAPA's historical access to SkyWest pilots; (2) being prohibited from wearing ALPA identification badge lanyards; and (3) being barred from posting materials on "general" company bulletin boards. The facts, as alleged by Plaintiff and as will be fleshed out herein and at hearing, demonstrate that Plaintiffs cannot show a significant likelihood of success on the merits of their various allegations.

### 1.     There Is Nothing Inappropriate About The Access That SAPA Has Been Provided To The SkyWest Pilots

Plaintiffs argue that SkyWest's relationship with SAPA violates the RLA because, in their view, SAPA is a "company union." They claim, therefore, that SkyWest has discriminated against them by allowing SAPA access to SkyWest pilots that it has not given to the Plaintiffs. Neither contention is accurate, as a matter of fact or law. Moreover, Plaintiffs' second point does not follow from the first, is without any support in the case law, and, as discussed below, seeks to enmesh the Court in a representation dispute that is within the exclusive jurisdiction of the NMB. Indeed, Plaintiffs offer no explanation for why the issue of SAPA's relationship with SkyWest is being raised now, for the first time, and in the context of a preliminary injunction proceeding. SAPA has been in existence throughout ALPA's organizing drive, and for years before that. Emerson Dec. ¶ 3, Livingston Dec. ¶¶ 2, 7. Nothing has changed recently regarding the SkyWest-SAPA relationship, and Plaintiffs do not claim otherwise. Emerson Dec. ¶ 6. If there is something unlawful about that relationship – which there is not – Plaintiffs could have challenged it at any time during the last

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

10

several years, presumably without the need to do so through expedited proceedings.  Indeed, ALPA could have raised SAPA's existence as a ground for election interference when it lost its last election in 1999.  It never did so.

        a.     **Section 2, Fourth Prohibits Employer Domination Of Labor Unions, Not Cooperative Alternatives To The Adversarial Model Of Labor Relations**

Section 2, Fourth was added to the RLA in 1934.  The "basic idea" behind the provision was to "prevent employer interference in union organizing, including employer support of company unions."  *Barthelemey v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1009 (9th Cir. 1990).  Although the courts initially strictly construed the paragraph, they since have recognized that "'changing conditions in the labor-management field seem to have strengthened the case for providing room for cooperative employer-employee arrangements as alternatives to the traditional adversary model.'"  *Id.* at 1017 (*quoting Northeastern Univ.*, 601 F.2d 1208, 1214 (1st Cir. 1979)).  As the Ninth Circuit explained in applying the analogous provision of the NLRA, "almost any form of employer cooperation, however, innocuous, could be deemed 'support' or 'interference.'"  *Hertzka & Knowles v. NLRB*, 503 F.2d 625, 630 (9th Cir. 1974), *cert. denied*, 423 U.S. 875 (1975).[3]  Yet, "such a myopic view" would undermine the purpose of the anti-support provision and the labor law as a whole "because it might prevent the establishment of a system the employees desired."  *Id.*  Thus, the literal prohibition "must be tempered by recognition" of the labor law's objectives.  *Id.*

In *Barthelemy*, the Ninth Circuit applied these NLRA decisions to Section 2, Fourth in concluding that the proper inquiry was to distinguish "permissible cooperation" from "prohibited support."  897 F.2d at 1016.  The dividing line, the court held, is whether the employer's assistance "actually deprived [the employees] of a meaningful choice of bargaining representative."  *Id.*  The court stressed that this was a "subjective inquiry," and that it was not the "potential for but the reality

---

[3]    Cases interpreting the NLRA on this issue are extremely probative.  *See Barthelemey*, 897 F.2d at 1015 (relying on cases applying § 8(a)(2) of the NLRA in construing RLA Section 2, Fourth).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  of domination that these statutes are intended to prevent." *Id.* (*citing*, among others, *Modern*

2  *Plastics Corp. v. N.L.R.B.*, 379 F.2d 201, 204 (6th Cir. 1967) ("active domination must be shown

3  before a violation is established"). Indeed, the Ninth Circuit noted in another case that this analysis

4  was consistent with the legislative history of the NLRA, as expressed by Senator Wagner himself:

> The erroneous impression that the bill expresses a bias for some particular
> form of union organization probably arises because it outlaws the
> company-dominated union. Let me emphasize that nothing in this
> measure discourages employees from uniting on an independent—or
> company-union basis. . . . The only prohibition is against the sham or
> dummy union which is dominated by the employer, which is supported by
> the employer, which cannot change its rules and regulations without his
> consent, and which cannot live except by grace of the employer's whims.

*Hertzka & Knowles*, 503 F.2d at 630.

### b.  SAPA Independently Represents The SkyWest Pilots In A Cooperative Relationship That Is An Alternative To The Traditional Adversarial Model Of Labor Relations

Notwithstanding Plaintiffs' allegations, SAPA enjoys the support of the SkyWest pilots and

is not dominated by SkyWest. SAPA was formed by the pilots, not management. Livingston Dec.

¶¶ 2, 4; Declaration of Klen Brooks ("Brooks Dec.") ¶ 2. Its bylaws were drafted by SAPA

representatives without input from SkyWest management. Livingston Dec., ¶ 3. Only SAPA has

the authority to modify those bylaws. *Id.* The bylaws also provide a process by which the pilots can

choose to dissolve SAPA if they so desire; management has no role in that process. *Id.* The pilots

have not done so.

There is no SkyWest management presence on SAPA. SAPA consists of a board of 19

regional representatives (the "SAPA Representative Board"), who all are non-management pilots,

elected by the pilots, and a three-person Executive Board, consisting of a President, Vice President,

and Secretary, elected from the ranks of the SAPA Representative Board. Livingston Dec. at ¶ 2.

The President and Vice President are elected directly by the SkyWest pilots as well. *Id.* SkyWest

does not dictate who can be on SAPA's Representative Board or Executive Board. *Id.*

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

12

Tellingly, there have been several union organizing efforts since SAPA came into being, and SAPA as an organization has remained neutral in each. Livingston Dec. at ¶ 12. That is true with respect to the current ALPA organizing campaign as well. *Id.* In fact, there are at least two members of the ALPA organizing committee on SAPA's Representative Board currently, and Internet forums maintained by SAPA frequently are used by members of the Organizing Committee to post pro-ALPA messages. *Id.* at ¶¶ 12, 5. A truly employer-dominated organization would not sit on the sidelines during a third-party organizing drive, much less allow its resources to be used for distribution of the third-party's message.

In addition, SkyWest and SAPA engage in negotiations over pilot compensation, and over the policies and work rules applicable to the pilots, which are contained in the Crewmember Policy Manual ("CPM"). Livingston Dec. ¶¶ 7, 8. These are arms-length negotiations, with each side presenting, accepting, countering and rejecting proposals. *Id.* at ¶ 11. Pilots vote on changes in compensation that SAPA and SkyWest management negotiate. *Id.* at ¶ 8. Indeed, in 2005-2006, pilots rejected a pay proposal that sent both SkyWest and SAPA back to the negotiations table for more discussions. *Id.* at ¶ 8. The CPM states that it may not be changed by management without SAPA's approval. *Id.* at ¶ 7; Emerson Dec., ¶ 4.

In addition, SAPA assists pilots in processing complaints involving application of the CPM and disciplinary matters. Livingston Dec. ¶¶ 9-10. With respect to discipline, there is a Review Board, consisting of two SAPA representatives and two company representatives, that hear the evidence and make a recommendation on whether to sustain, overturn or modify the discipline. *Id.* at ¶ 10. While management is not obligated to accept the recommendation of the Review Board, its practice is to do so. *Id.*

Finally, SAPA employs numerous tools for communicating with SkyWest pilots over which management has no oversight. For example, SAPA publishes a newsletter. (Livingston Dec. ¶ 6.) It

13

also maintains a website (sapapilot.org), and internet discussion forums (sapaforums.org), both of which are accessible only to non-management SkyWest pilots. (*Id.* at ¶ 5.) SkyWest management has no control over these communication tools. (*Id.* at ¶¶5, 6.) As noted previously, there is extensive discussion on sapaforums.org regarding the ALPA organizing drive, and numerous members of the ALPA Organizing Committee post pro-ALPA messages on that site. Livingston Dec. ¶ 5.

However much Plaintiffs may dislike the idea that SAPA represents the SkyWest pilots in a forward-thinking, cooperative model of labor relations, the plain fact is that it does so in a manner that is lawful and acceptable.

### c. Plaintiffs Cannot Establish Unlawful Domination Of SAPA By SkyWest

Plaintiffs' primary argument with respect to its assertion that SAPA is a prohibited "company union" is that SkyWest provides financial support for SAPA. However, the courts consistently have held that several types of employer assistance to employees' representatives do not constitute unlawful "domination" – even substantial financial assistance. In *Barthelemey*, for example, the court concluded that a carrier's payment of a $1.25 million debt on ALPA's behalf did not violate Section 2, Fourth, because there was no evidence that ALPA had "become somehow beholden" to the carrier as a result. 897 F.2d at 1017. *See also N.L.R.B. v. BASF Wyandotte Corp.*, 798 F.2d 849, 851-52 (5th Cir. 1986) (no violation; employer provided union air conditioned office, telephone, and use of copier); *N.L.R.B. v. Homemaker Shops, Inc.*, 724 F.2d 535, 545-47 (6th Cir. 1984) (no violation; employer scheduled union meetings, assisted with union elections, reimbursed for work time lost and travel expenses incurred due to union activities, and provided coffee and meeting space); *Lake City Foundry Co. v. N.L.R.B.*, 432 F.2d 1162, 1178 (7th Cir. 1970) (no violation; employer let union use company property for meetings); *N.L.R.B. v. Post Publishing Co.*, 311 F.2d 565, 569-70 (7th Cir. 1962) (permitting union to hold meetings in company cafeteria, use copier and

14

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

retain profits from cafeteria operations); *Northeastern Univ.*, 601 F.2d at 1214-15 (no violation; university had power to appoint employees to representative body, printed and distributed ballots with pay checks, and paid organization's expenses); *Coppus Eng'g Corp. v. N.L.R.B.*, 240 F.2d 564, 572-73 (1st Cir. 1957) (assisting with "election procedures" and providing "printing and secretarial services" does not constitute domination; anti-assistance provision was "'not enacted to prohibit or penalize courteous and friendly, or even generous, action on the part of employers").

In addition, neither Plaintiffs' assertion that "SAPA has no dues" nor that SkyWest "pays SAPA officers to serve full time" demonstrate "actual domination." Memorandum at pp. 8-9. *See Modern Plastics Corp.,* 379 F.2d 201 (no violation although committee received no dues, had no source of income, owned no property, and had no constitution or by-laws); *Northeastern Univ.*, 601 F.2d at 1213 ("[O]ur cases establish that an organization is not per se dominated simply because it has no formal membership, no dues, no mass meetings, and no written collective bargaining agreement."). *See also BASF Wyandotte Corp. v. Int'l Chemical Union*, 791 F.2d 1046, 1049 (2d Cir. 1986) (finding that payments to an employee who "is also a union official . . . for time off to permit him to tend to union duties" is not improper); *BASF Wyandotte Corp.*, 798 F.2d at 855 (no violation; union chairman paid by company four hours per day for "union business").

Plaintiffs note that SAPA has no "membership requirements, other than employment as a non-management pilot at SkyWest." Memorandum at 8. They fail to explain how that demonstrates SkyWest "domination" over SAPA, perhaps, because it does not. Indeed, ALPA seeks to represent the identical group of persons. Nor is the fact that SAPA has not been certified by the NMB as the representative of the SkyWest pilots relevant. *Id.* Such certification is not required under the RLA. Rather, a representative is defined as one the employees have designated to act for it; the definition does not mention NMB "certification." 45 U.S.C. § 151, Sixth. Such certification is necessary only "[i]f a dispute arises as to the *identity* of the employees' representative." *Id.* § 152, Ninth (emphasis

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

added). Courts, too, have recognized that NMB certification is not "a prerequisite to achieving

representation status under the [RLA]." *People Express Pilot Merger Comm. v. Texas Air Corp.*,

1987 U.S. Dist. LEXIS 9293, at *5 (D. N.J. Oct. 14, 1987) ("nowhere in the definition is

certification mentioned as a requirement for representational capacity"), *aff'd without pub. op.,* 958

F.2d 364 (3rd Cir. 1992); *see also Russell v. NMB*, 714 F.2d 1332, 1341 (5th Cir. 1983) ("[t]here are

no qualifiers attached to the [RLA's] simple definition of representative."), *cert. denied*, 467 U.S.

1204 (1984); *Int'l Ass'n of Machinists v. Alitalia Airlines*, 600 F. Supp. 268, 273 (S.D.N.Y. 1984),

*aff'd,* 753 F.2d (2d Cir. 1985). In short, it is irrelevant that SAPA has not been certified by the

NMB.

### d. Plaintiffs' True Dispute Over SkyWest's Relationship With SAPA Is A Representational Dispute Within The Exclusive Primary Jurisdiction Of The NMB

The RLA provides that if any dispute arises "among a carrier's employees as to who are the

representatives of such employees designated and authorized in accordance with the requirements of

this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute,

to investigate such dispute and to certify to both parties in writing [who the NMB finds is the proper

representative]." 45 U.S.C. § 152, Ninth. The Supreme Court has noted that "[h]owever wide may

be the range of jurisdictional disputes embraced within § 2, Ninth, Congress did not select the courts

to resolve them. To the contrary, it fashioned an administrative remedy and left that group of

disputes to the National Mediation Board. If the present dispute falls within § 2, Ninth, the

administrative remedy is exclusive." *General Comm. Of Adjustment v. Missouri-Kansas-Texas R.*

*Co.*, 320 U.S. 323, 337 (1943). *Accord Horizon Air Indus. v. Nat'l Mediation Bd.*, 232 F.3d 1126,

1132 (9th Cir. 2000), *cert. denied*, 533 U.S. 915 (2001).

Courts have interpreted the prohibition against treading on the NMB's authority broadly, in

light of the noted expertise of that agency in determining representation-related issues. Thus, even

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

16

where a lawsuit raises a claim otherwise justiciable, if it implicates a representation dispute, it should

be dismissed. *See, e.g., Int'l Bhd. of Teamsters v. Texas Int'l Airlines Inc.*, 717 F.2d 157, 161 (5th

Cir. 1983) (representation disputes are for NMB, and "a court may not entertain an action involving

such a dispute even if it arose in the context of other justiciable claims"); *Air Lines Employees*

*Assoc., Int'l v. Republic Airlines, Inc.*, 798 F.2d 967, 968 (7th Cir. 1986) (representational dispute

falls within the NMB's jurisdiction "even though . . . couched in terms of enforcing the collective

bargaining agreement"), *cert. denied*, 479 U.S. 962 (1986); *Int'l Fed. of Flight Attendants v. Cooper*,

141 F.3d 900, 903 (8th Cir. 1998) (state law tort claims arising out of union's alleged theft of other

union's membership list dismissed because they were "inextricably intertwined" with a

representation dispute); *Miller v. Norfolk S. R. Co.*, 183 F. Supp.2d 996, 1000 (N.D. Ohio 2002)

(dismissing Section 2, Fourth and RICO claims because representation dispute arguably involved;

"Plaintiffs should not be able to avoid the Board's jurisdiction or the designated remedial scheme by

asserting a RICO claim or a claim for organizational interference.").

All doubts as to whether a representational question exists are cast in favor of deferring to the

primary jurisdiction of the NMB. Accordingly, the courts dismiss actions where they cannot rule out

the possibility that a representational dispute may exist. *See Air Line Pilots Assocs., Int'l v. Texas*

*Int'l Airlines, Inc.*, 656 F.2d 16, 24 (2d Cir. 1981) ("even in such unconventional contexts section 2,

Ninth affords the sole and mandatory means for resolving disputes over representation"); *United*

*Transp. Union v. Gateway Western R. Co.*, 78 F.3d 1208, 1213-14 (7th Cir. 1996) ("when the precise

character of the dispute is in doubt (when the dispute, in other words, is only 'arguably'

representational), a federal court should not proceed"). In *United Transp. Union v. United States*,

987 F.2d 784 (D.C. Cir. 1993), the court held that it was "frankly uncertain whether the NMB

would, or should, have exercised jurisdiction over this case if it had been brought before it." *Id.* at

789. Because that made it an arguable representation dispute, the proper course, the court held, was

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. C 07-2688 CRB

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    to "recognize that the NMB has primary jurisdiction to determine whether it has exclusive

2    jurisdiction over the dispute." *Id.*

3        Here, the Plaintiffs are asking two things of this Court that make this at least an arguable

4    representation dispute. First, they seek to eliminate the longstanding, cooperative relationship that

5    SkyWest and SAPA have enjoyed. The RLA authorizes employees to bargain collectively through a

6    representative that has not been certified by the NMB. SkyWest and SAPA have engaged in arms-

7    length bargaining for years. Yet, Plaintiffs seeks an order from this Court that would prohibit

8    SkyWest from recognizing and bargaining with SAPA in order to assist them in conducting an

9    organizing drive on behalf of ALPA. There could hardly be a more compelling example of a

10   representational dispute.

11       Secondly, Plaintiffs want the Court to give them unfettered and unprecedented access to the

12   SkyWest pilots so they can enjoy an unfair advantage both before and after ALPA files its

13   representation application with the NMB. The Plaintiffs' claim that such extraordinary relief is the

14   only way they can protect their statutory right to organize is particularly galling given their

15   admission that ALPA <u>already</u> has collected enough cards from SkyWest pilot to invoke the NMB

16   process. Plaintiffs have shown no reason why resort to the NMB would be insufficient to guard their

17   interests, particularly given that agency's expertise in determining whether interference has

18   occurred, and its "broad discretion" in determining remedies for such conduct. *Horizon*, 24 NMB

19   458, 498 (1997).

20       None of the cases cited by Plaintiffs support the unprecedented position they are taking in

21   this case. None involved a case where, as here, a court decided the representation status of an

22   organization that held itself out as the employees' representative for years, negotiated agreements for

23   them, and submitted the agreements to the employees for democratic approval. Nor do any of the

24   RLA "company union" cases they cite involve a challenge to the legitimacy of an existing

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. C 07-2688 CRB

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

organization by a union on the verge of filing an application to represent those employees – much less one that wants to use access rights of the existing organization to stack the deck in its favor during the election period. On the contrary, the decisions they cite all involved cases brought by <u>certified</u> representatives to enforce their bargaining rights in light of employer efforts to form and/or bargain with competing unions. Memorandum at 16 (citing *Virginian Ry. Co. v. System Fed. No. 40*, 300 U.S. 515 (1937), *Texas & N.O. R.R. v. Brotherhood of R.R. & Steamship Clerks*, 281 U.S. 548 (1930), and *Bhd. Of Ry. & S.S. Clerks v. Virginian Ry. Co.*, 125 F.2d 853 (4th Cir. 1942)).[4]

As a final, practical point, of importance to the entire SkyWest pilot group, a holding that this Court lacks jurisdiction or should defer to the NMB's processes would avoid a quandary that Plaintiffs' arguments raise. If this Court held that SAPA is not a legitimate "representative," SkyWest would not be bound to continue to honor the agreements negotiated with SAPA. The vast majority of SkyWest's pilots who are not before this Court might not appreciate the voiding of agreements that they bargained for and approved. They might well assert that the Plaintiffs, who constitute a miniscule portion of the entire SkyWest pilot group and are trying to bring in a union that, historically, most pilots may not want, are not acting in the best interests of the group as a whole. The impact of the requested injunctive relief on the rest of the SkyWest pilot group should be given serious consideration.

### e. **Regardless Of SAPA's Status, Plaintiffs Have No Legal Right To The Same Access As SAPA Has Had**

Most of the injunctive relief requested by Plaintiffs is based upon their claim to "equal access" to SkyWest's means of communications as that granted to SAPA. This is the sole basis for

---

[4]    None of the other three cases Plaintiffs cite in this section of their brief support their argument either. *Railway Labor Executives' Ass'n v. NMB*, 29 F.3d 655 (D.C. Cir. 1994) dealt with the NMB's airline merger policies; *Horizon v. NMB*, 232 F.3d 1126, pertained to a carrier's contention that the NMB had exceeded its authority in resolving a representation dispute; and *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002), *cert. denied*, 537 U.S. 1193 (2003), merely held that a § 2, Fourth unlawful assistance claim could be maintained by a union dissident who alleged that his employer had improperly provided information to the existing union – ALPA.

19

Plaintiffs' contention that they are entitled to access to the Company's e-mail system, training classes for newly-hired pilots, pilot mailboxes, and "dedicated" bulletin boards. Plaintiffs assert that SAPA has such access, and claim that this is "discriminatory," and justified its request for identical access. Memorandum at pp. 14, 17. This leap in logic is unsupportable; the requested relief, unprecedented.

First and foremost, Plaintiffs are not entitled to an order granted them access pursuant to their motion for a preliminary injunction because their theories of liability fail and place them squarely within the exclusive primary jurisdiction of the NMB. Plaintiffs have failed to show a likelihood of success on the merits of the causes of action in their complaint directed at the relationship between SkyWest and SAPA, much less that the facts and law "clearly favor them." Accordingly, the equities tip strongly against all of these requests for injunctive relief.

Second, Plaintiffs misapprehend their supposed entitlement under the principle of equal access. Here, all of the access to the pilots given SAPA is for the purpose of carrying out its functions on the pilots' behalf.    Brooks Dec., ¶¶ 8-9; Livingston Dec., ¶ 13. Critically, it is not permitted to use that access for the purpose of "campaigning," and SkyWest has never received a complaint that SAPA was doing so. Brooks Dec., ¶¶ 8-9. According to a past SAPA President (and current SAPA Representative), SAPA does not use its access for anything other than its business purposes, which do not include "campaigning" regarding a union organizing effort. Livingston Dec., ¶ 13. Nor do the Plaintiffs' pleadings in this case make that allegation, other than a vague, hearsay reference that SAPA was spreading "misinformation" about ALPA to a new hire class. Bharath Dec., ¶ 10.

Plaintiffs cite no case law suggesting that, under the RLA, it is *per se* unlawful for an existing organization (whether a certified incumbent representative or an employee committee) to have greater access to employees and company property than a challenging union – much less that

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

20

the challenger is entitled to "equal access." On the contrary, the NMB has held that it is <u>not</u> interference with the employees' right to organize for an existing organization to have superior access to employees than a challenger has by virtue of its historical role vis-à-vis the employees. In *United Air Lines*, 1995 NMB LEXIS 111 (1995), for example, the IAM, the challenging union claimed that the carrier allowed the incumbent representative access to company bulletin boards, company property, and the "Unitel" phone system, while denying the challenger these same privileges. The NMB ruled that no improper interference had occurred, relying on its historical distinction between access as a result of "incumbent" status and access for campaign purposes. *See also Northwest Airlines*, 19 NMB 94 (1991) (finding no improper action by the company because "[b]y virtue of its incumbent status and its [CBA] with the carrier, the IAM had distinctly greater access to employees that [sic] did AMFA"); *Northwest Airlines*, 14 NMB 49, 56 (1986) (no pattern of carrier interference given lack of sufficient evidence that carrier had supported incumbent's use of the crew lounges for campaigning purposes); *Horizon Airlines*, 24 NMB 458, 501 (1997) ("the existence of active employee committees at a carrier is not necessarily improper interference with an election").

In this case, the access SAPA has had to communicate with the employees is because of its role as the existing representative of SkyWest's pilots. Thus, there is nothing "discriminatory" in not providing the same access to ALPA. Moreover, even if there were something improper regarding the access that SAPA had to the pilots, Plaintiffs do not cite to any authority to support the proposition that the appropriate remedy would be to give <u>them</u> the same access. On the contrary, as discussed previously, that would embroil the Court in a representation dispute that properly is within the exclusive jurisdiction of the NMB.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

21

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

2.    **Plaintiffs Cannot Show That The Facts And Law Clearly Favor Their Claim That SkyWest Has Discriminated Against Them Based On Their Views About ALPA Representation**

a.    **SkyWest Has Properly Enforced Its Uniform Policy**

In their declarations, Plaintiffs complain of 5 instances, all of which allegedly occurred 5 to 9 months ago, in which a Plaintiff was asked by SkyWest management to remove an ALPA lanyard. Bharath Dec. ¶ 4; Boehm Dec. ¶¶ 4, 6; Mansur Dec. ¶ 4; Shrier Dec. ¶ 6. Relying solely on NLRA case law and *Adams v. Fed. Express Corp.*, 470 F. Supp. 1356 (W.D. Tenn. 1979), an RLA case that applied NLRA precepts, Plaintiffs claim that RLA Sections 2, Third and Fourth gives them the right to wear union insignia absent an "exceptional reason" or "special considerations." Memorandum at pp. 12-13.

The problem with this argument is that NLRA concepts cannot be imported lock, stock and barrel into the RLA in this instance. As the Supreme Court has noted, although the NLRA may provide useful analogies for interpreting the RLA, it "cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes." *Trans World Airlines v. IFFA*, 489 U.S. 426, 439 (1989) (citation omitted). This is one situation where the NLRA precedent "cannot be imported wholesale" into the RLA. That is because the NLRA law on union insignia is based on interpretation of the "other concerted activities" language of Section 7 of the NLRA, 29 U.S.C. § 157. *See Immigration & Naturalization Serv. v. Fed. Labor Relations Auth. ("INS v. FLRA")*, 855 F.2d 1454, 1459 (9th Cir. 1988). As other courts have observed, the RLA does not contain analogous language. *See Johnson v. Express One*, 944 F.2d 247 (5th Cir. 1991) (refusing to apply Section 7 NLRA law on employee right to be accompanied to an investigatory interview into the RLA given absence of "concerted activities" language from Section 2, Fourth). Accordingly, NLRA law on this

issue should not be applied in this RLA context, and thus there is no basis to Plaintiffs' argument that they have a statutory right to wear ALPA lanyards.

A similar conclusion was reached by the Ninth Circuit in *INS v. FLRA*. In *INS*, the employer prohibited inspectors, who had frequent contact with the public, from wearing union insignia on their uniforms. 855 F.2d at 1456-57. The case turned on the interpretation of Section 7102 of the Federal Service Labor-Management Relations Act, 5 U.S.C. § 7102, which, like Sections 2, Third and Fourth, grants federal employees the "right to form, join, or assist any labor organization," but does not contain the "other concerted activities" language found in the NLRA. *Id.* at 1458. The Ninth Circuit held that Section 7102 does not create a statutory right among public contact federal uniformed employees to wear union insignia on the job. *Id.* at 1461-62. The Court based this decision on the fact that the Section 7 NLRA right is based on its "concerted activities" language, which is not included in the Federal Service Labor-Management Relations Act. *Id.* The same conclusion is inescapable when it comes to the RLA.

Regardless, even if the RLA contained the same "concerted activities" language of the NLRA, making the NLRA "special circumstances" standard appropriate in this context, such circumstances exist. Subsequent to the district court decision in *Adams* on which Plaintiffs rely, the Sixth Circuit held that "where an employer enforces a policy that its employees may only wear authorized uniforms in a consistent and nondiscriminatory fashion and where those employees have contact with the public, a 'special circumstance' exists as a matter of law which justifies the banning of union buttons." *Burger King Corp. v. NLRB*, 725 F.2d 1053, 1055 (6th Cir. 1984). A similar conclusion had earlier been reached by the Ninth Circuit in *NLRB v. Harrah's Club*, 337 F.2d 177 (9th Cir. 1964), on which the Sixth Circuit relied. *Id. See Harrah's*, 337 F.2d at 180 (the term "special circumstances" is not limited to considerations relating to employee efficiency, safety and personnel friction. "Most business establishments, particularly those which, like respondent, furnish

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

23

service rather than goods, try to project a certain type of image to the public. One of the most essential elements in that image is the appearance of its uniformed employees who furnish that service in person to customers."). *See also INS v. FLRA*, 855 F.2d at 1465 (citing *Burger King* and *Harrah's* for the proposition that "the management interest in requiring unadorned uniforms has been recognized in private sector cases as well.").

In this case, SkyWest has promulgated a Personal Appearance, Grooming and Uniforms policy that applies to its pilots. Brooks Dec. ¶ 5. The policy states that: "Both passengers and professional crewmembers realize that the passenger's choice of an airline is greatly influenced by the crewmember's level of professionalism and appearance." (*Id.* at Exh. A, § 1.A.) Therefore, "[i]t is the goal of Flight Operations to have each Pilot clothed in a standard Company issued uniform as a way of projecting to the public a professional appearance and attitude." (*Id.* at Exh. A, § 18.A.1.) The policy also goes into great detail regarding the appearance, grooming and uniform standards, including such things as hair style, jewelry and accessories and footwear. Brooks Dec. ¶ 5.

One of the items covered in the policy concerns display of Crewmember Identification Badges. There are two such badges: the Security Identification Display Area (SIDA) badge and the Company identification badge. Under the policy, these may be worn on a chain or "lanyard" around the neck, but the type of chain that may be used is restricted. The chain must be "gold, silver, plain dark navy or plain black" and logos are not permitted except those that say "SkyWest Airlines." Brooks Dec. ¶ 5, Exh. A, § 24.

Plaintiffs have claimed that this policy has been enforced discriminatorily so that only ALPA lanyards have been banned. That is not true. The policy has been enforced with respect to lanyards bearing the logos of sports teams, colleges, aircraft manufacturers, and the like. Declaration of Roy Glassey ("Glassey Dec.") ¶ 4, Livingston Dec. ¶ 16, Brooks Dec. ¶ 6.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

24

1    Some of the Plaintiffs allege that they have seen other pilots wearing non-standard lanyards

2  other than the ALPA lanyard. Boehm Dec. ¶ 9; Dow Dec. ¶ 12; Bharath Dec. ¶ 4  This does not

3  establish discriminatory enforcement. Obviously, management cannot correct what it does not see.

4  With over 2,600 pilots, 140 stations, and just 10 Chief Pilots, there well could be times when pilots

5
6  get away with wearing a non-standard lanyard. That does not mean the policy is not being enforced

7  across-the-board, however. Moreover, even if there have been lapses in the enforcement of the

8  policy, that does not demonstrate disparate treatment vis-à-vis ALPA supporters. *See Hertz Corp.*,

9  305 NLRB 487, 488 (1991) ("[O]ccasional lapses in enforcement . . . show only that the [employer]

10  had problems in attempting to carry out its uniform policy effectively. . . . [O]ccasional lapses in an

11  otherwise consistent application of a detailed uniform policy do not persuade us that there was

12
13  inconsistent and discriminatory enforcement.").

14    SkyWest made this very point when ALPA first raised the lanyard issue, in the fall of 2006.

15  At that time, Plaintiff Bharath contacted SkyWest General Counsel Todd Emerson to complain that

16  the company was only prohibiting ALPA lanyards. Mr. Emerson responded that non-standard

17  lanyards of all types are prohibited by the uniform policy, but that he would look into his concerns.

18  He did so, and confirmed that the policy was being applied to all non-standard lanyards. In a later

19
20  call, Mr. Bharath, joined by others on the Organizing Committee, stated that he was still seeing non-

21  conforming lanyards being worn. Mr. Emerson specifically asked them to report to him if they saw

22  anyone wearing a nonconforming lanyard, or a chief pilot engaged in selective enforcement, and he

23  would take care of it. Mr. Emerson never received any follow up complaints from them, or anyone

24  else for that matter, regarding alleged discriminatory enforcement regarding lanyards. Emerson Dec.

25  ¶ 7.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

26
27
28

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. C 07-2688 CRB

b. **SkyWest Has Not Discriminated Against Plaintiffs With Respect To General Bulletin Board Postings**

Plaintiffs also claim that Defendant has violated Section 2, Third and 2, Fourth by prohibiting pro-ALPA postings on general bulletin boards. However, even under the more expansive "rights" of the NLRA, it has been determined that "there is <u>no</u> statutory right of an employees or a union to use an employer's bulletin board." *Honeywell, Inc.*, 262 NLRB 1402 (1982) (emphasis added), *enf'd*, 722 F.2d 405 (8th Cir. 1983). <u>Only</u> where the employer permits non-work related postings will it be required to also permit union-related postings. *Id.*

In this case, management has prohibited or removed non-ALPA postings as well as ALPA postings from its bulletin boards. Glassey Dec. ¶ 3. Plaintiffs claim that they have seen non-business related postings on bulletin boards, such as advertisements for massages or river rafting trips. Dow Decl. ¶ 4. Again, with over 10,000 employees in over 140 cities, it obviously is impossible to monitor with 100% accuracy every single bulletin board every minute of the day to ensure compliance, but such is not the legal requirement. *See Hertz*, 305 NLRB at 488. Without a showing that ALPA postings have somehow been exclusively targeted for removal, there is no discriminatory treatment.

C. **Plaintiffs Have Not Established The Required Irreparable Harm Or That The Balance Of Hardships Tips Sharply In Their Favor**

1. **Plaintiffs Have Not Established That They Have Been Irreparably Harmed**

It is well-established that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Svcs and Garcia v. Baldridge et al.*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original). Moreover, "[a] party experiencing a legal harm should not delay in either commencing an action or in seeking preliminary injunctive relief.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

26

1    Courts will assess the length of the movant's delay in assessing whether to grant injunctive relief."

2    *Moore's Fed. Practice* § 65.22(1)(b) (3d ed. 2006). For both of these reasons, Plaintiffs fail to

3    satisfy the injury prong of the preliminary injunction test.

4           Plaintiffs' primary claim of irreparable injury is that they have been "deterred" in discussing

5    the ALPA organizing drive with SkyWest pilots, and "denied effective means of communicating

6    with other SkyWest pilots about ALPA." Memorandum at 20. That subjective assertion is not

7    reasonable in light of the facts.

8

9           SkyWest has taken a remarkably "hands off" approach in response to the ALPA campaign.

10   SkyWest has not, for example, engaged in any sort of "counter campaign" with the SkyWest pilots.

11   It has not sent <u>any</u> communications or information to the pilots, and has held no meetings with the

12   pilots to discuss the ALPA drive. Emerson Dec., ¶ 6. The pilots have been free to communicate

13   their views at SkyWest facilities in a variety of ways, including discussing the issue in crew lounges

14   and on the SkyWest intranet forums. Livingston Dec., ¶ 14; Emerson Dec., ¶¶ 8, 9. SkyWest has

15   not increased the role of SAPA, nor advertised it to the pilots as an alternative to ALPA. Emerson

16   Dec., ¶ 6. SAPA itself is neutral regarding the ALPA campaign, and its own computer forums have

17   been used as a vehicle for ALPA supporters to get out their message as well. Livingston Dec., ¶¶

18   12, 5. This includes the allegedly "chilled" members of the Organizing Committee. Livingston

19   Dec., ¶ 5. In contrast to the silence of SkyWest (and SAPA), ALPA and its supporters have engaged

20   in a blitzkrieg of communications to the pilots, using many different methods: telephone, email,

21

22   website, home mailings, and surveys, just to name a few.

23

24           What also is telling is the absence of the types of allegations that generally are found in

25   interference cases. Plaintiffs have not asserted that any SkyWest pilot has been discharged – or

26   otherwise disciplined, for that matter – because of their support for ALPA, their wearing of ALPA

27   lanyards, or their posting of unauthorized materials on the bulletin boards. Nor have they claimed

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

27

1    that SkyWest has engaged in surveillance or interrogation of union adherents, or launched a letter-

2    writing campaign to the pilots designed to "overwhelm" their will. All SkyWest has done is try to

3    enforce its policies uniformly, and continue to deal with SAPA in the same manner that it has for the

4    last several years.

5        The other alleged irreparable harm Plaintiffs cite is to the organizing campaign itself.

6    Memorandum at 20. The only support offered for this contention is the opinion of ALPA's Manager

7    of Representation, who hardly can be considered neutral in this matter, that, without relief, the

8    "energy and momentum" of the ALPA campaign may dwindle. *Id.* This is speculative in the

9    extreme. There are numerous reasons why support for ALPA's campaign may be waning, most

10   obviously a lack of interest on the part of the SkyWest pilots. There is no probative evidence that

11   anything SkyWest has done has had any effect on the progress of the ALPA campaign.

12       Plaintiffs have made no effort to "strictly tailor" their requested injunctive relief to their

13   alleged imminent harm: their claimed inability to stage an effective showing of "solidarity" without

14   being able to wear ALPA lanyards. Rather, as noted, they have attempted to obtain unprecedented

15   (and legally unwarranted) access to SkyWest pilots without showing how that relates to the alleged

16   "substantial and irreparable injury" that supports its requested injunctive relief. This violates the

17   NLGA. *See Aluminum Workers*, 696 F.2d at 446.

**2.    SkyWest And Its Pilots Would Suffer Substantial Countervailing Harm In The Event Of A Mandatory Preliminary Injunction**

Plaintiffs' blithely state that there would be no "conceivable harm" to SkyWest from the

issuance of an injunction. Memorandum at 22. On the contrary, the issuance of preliminary

injunctive relief would create substantial harm to SkyWest by tainting SkyWest with the specter of

illegality. As one court noted in denying preliminary injunctive relief:

> to grant the preliminary relief sought by the EEOC at this stage of the
> investigation would stigmatize Howard University when there is no
> evidence whatsoever to support the implication, which would

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

> necessarily flow from the issuance of a preliminary injunction, that
> Howard University was intimidating or threatening its students and
> employees.   To order preliminary relief would result in harm to the
> university which would outweigh any harm the EEOC might suffer if
> forced to resort to more forceful techniques to complete its
> investigation.   As the court wrote in *Anchor Hocking*, supra:
> "[O]ne reason the courts have traditionally been reluctant to issue
> preliminary injunctions is that 'judicial intervention before the merits
> have been finally determined frequently imposes a burden on
> defendant that ultimately turns out to be unjustified.'"

*EEOC v. Howard Univ.*, 1983 U.S. Dist. LEXIS 16246, *12 (D.D.C. June 14, 1983), *quoting EEOC*

*v. Anchor Hocking Corp.*, 666 F.2d 1037, 1043 (6th Cir. 1981) (*in turn quoting* 11 Wright and

Miller, *Federal Practice and Procedure*, § 2947 at 424 (1972)).

There is no question that ALPA would use that improper taint in its organizing campaign.

Indeed, that may well have been one of the goals of this suit in the first place. Given the broad scope

of Plaintiffs' claims, and the congestion in this District's civil docket, it will be months, if not years,

before this case would come to a full hearing on the merits.  In the interim, ALPA would use the

taint that would be created by preliminary injunctive relief to try to convince SkyWest's pilots that

they need "protection" from the company.  That, in turn, could make the difference between an

ALPA-represented, and a self-represented, workforce.[5]  Were the Court to issue preliminary

injunctive relief, and if an NMB election were held before a final judgment on the merits, the result

could improperly skew SkyWest pilots' views on unionization.  The harm thus caused to SkyWest,

in the form of direct costs (e.g., monetary and manpower investments in collective bargaining) and

---

[5]    There is not, under the RLA, any defined mechanism by which a union can lose its status as
the collective bargaining representative of any particular craft or class of employees. *See In re
Petitions of Chamber of Commerce and IBT for Rule Change*, 14 NMB 347 (1987) (denying petition
for rule change to create decertification procedure); *Alia Royal Jordanian Airlines*, 10 NMB 389
(1983) ("The Board notes that the Railway Labor Act, unlike the National Labor Relations Act, has
no statutory procedure for decertification of a bargaining representative.").

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

loss of productivity (e.g., loss of flexibility and lower morale) would be irreparable and, likely permanent.

## IV.    CONCLUSION

For all of the reasons set forth above, Plaintiffs' motion for a preliminary injunction should be denied in its entirety.

Dated:  May 29, 2007                    WINSTON & STRAWN LLP

                                        By: _____
                                            Robert Spagat

                                        Attorneys for Defendant
                                        SKYWEST AIRLINES, INC.

SF:173357.1

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. C 07-2688 CRB