1   Douglas W. Hall (Admitted *Pro Hac Vice*)
    Ford & Harrison LLP
2   1300 Nineteenth Street, N.W., Suite 700
    Washington, DC 20036
3   Telephone:    202.719.2065
    Facsimile:    202.719.2077
4   Email: dhall@fordharrison.com

5   Robert Spagat (SBN: 157388)
    WINSTON & STRAWN LLP
6   101 California Street
    San Francisco, CA  94111-5894
7   Telephone:    415-591-1000
    Facsimile:    415-591-1400
8   Email: rspagat@winston.com

9   Attorneys for Defendant
    SKYWEST AIRLINES, INC.
10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                 SAN FRANCISCO DIVISION

14

15  SKYWEST PILOTS ALPA ORGANIZING          Case No. C-07-2688 CRB
    COMMITTEE, et al.,
16                                          **DEFENDANT'S AMENDED OPPOSITION
                   Plaintiffs,              TO MOTION FOR PRELIMINARY
17                                          INJUNCTION**
         vs.
18                                          Preliminary Injunction Hearing:  June 7, 2007
    SKYWEST AIRLINES, INC.,
19
                   Defendant.
20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ..................................................................................................1

II.    STATEMENT OF FACTS ....................................................................................3

       A.     Background ...............................................................................................3

       B.     ALPA's Latest Organizing Campaign – And The Company's Lack of Any
              Counter-Campaign....................................................................................4

       C.     Shortly Before Filing Suit, ALPA Announces It Has Enough Cards To File
              For An NMB Election.................................................................................6

III.   ARGUMENT.........................................................................................................6

       A.     Plaintiffs Are Not Entitled To The Extraordinary Remedy Of Mandatory
              Preliminary Injunctive Relief....................................................................6

       B.     Plaintiffs' Claims Implicate A Representation Dispute Subject To The
              Exclusive Jurisdiction Of The NMB..........................................................7

       C.     Plaintiffs Cannot Show A Substantial Likelihood Of Success On Its
              Substantive Claims...................................................................................13

              1.     There Is Nothing Inappropriate About SAPA's Access To The
                     SkyWest Pilots..............................................................................14

                     a.     Section 2, Fourth Prohibits Employer Domination Of Labor
                            Unions, Not Cooperative Alternatives To The Adversarial
                            Model Of Labor Relations ................................................15

                     b.     SAPA Independently Represents The SkyWest Pilots In A
                            Cooperative Relationship That Is An Alternative To The
                            Traditional Adversarial Model Of Labor Relations.............16

                     c.     Plaintiffs Cannot Establish Unlawful Domination Of SAPA By
                            SkyWest ...........................................................................18

                     d.     Regardless Of SAPA's Status, Plaintiffs Have No Legal Right
                            To The Same Access As SAPA ..........................................19

              2.     Plaintiffs Cannot Show That The Facts And Law Clearly Favor Their
                     Claim That SkyWest Has Discriminated Against Them Based On
                     Their Views About ALPA Representation .......................................21

                     a.     SkyWest Has Properly Enforced Its Uniform Policy ..........21

                     b.     SkyWest Has Not Discriminated Against Plaintiffs With
                            Respect To General Bulletin Board Postings......................25

       D.     Plaintiffs Have Not Established The Required Irreparable Harm Or That The
              Balance Of Hardships Tips Sharply In Their Favor ..................................25

ii

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    1.    Plaintiffs Have Not Established That They Have Been Irreparably
          Harmed.................................................................................................................25

2    2.    SkyWest And Its Pilots Would Suffer Substantial Countervailing
3          Harm In The Event Of A Mandatory Preliminary Injunction............................27

4  IV.  CONCLUSION.............................................................................................................28

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5894**

DEFENDANT'S AMENDED OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION     CASE NO.  C 07-2688 CRB
SF:173796.1

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Fedederal Express Corp.,*
   470 F. Supp. 1356 (W.D. Tenn. 1979)..................................................................22

*Adams v. Federal Express Corp.,*
   1975 U.S. Dist. LEXIS 16267 (W.D. Tenn. 1975), *aff'd,*
   547 F.2d 319 (6th Cir. 1976) .............................................................. 13-14, 23

*Air Line Pilots Assocs., Int'l v. Texas Int'l Airlines, Inc.,*
   656 F.2d 16 (2d Cir. 1981)...............................................................................9

*Air Lines Employees Assoc., Int'l v. Republic Airlines, Inc.,*
   798 F.2d 967 (7th Cir. 1986), *cert. denied,* 479 U.S. 962 (1986)............................8

*Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.,*
   406 F. Supp. 492 (N.D. Cal. 1976) ............................................................ Passim

*Alia Royal Jordanian Airlines,*
   10 NMB 389 (1983)........................................................................................28

*Aluminum Workers Int'l Union v. Consol. Aluminum Corp.,*
   696 F.2d 437 (6th Cir. 1982) .......................................................................7, 27

*American Train Dispatchers Ass'n v. Denver & R.G.W.R. Co.,*
   614 F. Supp. 543 (D. Colo. 1985)............................................................. 10 -12

*Anderson v. United States,*
   612 F.2d 1112 (9th Cir. 1979) .........................................................................7

*Angotti v. Rexam, Inc.,*
   2006 U.S. Dist. LEXIS 42104 (N.D. Cal. June 14, 2006) .......................................7

*Barthelemey v. Air Lines Pilots Ass'n,*
   897 F.2d 999 (9th Cir. 1990) ...................................................... 2, 15-16, 18

*BASF Wyandotte Corp. v. Int'l Chemical Union,*
   791 F.2d 1046 (2d Cir. 1986)..........................................................................19

*Bhd. of Ry., Airline & S.S. Clerks v. Philadelphia, B. & N.E. R.R. Co.,*
   428 F.Supp. 1308 (E.D. Pa. 1977) ...................................................................14

*Burger King Corp. v. NLRB,*
   725 F.2d 1053 (6th Cir. 1984) ........................................................................23

*Caribbean Marine Svcs and Garcia v. Baldridge et al.,*
   844 F.2d 668 (9th Cir. 1988) ..........................................................................25

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

iv

*Coppus Eng'g Corp. v. NLRB,*
  240 F.2d 564 (1st Cir. 1957)..................................................................19

*Delta Air Lines,*
  30 NMB 102 (2002)............................................................................14

*EEOC v. Howard Univ.,*
  1983 U.S. Dist. LEXIS 16246 (D.D.C. June 14, 1983)...........................27

*General Comm. Of Adjustment v. Missouri-Kansas-Texas R. Co.,*
  320 U.S. 323 (1943)............................................................................8

*Hertz Corp.,*
  305 NLRB 487 (1991) .................................................................... 24-26

*Hertzka & Knowles v. NLRB,*
  503 F.2d 625 (9th Cir. 1974), *cert. denied*, 423 U.S. 875 (1975)...................... 16-17

*Honeywell, Inc.,*
  262 NLRB 1402 (1982), *enf'd*, 722 F.2d 405 (8th Cir. 1983)......................25

*Horizon Air Indus. v. NMB,*
  232 F.3d 1126 (9th Cir. 2000), *cert. denied*, 533 U.S. 915 (2001)................... 8, 13-14

*Horizon Airlines,*
  24 NMB 458 (1997)............................................................................21

*Immigration & Naturalization Serv. v. Fed. Labor Relations Auth.,*
  855 F.2d 1454 (9th Cir. 1988) ......................................................... 22-24

*In re Petitions of Chamber of Commerce and IBT for Rule Change,*
  14 NMB 347 (1987)............................................................................28

*Int'l Ass'n of Machinists v. Alitalia Airlines,*
  600 F.Supp. 268 (S.D.N.Y. 1984), *aff'd,* 753 F.2d (2d Cir. 1985)..................20

*Int'l Bhd. of Teamsters v. America W. Airlines,*
  156 LRRM 2490 (D. Ariz. 1997)........................................................11

*Int'l Bhd. of Teamsters v. Texas Int'l Airlines Inc.,*
  717 F.2d 157 (5th Cir. 1983) ................................................................8

*Int'l Fed. of Flight Attendants v. Cooper,*
  141 F.3d 900 (8th Cir. 1998) ................................................................8

*ITT Auto. v. NLRB,*
  188 F.3d 375 (6th Cir. 1999) ..............................................................13

*Johnson v. Express One,*
  944 F.2d 247 (5th Cir. 1991) ..............................................................22

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

v

*Konop v. Hawaiian Airlines, Inc.*,
   302 F.3d 868 (9th Cir. 2002), *cert. denied*, 537 U.S. 1193 (2003)...........................................12

*Lake City Foundry Co. v. NLRB*,
   432 F.2d 1162 (7th Cir. 1970) ...............................................................................18

*Miller v. Norfolk S. R. Co.*,
   183 F. Supp.2d 996 (N.D. Ohio 2002)...................................................................8

*Modern Plastics Corp. v. NLRB*,
   379 F.2d 201 (6th Cir. 1967) ...........................................................................16, 19

*NLRB v. BASF Wyandotte Corp.*,
   798 F.2d 849 (5th Cir. 1986) ...........................................................................18-19

*NLRB v. Harrah's Club*,
   337 F.2d 177 (9th Cir. 1964) ..............................................................................23

*NLRB v. Homemaker Shops, Inc.*,
   724 F.2d 535 (6th Cir. 1984) ..............................................................................18

*NLRB v. Post Publishing Co.*,
   311 F.2d 565 (7th Cir. 1962) ..............................................................................19

*Northeastern Univ.*,
   601 F.2d 1208 (1st Cir. 1979)........................................................................15, 19

*Northeastern Univ.*,
   601 F.2d 1214 (1ST Cir. 1979) ...........................................................................19

*Northwest Airlines*,
   14 NMB 49 (1986)...............................................................................................21

*Northwest Airlines*,
   19 NMB 94 (1991)...............................................................................................21

*People Express Pilot Merger Comm. v. Texas Air Corp.*,
   1987 U.S. Dist. LEXIS 9293 (D. N.J. Oct. 14, 1987), *aff'd without pub. op.*,
   958 F.2d 364 (3rd Cir. 1992) ..............................................................................19

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   2007 U.S. App. LEXIS 11420 (9th Cir. May 16, 2007) ........................................6

*Railway Labor Execs' Ass'n v. Wheeling & L. E. R. Co.*,
   756 F. Supp. 249 (E.D. Va.), *aff'd without pub. op.*, 943 F.2d 49 (4th Cir. 1991)..................11

*Railway Labor Executives' Ass'n v. NMB*,
   29 F.3d 655 (D.C. Cir. 1994) ..............................................................................12

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

*Russell v. NMB*,
  714 F.2d 1332 (5th Cir. 1983), *cert. denied*, 467 U.S. 1204 (1984)........................19

*SkyWest Airlines, Inc.*,
  26 NMB 485 (1999)..................................................................................................4

*SkyWest Airlines, Inc.*,
  31 NMB 348 (2004)................................................................................................11

*Stanley v. Univ. of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994), *cert. denied*, 528 U.S. 1022 (1999)........................7

*Switchmen's Union of N. America v. NMB*,
  320 U.S. 297 (1943)................................................................................................7

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
  316 F.2d 804 (9th Cir. 1963), *cert. denied*, 375 U.S. 821 (1963)........................6

*Texas & N.O. R.R. v. Brotherhood of R.R. & Steamship Clerks*,
  281 U.S. 548 (1930)..........................................................................................12-14

*Texidor v. Ceresa*,
  590 F.2d 357 (1st Cir. 1978)................................................................................10

*Trans World Airlines v. IFFA*,
  489 U.S. 426 (1989)..............................................................................................22

*United Air Lines*,
  1995 NMB LEXIS 111 (1995) ............................................................................20

*United Transp. Union v. Gateway Western R. Co.*,
  78 F.3d 1208 (7th Cir. 1996) ................................................................................9

*United Transp. Union v. United States*,
  987 F.2d 784 (D.C. Cir. 1993)..............................................................................9

**STATUTES**

29 U.S.C. § 157..........................................................................................................22

45 U.S.C. § 2..................................................................................................... Passim

45 U.S.C. § 151..........................................................................................................19

45 U.S.C. § 152......................................................................................................8, 20

29 U.S.C. § 151..........................................................................................................14

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

vii

29 U.S.C. § 101 .................................................................................................................7

5 U.S.C. § 7102..............................................................................................................23

29 C.F.R. § 1206.2 ...........................................................................................................1

**REGULATIONS**

*Moore's Fed. Practice* § 65.22(1)(b) (3d ed. 2006) ....................................................25

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

DEFENDANT'S AMENDED OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION    CASE NO.  C 07-2688 CRB

SF:173796.1

## I.    INTRODUCTION

Under rules set for the by the National Mediation Board ("NMB"), the Air Line Pilots Association, International ("ALPA") has gathered enough signature cards from SkyWest pilots to file for an election. This will be the third such election over the past 15 years, with SkyWest pilots having rejected unionization every time prior. However, instead of filing their cards with the NMB, ALPA has chosen to file a lawsuit, claiming that its organizing efforts have been chilled by SkyWest's uniform policies and the existence of the SkyWest Airlines Pilot Association ("SAPA"). Of course, ALPA's admission that it has gathered the requisite number of signature cards from the pilot group flies in the face of its own arguments that it needs mandatory injunctive relief. Not only is there absolutely no merit to the Plaintiffs' claims that SkyWest has violated the RLA, this Court is not even the proper forum to address these issues. Plaintiffs' rush on this forum is an attempt to escape the federal agency and specific law that truly governs this dispute.

Since 1934, the National Mediation Board ("NMB") has had the statutory authority to resolve representation disputes under the RLA, including claims of interference with representation rights like the Plaintiffs have alleged. A union seeking to represent employees of an air carrier applies for an election with the NMB, and must demonstrate a sufficient showing of interest among the targeted employee group (in this case, pilots). 29 C.F.R. § 1206.2. Any complaints the union has about employer conduct during the period prior to the election can be raised with the NMB, which has extensive experience and nearly unlimited authority in resolving representation disputes. Indeed, this Court has held that the NMB has been given "plenary power ... to deal with employer influence in the designation of representatives, rendering judicial intervention unnecessary." *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc. ("AMFA v. UAL")*, 406 F. Supp. 492, 503 n.11 (N.D. Cal. 1976).

In *AMFA v. UAL*, this Court held that the courts have <u>no</u> jurisdiction to decide interference allegations in advance of an election, except in those rare cases where the employer's conduct was so pervasive and egregious that it made it impossible for a union to obtain the necessary showing of employee support to invoke the NMB's services. 406 F. Supp. at 508 n.25. With ALPA proclaiming that it has surpassed the showing of interest required for it to file an application with the

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1

1  NMB, there is simply no reason to be here before the Court. As the Plaintiffs have sought relief in

2  the wrong forum, their motion must be denied.

3      One of the reasons Plaintiffs have avoided the NMB is the relief they seek is truly

4  unprecedented in RLA jurisprudence. They seek "captive audience" access to the SkyWest pilots, at

5  mandatory training sessions on company time and also through the email system, for the sole

6  purpose of promoting the union organizing drive. No organization seeking to represent employees

7  under the RLA is entitled to such remarkable access and SkyWest has never allowed it.

8      Plaintiffs claim that they are entitled to "equal access" as SAPA gets to the pilots, based on

9  their theory that SAPA is an illegitimate "company union." However, there is nothing improper

10  under the RLA in employees forming a committee to facilitate their relationship with management.

11  Indeed, the Ninth Circuit has recognized – in a case involving a Section 2, Fourth claim against

12  ALPA – that "'changing conditions in the labor-management field seem to have strengthened the

13  case for providing room for cooperative employer-employee arrangements as alternatives to the

14  traditional adversary model.'" *Barthelemey v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1009 (9th Cir.

15  1990) (citation omitted).

16      The cooperative approach is precisely the model that SkyWest and SAPA have adopted. All

17  access that SAPA has had to the pilots has been for the purpose of carrying out its functions on their

18  behalf, not for campaigning regarding a union drive. Indeed, SAPA's position on the ALPA

19  organizing drive is the same as it has been in past organizing efforts: neutral. Plaintiffs do not cite

20  (and SkyWest is not aware of) any cases in which a court granted union supporters "equal access"

21  with representatives of an existing organization, whether that organization was characterized as a

22  "company union," employee committee, or previously-certified representative. On the contrary, this

23  Court dismissed an "equal access" request in *AMFA v. UAL* on the ground it involved a

24  representation dispute, even though the challenging union had alleged that the carrier had failed to

25  ensure that the incumbent was not using its access to combat the challenger's campaign. 406 F.

26  Supp. at 508-09. What Plaintiffs have asked this Court to do would be a breathtaking departure from

27  existing RLA jurisprudence.

28      Finally, the Plaintiffs cannot make out the elements of even basic injunctive relief,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

2

1    notwithstanding the other obstacles. Plaintiffs are required to show that, based on the totality of the

2    circumstances, the employer's actions "corrupted" or "overrode" the will of the employees.  Far

3    from attempting to override its employees' will, SkyWest has taken a remarkably hands-off

4    approach to the ALPA drive.  SkyWest has not run <u>any</u> campaign of its own in response to the

5    ALPA drive: no letters to the pilots, no fliers on bulletin boards, no informational meetings, and no

6    prohibition against union discussions in crew lounges, break rooms, or on the company's intranet

7    forums.  Nor have Plaintiffs alleged that SkyWest has engaged in the type of conduct that generally

8    forms the basis of RLA interference claims, such discharge or discipline of union supporters,

9    surveillance, or interrogation.  All SkyWest has done is enforce its policies regarding pilot uniforms

10    and bulletin board access.

11         Irreparable harm is similarly untenable.  Claiming here that they have been "chilled" from

12    expressing support for ALPA, Plaintiffs ignore that they have maintained websites, a telephone

13    "hotline," sent out emails, home mailings, and surveys – and even launched a telephone blitz that,

14    ALPA claims, reached 1,200 SkyWest pilots in a 24-hour period.  Again, how can there be

15    irreparable harm at this stage when Plaintiffs admit they have had enough access to the pilots to

16    gather more than enough signature cards to file for an election?  If, however, ALPA obtains the

17    unprecedented relief it seeks, SkyWest and its pilots will suffer irreparable harm.  SkyWest will be

18    forced to halt FAA-required training and pay its new hire pilots to sit through an hour-long

19    commercial about ALPA.  Its private property will be appropriated for a third party's interests.  If

20    ALPA leverages these undue advantages enough to win the election, ALPA will become a virtually

21    irreversible representative of SkyWest pilots, because the NMB rules do not provide a formal

22    process for decertifying an unwanted union.  All this could happen before we ever reach a trial on

23    the merits.

24         For these and the many other reasons discussed herein, Plaintiffs are not entitled to any of the

25    relief they seek in their motion for a preliminary injunction.

26    **II.    STATEMENT OF FACTS**

27         **A.    Background**

28         SkyWest is a regional air carrier headquartered in St. George, Utah.  It operates as Delta

3

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  Connection, United Express and Midwest Connect, and serves 140 cities in 39 states and 3 Canadian

2  provinces. SkyWest employs approximately 10,000 employees, including 2,651 pilots. Declaration

3  of Todd Emerson ("Emerson Dec."), ¶ 2.

**B.    ALPA's Latest Organizing Campaign – And The Company's Lack of Any Counter-Campaign**

SkyWest's pilot group has long been an organizing target of ALPA. In 1999, ALPA lost a

representation election in which it was trying to become the collective bargaining representative of

the SkyWest pilots. *See SkyWest Airlines, Inc.*, 26 NMB 485 (1999). According to Plaintiffs, the

SkyWest Pilots ALPA Organizing Committee was formed in October 2005 to launch yet another

organizing drive. Dow Dec. ¶ 7. The Organizing Committee informed SkyWest about ALPA's

latest effort in mid-2006. Emerson Dec., ¶ 5.

SkyWest has not instituted any "campaign" of any sort in response to the ALPA organizing

effort. It has not sent out <u>any</u> communications to the pilots addressing the issue in any way, nor has

it held any meetings with pilots to discuss the ALPA drive or the company's views on it. *Id.* ¶ 6.[1]

Ironically, ALPA devoted an entire "special edition" of its "SkyWest ALPA Update" newsletter

telling the pilots what types of things they could expect to hear in a company campaign – a campaign

that never came. *See* Declaration of Jeffrey T. Rickman ("Rickman Dec."), Exh. A, pp. 17-22.

ALPA, on the other hand, has engaged in a high-profile public campaign. In the months

since the latest campaign began, ALPA developed numerous and varied ways of getting its message

to SkyWest pilots. ALPA created an extensive website dedicated to its organizing efforts at

SkyWest. Among other things, the website contains information about the campaign, including

upcoming organizational meetings; it solicits SkyWest pilots to provide their home addresses,

telephone numbers, and email addresses; it lists the 54 members of the Organizing Committee and

allows SkyWest pilots to email any committee member with the click of a button; and it allows a

SkyWest pilot to download a union authorization card if desired. The site is updated frequently;

documents relating to this lawsuit appeared on the site shortly after they were filed. *See*

---

[1]    Plaintiffs note that SkyWest has a "Union Free Statement" in its employee handbook.
Memorandum at 3. This statement existed well before the current ALPA campaign and was not
created in response thereto. Nor is there anything unlawful about an employer expressing its opinion
that it prefers to remain union-free.

4

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  www.skywestalpa.org.

2      The website also discloses several of the other methods ALPA has used to communicate with

3  SkyWest pilots – and touts the effectiveness of these means of communication. There are 10 issues

4  of the aforementioned SkyWest ALPA Update newsletter on the site, dating from May 2006 to April

5  2007. In the February 2007 issue, the Plaintiffs bragged that they had been able to contact 1,200

6  SkyWest pilots – almost half the entire workforce – by telephone in a single 24-hour period.

7  Rickman Dec., Exh. A, p. 10. Other avenues, noted on the website, that ALPA has employed to

8  communicate with SkyWest pilots include:

9      A toll-free ALPA SkyWest telephone "hotline."

10     "All pilot" telephone calls with ALPA national officers.

11     The periodically-published "SkyWest ALPA Update."

12     Telephonic and electronic surveys.

13     Numerous pilot information meetings held at various locations.

14     Rickman Dec., Exh. A, pp. 3, 4, 5-7, 10, 12.

15     The website also shows all of the past and upcoming organizing events. Contrary to what the

16  Plaintiffs have told the Court concerning their "inability" in the summer months to meet with

17  SkyWest pilots, there are seven organizational meetings already scheduled for the month of June.

18  Rickman Dec., Exh A, p. 4.

19     ALPA and its supporters have numerous other ways of communicating with SkyWest pilots.

20  Ironically, one of these is through a website maintained by SAPA – the organization that the

21  Plaintiffs berate as a "company union." SAPA maintains a site on the Internet called

22  sapaforums.org, that is accessible only to non-management SkyWest pilots. That site is a hotbed of

23  discussion regarding the ALPA organizing drive, and numerous members of the ALPA Organizing

24  Committee post pro-ALPA messages on that site. Declaration of David Livingston ("Livingston

25  Dec."), at ¶ 5. Similarly, SkyWest's own intranet system contains forums that have several union

26  threads that have been up and running for two years, without the company removing them.

27  Employees are free to post whatever they want about unions, pro or con. One thread is entitled "We

28  Should Start A Union" which was posted by an employee in December 2005. According to the

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

5

1    counter on the page, the thread has been viewed 11,709 times with 208 replies posted by other

2    employees, one as recently as May 24. Emerson Dec. ¶ 8. Pilots also have been given free reign to

3    discuss union issues in the crew lounges, and have done just that. Livingston Dec. ¶ 14, Emerson

4    Dec. ¶ 9. The Organizing Committee also has communicated with pilots about the ALPA drive via

5    email and mailings to pilots' homes. Livingston Dec. ¶ 15.

### C.    Shortly Before Filing Suit, ALPA Announces It Has Enough Cards To File For An NMB Election

A recent SkyWest ALPA Update on the website, dated April 2007, contained an article

entitled "Moving from Cards to Ballots: The Next Step in the National Mediation Board's Election

and Certification Process." Rickman Dec., Exh. A, pp. 15-16. In that article, ALPA stated that it

already had obtained more than enough signed authorization cards from the SkyWest pilots to meet

the threshold required by the NMB to obtain a representation election. *Id.* at p. 15. ALPA wanted

more cards, it said, so that it could be "better prepared … for the next phase:  the secret ballot

election." Rickman Dec., Exh. A, pp. 15-16.

On May 22, 2007, without filing for an election with the NMB, Plaintiffs filed this suit.

They allege that SkyWest has unlawfully supported SAPA, and that SkyWest interfered with their

expressive activity by discriminating against Plaintiffs on the basis of their support for ALPA.

Complaint, ¶¶ 42-50.

## III.    ARGUMENT

### A.    Plaintiffs Are Not Entitled To The Extraordinary Remedy Of Mandatory Preliminary Injunctive Relief

Preliminary injunctive relief is an "extraordinary remedy," whose purpose is to preserve the

"status quo" between the parties pending final determination of the merits. *See Perfect 10, Inc. v.

Amazon.com, Inc.*, 2007 U.S. App. LEXIS 11420 at *15 (9th Cir. May 16, 2007) (the burden "is

correctly placed on the party seeking to demonstrate entitlement to the extraordinary remedy of a

preliminary injunction at an early stage of the litigation, before the defendant has had the opportunity

to undertake extensive discovery or develop its defenses"); *Tanner Motor Livery, Ltd. v. Avis, Inc.*,

316 F.2d 804, 808-809 (9th Cir. 1963) ("It is so well settled as not to require citation of authority that

the usual function of a preliminary injunction is to preserve the status quo *ante litem* pending a

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

6

1  determination of the action on the merits."), *cert. denied*, 375 U.S. 821 (1963). The "status quo," in

2  this context, is the last uncontested status which preceded the pending controversy." *Id.* at 809.

3      Here, Plaintiffs do not seek to maintain the status quo *pendente lite*. On the contrary, they

4  seek to dramatically <u>alter</u> the status quo and obtain something that neither they nor any other

5  individual, group or organization at SkyWest has ever had. Most egregiously, they seek an order

6  giving them the right to speak to captive audiences of newly-hired SkyWest pilots during paid work

7  time at required company training sessions, and to use SkyWest's internal company e-mail to send

8  mass e-mails to pilots about the ALPA campaign. Plaintiffs thus are seeking a mandatory

9  injunction, which is "subject to a higher standard than prohibitory injunctions," *Angotti v. Rexam,*

10  *Inc.*, 2006 U.S. Dist. LEXIS 42104, *20 (N.D. Cal. June 14, 2006), and which is "'particularly

11  disfavored.'" *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979) (citation omitted). In

12  such cases, the district court should deny the requested injunctive relief "unless the facts and law

13  clearly favor the moving party." *Id. Accord Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir.

14  1994), *cert. denied*, 528 U.S. 1022 (1999).

15      Moreover, because Plaintiffs seek an injunction involving a labor dispute, the Court must

16  consider whether the requested injunctive relief satisfies the requirements of the Norris LaGuardia

17  Act, 29 U.S.C. §§ 101 *et seq.* ("NLGA"). Resort to equitable relief in this context "is an

18  extraordinary step that courts must not take lightly." *Aluminum Workers Int'l Union v. Consol.*

19  *Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982). In view of the extraordinary nature of

20  injunctive relief, the NLGA requires that, where granted, it must be "strictly tailored to accomplish

21  only that which the situation specifically requires." *Aluminum Workers*, 696 F.2d at 446 (citing

22  NLGA Section 9).

23  **B.    Plaintiffs' Claims Implicate A Representation Dispute Subject To The Exclusive**
         **Jurisdiction Of The NMB**

24

25      The right of employees to organize under the RLA is "protected by § 2, Ninth, which gives

26  the [NMB] the power to resolve controversies concerning it." *Switchmen's Union of N. America v.*

27  *NMB*, 320 U.S. 297, 300-01 (1943). Section 2, Ninth states that if any dispute arises "among a

28  carrier's employees as to who are the representatives of such employees designated and authorized

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

7

1    in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon

2    request of either party to the dispute, to investigate such dispute and to certify to both parties in

3    writing [who the NMB finds is the proper representative]." 45 U.S.C. § 152, Ninth. The Supreme

4    Court has noted that "[h]owever wide may be the range of jurisdictional disputes embraced within §

5    2, Ninth, Congress did not select the courts to resolve them. To the contrary, it fashioned an

6    administrative remedy and left that group of disputes to the National Mediation Board. If the present

7    dispute falls within § 2, Ninth, the administrative remedy is exclusive." *General Comm. Of*

8    *Adjustment v. Missouri-Kansas-Texas R. Co.*, 320 U.S. 323, 337 (1943).

9         Section 2, Ninth gives the NMB extensive, virtually unreviewable, authority to decide how it

10   will carry out its statutory duty of determining the employees' choice of representative. *Horizon Air*

11   *Indus. v. NMB*, 232 F.3d 1126, 1131 (9th Cir. 2000) (federal court jurisdiction over NMB actions is

12   "'one of the narrowest known to law'"), *cert. denied*, 533 U.S. 915 (2001) (citation omitted). This

13   includes making determinations as to whether the employees' choice of representative was made

14   "without interference, influence, or coercion exercised by the carrier." 45 U.S.C. § 152, Ninth.

15   Courts have interpreted the prohibition against treading on the NMB's authority broadly. Even

16   where a lawsuit raises an otherwise justiciable claim, if it implicates a representation dispute, it

17   should be dismissed. *See, e.g., Int'l Bhd. of Teamsters v. Texas Int'l Airlines Inc.*, 717 F.2d 157, 161

18   (5th Cir. 1983) (representation disputes are for NMB, and "a court may not entertain an action

19   involving such a dispute even if it arose in the context of other justiciable claims"); *Air Lines*

20   *Employees Assoc., Int'l v. Republic Airlines, Inc.*, 798 F.2d 967, 968 (7th Cir. 1986)

21   (representational dispute falls within the NMB's jurisdiction "even though . . . couched in terms of

22   enforcing the collective bargaining agreement"), *cert. denied*, 479 U.S. 962 (1986); *Int'l Fed. of*

23   *Flight Attendants v. Cooper*, 141 F.3d 900, 903 (8th Cir. 1998) (state law tort claims arising out of

24   union's alleged theft of other union's membership list dismissed because they were "inextricably

25   intertwined" with a representation dispute); *Miller v. Norfolk S. R. Co.*, 183 F. Supp.2d 996, 1000

26   (N.D. Ohio 2002) (dismissing Section 2, Fourth and RICO claims because representation dispute

27   arguably involved; "Plaintiffs should not be able to avoid the Board's jurisdiction or the designated

28   remedial scheme by asserting a RICO claim or a claim for organizational interference.").

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

8

1       All doubts as to whether a representational question exists are cast in favor of deferring to the

2   primary jurisdiction of the NMB. Accordingly, the courts dismiss actions where they cannot rule out

3   the possibility that a representational dispute may exist. *See Air Line Pilots Assocs., Int'l v. Texas*

4   *Int'l Airlines, Inc.*, 656 F.2d 16, 24 (2d Cir. 1981) ("even in such unconventional contexts section 2,

5   Ninth affords the sole and mandatory means for resolving disputes over representation"); *United*

6   *Transp. Union v. Gateway Western R. Co.*, 78 F.3d 1208, 1213-14 (7th Cir. 1996) ("when the precise

7   character of the dispute is in doubt (when the dispute, in other words, is only 'arguably'

8   representational), a federal court should not proceed"). In *United Transp. Union v. United States*,

9   987 F.2d 784 (D.C. Cir. 1993), the court held that it was "frankly uncertain whether the NMB

10  would, or should, have exercised jurisdiction over this case if it had been brought before it." *Id.* at

11  789. Because that made it an arguable representation dispute, the proper course, the court held, was

12  to "recognize that the NMB has primary jurisdiction to determine whether it has exclusive

13  jurisdiction over the dispute." *Id.*

14      In *AMFA v. UAL*, this Court thoroughly analyzed the same issue presented here: the

15  relationship between the NMB's authority to resolve representation disputes (and allegations of

16  election interference arising therein), and the district court's jurisdiction to resolve claims of

17  employer interference in violation of the RLA. AMFA was attempting to replace the International

18  Association of Machinists ("IAM") as the representative of United's mechanics. After it filed its

19  application with the NMB, AMFA and four of the employees it sought to represent filed suit

20  requesting injunctive relief, pending the NMB's determination, to prevent United from: (1)

21  continuing its ongoing negotiations with the IAM; (2) enforcing its no-distribution policy; and (3)

22  permitting representatives from the IAM, but not AMFA, from campaigning on United property.

23  406 F. Supp. at 494.

24      This Court discussed at length the 1934 amendments to the RLA, noting that they

25  "represented a significant increase in the power and authority of the [NMB] in the area of

26  representation disputes." *AMFA v. UAL*, 406 F. Supp. at 498. The amendments also "left unclear"

27  whether the district courts still would play a role in enjoining illegal employer interference. *Id.*

28  AMFA argued that the Court had jurisdiction because the NMB itself had no jurisdiction to resolve

9

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    alleged "unfair labor practices." *Id.* The Court found that plaintiffs' "major premise" was faulty

2    because although the NMB was "not empowered to remedy 'unfair labor practices' as such,

3    Congress has given that Board a great deal of power to regulate such practices indirectly." *Id.* at

4    502-03. "Where such practices are found by the Board to have tainted the designation or election

5    process certification of the union benefiting from the taint can (and must) be withheld. The Board

6    will continue to set aside elections tainted by improper influence until such time as the offending

7    practice ceases." *Id.* at 503. The NMB's interference findings, the Court held, were "binding on the

8    courts." *Id.* at 503 n. 11.

9    This Court also rejected the plaintiffs' argument that the Court had "concurrent"

10   jurisdiction with the NMB when a party raised allegations of unlawful interference, influence, or

11   coercion by the carrier in violation of Section 2, Third. The Court clearly stated that it was only in

12   extreme cases where the employer's actions made it <u>impossible</u> to invoke the NMB's procedures

13   where the Court would have jurisdiction:

> [T]he court believes strongly that <u>if</u> a matter involving allegations of
> carrier interference or coercion, no matter how egregious, can be brought
> before the Board – i.e., if the interference does not preclude access to the
> Board because of the requirements of 29 C.F.R. Section 1206.2 – then the
> Board's jurisdiction is exclusive, without concurrent jurisdiction in the
> federal courts. Stated in the converse, a judicial assertion of jurisdiction is
> appropriate only in those egregious situations of company unionism which
> <u>cannot</u> reach the Board because of the requirements of 29 C.F.R. Sec.
> 1206.2.

21   406 F. Supp. at 508 n.25 (emphasis in original). This Court thus denied plaintiffs' requested

22   preliminary injunction and dismissed for lack of jurisdiction. *Id.* at 508. *See also Texidor v.*

23   *Ceresa*, 590 F.2d 357, 359 (1st Cir. 1978) (following the "careful research and analysis" of *AMFA v.*

24   *UAL* in concluding that "jurisdiction of the federal courts to hear complaints of coercion affecting

25   representation disputes under section 2, Third of the RLA is extremely limited"); *American Train*

26   *Dispatchers Ass'n v. Denver & R.G.W.R. Co.*, 614 F. Supp. 543, 545 (D. Colo. 1985) (dismissing

27   claim that employer violated Section 2, Third by supporting "company union"; "It is up to the Board

28   to determine what level of involvement by the defendant DRGW would amount to illegal

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

10

1    interference, influence, or coercion.").

2        Although ALPA, unlike AMFA, has not filed an application with the NMB, it has

3    proclaimed that it has enough signed authorization cards from SkyWest pilots to do so.  Rickman

4    Dec., Exh. A, p. 15.  Thus, the alleged interference has not "preclude[d] access to the Board."

5    *AMFA v. UAL*, 406 F. Supp. at 508 n.25.  Indeed, SkyWest pilots have not been barred from access

6    to the NMB in the past, either.  In addition to ALPA's loss in 1999, the SkyWest pilots also rejected

7    a unionization effort by the "Unified Pilots Association" in 2004, with only 478 of SkyWest's 1,444

8    pilots at the time voting for any representative.  *SkyWest Airlines, Inc.,* 31 NMB 348 (2004).

9    Tellingly, in neither case did the union raise any election interference objections relating to the

10   SkyWest-SAPA relationship (or on any other ground for that matter).  At the very least, this matter

11   raises an arguable representation dispute, demonstrating that Plaintiffs cannot show likelihood of

12   success on the merits of their claims.[2]

13       Granting the relief Plaintiffs seek would turn the process on its head.  Rather than have the

14   NMB determine whether the challenged actions constitute interference, which would be binding on

15   the courts (*AMFA v. UAL*, 406 F. Supp. at 503 n. 11), Plaintiffs would have this Court make that

16   finding.  That effectively would ensure that the NMB never had an opportunity to decide whether the

17   conduct did, in fact, constitute interference with the employees' organizational rights – even though

18   it is the agency with the authority and expertise to make such decisions.  That result clearly is not

19   consistent with the structure and purpose of the RLA.  *See Railway Labor Execs' Ass'n v. Wheeling*

20   *& L.E. R. Co.,* 756 F. Supp. 249, 252 n.9 (E.D. Va.) ("NMB has exclusive jurisdiction to resolve

21   allegations of interference with elections it conducts"), *aff'd without pub. op.,* 943 F.2d 49 (4th Cir.

22   1991); *American Train Dispatchers,* 614 F. Supp. at 545 (declining to address interference claim;

23   court wanted to "avoid the possibility of conflicting outcomes in this court and before the [NMB]").

24       Moreover, the nature of the relief that the Plaintiffs seek also starkly demonstrates that this

25   ───────────────
     [2]    As SkyWest argued in conjunction with its previously-filed Motion to Dissolve the
26   Temporary Restraining Order, ALPA and the Organizing Committee lack standing to assert any
     claims under Sections 2, Third and Fourth, and thus are not entitled to injunctive relief on that
27   ground as well.  There is no merit to Plaintiffs' allegation that the Organizing Committee has
     "associational standing" either.  *See Int'l Bhd. Of Teamsters v. America W. Airlines,* 156 LRRM
28   2490 (D. Ariz. 1997) (rejecting union's associational standing argument in Section 2, Third and
     Fourth context).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

                                      11

1    matter involves a representation dispute.  Plaintiffs seek to eliminate the longstanding, cooperative

2    relationship that SkyWest and SAPA have enjoyed, and to obtain unfettered and unprecedented

3    access to SkyWest property for the purposes of promoting the ALPA campaign, all while attacking

4    the legitimacy of SAPA.

5         None of the cases cited by Plaintiffs support the unprecedented position they are taking in

6    this case.  None involved a case where, as here, a court has been asked to decide the representation

7    status of an organization that held itself out as the employees' representative for years, negotiated

8    agreements for them, and submitted the agreements to the employees for democratic approval.  *See*

9    Brooks Dec. ¶ 3; Livingston Dec. ¶¶ 7-8.  Nor do any of the RLA "company union" cases they cite

10   involve a challenge to the legitimacy of an existing employee organization by a union on the verge

11   of filing an application to represent those employees – much less one that wants to use access rights

12   of the existing organization to use work time and company property to campaign during the election

13   period.  On the contrary, the decisions they cite in this context all involved cases brought by <u>certified</u>

14   representatives to enforce their bargaining rights in light of subsequent employer efforts to form

15   and/or bargain with competing organizations.  Memorandum at 16 (citing *Virginian Ry. Co. v.*

16   *System Fed. No. 40*, 300 U.S. 515 (1937), *Texas & N.O. R.R. v. Brotherhood of R.R. & Steamship*

17   *Clerks*, 281 U.S. 548 (1930), and *Bhd. Of Ry. & S.S. Clerks v. Virginian Ry. Co.*, 125 F.2d 853 (4th

18   Cir. 1942)).[3]

19        As a final, practical point, of importance to the entire SkyWest pilot group, a holding that this

20   Court lacks jurisdiction or should defer to the NMB's processes would avoid a quandary that

21   Plaintiffs' arguments raise.  If this Court held that SAPA is not a legitimate "representative,"

22   SkyWest would not be bound to continue to honor the agreements negotiated with SAPA.   The vast

23   majority of SkyWest's pilots who are not before this Court might not appreciate the voiding of

24   agreements and rights that they bargained for and approved.  They might well assert that the

---

25   [3]      None of the other three cases Plaintiffs cite in this section of their brief support their
26   argument either.  *Railway Labor Executives' Ass'n v. NMB*, 29 F.3d 655 (D.C. Cir. 1994) dealt with
     the NMB's airline merger policies; *Horizon v. NMB*, 232 F.3d 1126, pertained to a carrier's
27   contention that the NMB had exceeded its authority in resolving a representation dispute; and *Konop
     v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002), *cert. denied*, 537 U.S. 1193 (2003), merely
28   held that a § 2, Fourth unlawful assistance claim could be maintained by a union dissident who
     alleged that his employer had improperly provided information to the existing union – ALPA.

12

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    Plaintiffs, who constitute a minority faction of the entire SkyWest pilot group and are trying to bring

2    in a union that, historically, most pilots have rejected, are not acting in the best interests of the group

3    as a whole. The impact of the requested injunctive relief on the rest of the SkyWest pilot group

4    warrants serious consideration.

5        **C.    Plaintiffs Cannot Show A Substantial Likelihood Of Success On Its Substantive Claims**

6            Even if this case did not implicate a representation dispute, Plaintiffs still would be unable to

7    meet their burden of demonstrating entitlement to basic injunctive relief. To obtain preliminary

8    injunctive relief for alleged violations of Section 2, Third and Fourth, Plaintiffs would have to show

9    a substantial likelihood of success (or serious questions going to the merits) that SkyWest's actions

10    corrupted or overrode the will of the SkyWest pilots. *Texas & N.O. R.R.*, 281 U.S. at 568. This is

11    not an easy standard to meet. In *Adams v. Federal Express Corp.*, 1975 U.S. Dist. LEXIS 16267

12    (W.D. Tenn. 1975), *aff'd*, 547 F.2d 319 (6th Cir. 1976), for example, the plaintiffs alleged that

13    Federal Express had <u>terminated</u> three employees and transferred another employee in retaliation for

14    their union activities; engaged in coercive questioning, surveillance, solicitation of grievances; and

15    made a variety of threats. The district court found that FedEx management "admittedly was not in

16    favor of the union and communicated that disfavor to the employees," and that "it may appear that

17    some or all of the individual plaintiffs were discharged because of their union activities," though the

18    company had advanced "legitimate plausible reasons for their discharge." 1975 U.S. Dist. LEXIS

19    16267 at *6-7. Nevertheless, it denied preliminary injunctive relief because there was no evidence

20    of a "<u>practice of discharging employees</u> that were union advocates," nor did it "appear . . . that the

21    defendant, its agents or employees were engaged in any <u>conscious concerted attempt to violate the ...</u>

22    <u>RLA.</u>" *Id.* (emphasis added). The Sixth Circuit affirmed without questioning the standards used by

23    the district court. 547 F.2d at 322-33. Thus, while an unfair labor practice under the National Labor

24    Relations Act, 29 U.S.C. §§ 151 <u>et seq.</u> ("NLRA"), may be shown if an employer's actions

25    "reasonably tend to coerce," *ITT Auto. v. NLRB*, 188 F.3d 375, 385 (6th Cir. 1999), in *Federal*

26    *Express* the plaintiffs properly were held to a higher standard under the RLA. *See also Texas &*

27    *N.O. R.R.* at 568 (equating the standard to common law fraud, duress and undue influence). This is

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

13

1    because the RLA does not provide the same procedural mechanisms to bring "unfair labor practice"

2    charges.

3    Moreover, the NMB, the federal agency tasked with nearly unfettered administration of the

4    RLA and protecting union representation elections against unlawful interference, influence or

5    coercion, 45 U.S.C. § 2, Ninth, does not use a dogmatic approach to assess election interference

6    claims. Rather, citing *Texas & N.O. R.R.*, it uses a "totality of the circumstances" standard. *Delta*

7    *Air Lines*, 30 NMB 102, 114 (2002). *See also Horizon Air Indus*, 232 F.3d at 1137 ("It is established

8    NMB practice to examine the 'totality of the circumstances' in order to determine whether a carrier

9    has interfered with a representation election."). That standard has been adopted by a least one

10    district court. *Bhd. of Ry., Airline & S.S. Clerks v. Philadelphia, B. & N.E. R.R. Co.*, 428 F.Supp.

11    1308, 1315 (E.D. Pa. 1977).

12    Plaintiffs allege three general types of activity that, they claim, violated Sections 2, Third and

13    Fourth: (1) SAPA's historical access to SkyWest pilots; (2) being prohibited from wearing ALPA

14    identification badge lanyards; and (3) being barred from posting materials on "general" company

15    bulletin boards. The facts, as alleged by Plaintiff and as will be fleshed out herein and at hearing,

16    demonstrate that Plaintiffs cannot show a significant likelihood of success on the merits of their

17    various allegations.

### 1.    There Is Nothing Inappropriate About SAPA's Access To The SkyWest Pilots

18

19    Plaintiffs argue that SkyWest's relationship with SAPA violates the RLA because, in their

20    opinion, SAPA is a "company union." They claim, therefore, that SkyWest has discriminated

21    against them by allowing SAPA access to SkyWest pilots that it has not given to the Plaintiffs.

22    Neither contention is accurate, as a matter of fact or law. Moreover, Plaintiffs' second point (1) does

23    not follow from the first, (2) is without any support in the case law, and, (3) as discussed above,

24    seeks to enmesh the Court in a representation dispute that is within the exclusive jurisdiction of the

25    NMB. Indeed, Plaintiffs offer no explanation for why the issue of SAPA's relationship with

26    SkyWest is being raised now, for the first time, and in the context of a preliminary injunction

27    proceeding. SAPA has been in existence throughout ALPA's organizing drive, and for years before

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

14

1   that.  Emerson Dec. ¶ 3, Livingston Dec. ¶¶ 2, 7.  Nothing has changed recently regarding the

2   SkyWest-SAPA relationship, and Plaintiffs do not claim otherwise.  Emerson Dec. ¶ 6.  If there is

3   something unlawful about that relationship – which there is not – Plaintiffs could have challenged it

4   at any time during the last several years, presumably without the need to do so through expedited

5   proceedings.  Indeed, ALPA could have raised SAPA's existence as a ground for election

6   interference when it lost its last election in 1999.  It never did so, and waived its claim.

7           a.      **Section 2, Fourth Prohibits Employer Domination Of Labor
                    Unions, Not Cooperative Alternatives To The Adversarial Model
8                    Of Labor Relations**

9           The "basic idea" behind Section 2, Fourth was to "prevent employer interference in union

10  organizing, including employer support of company unions." *Barthelemey v. Air Lines Pilots Ass'n*,

11  897 F.2d 999, 1009 (9th Cir. 1990).  Although the courts initially strictly construed the paragraph,

12  they since have recognized that "'changing conditions in the labor-management field seem to have

13  strengthened the case for providing room for cooperative employer-employee arrangements as

14  alternatives to the traditional adversary model.'"  *Id.* at 1017 (*quoting Northeastern Univ.*, 601 F.2d

15  1208, 1214 (1st Cir. 1979)).  As the Ninth Circuit explained in applying the analogous provision of

16  the NLRA, "almost any form of employer cooperation, however, innocuous, could be deemed

17  'support' or 'interference.'"  *Hertzka & Knowles v. NLRB*, 503 F.2d 625, 630 (9th Cir. 1974), *cert.*

18  *denied*, 423 U.S. 875 (1975).[4]  Yet, "such a myopic view" would undermine the purpose of the anti-

19  support provision and the labor law as a whole "because it might prevent the establishment of a

20  system the employees desired."  *Id.*  Thus, the literal prohibition "must be tempered by recognition"

21  of the labor law's objectives.  *Id.*

22          In *Barthelemy*, the Ninth Circuit applied these NLRA decisions to Section 2, Fourth in

23  concluding that the proper inquiry was to distinguish "permissible cooperation" from "prohibited

24  support."  897 F.2d at 1016.  The dividing line, the court held, is whether the employer's assistance

25  "actually deprived [the employees] of a meaningful choice of bargaining representative."  *Id.*  The

26  court stressed that this was a "subjective inquiry," and that it was not the "potential for but the reality

27

28  [4]     Cases interpreting the NLRA on this issue are probative.  *See Barthelemey*, 897 F.2d at 1015
        (relying on cases applying § 8(a)(2) of the NLRA in construing RLA Section 2, Fourth).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   of domination that these statutes are intended to prevent." *Id.* (*citing*, among others, *Modern*

2   *Plastics Corp. v. NLRB*, 379 F.2d 201, 204 (6th Cir. 1967) ("active domination must be shown

3   before a violation is established"). Indeed, the Ninth Circuit noted in another case that this analysis

4   was consistent with the legislative history of the NLRA, as expressed by Senator Wagner:

5        The erroneous impression that the bill expresses a bias for some particular form of union

6   organization probably arises because it outlaws the company-dominated union. Let me emphasize

7   that nothing in this measure discourages employees from uniting on an independent—or company-

8   union basis. . . . The only prohibition is against the sham or dummy union which is dominated by the

9   employer, which is supported by the employer, which cannot change its rules and regulations

10  without his consent, and which cannot live except by grace of the employer's whims.

11  *Hertzka & Knowles*, 503 F.2d at 630.

> **b.    SAPA Independently Represents The SkyWest Pilots In A
>        Cooperative Relationship That Is An Alternative To The
>        Traditional Adversarial Model Of Labor Relations**

14       Notwithstanding Plaintiffs' allegations, SAPA enjoys the support of the SkyWest pilots and

15  is not dominated by SkyWest. SAPA was formed by the pilots, not management. Livingston Dec.

16  ¶¶ 2, 4; Declaration of Klen Brooks ("Brooks Dec.") ¶ 2. Its bylaws were drafted by SAPA

17  representatives without input from SkyWest management. Livingston Dec., ¶ 3. Only SAPA has

18  the authority to modify those bylaws. *Id.* The bylaws also provide a process by which the pilots can

19  choose to dissolve SAPA if they so desire; management has no role in that process. *Id.* The pilots

20  have not done so.

21       There is no SkyWest management presence on SAPA. SAPA consists of a board of 19

22  regional representatives (the "SAPA Representative Board"), who all are non-management pilots,

23  elected by the pilots, and a three-person Executive Board, consisting of a President, Vice President,

24  and Secretary, elected from the ranks of the SAPA Representative Board. Livingston Dec. at ¶ 2.

25  The President and Vice President are elected directly by the SkyWest pilots as well. *Id.* SkyWest

26  does not dictate who can be on SAPA's Representative Board or Executive Board. *Id.*

27       Tellingly, there have been several union organizing efforts since SAPA came into being, and

28  SAPA as an organization has remained neutral in each. Livingston Dec. at ¶ 12. That is true with

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

respect to the current ALPA organizing campaign as well. *Id.* In fact, there are at least two members of the ALPA organizing committee on SAPA's Representative Board currently, and Internet forums maintained by SAPA frequently are used by members of the Organizing Committee to post pro-ALPA messages. *Id.* at ¶¶ 12, 5. A truly employer-dominated organization would not sit on the sidelines during a third-party organizing drive, much less allow its resources to be used for distribution of the third-party's message.

In addition, SkyWest and SAPA engage in negotiations over pilot compensation, and over the policies and work rules applicable to the pilots, which are contained in the Crewmember Policy Manual ("CPM"). Livingston Dec. ¶¶ 7, 8. These are arms-length negotiations, with each side presenting, accepting, countering and rejecting proposals. *Id.* at ¶ 11. Pilots vote on changes in compensation that SAPA and SkyWest management negotiate. *Id.* at ¶ 8. Indeed, in 2005-2006, pilots rejected a pay proposal that sent both SkyWest and SAPA back to the negotiations table for more discussions. *Id.* at ¶ 8. The CPM states that it may not be changed by management without SAPA's approval. *Id.* at ¶ 7; Emerson Dec., ¶ 4.

In addition, SAPA assists pilots in processing complaints involving application of the CPM and disciplinary matters. Livingston Dec. ¶¶ 9-10. With respect to discipline, there is a Review Board, consisting of two SAPA representatives and two company representatives, that hear the evidence and make a recommendation on whether to sustain, overturn or modify the discipline. *Id.* at ¶ 10. While management is not obligated to accept the recommendation of the Review Board, its practice is to do so. *Id.*

Finally, SAPA employs numerous tools for communicating with SkyWest pilots over which management has no oversight. For example, SAPA publishes a newsletter. (Livingston Dec. ¶ 6.) It also maintains a website (sapapilot.org), and internet discussion forums (sapaforums.org), both of which are accessible only to non-management SkyWest pilots. (*Id.* at ¶ 5.) SkyWest management has no control over these communication tools. (*Id.* at ¶¶5, 6.) As noted previously, there is extensive discussion on sapaforums.org regarding the ALPA organizing drive, and numerous members of the ALPA Organizing Committee post pro-ALPA messages on that site. Livingston Dec. ¶ 5.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

17

1    However much Plaintiffs may dislike the idea that SAPA represents the SkyWest pilots in a

2    forward-thinking, cooperative model of labor relations, the plain fact is that it does so in a manner

3    that is lawful and harmonious with the RLA.

c.    **Plaintiffs Cannot Establish Unlawful Domination Of SAPA By SkyWest**

4

5    Plaintiffs' primary argument with respect to its assertion that SAPA is a prohibited "company

6    union" is that SkyWest provides financial support for SAPA. However, the courts consistently have

7    held that several types of employer assistance to employees' representatives do not constitute

8    unlawful "domination" – even substantial financial assistance. In *Barthelemey*, for example, the

9    court concluded that a carrier's payment of a $1.25 million debt on ALPA's behalf did not violate

10   Section 2, Fourth, because there was no evidence that ALPA had "become somehow beholden" to

11   the carrier as a result. 897 F.2d at 1017. *See also NLRB v. BASF Wyandotte Corp.*, 798 F.2d 849,

12   851-52 (5th Cir. 1986) (no violation; employer provided union air conditioned office, telephone, and

13   use of copier); *NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 545-47 (6th Cir. 1984) (no violation;

14   employer scheduled union meetings, assisted with union elections, reimbursed for work time lost

15   and travel expenses incurred due to union activities, and provided coffee and meeting space); *Lake*

16   *City Foundry Co. v. NLRB*, 432 F.2d 1162, 1178 (7th Cir. 1970) (no violation; employer let union use

17   company property for meetings); *NLRB v. Post Publishing Co.*, 311 F.2d 565, 569-70 (7th Cir. 1962)

18   (permitting union to hold meetings in company cafeteria, use copier and retain profits from cafeteria

19   operations); *Northeastern Univ.*, 601 F.2d at 1214-15 (no violation; university had power to appoint

20   employees to representative body, printed and distributed ballots with pay checks, and paid

21   organization's expenses); *Coppus Eng'g Corp. v. NLRB*, 240 F.2d 564, 572-73 (1st Cir. 1957)

22   (assisting with "election procedures" and providing "printing and secretarial services" does not

23   constitute domination; anti-assistance provision was "'not enacted to prohibit or penalize courteous

24   and friendly, or even generous, action on the part of employers").

25   In addition, neither Plaintiffs' assertion that "SAPA has no dues" nor that SkyWest "pays

26   SAPA officers to serve full time" demonstrate "actual domination." Memorandum at pp. 8-9. *See*

27   *Modern Plastics Corp.*, 379 F.2d 201 (no violation although committee received no dues, had no

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

18

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   source of income, owned no property, and had no constitution or by-laws); *Northeastern Univ.*, 601

2   F.2d at 1213 ("[O]ur cases establish that an organization is not per se dominated simply because it

3   has no formal membership, no dues, no mass meetings, and no written collective bargaining

4   agreement."). *See also BASF Wyandotte Corp. v. Int'l Chemical Union*, 791 F.2d 1046, 1049 (2d

5   Cir. 1986) (finding that payments to an employee who "is also a union official . . . for time off to

6   permit him to tend to union duties" is not improper); *BASF Wyandotte Corp.*, 798 F.2d at 855 (no

7   violation; union chairman paid by company four hours per day for "union business").

8       Plaintiffs note that SAPA has no "membership requirements, other than employment as a

9   non-management pilot at SkyWest." Memorandum at 8. They fail to explain how that demonstrates

10  SkyWest "domination" over SAPA, perhaps, because it does not. Indeed, ALPA seeks to represent

11  the identical group of persons. Nor is the fact that SAPA has not been certified by the NMB as the

12  representative of the SkyWest pilots relevant. *Id.* Such certification is not required under the RLA.

13  Rather, a representative is defined as one the employees have designated to act for it; the definition

14  does not mention NMB "certification." 45 U.S.C. § 151, Sixth. Such certification is necessary only

15  "[i]f a dispute arises as to the *identity* of the employees' representative." *Id.* § 152, Ninth (emphasis

16  added). Courts, too, have recognized that NMB certification is not "a prerequisite to achieving

17  representation status under the [RLA]." *People Express Pilot Merger Comm. v. Texas Air Corp.*,

18  1987 U.S. Dist. LEXIS 9293, at *5 (D. N.J. Oct. 14, 1987) ("nowhere in the definition is

19  certification mentioned as a requirement for representational capacity"), *aff'd without pub. op.,* 958

20  F.2d 364 (3rd Cir. 1992); *see also Russell v. NMB*, 714 F.2d 1332, 1341 (5th Cir. 1983) ("[t]here are

21  no qualifiers attached to the [RLA's] simple definition of representative."), *cert. denied*, 467 U.S.

22  1204 (1984); *Int'l Ass'n of Machinists v. Alitalia Airlines*, 600 F.Supp. 268, 273 (S.D.N.Y. 1984),

23  *aff'd,* 753 F.2d (2d Cir. 1985). In short, it is irrelevant that SAPA has not been certified by the

24  NMB.

25          **d.     Regardless Of SAPA's Status, Plaintiffs Have No Legal Right To
                     The Same Access As SAPA**

26      Most of the injunctive relief requested by Plaintiffs is based upon their claim to "equal

27  access" to SkyWest's means of communications as that granted to SAPA. This is the sole basis for

28

19

1    Plaintiffs' contention that they are entitled to access to the Company's e-mail system, training

2    classes for newly-hired pilots, pilot mailboxes, and "dedicated" bulletin boards. Plaintiffs assert that

3    SAPA has such access, and claim that this is "discriminatory," and justified its request for identical

4    access. Memorandum at pp. 14, 17. This leap in logic is unsupportable; the requested relief,

5    unprecedented.

6        First and foremost, Plaintiffs' theories place them squarely within the exclusive primary

7    jurisdiction of the NMB. Plaintiffs cannot show a likelihood of success when they have come to the

8    wrong forum. They cannot expect this Court to even consider their complaints directed at the

9    relationship between SkyWest and SAPA, much less find that the facts and law "clearly favor them."

10   Accordingly, the equities tip strongly against all of these requests for injunctive relief.

11       Second, Plaintiffs misapprehend their supposed entitlement under the principle of equal

12   access. Here, all of the access to the pilots given SAPA is for the purpose of carrying out its

13   functions on the pilots' behalf.    Brooks Dec., ¶¶ 8-9; Livingston Dec., ¶ 13. Critically, SAPA is <u>not</u>

14   permitted to use that access for the purpose of "campaigning," and SkyWest has never received a

15   complaint that SAPA was doing so. Brooks Dec., ¶¶ 8-9. According to a past SAPA President (and

16   current SAPA Representative), SAPA does not use its access for anything other than its business

17   purposes, which do not include "campaigning" regarding a union organizing effort. Livingston

18   Dec., ¶ 13. Nor do the Plaintiffs' pleadings in this case make that allegation, other than a vague,

19   hearsay reference that a SAPA member was spreading "misinformation" about ALPA to a new hire

20   class. Bharath Dec., ¶ 10.

21       Plaintiffs cite no case law suggesting that, under the RLA, it is *per se* unlawful for an

22   existing organization (whether a certified incumbent representative or an employee committee) to

23   have greater access to employees and company property than a challenging union – much less that

24   the challenger is entitled to "equal access." On the contrary, the NMB has held that it is <u>not</u>

25   interference with the employees' right to organize for an existing organization to have superior

26   access to employees than a challenger has by virtue of its historical role vis-à-vis the employees.

27   Imagine the chaos and confusion if multiple labor unions demanded and were granted equal access

28   to company property. In *United Air Lines*, 1995 NMB LEXIS 111 (1995), for example, the IAM,

20

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    the challenging union claimed that the carrier allowed the incumbent representative access to

2    company bulletin boards, company property, and the "Unitel" phone system, while denying the

3    challenger these same privileges.   The NMB ruled that no improper interference had occurred,

4    relying on its historical distinction between access as a result of "incumbent" status and access for

5    campaign purposes. *See also Northwest Airlines*, 19 NMB 94 (1991) (finding no improper action by

6    the company because "[b]y virtue of its incumbent status and its [CBA] with the carrier, the IAM

7    had distinctly greater access to employees that [sic] did AMFA"); *Northwest Airlines*, 14 NMB 49,

8    56 (1986) (no pattern of carrier interference given lack of sufficient evidence that carrier had

9    supported incumbent's use of the crew lounges for campaigning purposes); *Horizon Airlines*, 24

10   NMB 458, 501 (1997) ("the existence of active employee committees at a carrier is not necessarily

11   improper interference with an election").

12           In this case, the access SAPA has had to communicate with the employees is because of its

13   role as the existing representative of SkyWest's pilots.  Thus, there is nothing "discriminatory" in

14   not providing the same access to ALPA.  Moreover, even if there were something improper

15   regarding the access that SAPA had to the pilots, Plaintiffs do not cite to any authority to support the

16   proposition that the appropriate remedy would be to give <u>them</u> the same access.  On the contrary, as

17   discussed previously, that would embroil the Court in a representation dispute that properly is within

18   the exclusive jurisdiction of the NMB.

19                   **2.**      **Plaintiffs Cannot Show That The Facts And Law Clearly Favor Their**
                              **Claim That SkyWest Has Discriminated Against Them Based On Their**
20                            **Views About ALPA Representation**

21                       **a.**      **SkyWest Has Properly Enforced Its Uniform Policy**

22           In their declarations, Plaintiffs complain of 5 instances, all of which allegedly occurred 5 to

23   12 months ago, in which a Plaintiff was asked by SkyWest management to remove an ALPA

24   lanyard.  Bharath Dec. ¶ 4; Boehm Dec. ¶¶ 4, 6; Mansur Dec. ¶ 4; Shrier Dec. ¶ 6.  Relying solely on

25   NLRA case law and *Adams v. Fed. Express Corp.*, 470 F. Supp. 1356 (W.D. Tenn. 1979), an RLA

26   case that applied NLRA precepts, Plaintiffs claim that RLA Sections 2, Third and Fourth gives them

27   the right to wear union insignia absent an "exceptional reason" or "special considerations."

28   Memorandum at pp. 12-13.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

21

1    The problem with this argument is that NLRA concepts cannot be imported lock, stock and

2    barrel into the RLA in this instance. As the Supreme Court has noted, although the NLRA may

3    provide useful analogies for interpreting the RLA, it "cannot be imported wholesale into the railway

4    labor arena. Even rough analogies must be drawn circumspectly with due regard for the many

5    differences between the statutory schemes." *Trans World Airlines v. IFFA*, 489 U.S. 426, 439

6    (1989) (citation omitted). This is one situation where the NLRA precedent "cannot be imported

7    wholesale" into the RLA. That is because the NLRA law on union insignia is based on

8    interpretation of the "other concerted activities" language of Section 7 of the NLRA, 29 U.S.C. §

9    157. *See Immigration & Naturalization Serv. v. Fed. Labor Relations Auth. ("INS v. FLRA")*, 855

10   F.2d 1454, 1459 (9th Cir. 1988). As other courts have observed, the RLA does not contain analogous

11   language. *See Johnson v. Express One*, 944 F.2d 247 (5th Cir. 1991) (refusing to apply Section 7

12   NLRA law on employee right to be accompanied to an investigatory interview into the RLA given

13   absence of "concerted activities" language from Section 2, Fourth). Accordingly, NLRA law on this

14   issue should not be applied in this RLA context, and thus there is no basis to Plaintiffs' argument

15   that they have a statutory right to wear ALPA lanyards.

16   A similar conclusion was reached by the Ninth Circuit in *INS v. FLRA*. In *INS*, the employer

17   prohibited inspectors, who had frequent contact with the public, from wearing union insignia on their

18   uniforms. 855 F.2d at 1456-57. The case turned on the interpretation of Section 7102 of the Federal

19   Service Labor-Management Relations Act, 5 U.S.C. § 7102, which, like Sections 2, Third and

20   Fourth, grants federal employees the "right to form, join, or assist any labor organization," but does

21   not contain the "other concerted activities" language found in the NLRA. *Id.* at 1458. The Ninth

22   Circuit held that Section 7102 does not create a statutory right among public contact federal

23   uniformed employees to wear union insignia on the job. *Id.* at 1461-62. The Court based this

24   decision on the fact that the Section 7 NLRA right is based on its "concerted activities" language,

25   which is not included in the Federal Service Labor-Management Relations Act. *Id.* The same

26   conclusion is inescapable when it comes to the RLA.

27   Regardless, even if the RLA contained the same "concerted activities" language of the

28   NLRA, making the NLRA "special circumstances" standard appropriate in this context, such

22

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    circumstances exist. Subsequent to the district court decision in *Adams* on which Plaintiffs rely, the

2    Sixth Circuit held that "where an employer enforces a policy that its employees may only wear

3    authorized uniforms in a consistent and nondiscriminatory fashion and where those employees have

4    contact with the public, a 'special circumstance' exists as a matter of law which justifies the banning

5    of union buttons." *Burger King Corp. v. NLRB*, 725 F.2d 1053, 1055 (6th Cir. 1984). A similar

6    conclusion had earlier been reached by the Ninth Circuit in *NLRB v. Harrah's Club*, 337 F.2d 177

7    (9th Cir. 1964), on which the Sixth Circuit relied. *Id. See Harrah's*, 337 F.2d at 180 (the term

8    "special circumstances" is not limited to considerations relating to employee efficiency, safety and

9    personnel friction. "Most business establishments, particularly those which, like respondent, furnish

10   service rather than goods, try to project a certain type of image to the public. One of the most

11   essential elements in that image is the appearance of its uniformed employees who furnish that

12   service in person to customers."). *See also INS v. FLRA*, 855 F.2d at 1465 (citing *Burger King* and

13   *Harrah's* for the proposition that "the management interest in requiring unadorned uniforms has

14   been recognized in private sector cases as well.").

15        In this case, SkyWest has promulgated a Personal Appearance, Grooming and Uniforms

16   policy that applies to its pilots. Brooks Dec. ¶ 5. The policy states that: "Both passengers and

17   professional crewmembers realize that the passenger's choice of an airline is greatly influenced by

18   the crewmember's level of professionalism and appearance." (*Id.* at Exh. A, § 1.A.) Therefore, "[i]t

19   is the goal of Flight Operations to have each Pilot clothed in a standard Company issued uniform as

20   a way of projecting to the public a professional appearance and attitude." (*Id.* at Exh. A, § 18.A.1.)

21   The policy also goes into great detail regarding the appearance, grooming and uniform standards,

22   including such things as hair style, jewelry and accessories and footwear. Brooks Dec. ¶ 5.

23        One of the items covered in the policy concerns display of Crewmember Identification

24   Badges. There are two such badges: the Security Identification Display Area (SIDA) badge and the

25   Company identification badge. Under the policy, these may be worn on a chain or "lanyard" around

26   the neck, but the type of chain that may be used is restricted. The chain must be "gold, silver, plain

27   dark navy or plain black" and logos are not permitted except those that say "SkyWest Airlines."

28   Brooks Dec. ¶ 5, Exh. A, § 24.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

23

1    Plaintiffs have claimed that this policy has been enforced discriminatorily so that only ALPA

2    lanyards have been banned. That is not true. The policy has been enforced with respect to lanyards

3    bearing the logos of sports teams, colleges, aircraft manufacturers, and the like. Declaration of Roy

4    Glassey ("Glassey Dec.") ¶ 4, Livingston Dec. ¶ 16, Brooks Dec. ¶ 6.

5    Some of the Plaintiffs allege that they have seen other pilots wearing non-standard lanyards

6    other than the ALPA lanyard. Boehm Dec. ¶ 9; Dow Dec. ¶ 12; Bharath Dec. ¶ 4 This does not

7    establish discriminatory enforcement. Obviously, management cannot correct what it does not see.

8    With over 2,600 pilots, 140 stations, and just 10 Chief Pilots, there well could be times when pilots

9    get away with wearing a non-standard lanyard. That does not mean the policy is not being enforced

10    across-the-board, however. Moreover, even if there have been lapses in the enforcement of the

11    policy, that does not demonstrate disparate treatment vis-à-vis ALPA supporters. *See Hertz Corp.*,

12    305 NLRB 487, 488 (1991) ("[O]ccassional lapses in enforcement . . . show only that the [employer]

13    had problems in attempting to carry out its uniform policy effectively. . . . [O]ccasional lapses in an

14    otherwise consistent application of a detailed uniform policy do not persuade us that there was

15    inconsistent and discriminatory enforcement.").

16    SkyWest made this very point when ALPA first raised the lanyard issue, in the fall of 2006.

17    At that time, Plaintiff Bharath contacted SkyWest General Counsel Todd Emerson to complain that

18    the company was only prohibiting ALPA lanyards. Mr. Emerson responded that non-standard

19    lanyards of all types are prohibited by the uniform policy, but that he would look into his concerns.

20    He did so, and confirmed that the policy was being applied to all non-standard lanyards. In a later

21    call, Mr. Bharath, joined by others on the Organizing Committee, stated that he was still seeing non-

22    comforming lanyards being worn. Mr. Emerson specifically asked them to report to him if they saw

23    anyone wearing a nonconforming lanyard, or a chief pilot engaged in selective enforcement, and he

24    would take care of it. Mr. Emerson never received any follow up complaints from them, or anyone

25    else for that matter, regarding alleged discriminatory enforcement regarding lanyards. Emerson Dec.

26    ¶ 7.

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**b.    SkyWest Has Not Discriminated Against Plaintiffs With Respect To General Bulletin Board Postings**

Plaintiffs also claim that Defendant has violated Section 2, Third and 2, Fourth by prohibiting pro-ALPA postings on general bulletin boards. However, even under the more expansive "rights" of the NLRA, it has been determined that "there is <u>no</u> statutory right of an employees or a union to use an employer's bulletin board." *Honeywell, Inc.*, 262 NLRB 1402 (1982) (emphasis added), *enf'd*, 722 F.2d 405 (8th Cir. 1983). <u>Only</u> where the employer permits non-work related postings will it be required to also permit union-related postings. *Id.*

In this case, management has prohibited or removed non-ALPA postings as well as ALPA postings from its bulletin boards. Glassey Dec. ¶ 3. Plaintiffs claim that they have seen non-business related postings on bulletin boards, such as advertisements for massages or river rafting trips. Dow Decl. ¶ 4. Again, with over 10,000 employees in over 140 cities, it obviously is impossible to monitor with 100% accuracy every single bulletin board every minute of the day to ensure compliance, but such is not the legal requirement. *See Hertz*, 305 NLRB at 488. Without a showing that ALPA postings have somehow been exclusively targeted for removal, there is no discriminatory treatment.

**D.    Plaintiffs Have Not Established The Required Irreparable Harm Or That The Balance Of Hardships Tips Sharply In Their Favor**

**1.    Plaintiffs Have Not Established That They Have Been Irreparably Harmed**

It is well-established that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Svcs and Garcia v. Baldridge et al.*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original). Moreover, "[a] party experiencing a legal harm should not delay in either commencing an action or in seeking preliminary injunctive relief. Courts will assess the length of the movant's delay in assessing whether to grant injunctive relief." *Moore's Fed. Practice* § 65.22(1)(b) (3d ed. 2006). For both of these reasons, Plaintiffs fail to satisfy the injury prong of the preliminary injunction test.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

25

1    Plaintiffs' primary claim of irreparable injury is that they have been "deterred" in discussing

2 the ALPA organizing drive with SkyWest pilots, and "denied effective means of communicating

3 with other SkyWest pilots about ALPA." Memorandum at 20. That subjective assertion is not

4 reasonable in light of the facts.

5    SkyWest has taken a remarkably "hands off" approach in response to the ALPA campaign.

6 SkyWest has not, for example, engaged in any sort of "counter campaign" with the SkyWest pilots.

7 It has not sent any communications or information to the pilots, and has held no meetings with the

8 pilots to discuss the ALPA drive. Emerson Dec., ¶ 6. The pilots have been free to communicate

9 their views at SkyWest facilities in a variety of ways, including discussing the issue in crew lounges

10 and on the SkyWest intranet forums. Livingston Dec., ¶ 14; Emerson Dec., ¶¶ 8, 9. SkyWest has

11 not increased the role of SAPA, nor advertised it to the pilots as an alternative to ALPA. Emerson

12 Dec., ¶ 6. SAPA itself is neutral regarding the ALPA campaign, and its own computer forums have

13 been used as a vehicle for ALPA supporters to get out their message as well.   Livingston Dec., ¶¶

14 12, 5. This includes the allegedly "chilled" members of the Organizing Committee. Livingston

15 Dec., ¶ 5. In contrast to the silence of SkyWest (and SAPA), ALPA and its supporters have engaged

16 in a blitzkrieg of communications to the pilots, using many different methods: full page newspaper

17 ads, telephone, email, website, home mailings, and surveys, just to name a few.

18    What also is telling is the absence of the types of allegations that generally are found in

19 interference cases. Plaintiffs have not asserted that any SkyWest pilot has been discharged – or

20 otherwise disciplined, for that matter – because of their support for ALPA, their wearing of ALPA

21 lanyards, or their posting of unauthorized materials on the bulletin boards. Nor have they claimed

22 that SkyWest has engaged in surveillance or interrogation of union adherents, or launched a letter-

23 writing campaign to the pilots designed to "overwhelm" their will. All SkyWest has done is try to

24 enforce its policies uniformly, and continue to deal with SAPA in the same manner that it has for the

25 last several years.

26    The other alleged irreparable harm Plaintiffs cite is to the organizing campaign itself.

27 Memorandum at 20. The only support offered for this contention is the opinion of ALPA's Manager

28 of Representation, who hardly can be considered neutral in this matter, that, without relief, the

26

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    "energy and momentum" of the ALPA campaign may dwindle. *Id.* This is speculative in the

2    extreme. There are numerous reasons why support for ALPA's campaign may be waning, most

3    obviously a lack of interest on the part of the SkyWest pilots. There is no probative evidence that

4    anything SkyWest has done has had any effect on the progress of the ALPA campaign.

5        Plaintiffs have made no effort to "strictly tailor" their requested injunctive relief to their

6    alleged imminent harm: their claimed inability to stage an effective showing of "solidarity" without

7    being able to wear ALPA lanyards. Rather, they have attempted to obtain unprecedented (and

8    legally unwarranted) access to SkyWest pilots without showing how that relates to the alleged

9    "substantial and irreparable injury" that supports their requested injunctive relief. This violates the

10   NLGA. *See Aluminum Workers*, 696 F.2d at 446.

### 2.    SkyWest And Its Pilots Would Suffer Substantial Countervailing Harm In The Event Of A Mandatory Preliminary Injunction

12       Plaintiffs' blithely state that there would be no "conceivable harm" to SkyWest from the

13   issuance of an injunction. Memorandum at 22. On the contrary, the issuance of preliminary

14   injunctive relief would create substantial harm to SkyWest by tainting SkyWest with the specter of

15   illegality. *See EEOC v. Howard Univ.*, 1983 U.S. Dist. LEXIS 16246, *12 (D.D.C. June 14, 1983)

16   ("to grant the preliminary relief sought by the EEOC at this stage of the investigation would

17   stigmatize Howard University when there is no evidence whatsoever to support the implication,

18   which would necessarily flow from the issuance of a preliminary injunction, that Howard University

19   was intimidating or threatening its students and employees").

20       There is no question that ALPA would use that improper taint in its organizing campaign. It

21   issued a press release the day after the revised TRO issued, claiming that the Court had "affirmed"

22   the pilots' right to organize – a right never challenged by SkyWest.[5] Indeed, that publicity may well

23   have been one of the goals of this suit in the first place. Given the broad scope of Plaintiffs' claims,

24   and the congestion in this District's civil docket, it will be months, if not years, before this case

25   would come to a full hearing on the merits. In the interim, ALPA would use the taint that would be

26   created by preliminary injunctive relief to try to convince SkyWest's pilots that they need

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

---

5       A copy of the press release is available on the ALPA website, alpa.org.

1    "protection" from the company.  That, in turn, could make the difference between an ALPA-

2    represented, and a self-represented, workforce.[6]  Were the Court to issue preliminary injunctive

3    relief, and if an NMB election were held before a final judgment on the merits, the result could

4    improperly skew SkyWest pilots' views on unionization.  The harm thus caused to SkyWest, in the

5    form of direct costs (e.g., monetary and manpower investments in collective bargaining) and loss of

6    productivity (e.g., loss of flexibility and lower morale) would be irreparable and, likely permanent.

7    **IV.    CONCLUSION**

8         For all of the reasons set forth above, Plaintiffs' motion for a preliminary injunction should

9    be denied in its entirety.

10

11   Dated:  June 1, 2007                           WINSTON & STRAWN LLP

12

13                                                 By:   /s/ Robert Spagat
                                                         Robert Spagat

14
                                                       Attorneys for Defendant
15                                                     SKYWEST AIRLINES, INC.

16

17

18

19

20

21

22

23

24

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [6]     There is not, under the RLA, any defined mechanism by which a union can lose its status as
     the collective bargaining representative of any particular craft or class of employees.  *See In re*
27   *Petitions of Chamber of Commerce and IBT for Rule Change*, 14 NMB 347 (1987) (denying petition
     for rule change to create decertification procedure); *Alia Royal Jordanian Airlines*, 10 NMB 389
28   (1983) ("The Board notes that the Railway Labor Act, unlike the National Labor Relations Act, has
     no statutory procedure for decertification of a bargaining representative.").

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894