| 74TH CONGRESS <br> 1st Session | HOUSE OF REPRESENTATIVES | REPORT <br> No. 1147 |
|---|---|---|

## NATIONAL LABOR RELATIONS BOARD

June 10, 1935.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. CONNERY, from the Committee on Labor, submitted the following

[1]                    R E P O R T

[To accompany S. 1958]

The Committee on Labor, to whom was referred the bill (S. 1958) to promote equality of bargaining power between employers and employees, to diminish the causes of labor disputes, to create a National Labor Relations Board, and for other purposes, having had the same under consideration, report it back to the House with amendments and recommend that the bill, as amended, do pass.

The committee amendments are as follows:

On page 1, line 3, strike out "declaration of".

On page 1, line 4, strike out all beginning with "The" down through line 24 on page 2 and insert in lieu thereof the following:

The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing interstate and foreign commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of interstate and foreign commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment or interruption, and promotes the flow of interstate and foreign commerce by

hearings by the Board, followed by orders that must be referred to the Federal courts for enforcement, are methods of procedure that could never be sufficiently expeditious to be effective in this connection.

The only results of introducing proposals of this sort into the bill, in the opinion of the committee, would be to overwhelm the Board in every case with countercharges and recriminations that would prevent it from doing the task that needs to be done. There is hardly a labor controversy in which during the heat of excitement statements are not made on both sides which, in the hands of hostile or unsympathetic courts, might be construed to come under the common-law definition of fraud, which in some States extends even to misstatements innocently made, but without reasonable investigation. And if the Board should decide to dismiss such charges, its order of dismissal would be subject to review in the Federal courts.

Proposals such as these under discussion are not new. They were suggested when section 7 (a) of the National Industry Recovery Act was up for discussion, and when the 1934 amendments to the Railway Labor Act were before Congress. In neither instance did they command the support of Congress.

The succeeding unfair labor practices are intended to amplify and state more specifically certain types of interference and restraint that experience has proved require such amplification and specification. These specific practices, as enumerated in subsections (2), (3), (4), and (5), are not intended to limit in any way the interpretation of the general provisions of subsection (1).

The second unfair labor practice prohibits an employer from dominating or interfering with the formation or administration of any labor organization or contributing financial or other support to it. It is provided, however, that subject to rules and regulations made and published by the Board, an employer may permit employees to confer with him during working hours without loss of time or pay. This section has its counterpart in provisions of other Federal statutes, such as the Railway Labor Act amendments of 1934, section 2; the Bankruptcy Act amendments of 1933 and 1934; and the Emergency Transportation Act, section 7 (e).

It is reliably estimated that about 70 percent of the company unions now in existence were established subsequent to the passage of section 7 (a) of the National Industrial Recovery Act. According to the semiannual report of the National Labor Relations Board to the President for the period July 9, 1934, to January 9, 1935, such company unions were a primary or attendant cause of the disputes in about 30 percent of the cases heard by the National Board; and the great majority of such company unions had become active in contemplation of or contemporaneously with a trade union organizing movement, or in close relation to a strike. Employer-promoted unions are most prevalent in the larger plants and industries, where the bargaining power of the individual worker is very weak, and, curiously enough, where the managements have hitherto been opposed

to organization of their workers. It is of the essence that the right of employees to self-organization and to join or assist labor organizations should not be reduced to a mockery by the imposition of employer-controlled labor organizations, particularly where such organizations are limited to the employees of the particular employer and have no potential economic strength.

[18] Nothing in the bill prohibits the formation of a company union, if by that term is meant an organization of workers confined by their own volition to the boundaries of a particular plant or employer. What is intended is to make such organization the free choice of the workers, and not a choice dictated by forms of interference which are weighty precisely because of the existence of the employer-employee relationship. The forms which such interference may take have been disclosed in the experience of the labor boards engaged in the investigation of charges of violation of section 7 (a) during the past 2 years. These are of course matters for decision on the facts of the individual case. The most commonly recognized forms of interference have been financial support, participation in the formulation of the constitution or bylaws or in the internal management of the company union, espionage, and the like. An extremely common form of interference is the provision in the constitution or bylaws of company unions that changes may not be made except with the consent of the employer. The prohibition of financial support is particularly justified. Collective bargaining is reduced to a sham when the employer sits on both sides of the table by supporting a particular organization with which he deals, by the payment of added compensation to their representatives, or by permitting such representatives to conduct organizational work among the employees during working hours without deduction of pay.

How often it has been said by employers who object to "outside unions" that their representatives "agitate" among the employees during working hours and that employees affiliated with such organizations "disturb" other employees. No action could be more provocative of resentment, unrest, and strife than these forms of financial support. On this subject it is pertinent to quote a portion of the opinion of the National Labor Relations Board in *Matter of B. F. Goodrich Co.* (1 N. L. R. B. 181, 184 (1934)):

> Another feature of the plan which raises a serious problem is the fact that it is financed by the company, and that, in particular, the company pays extra salaries to the employee representatives under the plan. At the time when the plan was initiated by the company there existed a group of employees within the plant, we do not know how numerous, who favored affiliation with an outside union as their designated agency for collective bargaining. We may assume that there were also at the plant employees who preferred a plant

organization. At this juncture we believe that the company interfered with the self-organization of its employees when it threw the great weight of its financial support in favor of the group of employees who wanted a plant organization, to the competitive disadvantage of the group of employees who wanted representation by an outside union. In effect this was a form of discrimination which handicapped the efforts of one group of employees in promoting their ideas of self-organization. The tendency of the thing at the time of the inauguration of the plan was corrupting and the continuance of financial support by the company at the present time is corrupting. This is particularly true of the payment of salaries to representatives. However, single-minded the elected represenatives under the plan might be in their devotion to the interests of the employees, the provision for paying extra salaries to the approximately 150 employee representatives causes their independence of employer domination to be highly dubious. It is improper for the company to influence the choice of employees in the manner described above, which involves, in substance, the subsidizing of an active group of propagandists among the employees for the type of employee representation the company would prefer to deal with.

The specific practices to which we have adverted have been recognized by our highest courts as forms of interference. In *Texas & New Orleans R. R. Co.* v. *Brotherhood of Railway Clerks* (281 U. S. [19], 548, 560), Chief Justice Hughes, writing for a unanimous Court, stated in a decision under the Railway Labor Act of 1926:

> The circumstances of the soliciting of authorizations and memberships on behalf of the association, the fact that employees of the railroad company who were active in promoting the development of the Association were permitted to devote their time to that enterprise without deduction from their pay, the charge to the railroad company of expenses incurred in recruiting members of the association, the reports made to the railroad company of the progress of these efforts, and the discharge from the service of the railroad company of leading representatives of the brotherhood and the cancelation of their passes, gave support, despite the attempted justification of these proceedings, to the conclusion of the courts below that the railroad company and its officers were actually engaged in promoting the organization of the association in the interest of the company in opposition to the brotherhood, and that these activities constituted an actual interference with the liberty of the clerical employees in the selection of their representatives.

It should be noted finally that the employer can be said to "dominate" the "formation or administration of a labor organization" where several of these forms of interference exist in combination, and he is able thereby to corrupt or override completely the will of employees.

The third unfair labor practice prohibits an employer, by discrimination in regard to hire or tenure of employment or any term or condition of employment, to encourage or discourage membership in any labor organziation. This spells out in greater detail the provisions of section 7 (a) prohibiting "yellow-dog" contracts and interference with self-organization. This interference may be present in a variety