Calender No. 595

| 74TH CONGRESS <br> 1st Session | SENATE | REPORT <br> No. 573 |

# NATIONAL LABOR RELATIONS BOARD

MAY 1 (Calendar day, MAY 2), 1935.—Ordered to be printed

Mr. WALSH, from the Committee on Education and Labor, submitted the following

# REPORT

[To accompany S. 1958]

The Committee on Education and Labor, to whom was referred the bill (S. 1958) to promote equality of bargaining power between employers and employees, to diminish the causes of labor disputes, to create a National Labor Relations Board, and for other purposes, after holding hearings and giving consideration to the bill, report the same with amendments and recommend the passage of the bill as amended.

In view of the impending expiration on June 16, 1935, of the National Industrial Recovery Act, with its fair promise in section 7 (a) of promoting industrial peace by the recognition of the rights of employees to organize and bargain collectively, and of Public Resolution 44, Seventy-third Congress, under which the present National Labor Relations Board was created, the time has come for a clean decision either to withdraw that promise or to implement it by effective legislation. Under the conditions existing a year ago the Congress was perhaps justified in passing Public Resolution 44 in lieu of a comprehensive dealing with the problem. But the compelling force of another year's experience, demonstrating that the Government's promise in section 7 (a) stands largely unfulfilled, makes unacceptable any further temporizing measures. In the committee's judgment the present bill is a logical development of a philosophy and a consistent policy manifest in many acts of Congress dealing over a period of years with labor relations.

## GENERAL OBJECTIVES OF THE BILL

(1) *Industrial peace.*—The first objective of the bill is to promote industrial peace. The challenge of economic unrest is not new. During the period from 1915 through 1921 there were on the average 3,043 strikes per year, involving the vacating of 1,745,000 jobs and

2300

7 (e) of the act creating the office of the Federal Coordinator of Transportation (48 Stat. 214, U. S. C., title 49, sec. 257 (e)).

The four succeeding unfair-labor practices are designed not to impose limitations or restrictions upon the general guaranties of the first, but rather to spell out with particularity some of the practices that have been most prevalent and most troublesome.

### THE COMPANY-UNION PROBLEM

The second unfair labor practice deals with the so-called "company-union problem." It forbids an employer—

to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it.

(The proviso will be discussed subsequently.)

With identical objectives in view, section 2 of the Railway Labor Act of 1934 provides:

The purposes of the Act are * * * (3) * * * it shall be unlawful for any carrier to interfere in any way with the organization of its employees. * * * (4) It shall be unlawful for any carrier * * * to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor.

10

To the same effect are the provisions of the Bankruptcy Act as amended in 1933 and 1934, and section 7 (e) of the Emergency Railroad Transportation Act of 1933. Under these sections it is unlawful for a carrier (whether under control of a judge, trustee, receiver, or private management) or for a judge, trustee, or receiver in a corporate reorganization under the Bankruptcy Act—

* * * to interfere in any way with the organizations of employees or to use the funds of the (property) under his jurisdiction in maintaining so-called "company unions."

This bill does nothing to outlaw free and independent organizations of workers who by their own choice limit their cooperative activities to the limits of one company. Nor does anything in the bill interfere with the freedom of employers to establish pension benefits, outing clubs, recreational societies, and the like, so long as such organizations do not extend their functions to the field of collective bargaining, and so long as they are not used as a covert means of discriminating against or in favor of membership in any labor organization. Such agencies, confined to their proper sphere, have promoted amicable relationships between employers and employees and the committee earnestly hopes that they will continue to function.

The so-called "company-union" features of the bill are designed to prevent interference by employers with organizations of their workers that serve or might serve as collective bargaining agencies. Such interference exists when employers actively participate in framing the constitution or bylaws of labor organizations; or when, by provisions in the constitution or by laws, changes in the structure of the organization cannot be made without the consent of the employer. It exists when they participate in the internal management or elections of a labor organization or when they supervise the agenda or procedure of meetings. It is impossible to catalog all the practices that might

constitute interference, which may rest upon subtle but conscious economic pressure exerted by virtue of the employment relationship. The question is one of fact in each case. And where several of these interferences exist in combination, the employer may be said to dominate the labor organization by overriding the will of employees.

The committee feels justified, particularly in view of statutory precedents, in outlawing financial or other support as a form of unfair pressure. It seems clear that an organization or a representative or agent paid by the employer for representing employees cannot command, even if deserving it, the full confidence of such employees. And friendly labor relations depend upon absolute confidence on the part of each side in those who represent it.

But the committee has been extremely careful not to work injustice by carrying these strictures too far. To deny absolutely by law the right of employees to confer with management during working hours without loss of time or pay would interrupt the very negotiations which it is the object of this bill to promote. For these reason, there is attached to the second unfair labor practice the following proviso:

> That, subject to rules and regulations made and published by the Board pursuant to section 6 (a), an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.

This proviso is surrounded by adequate safeguards. Where the right to receive normal pay while conferring is bestowed upon favored employees or organizations rather than equally upon all, it will run

11

up against many of the prohibitions of section 8. In addition, the proviso in entirety is made subject to the rules and regulations of the Board, thus enabling the Board to confine it to whatever extent may be necessary to effectuate the purposes of the bill.

The committee's decision to prevent company interference with employee organizations has been influenced by recent events. Practically 70 percent of the employer-promoted unions have sprung up since the passage of section 7 (a) of the National Industrial Recovery Act. The testimony before the committee has indicated that the active entry of some employers into a vigorous competitive race for the organization of workers is not conducive to peace in industry. It is the wish of the committee to prevent insofar as possible the perpetuation of bitterness or strife.

The third unfair labor practice forbids an employer—

> by discrinination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

(The proviso will be discussed subsequently.)

This provision rounds out the idea expressed in section 7 (a) of the National Industrial Recovery Act to the effect that—

> No employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing   *   *   *.

Of course nothing in the bill prevents an employer from discharging a man for incompetence; from advancing him for special aptitude;