070608e.txt

1

1
2                    ROUGH DRAFT DISCLAIMER
3
4            UNPROOFREAD, UNCERTIFIED ROUGH DRAFT
5
6        This transcript of proceedings is of rough draft.
7        There will be discrepancies in this form and the
8        final form.  This form has not been proofread,
9        finalized, or certified, AND IS PROVIDED SIMPLY FOR
10       YOUR CONVENIENCE.
11       ***There will also be a discrepancy in page and line
12       numbers in this form compared to the finalized and
13       certified form.****
14       Upon receipt of the final, certified transcript,
15       please destroy this rough draft.
16       Katherine A. Powell, CSR, CRR
17
18
19
20
21
22
23
24
25

2

1        THE CLERK:  Calling civil case number C07-2688,
2   SkyWest Pilots versus SkyWest Airlines.
3        Please state you're appearances, Counsel.

070608e.txt

4          MS. LYE:  For the plaintiffs, Linda Lye, Elizabeth

5    Ginsburg and Claire Prestel.

6          MR. SPAGAT:  For defendant, Robert Spagat, Norman

7    Quandt, Doug Hall, Brooke Ward, Todd Emerson and Patricia

8    Stambelos.

9          THE COURT:  Good afternoon.  Mr. Quandt, do you want

10   to proceed?

11         MR. QUANDT:  Your Honor, I have a couple of

12   housekeeping matters --

13         THE COURT:  Sure.

14         MR. QUANDT:  -- if I could raise right now.

15         First, I messed up on the exhibits at the end of the

16   day yesterday.  I would like on the record to correct -- we

17   have already talked to the court reporter, and I think this has

18   been explained to opposing counsel.

19         @@SPEAKER:  SOMEONE SAID NO.

20         MR. QUANDT:  Okay.  I'm sorry then.  Here's the

21   change that we're making.  The CPM, which is the crew member

22   policy manual, that is the contract between SkyWest and SAPA,

23   the document yesterday, Your Honor, I had marked it yesterday

24   as Exhibit 6.  That is now going to be Exhibit 5.

25         THE COURT:  Exhibit 5.

                                                              3


1          MR. QUANDT:  Yes, sir.

2          THE COURT:  It's Defense Exhibit 5.

3          MR. QUANDT:  Yes, sir.  And then, secondly, the set

4    of e-mails that were posted on the I-share related to the

5    subject of unions that was posted on the SkyWest website, that

6    I introduced yesterday as Exhibit 5, will now be Exhibit 4.

7    And there is no Exhibit 6 at this point, Your Honor.

8          THE COURT:  Okay.  So Exhibit 4 is admitted.  Exhibit

                              Page 2

070608e.txt

 9  5, which is the manual, is admitted.

10            (Exhibits 4 and 5 received in evidence)

11            MR. QUANDT:  That's it.

12            THE COURT:  And what about earlier exhibits that we

13  haven't gotten there.  Well, yes, we did.  That "Calling All

14  Pilots."

15            MR. QUANDT:  I think 1, 2, 3.

16            THE COURT:  That was 3.  3 was admitted.  Let me just

17  take a look at 2.  2 was admitted.  I remember that.

18            MR. QUANDT:  Yes, it was, Your Honor.

19            THE COURT:  And let's see.  We had testimony about 1.

20            MR. QUANDT:  Yes.

21            MR. SPAGAT:  Yes.

22            MR. QUANDT:  That has also been admitted.

23            THE COURT:  So one is admitted.  So 1, 2, 3, 4, 5 are

24  admitted.

25            MR. QUANDT:  Thank you, Your Honor.

                                                         4

 1            Another housekeeping matter, very brief, Your Honor,

 2  I would like if the -- if the Court would like it, I would like

 3  to pass around a copy of the Delta Airlines NMB decision with

 4  the flight attendants that were referred to repeatedly

 5  yesterday.  I have a copy of that decision.  It's a published

 6  decision that's available on the Internet, but it has not been

 7  cited previously in any of the briefs.  So I can pass that

 8  around if you would like to have a copy of that.

 9            THE COURT:  I would.  And give it to counsel.

10            MR. QUANDT:  I'm not offering it obviously as an

11  exhibit.

12            THE COURT:  No, it is not an exhibit.

13            MR. QUANDT:  Third --

                          Page 3

070608e.txt
14            THE COURT:  It's a case -- it's -- identify it for
15  the record.
16            MR. QUANDT:  It's the Delta Airlines with Association
17  of Flight Attendants national mediation decision that's
18  typically cited as 30NMB102.  It relates to interference
19  allegations by the AFA against Delta Airlines, and I argued
20  shows how the NMB could handle this sort of thing.
21            Your Honor, the third housekeeping matter very
22  quickly, we are going to have three witnesses today rather than
23  two.  We notified counsel late yesterday that the third
24  witness, Mr. Fizer, is also going to be testify.  It's going to
25  be short.  A number of things came up with Mr. Fizer yesterday

                                                            5

1  that we had not heard about previously.  So he is going to
2  testify briefly today.
3            Lastly, Your Honor, we have a responsive pleading due
4  Monday.  I would ask that we be given a 10-day extension on
5  that.
6            THE COURT:  We'll deal with that.
7            MR. QUANDT:  Thank you, Your Honor.
8            MS. GINSBURG:  Your Honor, I'm sorry, what responsive
9  pleading are we referring to?
10            THE COURT:  I don't know.  We'll deal with it later.
11            MR. QUANDT:  We are ready to proceed, Your Honor.
12            THE COURT:  I am all set.
13            MR. SPAGAT:  We would like to call Mike ice stat.
14            THE COURT:  Okay.
15            THE CLERK:  Please raise your right hand.
16                      MICHAEL EISENSTAT,
17  called as a witness for the Defendant herein, having been first
18  duly sworn, was examined and testified as follows:
                        Page 4

070608e.txt
19          THE WITNESS:  I do.

20          THE CLERK:  Please have a seat.

21          Please state and spell your full name for the record.

22          THE WITNESS:  Michael Eisenstat, E-i-s-e-n-s-t-a-t.

23

24

25

EISENSTAT - DIRECT EXAMINATION / SPAGAT          6

1                    DIRECT EXAMINATION

2   BY MR. SPAGAT:

3   Q.   Good afternoon, Mr. Eisenstat.

4        What do you do for a living?  What's your job?

5   A.   I am a full-time line pilot for SkyWest Airlines.

6   Q.   And are you familiar with the SkyWest Airlines Pilot's

7   Committee -- I'm sorry, the SkyWest Airlines Pilots

8   Association?

9   A.   I am.

10  Q.   What is the acronym for that?

11  A.   The SkyWest Airlines Pilots, SAPA.

12  Q.   Okay.  So I am going to be referring to SAPA in my

13  questions.  Do you understand that refers to the SkyWest

14  Airlines Pilots Association?

15  A.   Yes.

16  Q.   What is your role in SAPA?

17  A.   I'm the SAPA secretary on the executive board.

18  Q.   How long have you held that role?

19  A.   About eight years.

20  Q.   And are you familiar with how SAPA was founded originally?

21  A.   I am.

22  Q.   Whose idea was it to found SAPA?

23  A.   Woody Wood, Anthony Wood.

Page 5

070608e.txt

24   Q.   And who is Mr. Wood?

25   A.   Woody was a line pilot at the time for SkyWest Airlines.

EISENSTAT - DIRECT EXAMINATION / SPAGAT          7

1   Q.   Was he a member of management?

2   A.   No.

3   Q.   Okay.  And how did the -- how did SAPA come into being?

4              MS. GINSBURG:  Objection.  Hearsay.

5              THE COURT:  Well, let's see.

6              MS. LYE:  Can we make the conventional objection,

7   Your Honor, that's that it's reciprocal.  There was on

8   outstanding hearsay objection to a lot of our evidence on SAPA.

9   If their objection is sustained, then we would like our

10  objection to be sustained.

11             THE COURT:  Come in subject to a motion to strike.

12             Go ahead.

13             MS. LYE:  Thank you.

14             THE WITNESS:  SAPA came into being, I believe there

15  were faction of employee representation that were presented to

16  Mr. Holt through different acronyms.  The SkyWest Employees

17  Action Committee, I believe was one of them.  I don't think

18  Woody had -- Woody Wood had anything to do with those.  I

19  believe those were other pilots who approached.  But they had

20  their -- their beginnings and their endings almost as fast as

21  their beginnings.  I believe there was a cyclical up and down

22  of their successes.  It died off and came back and died off

23  until Woody, I believe, actually resurrected it under a

24  different acronym, different name -- Woody took charge of that

25  organization, approached Brad Holt and said, Let's make this go

EISENSTAT - DIRECT EXAMINATION / SPAGAT          8

1   per se.  And this is, of course, with conversations that I've

2   had with Woody throughout the years because of my involvement

Page 6

070608e.txt

3  with SAPA.

4          But it -- and then when I came into the group in

5  1997, it had already been established with representatives.  I

6  was elected representative in Salt Lake City and I joined the

7  group then, and Woody and the representatives had already been

8  discussing the policy manual with Brad Holt, and rewriting and

9  creating policy manuals.

10  Q.   Okay.  Let me slow you down.

11          MS. LYE:  Objection.  Your Honor, if I can make a

12  standing objection that the hearsay objection would be to all

13  of this.  I don't want to have to interrupt at each point.

14          THE COURT:  Okay.  In terms of the background

15  information.

16          When we get into something like in a period of time

17  that I care about, then I think we will have to hear the

18  individual objections.  This is by way of background so I get

19  some source of how the organization started and where they

20  were.

21          MS. LYE:  I think the background is helpful.  To the

22  extent this involves information that predates his involvement

23  with SAPA, by his own admission, we'll have that standing

24  objection.

25          THE COURT:  Sure.  But I think we will add his

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        9

1  involvement.

2          MR. SPAGAT:  That's correct.

3  BY MR. SPAGAT:

4  Q.   Does SAPA have bylaws?

5  A.   It does.

6  Q.   Who drafted the bylaws?

7  A.   Myself and Todd Schmidtke.

070608e.txt

8  Q.   When did that occur?

9  A.   Probably 1999.

10  Q.   Who is Todd Schmidtke?

11  A.   Todd Schmidtke was the president that followed Woody Wood.

12  Q.   And I'd like to draw your attention to tab 6 in the big

13  binder that you have there.

14  A.   This white binder?

15  Q.   Yes.

16       Do you recognize this document?

17  A.   I do.

18  Q.   What is it?

19  A.   It's the SkyWest Airlines Association bylaws.

20       MR. SPAGAT:  I would move to admit those into

21  evidence.

22       THE COURT:  Admitted.

23       (Exhibit 6 received in evidence)

24  BY MR. SPAGAT:

25  Q.   And how are the bylaws put into effect at Southwest

EISENSTAT - DIRECT EXAMINATION / SPAGAT        10

1  @(sic)?

2  A.   They were voted upon by the representative board.

3  Q.   And at the time they were voted on by the representative

4  board, how did the representatives come to be on the

5  representative board?

6  A.   They were elected.

7  Q.   By whom?

8  A.   By the pilots, by the general membership.

9  Q.   Okay.  Let's talk about how SAPA is constituted today.

10  How many members are there on the SAPA board?

11  A.   19 regional representatives.

12  Q.   Okay.  And are there any other members of the SAPA board?

070608e.txt

13  A.    There is a -- that's also cut off by -- well, by the

14  executive board, which are three representatives.  We are also

15  included in that 19.

16  Q.    So there are three executive members of the SAPA board

17  and, I guess, 16 representative members as well?

18  A.    Regional representatives, yes.

19  Q.    And how do you get to be a regional representative?

20  A.    Well, when there's an opening, when -- by attrition or

21  whatever the means, a term expiration, I put out a notice for

22  that region that there's an opening for a regional

23  representative.  And I have a deadline date, and they contact

24  me by a particular date of their interest.  And I ask them for

25  a bio, a biographical sketch of why you want to be a SAPA rep,

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        11

 1  what's your background at SkyWest, et cetera.

 2            And then we hold election.  If there's only one

 3  representative and one position and only one interested

 4  candidate, and by the deadline by default he/she becomes the

 5  regional representative.  If there are two or more for one

 6  position, there is an actual vote taken place within that

 7  region.

 8  Q.    How is the vote conducted?

 9  A.    Through a Campus-Vote.  It's a private independent

10  software company that we contract with back east.

11  Q.    And they tabulate the votes?

12  A.    Absolutely.

13  Q.    Okay.  Who pays for that?

14  A.    The vote is administered by Brandon Tilby, who is our

15  so-called computer guru, keeps our websites up and running, et

16  cetera.

17            MS. LYE:  Objection.  Nonresponsive.  The question

070608e.txt

18  is, who pays for that?

19          THE COURT:  Let me ask this.  Is every expense of

20  SAPA, this one included, paid for by the company?

21          THE WITNESS:  Yes.

22          THE COURT:  Thank you.  We don't need any more

23  evidence.

24          MR. SPAGAT:  Thank you, Your Honor.

25

                EISENSTAT - DIRECT EXAMINATION / SPAGAT      12

1  BY MR. SPAGAT:

2  Q.   Okay.  Does SAPA have committees?

3  A.   It does.

4  Q.   What are the committees?

5  A.   Let's see.  Benefits committee, the reserve committee, the

6  scheduling committee, the safety committee, the policy

7  interpretation and complaint committee, the jump seat

8  committee, the hotel committee, the disciplinary committee.

9          Is that nine?  We have nine committees.

10  Q.   I have a -- in my notes a communications committee.

11  A.   Yes.

12  Q.   And a flight standards committee?

13  A.   Flight standards committee.

14  Q.   And how often do these committees meet, if you can

15  generalize?

16  A.   The committees don't meet per se unless there is a

17  particular reason for a committee to meet, in which I schedule

18  that committee and they can meet.  However, those committees

19  meet with us during our monthly SAPA meetings and they report

20  on their committee activities.

21  Q.   And who -- how are the committees constituted?  Who sits

22  on various committees?  How is that determined?

                            Page 10

070608e.txt

23  A.    By way of executive board appointment.  However, we tend

24  to be on the side of who is more interested.  For instance, the

25  reserve committee, if there has been a pilot in our -- on our

EISENSTAT - DIRECT EXAMINATION / SPAGAT        13

1   regional representative board who has been on reserve for three

2   or four years, he might be a good candidate to be the reserve

3   committee chairperson.  So it's where your interest lies pretty

4   much and where you want to serve.

5   Q.    And the SAPA representative board delegates

6   responsibilities to these committees to look into the various

7   matters within their areas; is that --

8   A.    That's correct.

9   Q.    Okay.  Does -- you saw Mr. Canuch testify yesterday?

10  A.    Uh-huh, yes.

11  Q.    Does he sit on any committees?

12  A.    Presently, no.

13  Q.    Okay.  How often does the SAPA board meet?

14  A.    The representative board, we have once a month -- I'd say

15  nine meetings per year.  There are some months we don't meet.

16  Q.    And when you meet, how long do the meetings go on?

17  A.    They are generally two-day events.  Four to five hours

18  each day.

19  Q.    And are there rules governing -- what do you do at the

20  meetings?

21  A.    Well, we have an agenda, which I prepare, and a meeting

22  packet, which I also prepare, of the issues at hand, the

23  projects that we are working on.  And the proposals that are

24  issued come to me from the representative board to create the

25  meeting packet.  We review those proposals.  For an example,

EISENSTAT - DIRECT EXAMINATION / SPAGAT        14

Page 11

070608e.txt
1  reserve two-hour call out. We would like two-hour call out for
2  all domiciles, instead of an hour and a half. Well, that's
3  debated within the group why that would be good to our pilots,
4  and that --

5          THE COURT: What's a two-hour call out?

6          THE WITNESS: When you are on reserve, you are at the
7  mercy of the company. You have to have a number of pilots that
8  are guaranteed a particular amount of pay, but the company can
9  call them to fly at any time. That's a reserve pilot. They
10 are on reserve. And they have an hour and a half presently to
11 get to the domicile once they are called to fly a trip. It
12 covers a sick call, it covers a mechanical or something of that
13 nature.

14         THE COURT: So you would be in favor of lengthening
15 that time?

16         THE WITNESS: Absolutely.

17         THE COURT: And you say to get to the domicile. What
18 if they are not at the domicile? They have to get to their
19 domicile or get to a different location?

20         THE WITNESS: They have to be able to check in within
21 an hour and a half from the initial call.

22         THE COURT: At the domicile. But they may not even
23 be leaving from the domicile or they are generally -- are they
24 always leaving from the domicile?

25         THE WITNESS: The call with come in within an hour
               EISENSTAT - DIRECT EXAMINATION / SPAGAT      15

1  and a half. It's someone who lives within that domicile and
2  has to check in within an hour and a half.

3          THE COURT: Thank you.

4  BY MR. SPAGAT:

5  Q.   That's just one example of --
                        Page 12

070608e.txt

6    A.    One example of a proposal that we would like, and what are

7    the merits of this proposal and is it feasible, et cetera.  So

8    of the proposals are proposed, and they go crashing, flaming

9    down.  We just had a proposal -- well, if you would like me to

10   continue, I would, but we don't need to.

11   Q.    Okay.  I'm just trying to establish how the meetings are

12   conducted for now and how the business is done.

13   A.    If I can, not only proposals do we discuss, we have

14   committee reports on all our committees.  The committee

15   chairpersons report on their activities.  And the logistics of

16   the meeting, we vote in our bylaws, rather -- I'm sorry, our

17   meeting minutes from previous meetings that we vote in and

18   accept.  And all of these are done by motion and vote.

19   Q.    Can you give just -- I'm going to try to move as fast as I

20   can here, but just one example of one committee report that was

21   recently addressed in a SAPA meeting?  Do you have one in mind?

22   A.    Yeah.  Our jump seat committee report.  Jump seat is a

23   cockpit jump seat that is available to flight crews -- pilots,

24   rather, to jump seat across the nation for various reasons.

25              Our jump seat committee report was given by Michael

              EISENSTAT - DIRECT EXAMINATION / SPAGAT        16

1    @Masias.  Michael is no longer a representative, but he is a

2    jump seat coordinator because of his expertise in jump seat

3    matters.  And Michael came and just attended the jump seat

4    conference in Washington, D.C., and three days' worth, and

5    reported on some of the issues that are going on with jump

6    seats with United and the difficulties we are having in Salt

7    Lake City with our jump seat, et cetera.

8              So he reports on all of that.  We listen and we offer

9    suggestions.  And he wants suggestions and feedback from us.

10   Q.    And the --

                         Page 13

070608e.txt

11          THE COURT:   -- a three-day conference on jump seats?

12          THE WITNESS:   Boy, I don't know.  But I'm glad

13  Michael attended and not me.

14  BY MR. SPAGAT:

15  Q.   Just so you can explain, what is the controversy about

16  jump seats?

17  A.   There is quite a few actually.  Each airline reserves

18  their jump seat as very sacred, if you will.  Seniority within

19  cochair agreements, regionals connecting for a main line

20  partners, get very sticky on who goes first as far as seniority

21  when you walk up to get a jump seat.  Very, very in-depth.

22  There is also issues with TSA -- Homeland Security and TSA as

23  far as security-wise on who gets that jump seat and who is

24  allowed to sit in that cockpit.

25  Q.   And that's relevant for pilots?  One reason would be

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        17

 1  because pilots don't live in the same city as their domicile

 2  and they are relying on the jump seat to get to work, and there

 3  could be conflicts as to who gets priority?

 4  A.   Absolutely.

 5  Q.   Okay.  And I assume -- I am not going to go into all nine

 6  areas, but I assume all the committees have issues that they

 7  deal with in their areas and report to SAPA, their views for

 8  SAPA, for the SAPA representation board's consideration?

 9  A.   Periodically they do.  Not all committees have reports

10  during our SAPA meeting.  Some of them have nothing to report.

11  Q.   Okay.  And does it take a minimum number of SAPA

12  representatives to have a quorum at a meeting?

13  A.   It does.

14  Q.   What's that number?

15  A.   A quorum consists of two-thirds.

                              Page 14

070608e.txt

16  Q.   And if you vote on an issue -- I take it, you need a

17  quorum to vote on issues?

18  A.   We need a quorum.  That also includes two representatives

19  of the executive board.  So two of the three executive board

20  members need to be present for a quorum to be present.

21  Q.   So you need two of three executive members and two-thirds

22  of the representatives?

23  A.   Of the 19, yeah.

24  Q.   And if there's a quorum, you can vote on issues; is that

25  correct?

              EISENSTAT - DIRECT EXAMINATION / SPAGAT        18

 1  A.   Yes.

 2  Q.   What is the vote you need in order to pass?

 3  A.   50 percent.  Excuse me.  50 percent on proposals.

 4  Two-thirds on bylaws changes.

 5  Q.   Okay.  And the executives, you said there were three

 6  executives, correct?

 7  A.   Yes.

 8  Q.   What are the executive positions?

 9  A.   President, vice president and secretary.

10  Q.   And you're the secretary?

11  A.   I am.

12  Q.   And are those offline, meaning these are full-time

13  positions so you don't fly planes to do this work; is that

14  correct?

15  A.   We are full-time offline.

16  Q.   And how --

17          MR. SPAGAT:  Shall I avoid how they are paid?

18          THE COURT:  Well, we know you're paid by the company.

19  BY MR. SPAGAT:

20  Q.   How is the pay -- how is the amount of pay determined?

Page 15

070608e.txt

21  A.    When Todd Schmidtke and I went offline, we went to our

22  director of flight operations, then was Gary Overbaugh, and we

23  realized that we had to figure out how we were going to be

24  paid.  We looked back six months, Todd and I respectfully, and

25  the amount that -- we were doing quite a bit of flying back

EISENSTAT - DIRECT EXAMINATION / SPAGAT        19

1   then.  We looked back six months and it came to about 104, 105

2   hours per month is what we were doing in that six-month period,

3   and they agreed to pay us that to be offline.

4   Q.    So when you became an offline full-time SAPA executive,

5   did your pay change in any material way from what it had been

6   as a pilot?

7   A.    It didn't.

8   Q.    Okay.  And in your opinion, is -- are you doing a

9   full-time amount of work?

10  A.    Yeah.  Yes.

11  Q.    Would you explain what it is that you do that fills up

12  your time?

13  A.    I'm not sure we have that time here.  I am in charge of

14  correlating all meetings.  There are at least three, four or

15  five meetings per month out of town.  I am in charge of

16  minute-taking, minute-keeping, publishing the minute meetings.

17  In charge of all logistics as far as hotels are concerned, crew

18  scheduling for the scheduling of representatives, all though we

19  have PBS now for preassignments.

20        I am in charge of, again, keeping those meetings and

21  publishing.  I'm in charge of creating the agendas for these

22  meetings.  For some reason by default this has happened in

23  other meetings.  For instance, in flight ops meetings that we

24  have and PBS meetings and policy interpretation complaint

25  meetings.

070608e.txt
EISENSTAT - DIRECT EXAMINATION / SPAGAT          20

1          I'm in charge of preparing the meeting packets for
2    all of those.  I'm in charge -- I am the point person for
3    corporate SkyWest when they do have questions, they generally
4    will call me because of my longevity in SAPA and with the
5    company.  I get numerous calls sometimes that require all day
6    long issues that I'm dealing with pilots, and that I am
7    somewhat of a mediator in between crew support, crew payroll
8    when pilots call me with issues.  I'm in charge of the --
9          THE COURT:  Do they call you if they have an issue
10   with another pilot or another crew member, or they call you if
11   they have an issue with the company, or is it both?  Do you
12   understand my question?
13         THE WITNESS:  I do.  Generally I don't get calls when
14   there's issues with other pilots, pilot relationships.  It's
15   generally with the company.
16         THE COURT:  Okay.
17         THE WITNESS:  I am in charge of finding review board
18   member panel members and the logistics of getting them into
19   hotels and making sure that their trips are covered.
20         I am the point person for the regional
21   representatives who will call me with their issues and
22   problems.  I am the point person for -- as I said, it's just a
23   repeat, for the management issues that come up.  These areas
24   and these preparations are very, very time consuming, because I
25   am generally interrupted by telephone calls.

EISENSTAT - DIRECT EXAMINATION / SPAGAT          21

1          I literally am a 24-and-7 with my cell phone, except
2    for about three hours on Sunday when it is off.  So the work,
3    and I do get a good amount of calls between 1:00 in the morning
4    and 5:00 in the morning from pilots with issues.  In any case,
Page 17

070608e.txt

```
 5   I have tremendous amount of work.  I don't have it all in front
 6   of me, but I listed probably about 40 items that are quite time
 7   consuming, and that I am probably about two weeks to a month
 8   behind in a given time.
 9   BY MR. SPAGAT:
10   Q.    Okay.  Has management ever told you what to do on your
11   job?
12   A.    Never.
13   Q.    Has management ever told you how to vote on an issue?
14   A.    Never.
15   Q.    Has management ever disciplined you since you've taken on
16   a role with SAPA?
17   A.    Never.
18   Q.    Has management ever threatened to discipline you while you
19   have been working for SAPA?
20   A.    Have not.
21   Q.    Has management ever threatened to take away your pay while
22   you have been working for SAPA?
23   A.    Never.
24   Q.    Has management ever threatened to take you out of your
25   position at SAPA?
```

                    EISENSTAT - DIRECT EXAMINATION / SPAGAT        22

```
 1   A.    Never.
 2   Q.    Has management ever told you how to allocate your time?
 3   A.    Never.
 4   Q.    Never told you how to prioritize issues?
 5   A.    No.
 6   Q.    Never told you what your view should be on any issue?
 7   A.    Uhm -- uhm, by way of what we do, they have their views.
 8   They try to force those on us.  We force our views on them.
 9   Q.    So they negotiate with you?
```
                              Page 18

070608e.txt

10  A.    Yes.

11  Q.    To your knowledge, has anyone at -- has management of

12  SkyWest ever told anyone at SAPA what they should do in

13  representing SAPA?

14  A.    To my knowledge, no.

15  Q.    Has management ever told anyone in SAPA how to vote?

16  A.    No.

17  Q.    To your knowledge, has management ever disciplined anyone

18  in SAPA for their SAPA work?

19  A.    No.

20  Q.    Has management ever threatened to discipline anyone in

21  SAPA for their SAPA work?

22  A.    No.

23  Q.    To your knowledge, has management ever threatened not to

24  pay anyone at SAPA as a result of the work they were doing for

25  SAPA?

EISENSTAT - DIRECT EXAMINATION / SPAGAT        23

1   A.    No.  Questioned.  Sometimes they would like to see the

2   work produced.  And that's fine, because that again comes

3   through me, which I request the representative the work that's

4   produced and then I can produce that.  Generally, they -- they

5   just want to know do you have the work, and can you prove the

6   work produced?  I tell them I can, and they pay.

7   Q.    Okay.

8   A.    It's kind of a check and balance on me.

9   Q.    Okay.  Has management ever asked that any member of SAPA

10  be taken out of their position as a SAPA representative?

11  A.    No.

12  Q.    Can the company remove a SAPA officer?

13  A.    They can't.

14  Q.    Can the company remove a representative?

070608e.txt

15  A.    They can't.

16  Q.    What is your employment status?  Are you a member of

17  management?

18  A.    I'm not.

19  Q.    Were you eligible to vote in the last union election?

20  A.    I was.

21  Q.    So you were eligible to vote as a line pilot in the last

22  union objection?

23  A.    Yes..

24           MS. LYE:  Objection.  Assumes facts not in evidence.

25  Union -- the use of the term "union" would be a conclusion

                    EISENSTAT - DIRECT EXAMINATION / SPAGAT        24

1  here.

2           MR. SPAGAT:  Should I rephrase it to be the ALPA

3  campaign?

4           MR. EMERSON:  UPA.

5  BY MR. SPAGAT:

6  Q.    Were you eligible to vote in the UPA election in 2003?

7  A.    Yes.

8  Q.    Were you eligible to vote in the ALPA election in 1999?

9  A.    Yes.

10  Q.    Did you with any members of SAPA ever go to management and

11  ask to be certified as a bargaining representative under the

12  RLA?

13  A.    I did.

14  Q.    When did that occur?

15  A.    1998, possibly '99.

16  Q.    Who made that decision to ask?

17  A.    The representative board.  It was a unanimous decision.

18  Q.    Okay.  And who went to that meeting?

19  A.    Todd Schmidtke and myself traveled down to St. George.

                              Page 20

070608e.txt

20  Q.   So you were there at the meeting?

21  A.   I was.

22  Q.   Was Phil Alford at the meeting?

23  A.   He was not.

24  Q.   And what happened at the meeting?

25  A.   We presented a letter that had been drafted by Nate

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        25

1   @character, who was a line pilot and a SAPA representative at

2   the time, as our desire as a SAPA representative board to

3   organize.

4   Q.   And what happened at the meeting?

5   A.   As we presented the letter to those in attendance, Ron

6   Reber who is the current CEO of the company, Brad Holt, vice

7   president of flight operations, and Gary Overbaugh, who was at

8   the time the director of flight operations. We presented our

9   letter and our desires to organize.

10       After some discussion, Gary Overbaugh -- let me first

11  back up. Ron Reber left the room afterward and indicated that

12  he needed to call United Airlines. Apparently, there was a

13  negotiation going on with SkyWest and United Airlines. And he

14  needed to inform them that we are -- we have a desire to

15  organize, and that could probably have some issues regarding

16  the negotiations with United and SkyWest.

17       He left the room. Gary Overbaugh, after we were done

18  speaking about this, mentioned one more thing to us. And he

19  asked us, "Are you sure this is what the pilots want?" Todd

20  and I looked at each other and kind of shrugged our shoulders

21  and said, "We really don't know what the pilots want, but this

22  is what the representative board wants."

23       That night Todd and I discussed over dinner that we

24  needed to produce a survey and see if this is what the pilots

                                Page 21

070608e.txt

25  want as opposed to the representative board.

EISENSTAT - DIRECT EXAMINATION / SPAGAT        26

1   Q.   And did you do that?

2   A.   We did do that.  We conducted that survey.

3   Q.   How did you conduct a survey?

4            THE COURT:  I'm sorry, when was this again?

5            MR. SPAGAT:  I think he said 1998 or '99.

6            THE WITNESS:  We did conduct that survey, and I

7   believe it was via paper.  I can't recollect how we did that.

8   Our electronic means weren't real good and developed at that

9   time, so I believe it was a paper vote survey.

10  BY MR. SPAGAT:

11  Q.   And what did the survey show?

12  A.   About 17 percent that were in favor of organizing under

13  SAPA.

14  Q.   So only 17 percent of the actual group of pilots were in

15  favor of organizing?

16  A.   Yes.

17  Q.   And so what did you then do?

18  A.   We continued business as usual.

19  Q.   So you dropped the request to seek certification?

20  A.   We did.  We informed them after the survey that we

21  wouldn't be organizing.

22  Q.   Now, were you fired at that meeting?

23  A.   I was not fired.

24  Q.   What happened?

25  A.   On the way out, if you understand Brad Holt, who is the

EISENSTAT - DIRECT EXAMINATION / SPAGAT        27

1   vice president of flight operations and his dry sense of humor,

2   we shook hands and he said, "You guys leave your badges on the

Page 22

070608e.txt

3    table." Everybody chuckled. We left and said, "Please don't
4    kill the messenger." As we left, that was the end of the
5    conversation.
6    Q.   So did you understand that you were being fired at that
7    time?
8    A.   I had no recollection I was -- I wasn't being fired at
9    that time.
10   Q.   Were you ever reinstated?
11   A.   I wasn't because I wasn't fired.
12   Q.   Did you have a conversation with Phil Alford about what
13   had happened?
14   A.   I did.
15   Q.   What did you tell him?
16   A.   I told Phil Alford exactly what happened at the meeting.
17   I told him that Brad made a comment to leave our badges on the
18   table.  There was no significance to that whatsoever.  And that
19   was the conversation I had with Phil.
20   Q.   Okay.  Let's talk about some of the functions of SAPA.
21   What are the primary things that SAPA does to represent
22   employees at SkyWest?
23   A.   Well, it's all -- it's all based around our crew member
24   policy manual, and what we do is we uphold that manual.  We
25   improve upon that manual, but we work in concert with the

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        28

1    company to not tie their hands in issues that are unnecessary.
2         The manual is an open, living, breathing document
3    which we can approach management with anything at any given
4    time.  We don't have to open for negotiations.  Anything that
5    we deem is not working for us at the time, we can go in and
6    start work on it with management and say, This needs to change,
7    let's change it, let's get a proposal going.

070608e.txt

8          By the same token, management can come to us and say,
9   You know what, this section of the policy manual isn't working
10  for us.  Can we address it, can we talk about it, et cetera.
11         A good cooperative effort of resolving differences
12  within the crew member policy manual.  But the scope of the
13  crew member policy manual is pretty much where we lie in our
14  jurisdiction.
15  Q.   Okay.  Is there also an opportunity to bring complaints
16  about decisions that have been made under the crew member
17  policy manual?
18  A.   I'm sorry?
19  Q.   Can -- can pilots through SAPA bring complaints about
20  decisions, interpretations of the crew manual that have gone
21  against them?
22  A.   Yes.  It's through the policy interpretation complaint
23  system, which is all done online.  If they're not paid or not
24  treated accordingly as they feel, according to the policy
25  manual, they have a right to discuss that and file a policy

               EISENSTAT - DIRECT EXAMINATION / SPAGAT      29

1   interpretation complaint, a PIC.
2          I am the PIC committee person, chairperson.
3   Q.   I just want to get the list out.  So you negotiate over
4   the crew member policy manual.  There are policy interpretation
5   complaints.  Is that all correct?
6   A.   Yes.
7   Q.   And SAPA plays a role with the review board in
8   disciplinary proceedings; is that also correct?
9   A.   A minor role.
10  Q.   I'm sorry?
11  A.   Not a large role.  That -- that program is instituted and
12  runs through the human resource department.  SAPA's role is to

070608e.txt
13  appoint two SAPA representatives to be on that review board

14  panel.  That's the extent of where we play in that role.

15  Q.   Okay.  Let me talk a little bit about the crew member

16  policy manual.

17          How did that come into being?

18  A.   I believe there's a rough form of it already in existence,

19  before Woody Wood started an extensive work of rewriting and

20  making it just a better document back in 1994.

21          When I got into 1997, that work was still being

22  compiled with Woody and with Brad Holt.  Woody would meet with

23  Brad Holt.  They'd discuss certain factions of the policy

24  manual, and then bring back to the representative board for

25  discussion, and it went back and forth like that for quite some

          EISENSTAT - DIRECT EXAMINATION / SPAGAT        30

1   time.

2   Q.   What is the crew member policy manual cover?

3   A.   Well, it covers everything from vacation and user time to

4   scheduling to compensation to training issues, to PBS, our

5   preferential bidding system guidelines.  It has reserve

6   sections in it.  It has disciplinary sections in it.  Hours of

7   service.  So pretty much all what we're regulated under as far

8   as policy is concerned, as far as crew members are concerned.

9   Q.   Okay.  And you said that Woody Wood was negotiating with

10  Brad.  Who again is Brad Holt?

11  A.   Brad Holt is the vice president of flight operations.

12  Q.   So he is a member of management in charge of flying?

13          MS. LYE:  Objection.  Misstates testimony.  I don't

14  believe he used the word "negotiate".

15          MR. SPAGAT:  I mean, I'm asking.

16          THE COURT:  Go ahead.

17  BY MR. SPAGAT:

          Page 25

070608e.txt

18  Q.    Okay.  Brad Holt, is he the top member of management in

19  charge of flying planes?

20  A.    Yes.

21  Q.    And woody wood was the top SAPA representative at the

22  time?

23  A.    He was the president of SAPA.

24  Q.    And so describe the process by which they worked out

25  language for --

EISENSTAT - DIRECT EXAMINATION / SPAGAT        31

1   A.    When I came into the group in 1997, this work was already

2   underway.  Woody would discuss what he discussed with Brad

3   Holt.  And we would either counter or change or say, We don't

4   like this, it needs to be this way, et cetera.  And then Woody

5   would take everything back to Brad.  They would discuss it.

6   Woody would come back and say, Brad is willing to do this.  We

7   told him it's not good until we do this, et cetera, et cetera.

8         That's how.  It was this ping-pong volley back and

9   forth as far as the process was concerned until we finally came

10  to an agreement on the policy manual, and we were done and

11  ready to put it out for a vote.

12  Q.    So Woody would consult with the SAPA board and then bring

13  positions in and discuss SAPA's position with Brad Holt?

14  A.    Yes.

15  Q.    And they would discuss together, and then Woody would come

16  back and report on what happened with Mr. Holt to the SAPA

17  board, and then you would discuss that; is that correct?

18  A.    Yes.

19  Q.    So this went back and forth until you finally agreed on

20  the language of the crew member policy manual?

21  A.    Yes.

22  Q.    And when it was done -- I would like to draw your

Page 26

070608e.txt

23  attention to the tab number 5.

24  A.    Okay.  Yeah.

25  Q.    Is this the policy manual?  Do you recognize it?

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        32

 1  A.    Yes, this is the crew member policy manual.

 2  Q.    And drawing your attention to the first page after the

 3  cover page.

 4  A.    Okay.

 5  Q.    What is that page?

 6  A.    This is a letter of agreement.

 7  Q.    Okay.  Agreement between whom?

 8  A.    Between the SkyWest Airlines Pilot Association and SkyWest

 9  Airlines management.

10  Q.    Who is David Livingston?

11  A.    He was a -- he was a former SAPA president.

12  Q.    Was he president at the time he signed?

13  A.    Yes.

14  Q.    And who is Jessica Johnson?

15  A.    She was a former say SIA president.

16  Q.    And who is SIA?

17  A.    SkyWest Inflight Association.  It's our counterparts in

18  the flight attendant group.

19  Q.    Okay.  And who is Jerry C. Atkin?

20  A.    He's the president and CEO of SkyWest Airline -- of

21  SkyWest, Inc.

22  Q.    Okay.  And Ron Rebar (phonetic)?

23  A.    Ron Reber was the chief operating officer at the time.

24  Q.    And Brad Holt?

25  A.    Director of -- vice president of flight operations at the

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        33

 1  time.

070608e.txt

2  Q.   Okay.

3  A.   Still is.

4  Q.   Did SAPA make a difference in the language of the crew

5  member policy manual during the time that it was discussed

6  between Woody Wood and Brad Holt?

7  A.   Absolutely.

8  Q.   Do you have any examples in mind?

9  A.   I don't.  I would have difficulty remembering that far

10  back on the issues that were discussed.

11  Q.   Okay.  We'll discuss some of the newer changes in a minute

12  here.

13        Have you negotiated over the manual since?

14  A.   Absolutely.

15  Q.   I'd like to draw your attention to SP308-20, which is in

16  the manual.

17  A.   Okay.

18  Q.   Can you -- I guess the manual is from policy to policy.

19        Can you explain what SP308-20 is?

20  A.   SP308-20 is called pairing extensions.  Used to be called

21  trip extensions until we went to the preferential bidding

22  system and changed it to pairing extensions.  It is -- prior to

23  this policy coming into effect, we didn't have a way to pay a

24  crew member to fly on a scheduled day that he was scheduled to

25  fly on.  They only get overtime if they fly on a scheduled day

              EISENSTAT - DIRECT EXAMINATION / SPAGAT        34

1  off.

2  Q.   So there were instances where a pilot might fly beyond

3  what his schedule was on a scheduled day --

4  A.   And he would get straight pay for it instead of time and a

5  half for it.

6  Q.   Okay.

                        Page 28

070608e.txt

7   A.   This pairing extension says that if you show up prior to

8   your shift or exclusively asked to fly another round-trip or

9   more legs after your shift has ended, that you will receive

10  overtime for those legs, those leg segments flown.

11  Q.   whose idea was it to have overtime pay for unscheduled

12  flying on a scheduled flying day?

13  A.   As far as this SP section is concerned?

14  Q.   Right.  who wanted this policy change?

15  A.   The SAPA representative board.

16  Q.   So this idea came out of SAPA?

17  A.   Yes.

18  Q.   So how can did this policy find its way into the manual?

19  A.   As Todd Schmidtke and myself wrote it, we brought it up at

20  a flight ops meeting and proposed it.  Again, as we propose

21  anything, there are counterproposals that go back and forth

22  until eventually we came up with a proposal that both sides

23  could agree on.

24  Q.   So at your request, management considered and negotiated

25  this policy; is that correct?

EISENSTAT - DIRECT EXAMINATION / SPAGAT          35

1   A.   Yes.

2   Q.   And eventually the policy was implemented?

3   A.   Yes.

4   Q.   when did that occur approximately?

5   A.   I don't know.  This is about maybe seven years ago.  It

6   would be tough to -- for me to pinpoint exactly when it

7   occurred.

8   Q.   Okay.  How about SP317-13?

9   A.   317 -- what was the reference?

10  Q.   3 -- so it's SP317.

11  A.   Uh-huh.

070608e.txt

12  Q.    Dash 13.

13  A.    The displacement policy?

14  Q.    What is the displacement policy?

15  A.    At certain times there are training events that occur that

16  have to occur in the aircraft.  When a new hire pilot is --

17  after training is placed out on line flying, he does what's --

18  he's given a number of hours to do what's called initial

19  operator experience, IOE.  And he's trained by a line captain

20  who is qualified to give IOE, and the copilot receives the IOE.

21          If that happens, the regular crew member who bid that

22  line has to be displaced.  And the IOE candidate, copilot, is

23  now put in that position and now he gets the training from the

24  IOE captain.

25          Well, what to do with the displaced crew member?

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        36

 1  What -- where do we put him?  What do we do with him?  What are

 2  his rights?

 3          He is allowed as per this policy to up to 72 hours of

 4  the report time for the shift, they can put him back in another

 5  trip.  They can use him on another trip.

 6          And there are certain confines within the certain

 7  duty periods of that trip that they have.  They can't just do

 8  it at any given time.  There are certain confines that they had

 9  to work with them in that.

10          However, inside of 72 hours, he is going fishing,

11  basically.  The company cant' touch him, they can't call him.

12  He's done.  They haven't assigned him.  He gets all that time

13  off plus the shift pay that they displaced him from.

14  Q.    So before this policy went into effect, what was the

15  difference, if you can summarize it?

16  A.    I don't think I can summarize it.  And I don't remember it

                            Page 30

070608e.txt

17  well enough.  I do know that the displacement policy went all

18  the way up to the end, that they had an opportunity, as I

19  recall, to go right up to the last minute, where you had to

20  kind of -- you had to wait to see if there was a replacement

21  trip for you, the crew member being displaced.

22          There weren't the protections that we have now.  It

23  was not a very -- this is speculative.  It was not a very good

24  policy.  Because of SAPA, we went and we made it something that

25  was at least fair and equitable to the pilot.

                EISENSTAT - DIRECT EXAMINATION / SPAGAT          37

1   Q.    So the point is that if the pilot has not been rescheduled

2   72 hours before the previously scheduled trip, he is going to

3   get paid but he can't get called into work?   ·

4   A.    Yes.

5   Q.    That was a change that SAPA made to the crew manual

6   policy, to the crew member policy manual for the benefit of

7   pilots?

8   A.    It was.

9   Q.    Okay.  Let me ask you a little bit about SP317, the

10  preferential bidding system.  We heard testimony about that

11  yesterday.

12          Can you describe how SP317 works.

13  A.    SP317, our preferential bidding system -- actually SP317

14  is called scheduling.  However, all of our scheduling is based

15  on our PBS system now, which is preferential bidding system.

16  Prior to the preferential bidding system, we had what's called

17  a hard line bidding system where the company would produce

18  lines of flying and the number of lines that were in a

19  domicile.  A small domicile might have 30 lines of flying.  And

20  you could bid on those lines of flying.  If you are senior, you

21  will get your first pick.  If you are junior, you are going to

                            Page 31

070608e.txt

22  get what's left.  If you're junior and there's 30 lines, you

23  have to bid 30 lines.

24          The preferential bidding system is a way by which a

25  crew member now can go home, and during a seven-day window

EISENSTAT - DIRECT EXAMINATION / SPAGAT       38

1  actually build and create his own schedule based on the

2  available flying, the pairings that are available in a

3  stockpile over here they can pick.  All based by seniority, the

4  senior pilots will, of course, get the trips they select.

5  There's a lot of preferences on the preferential bidding;

6  hence, the word preferential.  For instance, I don't want to

7  fly with this captain.  I don't want to fly late at night.  I

8  want four-day trips instead of three-day trips.  I don't wan to

9  go east, I want to stay on the West Coast.  I want stand-up

10  overnights as opposed to two days of flying.  Guess what, I

11  want eleven days off at the first of the year, first of the

12  month and then load me up at the end.  A lot of preferences

13  that we can place in there, and the computer will all sort it

14  out.  That's preferential bidding system.

15  Q.    So you may or may not get what you request.  That goes by

16  seniority, but you have much greater ability to try and plan

17  your month?

18  A.    Absolutely.

19  Q.    And how did that come into being?

20  A.    Years ago there was a conference that SAPA was requesting

21  of -- scheduling -- let me just preface it by saying scheduling

22  is a very large part of a pilot's life.  It's -- it falls under

23  the quality of life.  The ability to bid a good schedule is a

24  very good thing as far as the quality of life for a pilot.

25  Maybe top priority, in my opinion.

EISENSTAT - DIRECT EXAMINATION / SPAGAT       39

070608e.txt

1        Our schedules from time to time have just not been
2    very good.  The larger we get, the more difficult it gets to
3    write good schedules and put the time in that it takes.
4        And we had a conference years ago about what to do
5    about this problem, and we invited some outside general
6    members, pilots, and we had executive boards of SIA and SAPA
7    there.  And management personnel were with us.  And we split up
8    into little work groups, and everybody brought up what they
9    thought would be best.  At the end of the day, it all boiled
10   down to we need a preferential bidding system like other
11   airlines have.  Knowing that it was a tremendous cost outlay to
12   the company but that's what we wanted.  From that time on we
13   pursued that and contracted with an outside vendor; and, hence,
14   the evolution of preferential bidding.
15   Q.   When did that go into effect?
16   A.   It started, I believe, about two years ago is when we
17   first, I believe, went live with the first domicile.  Then it
18   took six, seven, eight months to finish all domiciles where
19   everybody was live on that system.
20   Q.   Have you have you surveyed pilots to get feedback on that
21   system?
22   A.   We have.
23   Q.   What did that survey show?
24   A.   On that particular question, the question was stated on
25   the survey, Are you satisfied with preferential bidding, or

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        40

1    would you rather go back to hard line bidding?  Overwhelmingly,
2    I believe in the 80, 85 percentile was, yes, I'm satisfied with
3    preferential bidding.
4    Q.   Can you briefly discuss the ASAP program?

                            Page 33

070608e.txt

5  A.   As far as I know it, there's more -- there's other people

6  more qualified than I am to discuss this.  The ASAP program is

7  a program that was brought to us.  Chris @Sadell, who was then

8  the SAPA president, and myself were invited to attend an FAA

9  presentation of ASAP.  This wasn't something that SAPA founded.

10  ASAP is the Aviation Safety Program sic.  And we attended that,

11  and basically the FAA wants information on when you mess up as

12  a pilot.  That sounds pretty bad.  But there are certain things

13  that we do that we shouldn't do.  We -- altitude deviations;

14  for instance, you are cleared down to 20,000 feet and, guess

15  what, we head down to 19,000 feet.  That's a deviation.  That's

16  a no-no.  We shouldn't have done that.

17          They want to know why that happened and how did we do

18  that?

19          Well, they provided some amnesty for us by saying,

20  Here is a program that you can submit when you make a mistake

21  and we won't go after you, pretty much.

22  Q.   The FAA?

23  A.   The FAA.  But submit it so we can learn on where to focus

24  our -- our -- our training events, where to focus and help

25  companies in their training and say, look, we've got 70 percent

                EISENSTAT - DIRECT EXAMINATION / SPAGAT      41

1  altitude busts, people are busting altitude.  And this is a big

2  problem.

3          Now, would they have had that information prior to

4  the ASAP program?  Probably not.  Because a pilot worries about

5  keeping his license and certificate when he busts an altitude.

6  Nobody says anything.  He jumps right back up to 20,000 feet.

7          THE COURT:  Is this information given to the company?

8          THE WITNESS:  This information?

9          THE COURT:  When you fill out an ASAP, is that

                            Page 34

070608e.txt

10  information that goes to the company or does it go to the FAA,

11  or what?

12          THE WITNESS:  Goes to the FAA.  They review 120 of

13  these each month.  We have a three-member committee.  Yes.  One

14  of the committee members is our vice president, Jim Black of

15  SAPA.  The FAA is another.  And then the company representative

16  is another.  It's called the ERC, the event review committee.

17          THE COURT:  And that's maintained in the company?

18          THE WITNESS:  It is.  It's very -- it's --

19          THE COURT:  The company becomes aware of --

20          THE WITNESS:  No.  No, it's not maintained within the

21  company.  There is a safety -- we have a safety department

22  within the company, but that is confidential information.  That

23  does not go to flight operations personnel.

24          THE COURT:  Doesn't go to them?

25          THE WITNESS:  Uh-huh.

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        42

1           THE COURT:  That's interesting.  What's your view of

2   it, you have a pilot who is engaged in unsafe practices, and

3   simply fills out this form and the company, because either it's

4   not observed or there's a conspiracy of silence, how do you

5   know whether the pilot is competent?

6           THE WITNESS:  I wish I was more qualified to talk

7   about it.  However, the gross --

8           THE COURT:  I think this probably has nothing to do

9   with this case.

10          MR. SPAGAT:  There will be a witness who knows more

11  about this who administered the ASAP program.

12          THE COURT:  I'm sitting here.  I am also a passenger.

13          MR. SPAGAT:  Most of the reports are, they are little

14  things if that's of any help.

                              Page 35

070608e.txt
15          THE WITNESS:  Very trivial.

16          THE COURT:  Thank you.  Go ahead.

17   BY MR. SPAGAT:

18   Q.   Let me draw your attention to Defendant's Exhibit 12.  Tab

19   12 in the binder.

20          THE COURT:  Is this the memorandum of understanding?

21          MR. SPAGAT:  That's correct.  I'm just going to ask

22   him to authenticate it.

23   BY MR. SPAGAT:

24   Q.   Do you recognize the document?

25   A.   I know of the document.  I don't recognize the document.

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        43

1           THE COURT:  It will be admitted.  12 admitted.

2           (Defendant's Exhibit 12 received in evidence)

3           MR. SPAGAT:  Okay.  Thank you.

4    BY MR. SPAGAT:

5    Q.   Will you just read the last sentence of paragraph 1,

6    please.

7    A.   Paragraph 1.

8    Q.   Yes.

9    A.   The last sentence, "The pilots are represented by the

10   SkyWest Airlines Pilot Association," in parentheses, "SAPA."

11   Q.   Has SAPA negotiated over pilot pay with management?

12   A.   Yes, several times.

13   Q.   Okay.  Did SAPA negotiate a pay increase in early 2000s?

14   A.   Yes.

15   Q.   Can you describe how that happened?

16   A.   Probably not, other than in 1997, actually it's back

17   into -- to answer your question more correctly, it was 1999.

18   In 1997, we had a company policy manual and in concert with

19   a -- with -- company policy manual was completed.  We put that

                                Page 36

070608e.txt
20  out for vote along with a pay package proposal, which passed.

21  Q.   Actually let me back up because that's an important point.

22       When the crew member policy manual was agreed to by

23  the SAPA board and management, was it put out to vote by the

24  pilots themselves?

25  A.   Yes.

EISENSTAT - DIRECT EXAMINATION / SPAGAT        44

 1  Q.   And so did the pilots themselves vote to approve the crew

 2  member policy manual?

 3  A.   They did.

 4  Q.   And was that by a majority vote?

 5  A.   It was.

 6  Q.   And at the time that included a pay schedule; is that

 7  correct?

 8  A.   It did.

 9  Q.   Okay.  So the pilots also voted as a group to approve the

10  pay package in 1997?

11  A.   Yes.

12  Q.   Okay.  And how long was that pay schedule to be in effect?

13  A.   Three years.

14  Q.   So through 2000?

15  A.   Yes.

16  Q.   And when was the next time after 1997 that SAPA sought to

17  negotiate with management over compensation?

18  A.   1999.

19  Q.   So, but there was already a pay schedule in effect at that

20  time; is that correct?

21  A.   There was.

22  Q.   And, nonetheless, SAPA went to management asking to

23  negotiate?

24  A.   We were falling behind drastically within industry

Page 37

070608e.txt
25   standards.

EISENSTAT - DIRECT EXAMINATION / SPAGAT          45

1    Q.   That's what you felt?

2    A.   Yes.

3    Q.   And so you asked management to address that in the middle

4    of the term of this pay cycle?

5    A.   There was one more year left on it, yes.

6    Q.   And what did management do?

7    A.   They increased our pay.  We got a -- we were able to

8    obtain a pay raise.

9    Q.   What pay raise were you able to obtain?

10   A.   I -- I don't know.

11   Q.   At that time?

12   A.   At that time.  It was a pay increase at that time, and it

13   was -- brought us up to industry standards.

14   Q.   Okay.  And was there a time that management came to you to

15   talk about a bonus program thereafter?

16   A.   Yes.

17   Q.   Can you discuss how that happened?

18   A.   It's a little hazy.  However, the gist of it was that the

19   pilots at a given time were not happy with receiving a $500

20   quarterly bonus paycheck to share with a -- a ramper making

21   six-and-a-half dollars an hour who also makes $500 on the

22   quarter.

23   Q.   So the pilots didn't like how their bonus was structured

24   compared to that of other pilots?

25   A.   Exactly.  There was a difference between the

EISENSTAT - DIRECT EXAMINATION / SPAGAT          46

1    professionalism and what we had put into our careers and

2    receiving the same amount of bonus as were employees who did

3    not put that type of effort into their careers.

Page 38

070608e.txt

4  Q.   At least that's how the pilots felt?

5  A.   Yes.

6  Q.   And so what did SAPA do about that?

7  A.   We opted out of the bonus program for a two-dollar

8  increase in pay across the board.

9  Q.   Well, is that something that you had to discuss with

10 management?

11 A.   Absolutely.

12 Q.   So did SAPA go to management with a proposal, or was it

13 the other around?

14 A.   SAPA went to management with the proposal.

15 Q.   The proposal saying we will skip the bonus program, we

16 would rather have two dollars an hour?

17 A.   Yes.

18 Q.   And what happened when you made --

19 A.   Management was in agreement with that.  We felt that our

20 two dollars an hour would go a lot further as far as user time,

21 calculations and accruals and vacation accruals and 401(k) and

22 profit sharing.  That went a lot further than the $500 bonus.

23 Q.   So you negotiated a greater compensation than what

24 management was proposing?

25 A.   We did.

EISENSTAT - DIRECT EXAMINATION / SPAGAT        47

1  Q.   Okay.  I'd like to ask you some questions about the

2  performance rewards program.  The company wanted to implement a

3  performance rewards program; is that correct?

4  A.   Yeah.  It was a revamp of the old bonus program, which

5  really wasn't working for anybody at that time.

6  Q.   And this was the same program you had already opted out

7  of?

8  A.   Yes.

070608e.txt

9  Q.    So what happened?  Management proposed this program to

10  SAPA?

11  A.    Through about over the course of a year, year and a half,

12  Ron Reber occasionally visited the executive board and called a

13  meeting with us, and wanted to describe to him -- describe to

14  us what he was thinking about revamping the whole performance

15  rewards and bonus program.

16          And we looked and said, Well, that's fine, but you

17  need to include us in that.  And he says, Well, you will be

18  included.  We said, Well, you're going to get a lot of flack

19  from all the other employee groups because we opted out of it

20  for a pay increase.  And he felt that that pay increase by then

21  was a complete wash anyway, didn't matter.  Two dollars didn't

22  mean anything anymore.  We said, Okay, we'll go with that.

23          And he devised a way of giving a larger share to the

24  employees that have been here longer and that have a higher

25  W-2.  And all the way down the line, that's how the performance

EISENSTAT - DIRECT EXAMINATION / SPAGAT        48

1  rewards now is now set up.

2  Q.    So management developed a proposal for the performance

3  rewards program for pilots?

4  A.    For -- company-wide.

5  Q.    Including pilots?

6  A.    Yes.

7  Q.    And did the pilots accept management's first proposal?

8  A.    They didn't.

9  Q.    What did SAPA do?

10  A.    The first proposal, we were coming in at 50 percent share.

11  In other words, we would get one-half of the bonus.  All the

12  rest of the employees and groups would get a hundred percent

13  the first year.

Page 40

070608e.txt

14          The second year and subsequent years, we would be a

15     hundred percent.

16     Q.    And so did you negotiate over that?

17     A.    Didn't negotiate.  We just objected in front of all of the

18     rest of the employee groups at the time, and rallied the other

19     employee groups on our side who were -- who said we won't

20     participate in this program unless the pilots come in at a

21     hundred percent.  So strategically we rallied the troops.

22     Q.    And did you negotiate over what the margin would be that

23     the company would have to make in order to pay a bonus?

24     A.    We didn't.

25     Q.    Okay.  And how much does the performance rewards pay for

                     EISENSTAT - DIRECT EXAMINATION / SPAGAT        49

1     pilots?

2     A.    Well, it's variable.  It's based on the net profit margin

3     of the company.  And so it's variable.  When the program

4     started, our profit margins were higher, and so we -- well, let

5     me just give you an example.

6          When the program came out, my quarterly paychecks

7     were about 18, $1900 at my seniority longevity.  Now, they have

8     reduced to maybe 11, 12, 1300, something like that, just

9     because our net margins are a little lower now.

10     Q.    The point is that the performance reward is tied to the

11     performance of the company?

12     A.    That's one faction of it.  There's an on-time and

13     bag-handling portion of it where we get 250, 300 in increments.

14     But the other performance reward is based on our net profit

15     margin, percentage of that.

16     Q.    And was SAPA able to negotiate any increase in the way

17     that that amount is calculated?  Do you understand what I'm

18     saying?

                     Page 41

070608e.txt

19  A.    I do.  And we -- we weren't.  That program was set at the

20  time.  It's just the amount of money to bring us in at

21  100 percent on the first year, which equated into millions of

22  dollars was -- we had put a stop to that and said, We're coming

23  in at a hundred percent or we don't want to be a part of it.

24  Q.    Okay.  In the most recent round of pay negotiations, when

25  was pay most recently adjusted?

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        50

1  A.    November, I believe.  October or November of this last

2  year.

3  Q.    Now, as I understand it, management made a proposal in

4  November 2005, a pay proposal; is that correct?

5  A.    Yes.

6  Q.    And what happened with that proposal?

7  A.  · That proposal was put out for a pilot vote.  And it was --

8  it was rejected.

9  Q.    So SAPA had tried to negotiate with management?  This was

10  the best they could do; is that correct?

11  A.    Yes.  We felt; otherwise, we wouldn't have put that out

12  for a vote.

13  Q.    What happened?  What did the pilots do when it was put out

14  for vote?

15  A.    Well, they rejected it.  It was done through our private

16  software company that we use.  And they rejected the vote.

17  Q.    By what margin, if you know?

18  A.    I don't know.  I can't remember the margin of rejection.

19  Q.    So what happens when the pilots reject the proposal?

20  A.    Well, what we had heard from the pilot group was that this

21  is a -- let's send a statement to management.  And that's what

22  they felt they needed to do.  Because this is -- this is just

23  not enough.  This is too little and we need more.

                            Page 42

070608e.txt

24          And we took that, and at that point, to be honest
25  with you, didn't do anything with it at that point.  We
                EISENSTAT - DIRECT EXAMINATION / SPAGAT        51

1   wondered what to do, how soon management would be willing to
2   open negotiations with us again, and where to go at this point,
3   and what to propose.
4           Until eventually we got to the root crux of the whole
5   situation of what the pilots were actually asking for.
6   Primarily, it was a split in the rates of flying larger
7   aircraft.  We operated a Canada regional jet, which has
8   different seat configurations, a 200, 700, 900.  All of them
9   have different seat configurations.  And industry history would
10  indicate that you get more money to fly more seats in the
11  airplane.
12          So Brad Holt was adamantly against paying more for --
13  and, by the way, all of those aircraft require the same type
14  rating.  It's the same type rating.  So Brad Holt was against
15  paying more money for the same type rating aircraft.
16  Q.   But you had a different view, the pilots had a different
17  view?
18  A.   The pilots wanted more money because there are more seats,
19  and that's how the history of the airlines had shown it to be.
20  And we were able to actually split the rates and split the
21  aircraft rates between the three aircraft.  The 700 and the 900
22  have now an override, when you fly those aircraft you make more
23  money than if you would flying the 50-seat airplane.
24  Q.   And that's what the pilots wanted?
25  A.   That's primarily what they wanted.
                EISENSTAT - DIRECT EXAMINATION / SPAGAT        52

1   Q.   And so you were able to extract that concession from
                            Page 43

070608e.txt

2   management?

3   A.   We were.

4   Q.   And after you did that, was the pay package voted by the

5   pilots?

6   A.   It was.

7   Q.   And was it ratified by the pilots?

8   A.   It was.

9   Q.   Do you know by what margin?

10   A.   It was 56 percent in favor of.

11   Q.   And do you know what percentage of the pilots voted?

12   A.   There were 20 eligible -- around 2500 pilots.  I believe

13   2100 voted.

14   Q.   Okay.

15   A.   I take that back.  800 pilots didn't vote, so about 1700

16   pilots were in that voting.

17   Q.   Okay.  So 1700 out of about 2500?

18   A.   Yes.

19   Q.   Okay.  How in your opinion does pilot compensation at

20   SkyWest stack up against the industry?

21   A.   I believe in some areas we are high.  As far as the turbo

22   prop operation, we are probably highest paid on that aircraft

23   in the industry.  Close to it.  Our regional jets fall below

24   scale, even sometimes below average.  The middle of the line,

25   if you took the middle of the line of our regional competitors,

                EISENSTAT - DIRECT EXAMINATION / SPAGAT       53

1   we -- we are below average.  However, with our total

2   compensation, which would include performance rewards, it

3   brings us up pretty close to the top of the industry.

4   Q.   Okay.  Let's talk about the review board.  What does the

5   review board do?

6   A.   The review board processes the disciplinary option, that

                                Page 44

070608e.txt

7   all pilots are afforded for all disciplinary actions against

8   them other than the verbal warning.

9   Q.   Okay.  Are there exceptions to when a pilot is entitled to

10  a review board?

11  A.   Yes, there are.  Yes.  Unwritten exceptions, but yes.

12  Q.   What are the exceptions?

13  A.   Drug and alcohol abuse infractions.  I believe particular

14  sexual harassment infractions, although I am not certain about

15  that.  And there are particular training issues for which they

16  are not granted review boards.  Training by way of training

17  failures due to liability and safety issues.

18  Q.   Are there -- are probationary employees entitled to a

19  review board?

20  A.   They are not.

21  Q.   And why is that, if you know?

22  A.   Well, probationary pilots are -- is a one-year proving

23  ground to see if this employee is going to be able to fly our

24  airplanes and work out for us.  Pretty much, it has been

25  industry standard for as long as airlines started --

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        54

1            THE COURT:  I am aware of rules of probation.

2            THE WITNESS:  Thank you.

3            THE COURT:  Almost every industry.  Go ahead.

4   BY MR. SPAGAT:

5   Q.   Other than those categories, is a pilot entitled to a

6   review board?

7   A.   Yes.

8   Q.   Has management ever denied a pilot a right to a review

9   board other than pilots who fell into these categories?

10  A.   They haven't, not to my knowledge.

11  Q.   Okay.  Who sits on the review board?

                            Page 45

070608e.txt

12  A.   The jury panel members?

13  Q.   Yes.

14  A.   There are two management-appointed managers.  For

15  instance, I'll give you an example.  A chief pilot would be one

16  of the panel members.  And a supervisor of maintenance in a

17  particular domicile would be one.  And then two SAPA

18  representatives.

19  Q.   Who picks the SAPA representative?

20  A.   The bylaws indicate that the president will pick the

21  SAPA -- well, I'll answer the question.  I do.

22  Q.   And why is that?

23  A.   Uhm, because I am the administrative head of this

24  organization.

25  Q.   Have you ever discussed with any of the presidents of SAPA

                 EISENSTAT - DIRECT EXAMINATION / SPAGAT       55

 1  who should pick the representative?

 2  A.   Yes, every single one of them.

 3  Q.   And what have they told you?

 4  A.   Continue to delegate that to me.

 5  Q.   Okay.  Does the CPM address who gets the SAPA

 6  representative?

 7  A.   It -- yes.

 8  Q.   What does the CPM say?

 9         THE COURT:  You said that the president delegates,

10  has said that he can do it.

11         THE WITNESS:  According to our bylaws, it says that

12  the president will appoint.  In SP325, it indicates that under

13  41A4C, two crew member peer representatives will be selected at

14  random by SAPA.

15  BY MR. SPAGAT:

16  Q.   So in your agreement with the company, it's just SAPA who

                                Page 46

070608e.txt

17  designates?

18  A.    Yeah.

19  Q.    Has management ever told you who to pick to sit on a

20  review board?

21  A.    No.

22  Q.    Has management -- has management ever rejected the ruling

23  of a review board?

24  A.    No, not to my knowledge.

25  Q.    Can you give an estimate of how many review boards you've

                    EISENSTAT - DIRECT EXAMINATION / SPAGAT        56

1  appointed people to be on in the years?

2  A.    I would say eight review boards. Maybe nine a year. It's

3  just a rough estimate.

4  Q.    Over, what, did you say ten years?

5  A.    Over the eight years that I've been SAPA secretary.

6  Q.    And in all those review boards has discipline ever been --

7  has the review board ever recommended to overturn discipline?

8  A.    Absolutely.

9  Q.    Has the disciplinary board ever recommended to overturn a

10  discharge?

11  A.    Yes.

12  Q.    Can you -- do you have an estimate of how many times

13  that's occurred?

14  A.    I don't. Maybe at least twice -- once a year, at least,

15  in a review board. Possibly twice a year. I don't know.

16  Q.    And has management ever refused to follow the

17  recommendation of any review board?

18  A.    They haven't.

19  Q.    We touched briefly on the policy interpretation complaint

20  program. Who receives -- they are referred to as PICs?

21  A.    Uh-huh.

070608e.txt
22  Q.    And that's a complaint by a pilot against management?

23  A.    Against the interpretation of the crew member policy

24  manual.

25  Q.    Okay.  How often do you receive PICs from pilots?

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        57

1   A.    Anywhere from 20 to 30 a month.

2              THE COURT:  So these aren't the policy's wrong.

3   These are I don't know if they fall within the appropriate

4   interpretation of the policy?  Is that what it is?

5              THE WITNESS:  I was paid incorrectly.

6              THE COURT:  So these aren't policy --

7              THE WITNESS:  Or I went beyond the scope that it

8   indicates here, I should be paid for my --

9              MR. SPAGAT:  That's correct.  I think you've got

10  the --

11             THE COURT:  Okay.  So it's not, Let's rewrite the

12  policy?

13             THE WITNESS:  Right.

14             THE COURT:  It is, Given an appropriate application

15  of the policy, I was improperly treated?

16             MR. SPAGAT:  That's correct.

17             THE COURT:  I got that.  I understand all that.

18  BY MR. SPAGAT:

19  Q.    What is the procedure for reviewing PICs?

20  A.    We have a policy interpretation complaint committee.

21  Lately it's been just the executive board members.  It's

22  difficult to get all the committee members together due to

23  scheduling issues.

24             But the three of us review the current PICs.  We

25  determine whether or not it is based already on policy and

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        58

                               Page 48

070608e.txt

1  whether or not we have to review this with any management

2  personnel.

3            If that's the case, I will write a response and

4  submit that online.  And basically the policy is closed.  That

5  policy interpretation claim is closed.  There's an explanation

6  that goes with it.

7            If not and we feel the pilot has a case, we go down

8  and argue it with the appropriate department, which is

9  generally crew payroll or crew scheduling and with the

10  appropriate personnel down there.  If we reach an impasse

11  there, we have an opportunity to take it to the director of

12  flight operations, Glen Brooks and/or Brad Holt.  If we can't

13  get past them with this, we have another step that allows the

14  pilot to actually come down or have a phone call with them and

15  plead their individual cases with them.

16            And if we still can't reach any resolution, then the

17  company is required to make a policy clarification on the issue

18  and state that clarification, which would be inserted somewhere

19  as an appendix, most likely into the policy manual.

20  Q.  And how long does it generally take to resolve a PIC?

21  A.  Within 60 days.

22  Q.  And are there instances in which PICs are resolved

23  favorably and from the point of view of the pilot?

24  A.  Yes.

25  Q.  Can you give a rough percentage how many PICs are resolved

                 EISENSTAT - DIRECT EXAMINATION / SPAGAT        59

1  favorably versus unfavorably?

2  A.  I would say in the nature of 70 to 75 percent resolved

3  favorably.

4            THE COURT:  How many do you get in a year's time

5  approximately?

070608e.txt

6                   THE WITNESS:  About 300.

7                   MR. SPAGAT:  They are coming in every month.

8                   THE COURT:  Got it.

9    BY MR. SPAGAT:

10   Q.   We heard testimony yesterday about, I believe, a PIC under

11   policy SP308-11, shift cancellation pay.

12   A.   Uh-huh, yes.

13   Q.   Are you familiar with the PICs associated with that issue?

14   A.   I am.

15   Q.   Can you describe what the issue is?

16   A.   It's somewhat complicated.  When a pilot -- when --

17   anytime a pilot's shift or legs are cancelled --

18                   THE COURT:  Why do I need to know this?

19                   MR. SPAGAT:  This was the grievance where there was a

20   lot of back and forth about was it just resolved after this

21   lawsuit was filed?  You know, the president of SAPA sent out a

22   letter about it.

23                   THE COURT:  Okay.  All I need to know is when was it

24   resolved.

25                   THE WITNESS:  It is in the process of being resolved.

                 EISENSTAT - DIRECT EXAMINATION / SPAGAT        60

1    We determined it in four days of meetings and research that

2    there is a huge discrepancy on how this policy is being paid.

3    That was one.

4                   Two, let's clean up -- management agreed to clean up

5    all of the PICs, the 61 PICs that we had, and pay them as the

6    submitter requested, even at the peril of Brad Holt who didn't

7    feel that he had changed this way of being paid.  In any case,

8    he paid all of those.

9                   And now the third step is to continue working and

10   coming to a resolution on how this should actually be paid

070608e.txt

11  based on what's said in the policy manual.

12  BY MR. SPAGAT:

13  Q.   I just do want to clarify that.  So there were PICs --

14  there were complaints made by pilots who said they were not

15  paid appropriately under the shift cancellation policy?

16  A.   Uh-huh.

17  Q.   And there was -- is that correct?

18  A.   Yes.

19  Q.   And there was confusion about what the policy, how it was

20  being implemented and whether it was being implemented

21  consistently?

22  A.   Yes.

23        THE COURT:  When were these decisions made

24  essentially for resolving?

25

EISENSTAT - DIRECT EXAMINATION / SPAGAT        61

1  BY MR. SPAGAT:

2  Q.   So the decision to pay backpay to all the people who had

3  made complaints, when was that decided?

4  A.   At the last two days of meetings in St. George with the

5  executive board and management personnel on May 8th and 9th--

6  or 7th and 8th.

7  Q.   May 7th and 8th?

8  A.   Yes.

9  Q.   The decision was made to pay all of the PICs?

10  A.   To pay -- there were four that we found that didn't fall

11  into that category.  So about 56 or 57 of those PICs, yes.

12  Q.   Okay.  You are now in the process of working out on --

13        THE COURT:  That's what he said.  Go ahead.

14  BY MR. SPAGAT:

15  Q.   -- a going forward basis?

Page 51

070608e.txt

16  A.    Yes.

17  Q.    What is SAPA's position with respect to ALPA and its

18  organizing drive?

19  A.    Well, we believe that we have a better way to do it.  We

20  believe that SAPA is a very --

21  Q.    Hold on a second.

22  A.    We believe that what we offer is as good or better than

23  any collective bargaining agent recognized under the RLA.

24  Q.    Well, let me ask you this.  I mean, has SAPA voted on what

25  its position is on the ALPA organizing drive?

                EISENSTAT - DIRECT EXAMINATION / SPAGAT       62

1   A.    No, we haven't.

2   Q.    Are there ALPA supporters within SAPA, to your knowledge?

3   A.    There are.

4   Q.    And are there people within SAPA who believe that SAPA

5   should be the representative rather than ALPA?

6   A.    There are.

7   Q.    Okay.  Has management sought to remove anyone who supports

8   ALPA?

9   A.    No.

10  Q.    Has SAPA sought to remove anyone from its representative

11  board who supports ALPA?

12  A.    No.

13  Q.    Has ALPA ever -- has any ALPA entity ever recognized and

14  worked with SAPA as the representative of SkyWest pilots in the

15  past?

16  A.    They have.

17  Q.    Can you give an example of that?

18  A.    An example, when United Airlines was in the middle of

19  giving us aircraft to fly and flying thrown our way, there were

20  a number of furloughed pilots with United Airlines.  Those

                                Page 52

070608e.txt

21  pilots -- the union at ALPA at United Airlines wanted some

22  provisions for those for furloughed pilots to come in and fly

23  at SkyWest Airlines and under the SkyWest Airlines banner:

24  Here's airplanes that we are giving you.  Our furloughed pilots

25  are going to fly your airplanes.

EISENSTAT - DIRECT EXAMINATION / SPAGAT          63

1          They wanted to make them captains and pretty much

2  violate our seniority list.

3  Q.   Let me just back up a little bit.

4          So United management was in negotiations with SkyWest

5  management over the use of United aircraft at SkyWest; is that

6  correct?

7  A.   Yes.

8  Q.   And whether the pilots would come with them and how they

9  would be -- what the seniority would be --

10  A.   Yes.

11  Q.   -- United compared to SkyWest; is that correct?

12  A.   Uh-huh, yes.

13  Q.   Okay.  Continue on with what happened.

14  A.   The -- they came out with how they wanted to do that in a

15  document that was reviewed by SkyWest Airlines management given

16  to SAPA.  And as far as what we feel about it.  And SAPA

17  subsequently was called by United ALPA to Chicago in a meeting

18  to discuss why we were opposed to some of what their criterion

19  was for flying these airplanes on our property.

20  Q.   So let me back up a little bit.  You were opposed to a

21  tentative agreement between United and SkyWest; is that

22  correct?

23  A.   Between United ALPA and SkyWest, yes.

24  Q.   And was this a deal that management was in favor of?  Was

25  this a deal that SkyWest management was in favor of?

Page 53

070608e.txt

EISENSTAT - DIRECT EXAMINATION / SPAGAT          64

1  A.    They left that -- they left that to us.  They left that to

2  SAPA to make that decision.

3  Q.    Well, they --

4  A.    Let's put it this way.  They wanted that flying and they

5  wanted those airplanes.

6  Q.    SkyWest management wanted it?  But SAPA opposed the way in

7  which it was going to be --

8  A.    Based on the violation of our seniority list.

9  Q.    Okay.  And so you went to Chicago and talked to the United

10 ALPA people?

11 A.    Yes, we did, along with United management and SkyWest

12 management was also present.

13 Q.    And what was the upshot of the discussion?

14 A.    The result was we ended up staying a couple of days longer

15 than we needed to there because we were at an impasse.

16 However, when it was all said and done, United furloughed

17 pilots would come and fly those pilots as first officers in the

18 right seat, at the bottom of the seniority list at first year

19 pay.  The impasse was they gave up on the captain issue, they

20 went to first officer, and the impasse was we want second year

21 pay at SkyWest Airlines to fly these airplanes.  And that --

22          THE COURT:  That's fine.

23 BY MR. SPAGAT:

24 Q.    Okay.

25          THE COURT:  I don't need any more details.

EISENSTAT - DIRECT EXAMINATION / SPAGAT          65

1          MR. SPAGAT:  Got it.

2          THE COURT:  I'm not going to look at this agreement.

3  What's next?  Wrap it up here.

070608e.txt

4          MR. SPAGAT:  Just five or ten more minutes at the

5  most.

6          THE COURT:  I think five.

7          MR. SPAGAT:  Okay.

8  BY MR. SPAGAT

9  Q.   Have you been invited to conferences by Delta ALPA and

10 United ALPA representatives on behalf of SkyWest?

11 A.   On behalf of SAPA, yes, we have -- in years past we have.

12 Q.   And what were those conferences?

13         THE COURT:  Let's move on.

14         MR. SPAGAT:  Okay.

15 BY MR. SPAGAT:

16 Q.   How does -- does SAPA have dedicated bulletin boards?

17 A.   I'm not aware of a SAPA-dedicated bulletin boards.  I at

18 least have not administered any of that.

19 Q.   Was there a time that SAPA tried to implement dedicated

20 bulletin boards at SkyWest?

21 A.   Yes.

22 Q.   When was that?

23 A.   Seven years ago.  A rough guess, seven, eight -- about

24 seven years ago.

25 Q.   And what happened?

              EISENSTAT - DIRECT EXAMINATION / SPAGAT        66

1  A.   It got too difficult for me personally to visit every

2  domicile every two weeks and update that bulletin board.  And I

3  couldn't find domicile representatives that could dedicate that

4  kind of time either.  I sort of gave up on it.

5  Q.   And is it possible that there are SAPA bulletin boards at

6  some domiciles?

7  A.   That is possible, but, again, it's not to my knowledge

8  that we're -- have anything to do with it, other than Jim

Page 55

070608e.txt

9   Black's ASAP information.

10  Q.    It's not something that you are using?

11  A.    No.

12  Q.    Okay.  SAPA has a website SAPAforums-dot-org; is that

13  correct?

14  A.    Yes.

15  Q.    Does the company have access to the content of that

16  website?

17  A.    No.

18  Q.    And are union issues, pro and against, addressed on the

19  SAPA website?

20  A.    Primarily.

21  Q.    Okay.  How many pilots are signed up for

22  SAPAforums-dot-org?

23  A.    I believe around 1300.

24          MR. SPAGAT:  Okay.  No further questions.

25          THE·COURT:  I have one.  Let's say I issued an order

          EISENSTAT - DIRECT EXAMINATION / SPAGAT      67

1   saying that the company can't pay for any more for SAPA.  Got

2   it?  Okay.  What would happen?

3           SAPA goes out of existence.  Now you tell me what

4   effect that would have, in your view, as to everything that you

5   do within -- everything SAPA does in connection with the

6   operation of the airlines.  Now is your chance.

7           THE WITNESS:  In my view, this -- this is too time

8   consuming and too big to be doing this on our own time.

9           I have to make a living.  So does Jim Black and Mark

10  Nolin.  We would go back to line flying, flying airplanes.  And

11  there would be no representation at SkyWest Airlines.

12          THE COURT:  So in your view, whatever services you

13  perform in connection with the operation of SAPA would come to

070608e.txt

14  an end?

15          THE WITNESS:  Yes.

16          THE COURT:  Anything further?

17          MR. SPAGAT:  Nothing further.

18          THE COURT:  I mean, I guess the question is, well,

19  one has to ask the question, so what?  I think it's

20  self-evident.  What you're really saying, if I understand it,

21  is that everything that you have been doing and do on a daily

22  basis in connection with the duties you described, the services

23  that you perform would, at least from your point of view, from

24  what you can see, would come to an end.

25          Now, somebody could pick it up, if somebody were paid

                EISENSTAT - DIRECT EXAMINATION / SPAGAT        68

1  for it and paid people to do it.  I suppose that could happen.

2  But you don't see that forthcoming.  @words @@@.

3          As far as you know, nobody is willing to step up

4  and -- do you know, are there people who are willing to step up

5  at no pay and perform these services?

6          THE WITNESS:  I don't know how they would do that and

7  fly the line full-time either.  I just don't know how that

8  would be possible.

9          THE COURT:  They'd have to have people who are

10  familiar with the operation of the company, have the competence

11  that to the extent that management feels comfortable in

12  discussing any of these issues, some of which are very

13  confidential and competitive, confidential from the personnel

14  point of view, competitive from an industry point of view,

15  those are real issues and they have to be careful of the person

16  that they discuss it with in that there has to be some level of

17  confidence that people have the ability and the integrity to

18  carry on these tasks?  That's your view?

                            Page 57

070608e.txt

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  Thank you very much.

21          Okay.  We'll have cross-examination.  We are going to

22     take a 12-minute recess.

23          (Recess.)

24          THE COURT:  Okay.  Cross.

25          MS. GINSBURG:  Thank you, Your Honor.

              EISENSTAT - CROSS EXAMINATION / GINSBURG       69

 1                    CROSS EXAMINATION

 2     BY MS. GINSBURG:

 3     Q.    Mr. Eisenstat, I'm Elizabeth Ginsburg, Counsel for

 4     plaintiff.

 5          Mr. Eisenstat, you were elected to this position

 6     eight years ago at SAPA; is that correct?

 7     A.    The current position of secretary, yes.

 8     Q.    Position of secretary.  Before that did you hold other

 9     positions at SAPA?

10     A.    I didn't.  I was a representative.

11     Q.    And you became a full-time representative when you were

12     elected secretary?

13     A.    Shortly thereafter.

14     Q.    You haven't flown the line for some time; is that correct?

15     A.    Not as a -- no, I haven't.

16     Q.    when is the last time you flew the line?

17     A.    When is the last time I flew an airplane?

18     Q.    No, my question is, when did you last fly -- fly the line

19     for the company on a regular flight?

20     A.    A full paying line, about eight years ago.

21     Q.    So you have not maintained currency?

22     A.    I did to a point.

23     Q.    To what point?

                              Page 58

070608e.txt

24  A.    That would be hard to determine.  I think in the last four

25  years is when I stopped maintaining currency.

                EISENSTAT - CROSS EXAMINATION / GINSBURG        70

1  Q.    So you haven't flown the line for four years at all; is

2  that correct?

3  A.    No, I haven't flown an aircraft for about two years now.

4  The line flying is -- I flew passengers, that would be

5  considered line flying.

6  Q.    That's what I'm asking you.

7  A.    It was about a year and a half, two years ago.

8  Q.    Two years ago you flew passengers?

9  A.    Yes.

10  Q.    And were you current at that time?

11  A.    I was, uh-huh.

12  Q.    I believe your testimony a moment ago was that you had not

13  maintained currency for the last four years?

14  A.    There are periods of types of currency that you can go out

15  of currency and get recurrent with a simulator ride or

16  something of that nature.

17  Q.    So you have been taking the simulator rides to maintain

18  your takeoffs and landings?

19  A.    Yes, up until about a year ago.

20  Q.    What happened a year ago?

21  A.    I just got too busy.  We have to have -- we just got too

22  busy.  We couldn't keep up with it.

23  Q.    So at this time you are not qualified to fly the line; is

24  that correct?

25  A.    I am not.

                EISENSTAT - CROSS EXAMINATION / GINSBURG        71

1  Q.    Do you hold a medical certificate?

2  A.    Not currently.

                        Page 59

070608e.txt

3   Q.   How long have you been without a medical certificate?

4   A.   Three -- two months.

5   Q.   A medical certificate is required to do any flying in

6   revenue flight; isn't that correct?

7   A.   Absolutely.

8   Q.   So you are not medically qualified -- you are not

9   qualified to serve as a pilot for SkyWest Airlines, correct?

10  A.   Not currently.

11  Q.   You're familiar with the bylaws of this -- of SAPA?

12  A.   I am.

13  Q.   And you're familiar with the membership requirements for

14  membership at SAPA?

15  A.   Yes.

16  Q.   I'd ask you not to look at the exhibit for a moment until

17  I am done with my questions.

18       Membership requires that you are currently employed

19  as a line pilot but not full-time management; isn't that right?

20  A.   I believe that's correct.

21  Q.   And the officers must meet those requirements as well as

22  the members?

23  A.   I would think so, yes.

24  Q.   Okay.  In order to be a line pilot, you have to be

25  qualified to fly the line, don't you?

                EISENSTAT - CROSS EXAMINATION / GINSBURG        72

1   A.   Yes.

2   Q.   What happens to a line pilot at SkyWest Airlines when he

3   is not medically qualified to fly?

4   A.   He goes offline.

5   Q.   When you say "offline," is he on a pay status?

6   A.   No, unless the company puts him in a different position.

7   Q.   So he could be paid in a position such as SAPA
                        Page 60

070608e.txt

8   representative or customer service representative but not as an

9   airline pilot?

10  A.   No, he can't be a SAPA representative because he would

11  have to be elected to that position.  He could audit flights,

12  for instance.  He could do work down at St. George or a hangar,

13  something of that nature.

14  Q.   So that would be a nonpilot position?

15  A.   Yeah.

16  Q.   He would could be a SAPA representative if, in fact, he

17  were elected to that position?

18  A.   Yes.

19  Q.   And your testimony is that you are qualified to serve as

20  an officer because you are an elected -- because you were

21  elected to that position, correct?

22  A.   Yes.

23  Q.   Could you be elected to that position today, assuming that

24  you had the votes, of course?

25  A.   Yes.

                 EISENSTAT - CROSS EXAMINATION / GINSBURG      73

1   Q.   Do you consider yourself eligible under the bylaws to

2   serve as an officer of SAPA?

3   A.   I do.

4   Q.   And yet you're not qualified to fly the line?

5   A.   Yes.

6   Q.   So you are not -- you do not meet the membership

7   requirements specified in the bylaws, correct?

8   A.   Apparently not.

9   Q.   Are you familiar with Jason @Meister?

10  A.   I'm not.

11  Q.   I'm wondering what your current status is with SkyWest

12  Airlines.  Are you considered to be a member of management?

070608e.txt

13  A.   I'm not.

14  Q.   Are you aware that you are shown as a member of management

15  in some documents that SkyWest Airlines provides?

16  A.   I believe I am aware of that, yes.

17  Q.   And so for purposes of SkyWest records, you are indicated

18  as a member of management?

19          MR. SPAGAT:  Objection.  Mischaracterizes the record.

20          MS. GINSBURG:  Well, I'm asking.

21          THE COURT:  Right.  She's asking.

22          Go ahead.  Overruled.

23          THE WITNESS:  I have seen a document with the letters

24  MGR on it or MGM, or something of that nature.

25

          EISENSTAT - CROSS EXAMINATION / GINSBURG      74

 1  BY MS. GINSBURG:

 2  Q.   And if in fact you are a member of management, that would

 3  also be disqualifying for membership in SAPA, wouldn't it?

 4  A.   Absolutely.

 5  Q.   When were you last elected to the position of secretary at

 6  SAPA?

 7  A.   About two years ago.  Well, take that back.  It's a

 8  two-year position.  A year ago.

 9  Q.   Was an election held?

10  A.   Hold on.  I'm up in December of this year, is when I

11  expire.  So it's -- it's now June.  So a year-and-a-half ago I

12  was reelected as the secretary.

13  Q.   Let me just go back for a moment to our discussion of the

14  options for a pilot who is not medically qualified to fly.  You

15  said he could serve -- he or she could serve in a nonpilot

16  position.

17          Is that at the option of the company?
          Page 62

070608e.txt

18  A.    Yes.

19  Q.    And if the company chooses not to provide a position for

20  that pilot, that pilot is without a job, correct?

21  A.    No.  A medical leave of absence until --

22  Q.    Is medical leave of absence a paid position?

23  A.    It's not a paid position.

24  Q.    So when you are on medical leave of absence, you are an

25  unpaid former employee at the time.  Is there a recall

           EISENSTAT - CROSS EXAMINATION / GINSBURG        75

1   potential?

2   A.    I'm sorry, say it again.

3   Q.    When you are on medical leave of absence, are you

4   considered a former employee?

5   A.    No.

6   Q.    You are not capable of coming back to work, correct?

7         MR. SPAGAT:  Objection.  I think it misstates his

8   testimony.

9         THE COURT:  She's not asking what was his testimony.

10  She's asking what is his testimony.

11        Overruled.  Go ahead.

12        THE WITNESS:  Would you repeat the question.

13  BY MS. GINSBURG:

14  Q.    When you're on a medical leave of absence, you are a

15  former employee.  You are not employed by the company at that

16  point, correct?

17  A.    No, I believe we're still employed.  You're on a leave of

18  absence.

19  Q.    When you're on a leave of absence, you have no income from

20  the company for revenue service, correct?

21  A.    Correct.

22  Q.    You mentioned that you and Todd Schmidtke, I believe,

                         Page 63

070608e.txt

23  determined the amount of pay you thought was appropriate for an

24  officer of SAPA at 104 hours per month.  When was that?

25  A.    That was right after we were -- the -- right after the

EISENSTAT - CROSS EXAMINATION / GINSBURG      76

 1  ALPA drive of 1999, I believe.

 2  Q.    And in 1999 you determined that 104 hours was a reasonable

 3  amount of pay because that, you believed, was what you had been

 4  paid at that time?

 5  A.    Yeah.  We had checked the records for the past six months.

 6  Q.    The average now is more in the neighborhood of 87 hours a

 7  month, isn't it?

 8  A.    That varies.  I don't know what the average is.  It varies

 9  from domicile to domicile.

10  Q.    But it's safe to say that 104 hours is significantly more

11  than most line pilots earn in a month, isn't it?

12  A.    Not for a senior pilot, no.

13  Q.    You identified a long list of duties in which you engage

14  as the secretary of SAPA.  It almost sounds as if there's

15  nothing left for the president or the other officers.  Do they

16  put in full-time as well?

17  A.    Their activities are unmonitored by myself.  However, I

18  do -- I am aware of the activities that are monitored by the

19  vice president Jim Black.

20  Q.    And are your activities monitored by the president?

21  A.    I don't believe they are.

22  Q.    Do you coordinate with the president?

23  A.    I do.

24  Q.    Do you report to the president?

25  A.    Report?  Theoretically, I'm -- I don't report to anybody.

EISENSTAT - CROSS EXAMINATION / GINSBURG      77

070608e.txt

1  Q.    As I read the bylaws, it says that "The secretary shall

2  function under the direction of the president in carrying out

3  the policies of the executive board."

4          Is there no reporting function associated with that?

5  A.    I do.  I do carry out the functions and responsibilities

6  that the president has me do.

7  Q.    And do you report back to the president on your carrying

8  out the policies of the executive board?

9  A.    We have executive board meetings where we report our

10  activities.  There are particular things that we do that are

11  just through the natural course of business that we have to get

12  done on a monthly basis.

13  Q.    And then do you report about them to the president?

14  A.    We discuss them.  I don't know if I actually report.

15  Q.    I see.

16          Well, let me ask you about some of the -- another

17  aspect of your testimony that I found a little puzzling.

18          You were talking with counsel about the crew member

19  policy manual.  And there was a question about who -- who

20  designates the members of the disciplinary review board.  Do

21  you remember that testimony?

22  A.    Yes.

23  Q.    And you said that you were the administrative head of the

24  association and that's why you appoint them.  Correct?

25  A.    Yes.

              EISENSTAT - CROSS EXAMINATION / GINSBURG      78

1  Q.    I look at the bylaws, and I see that it says that the

2  president shall be the chief executive and administrative head

3  of SAPA.  Is there a change in the bylaws?

4  A.    There isn't.

5  Q.    So have you taken a new role in the organization?

070608e.txt

6   A.   I haven't.

7   Q.   You have no authority under the bylaws to act as the

8   administrative head of the association, do you?

9   A.   I believe I do under the duties and responsibilities in

10  the bylaws under the secretary position.

11  Q.   Well, it says right here in the bylaws that your counsel

12  admitted that the president shall be the administrative head of

13  SAPA.  Is that not the case?

14  A.   That is the case.

15  Q.   That would explain to some extent why you testified later

16  perhaps that the president -- every president has delegated to

17  you the task of picking the members of the disciplinary review

18  board?

19  A.   Yes.

20  Q.   So if it's delegated, presumably, it would be the

21  president's responsibility in the first instance?

22  A.   Yes.

23  Q.   You said that every president has delegated that.  Who is

24  the current president of SAPA?

25  A.   Mark Nolin.

                EISENSTAT - CROSS EXAMINATION / GINSBURG       79

1   Q.   And has he delegated that authority to you as well?

2   A.   He has.

3   Q.   When did that occur?

4   A.   In a prelim -- actually our first executive board meeting

5   that was held in Salt Lake City with Jim Black, Mark Nolin, and

6   myself in attendance.

7   Q.   And how did that occur?

8   A.   As we went over our duties and responsibilities, I asked

9   Mark if he would continue to want me to delegate or rather if

10  he would continue to want me to get the review board panel

                              Page 66

070608e.txt
11  members, and mark said, Yeah, continue to go do that.

12  Q.    Let me go back, if I may, to your testimony about the crew

13  manual.  You talked at some length about your discussions with

14  the company concerning how the crew manual was developed and

15  worked out, and that you can make this a living, breathing

16  document, correct?  Remember that testimony?

17  A.    Yes.

18  Q.    Now, if the company decides to make a change to that

19  document, it can do so at any time, can't it?

20  A.    It can.

21  Q.    And if you disagree with its change, you don't have any

22  resort to a third party to resolve that issue, do you?

23  A.    I believe we do, but I'm not certain that we do.

24  Q.    What third party might you have resort to?

25  A.    Only from what I've heard, from the issues that have

                    EISENSTAT - CROSS EXAMINATION / GINSBURG        80

 1  occurred with SIA in their dealings with management.

 2  Q.    I want to talk about SAPA's dealings with management, and

 3  ask you what is it that SAPA has as an option for a third-party

 4  review in the circumstances I described.

 5  A.    Well, none that I'm actually aware of, no.  Just what I've

 6  heard.

 7  Q.    Going back to the disciplinary review board for a moment,

 8  you mentioned that there were some unwritten exceptions to the

 9  rules that you and the company agreed to.  How do you know

10  about those?

11  A.    Because based on the disciplinary actions that have been

12  handed down from the company, that review boards in those

13  instances were not granted.  That's how I would know that.

14  Q.    I see.  You testified in response to a question from your

15  counsel about SAPA's position regarding ALPA.  And I'm

070608e.txt

16  wondering if this is a policy determination that was made by

17  SAPA?

18  A.    No.

19  Q.    Are you authorized today to speak on behalf of SAPA with

20  respect to the ALPA organizing campaign?

21  A.    I am not.

22  Q.    Has SAPA voted on the ALPA organizing campaign or its

23  position on the ALPA organizing campaign?

24  A.    They have not.

25  Q.    Would you please wait until I finish my questions, for the

                    EISENSTAT - CROSS EXAMINATION / GINSBURG        81

1  sake of the reporter.  Thank you.

2          Has SAPA expressed a view of its policy on this

3  matter based on a consensus?

4  A.    No.

5  Q.    So when you expressed the view that "we believe SAPA is a

6  better option," that was your view, correct?

7  A.    Yeah, I apologize.  It was my view.

8  Q.    Okay.  There was some testimony in -- you testified in

9  response to a question from the Judge concerning what might

10  happen if SAPA were defunded.

11         It's possible for SAPA to raise dues on its own,

12  isn't it?

13  A.    I don't know.

14  Q.    It's possible for the company to create committees that

15  advise on various issues, isn't it?

16  A.    I would believe that would be possible, yes.

17  Q.    Is every line pilot who is qualified to fly a SAPA member?

18  A.    Yes.

19  Q.    Is there a procedure to opt out of being a member if you

20  desire?

                              Page 68

070608e.txt

21  A.    No, there isn't.

22  Q.    Are there any procedures in the bylaws that enable SAPA

23  members to pay dues?

24  A.    There aren't.

25  Q.    Is there a provision in the bylaws for removing a pilot

                    EISENSTAT - CROSS EXAMINATION / GINSBURG       82

1  from membership?

2  A.    No, there aren't.

3  Q.    Now, you administer the secret ballot process for SAPA,

4  correct?

5  A.    Particular votes, yes.

6  Q.    Well, is there anyone else who is responsible for that?

7  A.    The last vote that we had, Brandon Tilby administrated the

8  vote.

9  Q.    Well, as I understood your testimony, he was the person

10  who administered the voting process.  Is this your

11  responsibility under the SAPA bylaws to oversee?

12  A.    I believe it is.

13  Q.    And do you have secret ballot procedures for implementing

14  voting processes at SAPA?

15  A.    When you -- explain "secret."  I don't understand "secret

16  voting policies."

17  Q.    I thought you might not.  Is there a written procedure for

18  balloting in any way at SAPA?

19  A.    No, no written procedure.

20  Q.    So there's no description of your election process, for

21  example?

22  A.    There is in the SAPA bylaws and how the infrastructure and

23  officers are elected.

24  Q.    No, I want to focus your testimony on the actual balloting

25  procedure.  Is there any description written anywhere about the

                                Page 69

070608e.txt
EISENSTAT - CROSS EXAMINATION / GINSBURG          83

1   balloting procedure?

2   A.   As far as our Campus-Vote --

3   Q.   Or your votes for officers and representatives.

4   A.   No specific procedures on how to go about.  I'm elected

5   differently than the other two, the president and vice

6   president are elected.

7   Q.   I think this is a simple question.  I'm sorry to belabor

8   it.  I just want to be sure we are clear what I am talking

9   about is how do you send out and count ballots in an election

10  process.

11  A.   Through our Campus-Vote procedure.

12  Q.   And Campus-Vote is the software company you mentioned

13  earlier?

14  A.   Yes.

15  Q.   Do you have a set of written procedures that they follow?

16  A.   No.

17  Q.   So there has not been a set of written procedures

18  provided, for example, to the Department of Labor for the

19  organization?

20  A.   No.

21          MS. LYE:  I'm sorry, I didn't hear the answer.

22          THE WITNESS:  No.

23  BY MS. GINSBURG:

24  Q.   Now, you are the secretary.  Is there a treasurer of the

25  association?

EISENSTAT - CROSS EXAMINATION / GINSBURG          84

1   A.   There isn't.

2   Q.   Do you perform the functions of the treasurer?

3   A.   Yes.

4   Q.   What functions do you perform for the treasurer?
                        Page 70

070608e.txt

5   A.    Uhm, as a treasurer-type position?  We don't have any

6   funds coming in.  We only have expenses.  And I'm -- I incur

7   the expenses upon a credit card, and I submit my expenses to

8   the company for reimbursement.

9   Q.    who writes the check for those expenses?

10  A.    SkyWest Airlines.

11  Q.    Who at SkyWest Airlines, if you can tell me?

12  A.    It -- I don't know.  It's a direct deposit into my account

13  once the expense report is reviewed.

14  Q.    Do you see who pays, for example, when you have a hotel

15  bill?

16  A.    It's the direct bill that SkyWest Airlines contracts with

17  the hotel.

18  Q.    So SkyWest's financial department, whatever it's called,

19  would pay that bill?

20  A.    Yes.

21  Q.    And who pays your -- who signs your paycheck?

22  A.    I believe it's Brad Rich.

23  Q.    And is that the same person who signed it when you were a

24  line pilot?

25  A.    Yes.

EISENSTAT - CROSS EXAMINATION / GINSBURG      85

1   Q.    Now, we've established the company pays all of SAPA's

2   expenses.  I don't need to belabor that.

3         That includes, just to be clear, the cost of the SAPA

4   newsletter?

5   A.    That's in the electronic newsletter.  There are no costs

6   associated with that other than the medium in which it's

7   produced.

8   Q.    Well, let me ask you about that.  What medium is it

9   distributed through?

070608e.txt

10  A.   Through the SkyWest online, the IT department. @check

11  Q.   And that newsletter addresses various issues of interest

12  to the pilot group, is that --

13  A.   Yes.

14  Q.   Does SAPA have any kind of budget?

15  A.   It doesn't.

16  Q.   So when you decide to engage in an activity, who approves

17  that expense?

18  A.   Nobody.

19  Q.   But it's paid?

20  A.   It is paid.

21  Q.   Does SAPA have outside counsel?

22  A.   We don't.

23  Q.   Outside accountant?  An outside accountant?  Does SAPA

24  have an outside accountant?

25  A.   We don't.

                 EISENSTAT - CROSS EXAMINATION /  GINSBURG       86

 1  Q.   SAPA conduct any audit of its own records?

 2  A.   We don't.

 3  Q.   Does SAPA have a bank account?

 4  A.   No.  We used to.  We don't.

 5  Q.   Now, SAPA makes presentations to the new hire classes,

 6  correct?

 7  A.   Yes.

 8  Q.   That's with company permission?

 9  A.   No.

10  Q.   You don't have the company's permission to appear in front

11  of the new hire classes?

12  A.   No.  That's -- that's what we do.  We talk to the new hire

13  classes.

14  Q.   So you don't need the company's permission to talk to new

070608e.txt

15  hire classes?

16  A.   We don't.

17  Q.   Could anyone appear and talk to the new hire class without

18  permission from the company?

19  A.   I don't think so.

20  Q.   But that's something that SAPA is permitted to do without

21  permission?

22  A.   Yes.

23  Q.   In fact, you do have permission from the company, don't

24  you?

25          THE COURT:  I think -- I understand your point.  The

            EISENSTAT - CROSS EXAMINATION / GINSBURG     87

1   point is that he doesn't have to go each time and say, By the

2   way, are we going to be permitted to address this group?  It's

3   just if he wants to address the group, he asks somebody, what

4   time can I come and address the group?  They tell him, I guess.

5   BY MR. SPAGAT:

6   Q.   And the company allows you to do that?

7           THE COURT:  Yeah, I mean, it's not a big deal.  This

8   is SAPA.  We know.  There is their organization.  Got that.

9           MS. GINSBURG:  Thank you.

10  BY MS. GINSBURG

11  ·Q.  Do you get paid for your time spent on those presentations

12  or your fellow representatives when they appear before the new

13  hire class?

14  A.   Jim Black, who is the vice president of SAPA, presents

15  presentation to the new hire classes.  He is paid at 104 hours

16  a month to be offline.

17  Q.   That includes his time before the new hire class?

18  A.   Yes.

19  Q.   SAPA distributes SAPA pins at that presentation?

            Page 73

070608e.txt

20  A.    we do.

21  Q.    And those are worn on the uniform?

22  A.    The pilots who choose to do so, yes, they are lapel pins.

23  Q.    Pilots are permitted to wear SAPA pins, correct?

24  A.    Yes.

25  Q.    Now, your testimony was that you have been able to

                EISENSTAT - CROSS EXAMINATION / GINSBURG        88

 1  persuade the company to make some changes to the crew member

 2  policy manual that you've discussed various issues with them

 3  over time, correct?

 4  A.    Yes.

 5  Q.    The company retains the right to reverse itself at any

 6  time, correct?

 7  A.    Yes.

 8  Q.    And you can't enforce that agreement if the company

 9  decides to violate it, correct?

10  A.    we can strongly oppose it, but we can't enforce it.

11  Q.    And you can't negotiate with the company regarding the

12  company policy manual, can you?

13  A.    Strongly oppose it but not enforce it.

14  Q.    Now, you referred to, I believe, the letter of agreement

15  standard -- the crew member policy manual.  And if you will

16  turn to Exhibit 1, it's Union Exhibit 1.  So it might be in a

17  different binder than the one currently before you.

18  A.    Okay.

19  Q.    If you would turn to page 1, which is actually the second

20  page of the document.

21  A.    Yes.

22  Q.    Draw your attention to the provision right above the

23  signature lines, the paragraph that delineates the scope of

24  this document.  Do you see that?

                                Page 74

070608e.txt

25   A.   Yes, I do.

EISENSTAT - CROSS EXAMINATION / GINSBURG        89

1   Q.   Do you see where it says, "No policy within this policy
2   manual will remain in effect if it is discovered to be in
3   violation of various things, including policies contained
4   within the SkyWest Airlines, Incorporated, company policy
5   manual"?   @check quote
6   A.   Yes.
7   Q.   That's the provision that enables the company to change
8   the manual whenever it wants to, doesn't it?
9   A.   The company policy manual, yes.
10   Q.   Yes.  In fact, nothing in this policy manual will remain
11   in effect if it's in conflict with whatever they do in the
12   company manual, correct?
13   A.   That's the inference of this, yes.
14   Q.   I think you mentioned 16 representatives on the SAPA
15   board; is that correct?
16   A.   19 representatives.
17   Q.   Forgive me.   16 plus the members of the executive board?
18   A.   Yes.
19   Q.   Which of those representatives are check airmen?
20   A.   I believe three of them are.
21   Q.   And who would that be?
22   A.   Dave Becktold, Mike Spencer and Mike Greggs.@@@
23   Q.   Is Sean @Ragan a check airman?
24   A.   He could be.
25   Q.   Is Bill -- forgive me if I mangle this --

EISENSTAT - CROSS EXAMINATION / GINSBURG        90

1   A.   Bill @@Sluder could be, yeah, I believe Bill is also.
2   Q.   All five of those might be check airmen?

Page 75

070608e.txt
3  A.    Yes.  Three for sure that I know of.

4  Q.    Being SAPA reps is not a bar to serving as a check airman,

5  correct?

6  A.    No.

7            MS. GINSBURG:  One moment, Your Honor.

8            Thank you.  Nothing further.

9            THE COURT:  I want to ask questions about the e-mail

10 system.  The company e-mail system is a system in which the

11 company communicates with all its pilots, correct?

12           THE WITNESS:  That's correct.

13           THE COURT:  And on that company e-mail -- by the way,

14 a pilot can respond to a communication on that; is that

15 correct, or not?  Do you know that?  This may not be your

16 subject.

17           THE WITNESS:  I don't know.  Sometimes there are

18 read-only messages and you can't respond to it.

19           THE COURT:  Well, so if they say like, alert, the --

20 we have received a terrorist threat, that goes to all pilots?

21           THE WITNESS:  Yes.

22           THE COURT:  Okay.  And that can only be read by the

23 pilots, I assume, or anybody who has access to that website or

24 e-mail system, but that would be just the pilots; is that

25 right?

            EISENSTAT - CROSS EXAMINATION / GINSBURG      91

1            THE WITNESS:  If it's only sent to just the pilots,

2  yes.

3            THE COURT:  If it's only sent to.  And the pilots

4  have the capability to respond on that system?

5            THE WITNESS:  I don't think they do.  I think there's

6  a provision where -- otherwise, it would just flood the system.

7            THE COURT:  So it's a one-way system?  It's poster --
                          Page 76

070608e.txt

8    it's a poster board, as you understand.

9        THE WITNESS:  Yes.  There's an option, I believe,

10   Your Honor.

11       THE COURT:  Well, anyway, that's okay.  We'll get to

12   it in a minute.  Actually I'm asking sort of a different

13   question, which is, does SAPA use this system?

14       THE WITNESS:  We do.

15       THE COURT:  And what I take your -- that you put in

16   announcements like we're all getting a pay raise or nobody is

17   getting a pay raise, or this jump seat thing is under dispute,

18   or, dah, dah, dah, dah, dah, dah, dah.  Is that right?

19       THE WITNESS:  That's correct.

20       THE COURT:  Is that a two-way system?  That is, can

21   somebody who gets that message respond to that?

22       THE WITNESS:  It can be, yes.

23       THE COURT:  It can be.  Okay.

24       Other than the company and SAPA, does anybody else

25   have access to that system?

EISENSTAT - CROSS EXAMINATION / GINSBURG      92

1        THE WITNESS:  No.

2        THE COURT:  So is it the principal method of

3    communication between the company and its employees?  When I

4    about employees, I'm talking about pilots.

5        THE WITNESS:  It is.

6        THE COURT:  Has it ever been used -- has SAPA ever

7    been engaged in a campaign or organizational campaign?

8        THE WITNESS:  We haven't.

9        THE COURT:  Okay.  I think that answers that

10   question.

11       Thank you.  You may step down, because we are all

12   finished with you.

Page 77

070608e.txt
13          THE WITNESS:  Thank you.

14          (witness excused.)

15          THE COURT:  All right.  It's now quarter after 4:00.

16  Before you call your other witnesses, I would like a little bit

17  of discussion on a couple of issues here.

18          Looking at the temporary restraining order, the third

19  paragraph enjoins SkyWest as to certain -- as to channels of

20  communication.  What I'm referring to, I think, is the one we

21  just addressed, the e-mail system.

22          And do I understand, first of all, the plaintiffs are

23  asking that they be given access to this -- to the e-mail

24  system that I've just had this witness describe?  Is that what

25  we're all talking about?  I know we are talking about other --

                EISENSTAT - CROSS EXAMINATION / GINSBURG      93

1  there may be other channels of communication.  But at least are

2  we talking about that channel of communication?

3          MS. LYE:  With respect to the e-mail issue, Your

4  Honor, my understanding -- and I think there hasn't been a

5  disagreement on the logistics of it -- is that all pilots have

6  access to the e-mail system.  They can send to each other

7  individual messages.  The company can also send e-mail messages

8  through a group functions; so it can be all pilots, all pilots

9  by domicile, all pilots in Denver, et cetera.

10          The capacity to send using a group e-mail function is

11  limited to the company and a certain number of SAPA-related

12  individuals.  Individual pilots do not have the capacity to

13  send, quote, unquote, group e-mails, and it would be an

14  extremely laborious process to do so.

15          MR. EMERSON:  Tentative. @can't hear him

16          THE COURT:  You are talking about 270 e-mails.  Now,

17  that's very helpful.

                        Page 78

070608e.txt

18          Next question.  In the relief that you are seeking,

19   were you including this particular system to have access to

20   this particular system?

21          MS. LYE:  The specific -- what we wanted specifically

22   was the same capacity to send group e-mails that SAPA has.

23          THE COURT:  And so now I have to hear what your

24   justification for that would be.

25          MS. LYE:  The justification would be that the company

              EISENSTAT - CROSS EXAMINATION / GINSBURG        94

1    has been giving preferred discriminatory access to SAPA that is

2    not provided to others, and that under CONOP, controlling Ninth

3    Circuit precedent, a company may not prefer one union faction

4    over another.  It's preferential access that no one else has.

5    And, therefore, in order to remedy --

6          THE COURT:  It cannot come up in the context of an

7    organizing or campaign.

8          MR. QUANDT:  Did not.

9          MS. LYE:  Yes, it did.  What happened in CONOP, there

10   was an individual who was seeking his right to organize a rival

11   union.  There was actually an incumbent in that case.  So it

12   was actually post-certification, and yet the Court found

13   jurisdiction over his claims, his private right of action in

14   federal court to enforce his rights to exercise free choice.

15          Now, interesting --

16          THE COURT:  Go ahead.

17          MS. LYE:  It's well-established in Supreme Court and

18   Ninth Circuit case law that judicial enforcements of statutory

19   RLA rights is much more -- is especially appropriate in the

20   precertification context.

21          THE COURT:  I'm not disagreeing with that.  I

22   understand that.

                              Page 79

070608e.txt

23                I'm just trying to figure out that if the
24    representative -- if SAPA is performing -- for example, they
25    send out a notice, and the notice says, We are working on the

                EISENSTAT - CROSS EXAMINATION / GINSBURG        95

1    jump seat problem.  Here are the issues on the jump seat
2    problem.
3                Is it your view that by virtue of that, the union is
4    entitled to access -- under the applicable law, the union is
5    entitled to access to that system?
6                MS. LYE:  Yes.
7                THE COURT:  Putting it another way, if, in fact, the
8    evidence is that SAPA is not promulgating information for
9    organizational purposes or for campaign purposes but rather for
10   purposes of informing its membership or whoever they
11   purportedly act on behalf of what their activities are with
12   respect to issues of concern to the organization, is it your
13   view that the law compels access to the organizing union?
14               MS. LYE:  Given the unique structure of SAPA,
15   absolutely yes, Your Honor.
16               THE COURT:  So anything SAPA did?
17               MS. LYE:  Because SAPA is a company-controlled entity
18   that exists for the very purpose of -- it is the employer's
19   tool for campaigning against outside independent
20   representation.  Everything that SAPA does is inherently
21   campaigning, because --
22               THE COURT:  You have a case.  Fine.  You have a case
23   that says that?
24               MS. LYE:  Well, the Supreme Court precedent on
25   company unions, employer interference can take many forms.  One

                EISENSTAT - CROSS EXAMINATION / GINSBURG        96

1    of the classic forms of employer interference is establishment
                                Page 80

070608e.txt

2  of a company union.  And, therefore, it's necessary to enjoin

3  further support of company unions because they are inherently

4  destructive of employee choice.  They exist for the purpose of

5  lulling employees into the idea that they have independent

6  representation when they have none.  And the purpose and effect

7  of their entire existence is to keep independent unions off of

8  the property.  And that's why everything that SAPA does,

9  purportedly under the rubric of representational activities, is

10  actually inherently campaigning activity.

11        THE COURT:  And there's a case, you say there is a

12  case out there --

13        MR. QUANDT:  There is not.

14        THE COURT:  -- that you can point me to right now

15  which says that?

16        MS. LYE:  Uhm, the reason why it's -- there aren't

17  cases exactly like this is because no one has thought to engage

18  in this kind of brand of company unionism since the 1920s and

19  '30s.

20        THE COURT:  Well, I doubt if that's true.  I mean, I

21  belong to one, arguably.

22        I don't think this is a unique -- I'd be very

23  surprised to hear that SAPA is a unique organization.  There

24  are a lot of companies out there that have, quote, captive

25  or -- that fund organizational -- I mean, representational

EISENSTAT - CROSS EXAMINATION /  GINSBURG        97

1  groups to deal with different times.

2        I don't know that I need to get into that argument.

3  There is no evidence in front of me of that.  If you're coming

4  in and saying to me that, look, the evidence will show that in

5  the United States this is unique.  Maybe it is, maybe it's not,

6  but I don't have that evidence one way or another.  I'm just

Page 81

070608e.txt

7  telling you I would be surprised to learn that there aren't a
8  lot of SAPA-like organizations in the United States in
9  companies @words.  There may be, may not be.  I don't really
10 care.  I just ask you a different question, which is do you
11 have a case?
12        MS. LYE:  Well, are we speaking of line authority or
13 remedy here?  It's clearly --
14        THE COURT:  Remedy.
15        MS. LYE:  Remedy.  The principle -- what we have for
16 remedy is --
17        THE COURT:  There is a preliminary injunction hearing
18 here.
19        MS. LYE:  Yes.  Likelihood of success on the merits
20 or the specific terms of the -- of relief afforded in the
21 preliminary injunction.
22        THE COURT:  And harm.
23        MS. LYE:  And harm.
24        The likelihood of success on the merits, I think, is
25 established clearly under Supreme Court precedent, controlling
           EISENSTAT - CROSS EXAMINATION / GINSBURG     98

1  Supreme Court precedent on company unions.  This goes back to
2  Texas and NOR, a 1930 case; Virginia Railway, a 1937 case,
3  where employees were -- where the question was whether the
4  federal courts had equity jurisdiction to enjoin interference
5  that took the form of a company union, support for a company
6  union.  And in both of those cases, the Supreme Court said
7  unequivocally, yes, absolutely.
8        And, in fact, in those cases even required in the
9  first case, there were contempt proceedings and the employer
10 was required to, quote, disestablish the company union.
11        So we have that principle, that support for a company
                         Page 82

070608e.txt

12  union can be enjoined.  The federal courts have equity

13  jurisdiction to do so.  And, in fact, Congress recognized and

14  Supreme Court understood that support for company unions is a

15  particularly insidious brand of employer interference that can

16  be and must be protected by the federal courts in the exercise

17  of their equity jurisdiction.

18         And then what we have are general principles of

19  equity that absolutely apply in the Railroad Labor Act context.

20  So that in order to remedy the destructive harm of SAPA over

21  many years, which had the purpose and effect of keeping off

22  independent -- keeping independent union representation at bay,

23  to lull employees into the idea that they had a collective

24  bargaining agreement when, in fact, it's not worth the paper

25  it's written on since the company can change it at will by

EISENSTAT - CROSS EXAMINATION / GINSBURG      99

1  altering the company policy manual, when, in fact, there is no

2  outside means of enforcing even the crew member policy manual,

3  assuming the company wanted to enforce it.

4         All of the indicia of independent representation are

5  not there at all.  So in order to remedy --

6         THE COURT:  Aren't you slightly -- aren't you

7  slightly overstating your case?  I mean, the evidence has come

8  in this afternoon shows that there's some indicia of

9  independence.

10         Now, you can -- you can say, well, that's small

11  potatoes in the whole picture, and so forth and so on.  I

12  wouldn't overstate it.  I didn't hear evidence today and I

13  don't know that you would offer evidence that everything that

14  SAPA does is exactly what the company wants.  You can sort of

15  ipso facto, or whatever that expression is, that you can say,

16  well, look, they ultimately agree to whatever the final

070608e.txt

17  position is, that's proof that they agree.

18        MS. LYE:   It was certainly enough for the Supreme

19  Court, the fact that all of the expenses paid in Virginia and

20  Texas and NOR, it was certainly enough for the Supreme Court

21  that all of the expenses were paid for by the union and the

22  salaries were paid.

23        THE COURT:   Then I have to ask SkyWest what -- why

24  they think there's some issue as to the financial aspects.

25        MS. LYE:   And there's also --

            EISENSTAT - CROSS EXAMINATION / GINSBURG      100

1         MR. SPAGAT:   Thank you, Your Honor.

2         MS. LYE:   -- there's also the express statutory

3  provision in Section 24.

4         THE COURT:   Well, but remember, we'll get back --

5  there is an express -- I know that there's an express

6  prohibition.  And I guess what I have to find out from counsel

7  is, what are they saying the evidence would show, what it has

8  shown and what it would show in a trial as to the -- the

9  support by the company?  That's what I think I have to --

10        MS. LYE:   On that we are undisputed, aren't we?

11        MR. QUANDT:   I don't think we are, Your Honor.   I

12  finally have a chance here.  May I speak, Your Honor?  Thank

13  you.

14        THE COURT:   Everybody gets a chance.

15        MR. QUANDT:   We shifted from a small issue back to

16  the closing arguments on the merits likely to test the merits.

17        THE COURT:   It's 4:30.

18        MR. QUANDT:   I understand, Your Honor.  Very

19  interesting counsel did not -- @@she conceded the fact that

20  there is no case allowing the union access to the Internet

21  system of the company under these circumstances.  And she's

                          Page 84

070608e.txt

22    right.  There is no case, Your Honor.

23          She then argued by analogy, said, well, it's

24    consistent with the policy in the New Orleans case and Virginia

25    Railroad case, both of which, Your Honor, are ancient cases.

          EISENSTAT - CROSS EXAMINATION / GINSBURG      101

1     These ancient cases are often the best cases.  They are cases

2     that predate the creation of the National Mediation Board.

3     Your Honor, that's a vital essential point.  Because our

4     argument obviously on the success of the merits is this all

5     belongs in front of the National Mediation Board.  And we have

6     cited all the law on that particular point.

7           In the CONOP case, there is no case, Your Honor, on

8     the merits of this entire case, there is no case out there,

9     they have not cited it, and actually they incorrectly cited one

10    case, I want to point that out.  There is no case out there,

11    Your Honor, where a court has issued a preliminary injunction

12    in this setting, where we have an ongoing representation

13    dispute with ALPA attempting to represent the pilots.

14          The CONOP case, there are two cases identified by

15    counsel yesterday.  One was the CONOP case.  Counsel just

16    referred to that a minute ago.  Not an ongoing representation

17    dispute.  It was a disgruntled pilot that was actually angry

18    with his incumbent union, ALPA.  There was no campaign going

19    on.  There were no cards being disseminated, nothing of that

20    type.  There was not an issue of another committee or another

21    union in the picture.  He was unhappy with ALPA.  That's what

22    was going on.  That was the context of the CONOP case.  It's

23    one of the most colorful cases out there in the United States,

24    and it was a first pro se plaintiff, and he did a heck of a job

25    in that case.  In any event, that case has nothing to do with

          EISENSTAT - CROSS EXAMINATION / GINSBURG      102

070608e.txt

1  the situation we are in now.

2         The other case that was cited yesterday was this --
3  what was the name of the case?  It's the Burke case with
4  Mexicana Airlines.  The Burke case was a fellow, the campaign
5  was over.  He was ineligible to be -- he wasn't eligible to be
6  in the bargaining unit, but he was a salesman.  He was
7  sympathetic with the union when they were trying to get
8  organized.  The company turned around after the campaign was
9  over and fired him.  And after the election was over, this is
10 adjudicated.  That's the context of that case.  It did not come
11 up in the context of an ongoing representation election, Your
12 Honor.  It has nothing to do with the facts in this case.

13        The closest case out there is the Adams case, Adams
14 versus Federal Express case that we talked about over and over
15 again in our brief.  That case, I'm sure inadvertently, was
16 miscited in their brief, their amended reply brief, Your Honor,
17 to our motion opposing the preliminary injunction.  On page 2,
18 it refers to the granting of a preliminary injunction.  The
19 preliminary injunction in that case was denied.  It was denied
20 by the trial court.  It went up to the Sixth Circuit.  It was
21 denied.  It went up to the Sixth Circuit.  The Sixth Circuit
22 affirmed the denial of the preliminary injunction but remanded
23 it back on the merits.

24        On the merits of the case, the Sixth Circuit
25 confirmed that the men were, in fact, discharged illegally, et

              EISENSTAT - CROSS EXAMINATION / GINSBURG     103

1  cetera.  But the preliminary injunction was denied in that
2  case, and it's miscited in their brief on page 2.  It's almost
3  their lead case.  I would certainly ask the Court to pay
4  attention to that.

                        Page 86

070608e.txt

5          Beyond that, Your Honor, since we are on the merits
6  of this thing, if I may continue -- sounds like this is
7  probably going to be the closing argument.  The key thing here,
8  Your Honor, again in terms of jurisdiction, this is complicated
9  law.  This is not something that is easy.  There is no -- at
10 most, the Court is going to be creating new precedent here.
11         THE COURT:  Tell me what's so complicated about that
12 all the money for the -- for this organization comes from the
13 company.  Everything about it.
14         MR. QUANDT:  Thank you.  You asked me that.
15         THE COURT:  The only thing that doesn't come from the
16 company, as I understand it, is the people who do work of
17 the -- of SAPA --
18         MR. QUANDT:  Yes.
19         THE COURT:  -- are not management.  I mean, it's not
20 an issue.
21         MR. QUANDT:  Your Honor, there is no case out there,
22 not been cited, there is no case out there where paying the
23 money to the officers, the representatives alone has consisted
24 of company domination.  No case on it.  And, in fact, Your
25 Honor, we will put in evidence shortly -- we are going to

                EISENSTAT - CROSS EXAMINATION / GINSBURG    104

1  finish this case fairly quickly, I think you will see, Your
2  Honor.  We are going to put evidence in on three different
3  major airline contracts, the Delta, U.S. Airways and the
4  Northwest Airlines contracts.  They all did the exact same
5  thing -- not exact same thing.  Very close.  I don't want to
6  overstate it.
7          They provided contract provisions in there in which
8  they pay ALPA representatives, full-time ALPA representatives
9  for their union services.  We will put that into evidence.

                            Page 87

070608e.txt

10  It's a substitution for what they call flight pay laws.  Rather

11  than getting reimbursed for individual meetings the pilots were

12  attending and not flying, and it gets complicated because these

13  are ongoing, they would agree to a fixed amount of money.  It's

14  fascinating the comparison.  I think it's the U.S. airways.

15  One of them is $600,000.  I may have the wrong carrier.  They

16  are paying, frankly, a very comparable amount of money to what

17  SkyWest is paying.  I concede the difference is that there is

18  no indication in the contract that the company is paying

19  expenses as well.  I concede that point.

20          But I also make the point, Your Honor, there is no

21  case out there, none, it hasn't been cited, we haven't found

22  it, it doesn't exist, that finds that paying -- supporting this

23  union in the fashion that we are financially constitutes

24  domination.

25          In the final analysis, Your Honor -- I am going to be

              EISENSTAT - CROSS EXAMINATION / GINSBURG      105

1  quiet here in a second -- the final analysis.  What is

2  complicated in this case is the jurisdictional issue.  Your

3  Honor, with your permission, we are going to file a motion to

4  dismiss this case where we will brief this much more

5  thoroughly.  That's one of the reasons we are asking for the

6  10-day extension, because we actually think this is a legal

7  issue predominantly, and we are going to file a motion to

8  dismiss in lieu of an answer here shortly.

9          What we are going to focus on, Your Honor, in the

10  motion to dismiss is -- it's ultimately the same arguments we

11  have been making, except we are really going to focus on the

12  switchman's case.  Switchman is one of the famous Supreme Court

13  cases out there.  It is one that labor lawyers on this side of

14  the practice know about and talk about all the time.  We don't

070608e.txt
15  always like the switchman case.  It's 320 U.S. 297, 1943

16  decision by Judge Douglas.  It's the decision that says the

17  National Mediation Board's role here is unreviewable by courts.

18  This is the exclusive area.  When the NMB makes decisions, that

19  one came up in the context of who should be eligible to vote

20  and who shouldn't be eligible to vote.  Those decisions are not

21  even reviewable by the federal courts.

22      If I just may finish, Your Honor, quickly, and then I

23  will be quiet.

24      What I'm saying here is, this is analogous, because

25  the same thing, just as the decisions of the NMB, when it comes

EISENSTAT - CROSS EXAMINATION / GINSBURG      106

1  to who should be eligible to vote, so decisions of the NMB

2  concerning how the rules should go on, what are the rules

3  during a campaign, who should be allowed to wear lanyards, at

4  what point does the company overstate it?  That is the NMB's

5  responsibility.  That's how Congress set it up.  Those

6  decisions per the switchman case are not reviewable by a

7  federal court.

8      Your Honor, the Court, respectfully, would be turning

9  that case on its head if you interjected with a preliminary

10  injunction doing the same thing at this stage when ALPA has the

11  opportunity, we've acknowledged the right, the option to go to

12  the National Mediation Board.

13      THE COURT:  Okay.

14      MR. QUANDT:  Thank you.

15      THE COURT:  Don't sit down.

16      The Section Number 4 of the Railway Labor Act

17  provides that no carrier, et cetera, et cetera, et cetera,

18  shall use the funds for the carrier maintaining or assisting or

19  contributing to any labor organization, labor representative or

Page 89

070608e.txt
20  other agency for collective bargaining.

21          Now, assuming those words mean something, and

22  assuming that your argument is there's no case out there that

23  says if the carrier pays for everything, that's wrong; how do

24  you put the two -- and the evidence is, well, United does it,

25  Delta does it, blah, blah, blah, they all do it in some form,

            EISENSTAT - CROSS EXAMINATION / GINSBURG    107

1   how do I reconcile that?  I mean, I may or may not be able to

2   take notice of what Delta and United does, but how do I deal

3   with the -- as Justice Scalia would say, the plain language of

4   the statute.

5           MR. QUANDT:  Your Honor, you defer to the National

6   Mediation Board, because it's their issue, their jurisdiction.

7   They will deal with that issue.  If they feel that is improper,

8   they will deal with that issue.

9           THE COURT:  That's your argument.

10          MR. QUANDT:  That's my argument, Your Honor, and no

11  court has ever interpreted that language as providing

12  jurisdiction in this context.  Your Honor is a well-known

13  judge, and I understand that --

14          THE COURT:  I don't know that I'm well-known.

15          MR. QUANDT:  You certainly have the ability to do

16  that, but, Your Honor, no court has ever done that.

17          THE COURT:  Well --

18          MR. QUANDT:  And when you look at the --

19          THE COURT:  -- again, I'm well-known for precedent

20  setting.  That's always dangerous for a District Court judge,

21  in my experience.  But I'm going to try to figure it out.  I'm

22  always guided by precedent, at least I hope I am and try to

23  figure things out.  @@check carefully the beginning of that

24  statement@@.

                        Page 90

070608e.txt

25          There we are.  Yes, the first judge to do something

          EISENSTAT - CROSS EXAMINATION / GINSBURG      108

1  gives one pause, not because it takes courage to do something

2  first, but the suggestion is maybe you are wrong.

3          MR. QUANDT:  But at a preliminary injunction·stage,

4  Your Honor, is the issue.  We have not --

5          THE COURT:  I understand that.

6          MR. QUANDT:  That goes to the merits of the case,

7  likelihood of success.  And I submit the likelihood of success

8  is mixed at best here.  We think we have a heck of an argument.

9  I'm sure they think they have an heck of an argument.  It's an

10 unsettled question.  It has to be a close question.

11         Having said that, the irreparable harm aspect of this

12 is overwhelmingly in favor of the company, particularly when

13 ALPA can run down tomorrow and file a petition with the

14 National Mediation Board.

15         THE COURT:  Well, I don't think -- I certainly don't

16 need any more evidence on harm.  I'm satisfied as to that.

17         Let me ask you, because it's now 20 to 5:00.  Is

18 there any reason why we couldn't have an offer of proof as to

19 what these people would say?  What difference does it make,

20 it's in the record as to what they would say?

21         MR. HALL:  Your Honor, Douglas Hall.  Certainly, we

22 could do that.  The evidence primarily when we @@ask these

23 witnesses would be --

24         THE COURT:  Just identify the basically what they'd

25 say.

          EISENSTAT - CROSS EXAMINATION / GINSBURG      109

1          MR. HALL:  Captain Tony Fizer would come to testify

2  that he has been a 13-year employee of SkyWest Airlines.  He

3  worked for the military for 14 years after that.  He has been

Page 91

070608e.txt

4  in management for the last three years.  Ever since he came to
5  management, he has enforced the uniform policy very strictly
6  with regard to belts, with regard to epaulets, with regard to
7  name tags.  He even told his boss he was wearing the wrong belt
8  at one point.  And he has removed 50 lanyards, 10 of which have
9  been ALPA in his estimation.  He enforces across the board.
10  There are documents that we are willing to submit, or however
11  you would like us to do this, that show they have been telling
12  the pilots, You've got to remember the uniform policy.
13         And there is an April 2006 e-mail from Glen Brooks,
14  who is the other -- Captain Glen Brooks would be our other
15  witness saying there's been issue about ALPA lanyards, you've
16  got to enforce these policies -- remember, you've got to
17  enforce these policies across the board, no matter who is
18  wearing what lanyard.  April 2006, which goes to if -- that's
19  the only --
20         THE COURT:  Where was that sent?
21         MR. HALL:  That was sent to the chief pilots.  Then
22  there's several weekly notices that the chief pilots send out
23  to the pilots where they say, Remember, you got to read the
24  uniform policy.  You have got to abide by the uniform policy.
25  Well, here it is, wear a tie.  You've got to make sure if you

          EISENSTAT - CROSS EXAMINATION / GINSBURG      110

1  wear your overcoat, you're wearing your hat.  The issue of
2  uniform is important, and they enforce it, and it's not just
3  against ALPA.
4         THE COURT:  That's what your offer of proof would be?
5         MR. HALL:  That would be Captain Fizer and also
6  Captain Glen Brooks.
7         THE COURT:  Do you have any response to that offer of
8  proof?  There's an issue as to whether --
          Page 92

070608e.txt

 9         MR. QUANDT:  Your Honor, if they are not willing to

10   stipulate, we need to put the witnesses on, because we are

11   entitled to live testimony and maybe they will stipulate to it.

12         THE COURT:  Will you stipulate that would be their

13   testimony?

14         MS. LYE:  Could we also just add to that, and I don't

15   think this would be a controversial fact, that the chief pilots

16   also have the authority to fire on the spot?

17         MR. EMERSON:  On the spot, no.

18         MR. HALL:  I don't think we can stipulate to that.

19         THE COURT:  We can take some testimony on that.

20         MR. HALL:  The documents, by the way, that we would

21   introduce through Captain Fizer and Captain Brooks are at tabs

22   7 and 8.

23         THE COURT:  Would you take a look at tab 7 and 8, and

24   see if you have an issue.

25         MS. LYE:  How about hire and fire authority?  That

           EISENSTAT - CROSS EXAMINATION /  GINSBURG      111

 1   chief pilots have the authority to hire and fire, if we can add

 2   that to the offer of proof?

 3         (@@counsel conferring with each other.  NOTE:  They

 4          are talking to each other, I can't hear.)

 5         THE COURT:  This is for the purpose of the

 6   preliminary hearing only.  At trial if the evidence changes, it

 7   changes.

 8         MR. QUANDT:  We cannot stipulate that they have

 9   hiring authority.  They make recommendations on that.  They are

10   involved in the process.  That's hiring authority.  They have

11   no role in the hiring process apparently, Your Honor.  We can't

12   stipulate on that.

13         On the firing, they make recommendations, so we would
                              Page 93

070608e.txt

14  agree they have a role in the disciplinary process, yes.

15        We would stipulate that they're considered members of

16  management, chief pilots are members of management.

17        THE COURT:  We know that.

18        MS. LYE:  That's fine.  We'll stipulate with that,

19  that they are in management and they have a role in the firing

20  process.

21        THE COURT:  Okay.  With that, the offers of proof are

22  accepted.  And the Exhibits are 7 and 8?

23        MR. QUANDT:  Yes.

24        THE COURT:  They may be admitted into evidence.

25        MR. QUANDT:  We also have some other exhibits.

          EISENSTAT - CROSS EXAMINATION /  GINSBURG      112

1         MR. HALL:  These are the --

2         MS. LYE:  May we review these, please?

3         MR. HALL:  Sure.

4         MS. LYE:  Thank you.  We have no objections to the

5   exhibits.

6         THE COURT:  Okay.  7 and 8 admitted.

7         (Defendant's Exhibits 7 and 8 received in evidence)

8         MR. HALL:  The other documents we would like to put

9   in, Your Honor, are the excerpts from the three collective

10  bargaining agreements that my colleague referred to.  This goes

11  to the question Your Honor has posed that says @@two courts

12  said you can't give financial support to a labor organization.

13  We cited the @Bartholomew and Kirska cases from the Ninth

14  Circuit in our opposition brief that show it doesn't really

15  mean that you can't do anything.  It's a myopic view that would

16  discourage collaborative labor cooperative agreements.

17        The Bartholomew case involved ALPA.  It was a

18  $1.25 million payment on his behalf by the carrier.  And the
                              Page 94

070608e.txt

19 @@excerpt we would show are situations where the company pays

20 for ALPA officers to do business.

21          In the Northwest situation, $600,000 a year for the

22 full-time salary of three ALPA officers.  In the situation of

23 Delta, there's a long list.  I believe about 15 union positions

24 that when they are doing work, they get paid and the union does

25 not have to reimburse the company.  And there's a similar

          EISENSTAT - CROSS EXAMINATION / GINSBURG      113

1 situation with Delta -- I'm sorry, with U.S. Airways.  So we

2 would submit those as well.  These are all agreements in which

3 ALPA is a party.

4          THE COURT:  What exhibits are they?

5          MR. HALL:  They are Exhibits 11, 13.  I have number

6 15 for you here, Your Honor.  It was not included in the

7 binder.

8          THE COURT:  Okay.  They will be admitted.

9          (Defendant's Exhibits 11, 13 and 15 received in

10          evidence)

11          THE COURT:  Any further evidence?

12          MR. QUANDT:  No further -- Your Honor, we have no

13 further evidence.  Before we rest, we have -- those have been

14 admitted?  Those contracts have been admitted?

15          THE COURT:  Yes.

16          MR. QUANDT:  Thank you.  That's the only other --

17 before we rest, Your Honor --

18          MS. LYE:  I'm sorry, could we slow down a little bit

19 because we are trying to look at things.

20          MR. QUANDT:  The Judge has already ruled.

21          THE COURT:  Well, I haven't finally ruled.  I want to

22 give them an opportunity if they have an objection.

23          MS. LYE:  We just want to read the documents.
                    Page 95

070608e.txt

24   THE COURT:  Yes, I think you are entitled to read the
25   document.       .

EISENSTAT - CROSS EXAMINATION / GINSBURG     114

1    MS. LYE:  Appreciate that.
2    (Recess.)
3    THE COURT:  Okay.  So where are we?
4    MS. LYE:  We have an issue that we need to resolve.
5    We want to expedite this as quickly as possible.  And yesterday
6    when Mr. Canuch was on the stand, defense objected to us
7    admitting a conversation that was very critical to SAPA because
8    they said that the person who had the conversation was in the
9    courtroom.  And so we said we could bring him --
10   THE COURT:  I remember that.  Who was that?
11   MS. LYE:  Mr. Mark Nolin, who is president of SAPA.
12   We -- there were a number of things --
13   THE COURT:  You want to call him?
14   MS. LYE:  We would like to call him.
15   THE COURT:  Well, all right.  You have a right to
16   call him.
17   MS. LYE:  Okay.
18   THE COURT:  I'll give you that right.  Okay.  Where
19   are we on exhibits?  In?
20   MS. LYE:  Oh, I'm sorry.  Yes.
21   THE COURT:  Okay.  Those are all in.
22   MR. QUANDT:  Before we rest, because that's before
23   they would call their witness, we would have to rest.  Your
24   Honor, before I rest, there is the outstanding issue from our
25   perspective of the motion to dismiss based on hearsay, whereas

EISENSTAT - CROSS EXAMINATION / GINSBURG     115

1   Your Honor allowed --

Page 96

070608e.txt

2          THE COURT:  I will tell you what I am going to do on

3    the motion to strike, what I'm going to do is take a look.  We

4    have a transcript.  I assume somebody ordered a transcript.

5          MS. LYE:  We got up to lunch yesterday, but I

6    think --

7          THE COURT:  I will have the transcript and I'm going

8    to go through it and I'm going to write an order, and in that I

9    will decide how I want to treat the motion to strike.

10         MR. QUANDT:  Your Honor, we are prepared to argue

11   that we have now had a chance to read their cases, which we

12   didn't have previously.  We are prepared to make an argument on

13   that.  At least Ms. Stambelos would like to have the

14   opportunity to argue that point.  We had not heard those cases

15   previously and hadn't had a chance to look at them.

16         THE COURT:  Great.  I will allow you to submit a

17   brief of not more than three pages on the hearsay.

18         MS. LYE:  By when, Your Honor?

19         THE COURT:  By close of business on Monday.  How's

20   that?  Tuesday?

21         MR. QUANDT:  Close of business Monday would be fine,

22   Your Honor.

23         MS. STAMBELOS:  We can do it by Monday.  If it would

24   hold up a ruling on this case, we would waive our right to do

25   it.

                 EISENSTAT - CROSS EXAMINATION / GINSBURG      116

1          MS. LYE:  @check speaker@ May we have an opportunity

2    to --

3          MR. QUANDT:  Both sides can file a briefs on that

4    issue by close of business on Monday?

5          MS. LYE:  Simultaneous briefing?

6          THE COURT:  I'm not sure simultaneous makes sense.

                              Page 97

070608e.txt
 7  Why don't you get yours on by Wednesday at noon, okay?
 8           MS. LYE:  Thank you very much, Your Honor.
 9           MR. QUANDT:  Actually, both sides made the motion,
10  though, Your Honor.  I mean, they made the same motion.  So it
11  does seem to me that simultaneous briefing is appropriate in
12  this case.
13           THE COURT:  Well, they cited cases.  You want to
14  respond to it, they can reply to your response.  No one is
15  going to win this battle.
16           MR. QUANDT:  Thank you, Your Honor.
17           THE COURT:  Hopefully, I will get the ruling right.
18  That is where it counts.
19           There's plenty of nonobjected testimony in this
20  record on all of the issues.  So I don't know that somehow
21  these form as a turning point.  Obviously, if it's crucial or I
22  thought it was crucial, I would treat it a little bit
23  differently than the way I am presently treating it.
24           MR. QUANDT:  The only debate, the evidence on that
25  point is there's allegation of one example, I believe, was
                EISENSTAT - CROSS EXAMINATION / GINSBURG    117

 1  given of somebody talking, somebody from SAPA talking about
 2  campaigning during one of the classes.  So we still think it's
 3  inadmissible and was hearsay.  But in the big picture, it's
 4  also in our view, I guess, probably it would be a de minimus
 5  error in our view, in our opinion, if that actually happened.
 6  Having said that, we will then -- we, Your Honor, at that point
 7  we are prepared to rest.
 8           THE COURT:  Do you want to call your witness?
 9           MS. PRESTEL:  Yes, Your Honor.  Plaintiffs call Mark
10  Nolin.
11                           MARK NOLAN,
                             Page 98

070608e.txt

12  called as a witness for the Plaintiff herein, having been first

13  duly sworn, was examined and testified as follows:

14        THE CLERK:  Please state and spell your full name for

15  the record.

16        THE WITNESS:  Mark Nolin, M-a-r-k, N-o-l-i-n.

17                    DIRECT EXAMINATION

18  BY MS. PRESTEL:

19  Q.   Are you a captain for SkyWest Airlines?

20  A.   Yes.

21  Q.   How long have you worked for SkyWest?

22  A.   Five-and-a-half years.

23  Q.   Have you -- you've heard testimony today and yesterday

24  about SAPA?

25  A.   Yes.

                NOLIN - DIRECT EXAMINATION / PRESTEL          118

1  Q.   Are you involved in SAPA?

2  A.   Yeah.  I'm currently the SAPA president.

3  Q.   Why did you decide to run for SAPA president?

4  A.   I think @@@mike's rosey's testimony sums up the reasons I

5  decided to run.  I felt that I ran not because I think SAPA is

6  effective, but I think it's a deceptive organization.  And I

7  felt that I could do better with forthright and honest

8  communication to the pilot group about how it actually

9  functions.

10  Q.   What was your view of SAPA's effectiveness as a

11  representative of the employees?

12        MR. SPAGAT:  Objection.  Goes beyond the scope.

13        THE COURT:  Well, I am going to allow it.

14        Go ahead.

15        THE WITNESS:  I think it is ineffective.

16  BY MS. PRESTEL:

070608e.txt

17  Q.    How do you feel about SAPA now that you have been in

18  office?

19  A.    I think it's ineffective.

20  Q.    You heard Mr. Eisenstat testify earlier today that he is

21  the administrative head of SAPA?

22  A.    That was news to me.  I didn't know that.  And that's why

23  I think that they're also deceptive.

24  Q.    Do you fly the line for SkyWest?

25  A.    Yes.

                    NOLIN - DIRECT EXAMINATION / PRESTEL        119

 1  Q.    Do the two other SAPA e-board members fly the line?

 2  A.    No.

 3  Q.    Is SAPA a union?

 4  A.    No.

 5  Q.    Is SAPA an RLA representative?

 6  A.    No.

 7              MR. QUANDT:  Objection.

 8              THE COURT:  Sustained.

 9              MR. SPAGAT:  Objection.  Legal conclusion.

10              THE COURT:  How many people are objecting?

11              MR. SPAGAT:  Just me, Your Honor.

12              MR. QUANDT:  Excuse me, Your Honor.

13              THE COURT:  Sustained.  I just wanted to see if I had

14  to say "sustained" twice.

15  BY MS. PRESTEL:

16  Q.    Have you ever been informed that SAPA is an hourly

17  representative?

18  A.    No.

19  Q.    In your view, are there services that a union could

20  provide to pilots that SAPA can't?

21  A.    Yes.

                            Page 100

070608e.txt
22  Q.    Can you give me an example?

23  A.    A binding contract that's legally recognized.

24  Q.    So does SAPA have an enforceable contract with SkyWest?

25  A.    No.

NOLIN - DIRECT EXAMINATION / PRESTEL          120

1           MR. SPAGAT:  Same objection, Your Honor.

2           THE COURT:  Well, these things, I don't think to the

3   extent that they are statements in the record, I understand

4   that.  To the extent they are opinions, I'm not sure I need

5   them.  After a few minutes of the witness's description of his

6   views, I understand his -- well, the word "biases" in his

7   testimony.  I understand where he is coming from.  They don't

8   say you have a bias, they say where are you coming from?  I

9   understand where he is coming from.  So let's get there.

10  BY MS. PRESTEL:

11  Q.    As president of SAPA, have you ever had a conversation

12  with Jim Black about his presentations on behalf of SAPA to new

13  hire classes?

14  A.    Yes, I have.

15  Q.    How long has Captain Black been making those

16  presentations?

17  A.    For several years, as far as I know.

18  Q.    How long ago did you have this conversation?

19  A.    About five-and-a-half or six weeks ago.

20  Q.    Can you briefly describe it?

21  A.    Yes, I got a report --

22          MR. SPAGAT:  Objection.  Hearsay.

23          THE COURT:  Wait.  @words Who is this person that's

24  talking?

25          THE WITNESS:  I was talking to the vice --

NOLIN - DIRECT EXAMINATION / PRESTEL          121

Page 101

070608e.txt

```
 1          THE COURT:  To the management?  You had a
 2  conversation with the person who was part of management?
 3          MS. LYE:  He had a conversation with Jim Black, who
 4  is the vice president of SAPA, who is permitted to give these
 5  presentations to new hire classes.
 6          THE COURT:  I see.  Well, your view is that that
 7  would be -- that would be part of management, that's your view,
 8  anyway?  I am going to allow it subject to a motion to strike.
 9  I will give you an extra page to respond in your brief.
10          Go ahead.  Excuse me.  What was said.
11          THE WITNESS:  I had a report from a pilot saying that
12  Mr. Black had been saying negative and false information about
13  the Airline Pilots Association during a SAPA new hire briefing.
14  I asked him if he had done that, and he indicated that he had
15  said some things that were inappropriate.
16  BY MS. PRESTEL:
17  Q.   Things that were inappropriate about ALPA?
18  A.   Yes.
19          THE COURT:  What did he say he said?
20          THE WITNESS:  I didn't ask.
21          THE COURT:  Okay.  What did you say -- you said, "I
22  heard you said some negative things or inappropriate things
23  about ALPA?"
24          THE WITNESS:  I asked him if he had been saying
25  negative things about ALPA.  And he said he had been saying
```

                NOLIN - DIRECT EXAMINATION / PRESTEL        122

```
 1  things that were inappropriate, and that he wouldn't -- my
 2  point was to get him to stop doing that.  Whether or not he is
 3  doing that anymore, I don't know.
 4          THE COURT:  Okay.  I understand that was your point.
 5  The question is, what's your recollection of this entire
```
                              Page 102

070608e.txt

6  conversation, and have you given it?

7          THE WITNESS:  Yes.

8          THE COURT:  Do you remember anything else he said or

9  you said on this subject?

10         THE WITNESS:  That's it.

11         THE COURT:  Okay.

12 BY MS. PRESTEL:

13 Q.  Have you ever had any conversation with Mike Eisenstat

14 about why there was an increase from one to three in the number

15 of SAPA officers who are paid full-time?

16 A.  Yes, I have.

17 Q.  When was that conversation?

18 A.  About a year ago.

19 Q.  Can you briefly describe the conversation?  What was said?

20         MR. QUANDT:  Same objection.  Hearsay. @check speaker

21         THE COURT:  Come in subject to a motion to strike.

22         THE WITNESS:  I approached Mike.  When I joined SAPA,

23 I thought it was a mistake that the executive board members

24 weren't flying the line.  And was talking to Mike about that,

25 he told me -- or he took me aside and said, Let me give you a

NOLIN - DIRECT EXAMINATION / PRESTEL     123

1  little bit about the history of SAPA.  Before the '99 union

2  drive, they had one full-time member.  And after that union

3  drive, he said that the union drive failed by just a few votes,

4  I guess.  And he said that Mr. Brad Holt approached him and

5  said, Wow, that was really close.  What can we do to prevent

6  that from happening?  And that's when Mike told him, I need

7  three full-time guys to keep the union off the property.

8          THE COURT:  I'm sorry, what did you say?

9          THE WITNESS:  I need three full-time executive --

10 that's who we are now, three full-time SAPA positions to keep

070608e.txt

11  the union off the property.

12          THE COURT:  Okay.

13          MS. PRESTEL:  I think that's it, Your Honor.

14          THE COURT:  Cross?

15                  CROSS EXAMINATION

16  BY MR. SPAGAT:

17  Q.   Good afternoon, Mr. Nolin.

18  A.   Good afternoon.

19  Q.   You are an ALPA supporter; is that correct?

20  A.   That's correct.

21  Q.   And you were when you ran for president of SAPA?

22  A.   That's correct.

23  Q.   And you were elected president of SAPA, it being known

24  that you were an ALPA supporter?

25  A.   That was not public.

            NOLIN - CROSS EXAMINATION /  SPAGAT        124

1  Q.   It's known now; isn't that true?

2  A.   It is now, yes, sir.

3  Q.   As the SAPA president, even though you are an ALPA

4  supporter, has SkyWest ever tried to remove you?

5  A.   No, sir.

6  Q.   I thought I heard you start to testify in your

7  conversation with Jim Black, did he tell you that he wouldn't

8  do it again?

9  A.   Yes, sir.

10          MR. SPAGAT:  Okay.  No further questions.

11          THE COURT:  Thank you, Captain.  You are excused.

12          (Witness excused.)

13          THE COURT:  Anything else from the plaintiffs?

14          MS. LYE:  No, Your Honor.

15          THE COURT:  Okay.
                    Page 104

070608e.txt

16          MR. QUANDT:  Not from me, Your Honor.  Nothing on
17  this case.  As Your Honor knows, we rest as well.  We would
18  like to renew our request that we be given ten days' extension
19  on our answer that's currently due on Monday.  In light of
20  everything that's been going on, we have just not had a chance
21  to focus on that.  We would ask for a 10-day extension in which
22  to file our motion to dismiss on jurisdictional grounds.
23          MS. LYE:  No objection.
24          THE COURT:  Okay.  Granted.
25          MR. QUANDT:  Thank you.
              NOLIN - CROSS EXAMINATION /  SPAGAT          125

1           THE COURT:  What I propose to do is to, pending the
2   decision on the preliminary injunction, to keep the provisions
3   of the temporary restraining order with respect to paragraphs 1
4   and 2 in force, but delete paragraph 3.
5           Anything further?
6           MR. QUANDT:  You're not asking for our view on that.
7   We have nothing further, Your Honor.
8           THE COURT:  Well, I mean, I'm not asking for it.
9           MR. QUANDT:  Your Honor, we do not object.
10          THE COURT:  And then I -- now, that's without
11  prejudice, so you understand.  If I determine for the purposes
12  of the preliminary injunction that, one, it should be granted
13  and, two, what the terms would be, and I would consider as the
14  term of paragraph 3.  So it's not off the table, but it is, in
15  my view -- I can go into all the reasons, but I don't know that
16  I need to.  In my view, it would not be appropriate to grant
17  that form of relief in the temporary restraining order, which
18  is still in effect and which will be in effect until I issue my
19  order on the preliminary injunction.
20          MR. QUANDT:  We understand.
                    Page 105

070608e.txt

21          THE COURT:  Which I intend to do rather quickly.

22          MS. LYE:  Would you be amenable to accepting our

23   additional oral or -- I hate to say this -- or written argument

24   on the paragraph 3 issue?

25          THE COURT:  Yes.  What I will do is I will allow you

                NOLIN - CROSS EXAMINATION /  SPAGAT          126

1    to address it in written form in connection with the

2    preliminary injunction.

3          MS. LYE:  And then the TRO paragraphs 1 and 2 would

4    remain in effect until such time --

5          THE COURT:  Yeah.  And, listen, I'm going to get to

6    this as quickly as possible.  I don't think I have -- whatever

7    my reputation is, it's not delay.  So I will turn to it

8    immediately.  It's absolutely at the top of the list.  I

9    understand that.  Especially smarting from the accusation that

10   my calendar is too congested to the -- compared to the District

11   of Utah.

12          MR. SPAGAT:  It was an element of the test, Your

13   Honor.

14          THE COURT:  Pardon?

15          MR. SPAGAT:  It was an element in the test.

16          THE COURT:  Oh, in the test.  So I would do it

17   anyway.  In any labor dispute, I think there is -- in an

18   ongoing business where it could easily get out of hand through

19   neglect by the courts, I think it is important to resolve it

20   quickly.  I think both sides want to resolve it quickly.  No

21   one is wanting to delay.  I will turn to it immediately.  I

22   want you to understand, you can certainly put it in your -- you

23   can brief them further.  They can respond.

24          MR. QUANDT:  Your Honor, of course, when I commented

25   that I don't object, it's not that we agree that paragraphs 1

                              Page 106

070608e.txt

NOLIN - CROSS EXAMINATION / SPAGAT        127

1  and 2 should even be in there.  On the current basis, we do not

2  agree with that.

3        THE COURT:  No, no.  This is a short-term interim

4  measure for addressing the problem in a civilized manner.

5        MR. QUANDT:  Thank you.

6        MS. STAMBELOS:  Excuse me, Your Honor, one more

7  housekeeping issue on the motion to strike.  I understand that

8  you -- this is Patricia Stambelos on behalf of SkyWest

9  Airlines.  I understand that you have directed the parties to

10  brief the issue, SkyWest by Monday and plaintiffs by Wednesday.

11  Unfortunately, we do understand that we won't have an

12  opportunity to receive a transcript of this proceeding by

13  Monday.  They may, in fact, have one by Wednesday.  I don't

14  know.  My question is, do you want a general discussion of the

15  law and the topics that we recall --

16        THE COURT:  I think you have pretty good notes of

17  what was said.  There are only three or four or five

18  objections.  You have transcripts of the earlier ones, don't

19  you?

20        MS. STAMBELOS:  We, in fact, don't have yesterday's

21  transcript yet.  I understand that plaintiffs suggested they

22  might have the first half of the day, but we have received none

23  yet.

24        MS. LYE:  I was told we have half the day.

25        THE COURT:  Well, work it out with the court

NOLIN - CROSS EXAMINATION / SPAGAT        128

1  reporters.  If you need an additional day, work it out.

2        MS. STAMBELOS:  No, we are happy to actually brief it

3  on Monday, so as not to delay this at all.  We just simply

Page 107

070608e.txt

 4 didn't want a three-page motion on our side that really doesn't
 5 have the actual testimony and it's only going to be --
 6         THE COURT:  Do you want to do it on Tuesday and have
 7 them respond on Thursday?  Is that better?
 8         MS. STAMBELOS:  If it would delay the Court's ruling,
 9 then --
10         THE COURT:  It's not going to delay.  24 hours, the
11 world is not going to end, right?
12         MS. LYE:  What scheduling would you like for the
13 paragraph 3 remedy issue, Your Honor?
14         THE COURT:  Well, that's a good question.  Do you
15 have any thoughts on that?  I think you should get -- I think
16 you should address it next week early on.  So what suits you?
17         MS. LYE:  Is Tuesday, Thursday also?
18         THE COURT:  Sure.
19         MS. LYE:  Thank you.
20         MR. SPAGAT:  What did we just agree to?
21         MS. LYE:  The same briefing schedule.  So your motion
22 to strike due Tuesday, our follow-up on the remedy issue due
23 Tuesday, and then responses --
24         MR. QUANDT:  Why would we file first and you have a
25 chance to read our brief on that particular issue?

                NOLIN - CROSS EXAMINATION / SPAGAT       129

 1         THE COURT:  No, no, no.  The question is, as I
 2 understand it -- what I'd like to do is hear from the
 3 plaintiffs as to the propriety of -- including paragraph 3 in
 4 the injunctive relief order addressing that issue.
 5         MS. LYE:  Actually, on this one, Your Honor, it seems
 6 simultaneous briefing would be more appropriate.
 7         THE COURT:  Just give me your reasons, and then they
 8 can respond.  Then if you feel compelled to write something,

                            Page 108

070608e.txt

9   maybe you have to write something. I don't know. Just see.

10  You know, take a look at it. You know, I have in mind your

11  argument, so -- but you better put it in writing. You said

12  certain things about this, and so I want to see whether there

13  is some authority that I would look at that would be helpful on

14  this subject.

15          MS. LYE:  Okay.

16          MR. QUANDT:  So the briefing schedule on both again,

17  one more time, is what?

18          MS. LYE:  Tuesday and Thursday.

19          MR. QUANDT:  Tuesday and Thursday. But it's split.

20  We go first on the motion to strike and you go first on the

21  paragraph 3 motion?

22          THE COURT:  Yes.

23          MR. QUANDT:  Or issue.

24          MS. LYE:  That's my understanding.

25          THE COURT:  Yes.

                NOLIN - CROSS EXAMINATION /  SPAGAT        130

1           MR. QUANDT:  I understand. Yes, Your Honor.

2           THE COURT:  Yes.

3           MS. LYE:  There was extensive argument yesterday on

4   the jurisdictional issue, Your Honor, and --

5           THE COURT:  Well, I think I'm going to fight that

6   battle -- well, I can see it in the motion to dismiss, I

7   suppose. Is there anything more that needs to be said about

8   it?

9           MR. QUANDT:  No. We briefed it extensively and we

10  have argued extensively.

11          THE COURT:  Right. Everybody has been able to

12  misquote cases with equal ease on both sides. The Bartholomew

13  case, I think you cited the National Mediation Board decision?

Page 109

070608e.txt
14  No, it's a Ninth Circuit decision.

15          MR. QUANDT:  Hope not.

16          THE COURT:  Well, who knows.  I don't remember who

17  cites what as what.  I will take your obviously cautionary

18  instructions with respect to the injunction in that other case,

19  was it Burke?

20          MR. QUANDT:  Burke and CONOP.  The one I said was

21  miscited was actually the Adams case.

22          THE COURT:  Adams.  Okay.  So I will look at it.  I'm

23  not looking at it from the point of view can somebody be

24  trusted.  I'm looking at it from the point of view of what did

25  the Court say.  Okay?  We all want to get it right.

                NOLIN - CROSS EXAMINATION /  SPAGAT         131

1           MR. QUANDT:  I understand.

2           MS. LYE:  I believe five minutes of just a little

3  summary could elucidate some issues.

4           MR. QUANDT:  If counsel wants five minutes, we're

5  going to be here -- I am happy to do that if Your Honor wants

6  it, but I am going to also ask to argue.

7           THE COURT:  Nope, not now.  I have a shelf life, like

8  Langendorf bread.  Probably it's a lot like Langendorf bread.

9  Anyway, I have reached it.

10          So I want to thank everybody.  I want to thank the

11  courtesy, the professionalism.  I know that all these witnesses

12  came from Salt Lake, St. George, and other places.  I want to

13  thank them.  I don't think this was the most convenient --

14  certainly wasn't the most convenient venue for everybody.  I

15  understand that.

16          There are a variety of reasons why I thought that it

17  was in the interest of the parties to hear the case on the date

18  set, time set.  I thought essentially -- notwithstanding the

                            Page 110

070608e.txt

19  merits of where it should be tried, I thought that the

20  realities of the situation and my investment in it in terms of

21  time and effort and scheduling dictated otherwise.  I'm quite

22  certain you don't agree with that.

23          But, nevertheless, my -- I appreciate -- I appreciate

24  everybody's attitude towards it and their willingness to work

25  through it.  So thank you very much.

                NOLIN - CROSS EXAMINATION /  SPAGAT           132

1           MR. HALL:  Thank you, Your Honor.

2           MS. LYE:  Thank you very much for your time and

3   attention, Your Honor.

4           MR. QUANDT:  Thank you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

070608e.txt

24

25