# EXHIBIT A

Pages 1 - 337

United States District Court

Northern District of California

Before The Honorable Charles R. Breyer

SkyWest Pilots ALPA        )
Organizing Committee,      )
et al.,                    )
                           )
        Plaintiff,         )
                           )
  vs.                      )          No. C07-2688 CRB
                           )
SkyWest Airlines,          )
Incorporated,              )
                           )
        Defendant.         )          
_____    )

San Francisco, California
Thursday, June 7, 2007

## Reporter's Transcript Of Proceedings

**Appearances**:

For Plaintiff:          Altshuler Berzon, LLP
                        177 Post Street, Suite 300
                        San Francisco, California  94108
                By:   **Stephen P. Berzon, Esquire**
                      **Linda Lye, Esquire**
                      **Claire P. Prestel, Esquire**

                        Air Line Pilots Association, Int'l.
                        1625 Massachusetts Avenue, N.W.
                        Washington, DC  20036
                By:   **Elizabeth Ginsburg, Esquire**


(Appearances continued on next page.)

Reported By:      *Sahar McVickar, RPR, CSR No. 12963*
                  ***Official Reporter, U.S. District Court***
                  ***For the Northern District of California***

(Computerized Transcription By Eclipse)

1   *Q.*   The C Team.

2           Have you played a major role in the organizing

3   campaign?

4   *A.*   Yes.

5   *Q.*   And what is the mission of the OC?

6   *A.*   Well, the mission of the Organizing Committee is to educate

7   the pilot group to the benefits of ALPA and representation.

8   And to bring us to a vote.

9   *Q.*   Does the OC itself seek to get recognized as a bargaining

10  representative?

11  *A.*   No, we do not.

12  *Q.*   And the OC has members?

13  *A.*   Yes.

14  *Q.*   How many approximately?

15  *A.*   Somewhere between 100 and 150.  My best guess would be 125.

16  *Q.*   And how many of them have permitted themselves to be

17  publicly identified?

18  *A.*   I believe my last count was 53 currently.

19  *Q.*   Why haven't the others gone public?

20  *A.*   Well, there are a lot of reasons why people choose not to

21  go public, several of them.  But I guess the main reasons --

22          **MR. QUANDT:**  Object to this.  How is he speculating,

23  what is the foundation, he is speculating as to why other

24  people choose not to go public?

25          **THE COURT:**  Well, let's see.  I don't know that he

1    is speculating.

2    **BY MR. BERZON:**

3    **Q.**  Do you know?

4          **THE COURT:**  The question is whether it's hearsay.

5    The question is -- I mean, he is going to testify against the

6    people that told him why they don't want to be identified, so

7    then the question is why isn't that hearsay, which it is.

8    And --

9          **MR. BERZON:**  He is a member.

10         **THE COURT:**  Well, I don't think that makes any

11   difference.  I think the difference is whether since I guess we

12   are going to get into the impact of certain actions.

13         **MR. BERZON:**  Yes.

14         **THE COURT:**  By alleged actions by the company, as to

15   whether or not that then -- that then has some impact on their

16   ability to organize.  So let's hear what the foundation is.

17   I'm going to let it in subject to a motion to strike.

18   **BY MR. BERZON:**

19   **Q.**  You had conversations with members of the Organizing

20   Committee who have not gone public as to why they have chosen

21   not to be public?

22   **A.**  Yes, I have.

23         **MR. QUANDT:**  That I object to on hearsay.

24         **THE COURT:**  It's going to come in subject to a

25   motion to strike.

1          Go ahead.

2    BY MR. BERZON

3    Q.   What have you found out from those conversations as to the

4    reason why pilots who are members of the Organizing Committee

5    has -- of not permitting their names to be released publicly?

6    A.   Several pilots have told me they are afraid to go public,

7    fearful of retribution, retaliation from the company if they

8    were to go public.  Several have told me that they are afraid

9    that if they were to apply for a job at another airline that

10   their application process may be sabotaged because of their

11   support of ALPA.

12          Others have told me that they're afraid that they

13   would not be granted check airmanship because if they were

14   known supporters of ALPA.

15          MR. QUANDT:  Your Honor, I renew my motion to

16   strike.  He is going --

17          THE COURT:  No, I understand the motion.  I

18   understand the motion, and I'm taking it under submission.

19          Go ahead.

20   BY MR. BERZON:

21   Q.   Has the company publicly expressed a view about whether it

22   wants the organizing campaign to succeed?

23   A.   Yes, it has.

24   Q.   Where has it done that?

25   A.   Well, there have been a couple of instances.  One is on our

1  **Q.**  Has anyone from those airlines ever told you that you have

2  to be able -- you have to be a union member in order to be

3  hired?

4          **MR. QUANDT:**  Objection, hearsay.  And objection,

5  relevance.

6          **THE COURT:**  I think sustained.  What would be the

7  relevance?

8          **MR. BERZON:**  The relevance is that this is a

9  statement, "It is not necessary for anyone to join a union in

10  order to get a job at SkyWest."  It's not necessary at any

11  carrier to join a union to get a job, whether they are union or

12  not.  And he can talk about the experience of ALPA carriers

13  from what he knows.

14          **THE COURT:**  I -- yeah, okay.  Sustained.  Objection

15  sustained.

16  **BY MR. BERZON:**

17  **Q.**  In addition to Exhibit 4, have you as a member -- as a

18  member of the C Team, learned about other anti-union -- about

19  hostility to the -- to the attempt by the Organizing Committee

20  to bring ALPA to the SkyWest premises?

21  **A.**  Yes.

22  **Q.**  Okay.

23          Can you give us some examples.

24  **A.**  There have been pilots who have reported to me --

25          **MR. QUANDT:**  Objection, hearsay.

Dow - Direct / Berzon

1       **THE COURT:**  I'm going to let it in subject to a

2    motion to strike.

3           Go ahead.

4           **MR. BERZON:**  Your Honor, we can put on 20 witnesses.

5    We are --

6           **THE COURT:**  I'll let it in.

7           **MR. BERZON:**  Thank you.

8           **THE COURT:**  That means he can testify.

9    **BY MR. BERZON:**

10   **Q.**  Please answer the question.

11   **A.**  Pilots have reported to me that they have been instructed

12   not to post information on bulletin boards and crew rooms.

13   There have been pilots who have been instructed to take their

14   ALPA lanyards off while wearing them on duty.

15   **Q.**  When did this occur?

16   **A.**  Over the course of the last year and a half.  Several

17   times.

18   **Q.**  Are there pilots --

19          **MR. QUANDT:**  Objection, Your Honor.  I'm going to

20   object on hearsay again, and I also ask you to strike this.

21   Among other things, we don't know, pilots have been asked by

22   who?

23          **THE COURT:**  There is -- this is called

24   cross-examination.

25          **MR. BERZON:**  And I'm about --

1    **THE COURT:**  You will be given latitude in

2    cross-examination.

3          Okay.  So the landyards about a year and a half.

4    What about the -- you said notices as well?

5          **THE WITNESS:**  Posting information notices on

6    bulletin boards.

7          **THE COURT:**  And has that taken place over the last

8    year and a half?

9          **THE WITNESS:**  Yes.

10         **THE COURT:**  In both cases, the lanyards and the

11   posting notices, approximately how many complaints have you

12   received?

13         **THE WITNESS:**  On the lanyard issue, I would guess

14   somewhere around 20 complaints, 20 different complaints.  And

15   on the bulletin board issue, two that I can recall clearly.

16         **THE COURT:**  Okay.  Thank you.

17         Go ahead.

18   **BY MR. BERZON:**

19   **Q.**  Have pilots talked to you about hostility they received

20   from Tony Fizer, chief pilot?

21   **A.**  Yes.

22   **Q.**  What about -- what about Chief Pilot Glassey?

23   **A.**  I wouldn't call it hostility, I've had reports of pilots

24   who have had conversations with Roy Glassey, for example, about

25   the bulletin boards.

## Dow - Direct / Berzon

```
 1   Q.   And were those conversations directed to not put material

 2   up on bulletin boards?

 3            MR. QUANDT:   Objection, this is leading.

 4   BY MR. BERZON:

 5   Q.   What were those conversations?

 6   A.   Roy Glassey instructed Marc Johnson not to post ALPA

 7   information in the crew room.

 8            MR. QUANDT:   Objection, hearsay.

 9            THE COURT:   Okay.  And that will come in subject to

10   a motion to strike.

11   BY MR. BERZON:

12   Q.   Who is Roy Glassey?

13   A.   He is the Chicago chief pilot.

14   Q.   What about Jeff Curry?

15   A.   The Denver chief pilot.

16   Q.   And have there been any complaints about Curry?

17   A.   Curry had asked -- I wasn't there, other members of the

18   Organizing Committee were holding an informational meeting in

19   Denver in a common area near the crew room and Curry asked them

20   to leave.

21            MR. QUANDT:   Objection, hearsay.

22            THE COURT:   Come in subject to a motion to strike.

23            MR. BERZON:   Okay.

24   BY MR. BERZON:

25   Q.   Exhibit 4, which is in front of you, the letter from Brad
```

Dow – Direct / Berzon

1    **A.**    Yes, I do.

2    **Q.**    Would you identify pilots you know who were terminated,

3    wanted to appeal and were denied an appeal by the company.

4    **A.**    Yes.    First one I'll mention is Mike Seymour, he was a

5    Chicago first office.

6            **THE COURT:**    Why is this relevant?    Let me ask this

7    question.

8            **MR. BERZON:**    I want to show there is no grievance

9    procedure at all, the works.

10           **THE COURT:**    Let's say you are right.    Let's say that

11   this is basically a pretty illusory grievance procedure or one

12   that is not -- doesn't protect, as we know grievance procedures

13   don't comport with certain acknowledged ways that grievance

14   procedures ought to proceed, to which I say, I understand that,

15   but why would that have some bearing on the issues that I have

16   to decide?

17           **MR. BERZON:**    Because I want to establish that SAPA

18   is not an RLA representative in any way, shape or form, and

19   therefore, this is not a representational issue even on the

20   broadest possible theory just to dot every I and cross every T.

21   This case does not involve in any way a dispute between

22   unions -- two unions -- an incumbent union in any way and

23   another union attempting to displace a union under the Railway

24   Labor Act.

25           **MR. QUANDT:**    May I be heard?

Dow - Direct / Berzon

1    **THE COURT:**  Yes.

2        **MR. QUANDT:**  If the claim -- I mean, this is the

3    heart of the legal argument in the case, but if the claim is

4    actually being made that to have two rival unions warring with

5    one another in order to have a representation dispute, that

6    principle is absolutely unsupportable.

7        That representation dispute that exists with ALPA is

8    attempting to become the certified bargaining representative

9    for these employees, end of story.  It has nothing to do with

10   whether or not SAPA is an incumbent union within the meaning of

11   the Railway Labor Act.

12       The issue of representational dispute is established

13   simply by their placement which indicates that they are

14   attempting to represent the employees, the pilots at SkyWest

15   Airlines.  End of story.

16       Now, the only other question, and I certainly

17   understand that the issue of company domination of SAPA,

18   whether or not the company dominates SAPA in an illegal sense

19   or not, that is relevant to the case, I do understand that.

20       **MR. BERZON:**  That was my second point.

21       **MR. QUANDT:**  If it's being offered for that purpose,

22   I have no objection.

23       **MR. BERZON:**  That was my second point.  First, I

24   just want to establish that this -- I mean, because ALPA has

25   not gone to the NMB and is not seeking recommendation at this

1    stage what it's trying to organize to be in a position, but

2    what I wanted to do -- so I want to establish that, one, we

3    don't have someone who has some sort of protected status of any

4    kind.

5            But, secondly, we are trying to show this is a

6    company-denominated union in every regard.  And we are going to

7    deal with a number of aspects and one of them is that any

8    protection it provides is completely illusory.

9            And it's important, I think, in that regard that

10   there are pilots who requested assistance, specifically, and

11   because they were denied an appeal process.

12           **THE COURT:**  Well, then it's an issue of whether it's

13   a company dominated union or representative so forth, it would

14   be relevant to that issue.

15           **MR. BERZON:**  Yes.

16           **THE COURT:**  Yeah.  Okay.

17   **BY MR. BERZON:**

18   **Q.**  Okay.

19           So would you tell us about Mike Seymour and --

20   **A.**  Mike Seymour --

21           **MR. QUANDT:**  Again, we are getting into hearsay.

22   What is his basis of knowing the circumstances --

23           **THE COURT:**  You have to lay a foundation.

24   **BY MR. BERZON:**

25   **Q.**  Did you receive a phone call from -- from Mike Seymour?

**Dow - Direct / Berzon**

1   **A.**  I received a phone call from Mike Seymour in approximately

2   October of 2005.

3   **Q.**  Why did he call you?

4   **A.**  He had been terminated.

5   **Q.**  And why did he call you?

6   **A.**  He was referred to me by a member on the Organizing

7   Committee because he was looking for help on how to get his job

8   back, how to save his job.

9   **Q.**  Did you try to help him?

10  **A.**  I did.

11  **Q.**  What did you do?

12  **A.**  I advised him to contact the people department -- I advised

13  him to read standard practice 325, and in standard practices

14  325 it outlines how to go about obtaining that appeals process.

15  I advised him to contact the people department, specifically

16  Kelly Jasmine and ask her -- request a review hearing.

17  **Q.**  And what happened?

18  **A.**  He was denied the review hearing.  Her office called the

19  day after the request.  And told him that his review hearing

20  had been denied.

21  **Q.**  So in other words, he was not allowed to appeal?

22  **A.**  That's correct.

23  **Q.**  All right.

24          Now, what about Farouk Hamid *(phonetic)*, did he call

25  you?

**Dow – Direct / Berzon**

1    **A.**   Farouk Hamid called me approximately two months ago, maybe

2    three months ago, after he had been taken off-line.

3              He had flown a flight with a check airman and check

4    airman didn't feel that his performance was adequate, so they

5    took him off the trip.  He had been scheduled for a meeting

6    with the chief pilot the following day.  So Farouk called me

7    and asked me for advice on what he should do.

8              I advised him to go into the chief pilot's office

9    and be very humble and explain that he has not been on-line

10   very long, that he had not been flying very much.  He was a

11   reserve pilot, he only had 120 hours in the airport, and just

12   be very humble and ask for help.

13             I didn't expect he would be terminated.

14   **Q.**   What happened?

15   **A.**   He was terminated the next day.

16   **Q.**   Was he able to appeal?

17   **A.**   As Mike Seymour did, Farouk called me and he asked what he

18   should do.  Again, I advised him to contact Kelly Jasmine,

19   which he did via E-mail and request a review hearing.

20             He was denied the review hearing, and after that I

21   contacted our SAPA president to ask for help, as I did with

22   Mike Seymour's case.  I called the SAPA president and said,

23   "Hey, I've got a phone call from this guy that had just been

24   terminated.  He would like a review hearing pursuant to

25   standard practice 325, and he has been denied.  Can you help

Dow - Direct / Berzon

```
 1   him get a review hearing?"
 2   Q.  Was he granted a review hearing?
 3   A.  He was not.
 4   Q.  I want to turn now to the activity of the --
 5              THE COURT:  Well, Exhibit 2 admitted.
 6                       (Plaintiff's Exhibit 2 was received in
 7                       evidence.)
 8              MR. BERZON:  Oh, I'm sorry, Your Honor.  Thank you.
 9   BY MR. BERZON:
10   Q.  Want to return now to the activity of the Organizing
11   Committee.
12              And I'll try to shorten this so I'm going to ask a
13   series of direct questions.  If there is objection, I can just
14   make it more general.
15              Did the committee try to distribute literature in
16   crew lounges?
17   A.  Yes, we have.
18   Q.  Are crew lounges work areas?
19   A.  No.
20   Q.  Did the committee try to distribute literature in pilot
21   mailboxes, in crew lounges, such as -- are those called B
22   mails, by the way?
23              MR. QUANDT:  Your Honor, again, foundation or
24   objection, he is testifying.
25              MR. BERZON:  I'll make it general.  I was trying to
```

1          What has been the company's response to the

2   Organizing --

3          THE COURT:  Well, I think you have to lay a

4   foundation.  What did he observe?  What did he see?

5   BY MR. BERZON:

6   Q.  As a leader of the organizing campaign, what did you learn

7   about the Organizing Committee?

8          MR. QUANDT:  Objection.  It's what he observed that

9   is relevant.

10         THE COURT:  Sustained.

11  BY MR. BERZON:

12  Q.  What have you observed?

13  A.  I have observed the company --

14  Q.  In general terms.  We'll get to the specifics.

15  A.  The company has instructed pilots not to post literature in

16  crew rooms.  They have instructed pilots not to leave

17  information in crew rooms, instructed pilots not to wear the

18  ALPA lanyards.  They've instructed pilots not to solicit in

19  crew rooms.  Instructed pilots not to hold informational

20  meetings in crew rooms.

21  Q.  Has the company's hostility had an effect on the organizing

22  campaign?

23  A.  Very much so.

24  Q.  What kind of effect?

25  A.  Well, it's stifled our ability to communicate and has put

 1    fear into pilots, fear of retaliation from the company for

 2    promoting the campaign.

 3            **MR. QUANDT:**  Objection.  If he is testifying it's

 4    his opinion this has happened to him, that is one thing.  For

 5    him to testify, that the ramifications --

 6            **THE COURT:**  He may have to lay some foundation.

 7            **MR. BERZON:**  Your Honor, actually, because Counsel

 8    will have an opportunity to cross-examine, this is a

 9    preliminary injunction hearing.  And the Ninth Circuit has held

10    that the trial court may give even inadmissible evidence some

11    weight when to do so serves the purpose of preventing

12    irreparable harm before trial.

13            Ordinarily, you can give a preliminary injunction on

14    hearsay declarations.  In this case, we are going through the

15    Norris Laguardia procedures which require live evidence and an

16    opportunity for cross-examination.  But it is completely

17    permissible to have a preliminary injunction based on hearsay.

18            The cite is *Flint Distribution Company, Inc. versus*

19    *Harvey*, 734 F.2d --

20            **THE COURT:**  734.

21            **MR. BERZON:**  F.2d 1389 at 1394.  And *Hiedeman* --

22    it's Ninth Circuit case.  Hiedeman is a Tenth Circuit case,

23    H-e-i-d-e-m-a-n, *versus Salt Lake City*, 348 F.2d -- F.3d,

24    excuse me, 1182 at 1188.

25            I just want to make sure that's right, because I

**Dow - Direct / Berzon**

```
 1   have one -- 188 here.  I have the cite here.  I have the case
 2   here, actually.
 3              It's 348 F.3d 1182 at 1188 Tenth Circuit 2003.  The
 4   federal rules do not apply to federal preliminary injunction
 5   hearings.  So I would ask the Court for some latitude on this.
 6   Obviously, the weight of the testimony is for Your Honor to
 7   decide.  And if you think it's not credible or viable
 8   testimony --
 9              THE COURT:  Well --
10              MR. BERZON:  -- you'll take that into account.
11              THE COURT:  Okay.  I mean, I have let in some of
12   these things subject to a motion to strike, and what I have to
13   figure out is exactly the issue that you raise.  I -- I'll go
14   look at the cases.
15              MR. BERZON:  I'm going to have a number of specific
16   witnesses with specific incidents.
17              THE COURT:  I'm just trying to get going on this.
18              MR. BERZON:  I know.
19              THE COURT:  It's coming in subject to a motion to
20   strike.  I assume you do have witnesses with some specificity.
21   And to the extent he can be specific, he should be, and to the
22   extent he is unable to be specific, I understand and I'll deal
23   with it.
24              MR. BERZON:  Okay.  I would allow it -- a standing
25   objection to --
```

**Dow - Direct / Berzon**

1  **Q.**  Did there come a point when you stopped wearing the

2  lanyard?

3  **A.**  Yes.

4  **Q.**  Why specifically did you stop wearing the lanyard?

5  **A.**  I was checking in for a trip in my crew room, and Susan

6  Brown, the administrative assistant again, saw me wearing the

7  lanyard, and she said, "Steve, you need to take that off.

8  You'll get in trouble for wearing that."

9  **Q.**  Did you take that seriously?

10  **A.**  Very much so.

11  **Q.**  Why was that?

12  **A.**  Well, she was telling me I would get in trouble for wearing

13  the lanyard and I didn't want to get in trouble.  I like my

14  job, I love my job.

15  **Q.**  Are you also interested in being a check airman?

16  **A.**  Not today but at some point in the future of my career, I

17  would like to be, yes.

18  **Q.**  And Susan Brown works directly for the chief pilot?

19  **A.**  That's correct.

20  **Q.**  Okay.

21  Was your experience with regard to wearing your

22  lanyard unique?

23  **A.**  No, I've had many, many reports of pilots being told to

24  take the ALPA lanyard off.

25  **MR. QUANDT:**  Your Honor, just for the record, again,

Dow - Direct / Berzon

```
 1    same objection.  This is hearsay.
 2              THE COURT:  Right.  Come in subject to a motion to
 3    strike.
 4              Over what period of time have you received these
 5    complaints?
 6              THE WITNESS:  I would say we were wearing the
 7    lanyards for approximately six months.
 8              THE COURT:  When was the six-month period,
 9    approximately?
10              THE WITNESS:  Approximately October of '05
11    through --
12              MR. BERZON:  You mean '06?
13              THE WITNESS:  No.
14              MR. BERZON:  '05?
15              THE WITNESS:  October of '05 through the spring of
16    '06.
17              THE COURT:  So the ALPA lanyard hadn't been worn
18    since the spring of '06?
19              THE WITNESS:  That's correct.  It was around the
20    spring of '06 that Ms. Brown asked me to take mine off.  And I
21    had phone calls from several other pilots telling me of them
22    being told to take theirs off.
23              One pilot was met at the gate, or several pilots
24    were met at the gate, one in particular was met at the gate by
25    Tony Fizer, he was waiting for him at the gate and actually
```

 1    took him off-line -- threaten to take him off-line, took him to

 2    his office for wearing the ALPA lanyard.

 3            There was another instance, David Boehm was in

 4    upgrade training, upgrading from first officer to captain, and

 5    he was in the training department, not in uniform.  You are not

 6    required to be in uniform when you are in training.  He was

 7    wearing his ALPA lanyard, and Jason Meister came to him and

 8    instructed him that he had been told by Roy Glassey to tell

 9    David that if he wanted to wear an ALPA lanyard, he should go

10    work for an ALPA carrier.

11            **MR. QUANDT:**  Your Honor, same objection.  It's

12    hearsay.

13            **THE COURT:**  It may come in subject to a motion to

14    strike.

15    *BY MR. BERZON:*

16    **Q.**  Let me ask a foundation question.

17            Did you receive all these reports because of your

18    position on the C Team?

19    **A.**  Yes.  I get phone calls on a daily basis from Organizing

20    Committee members.

21    **Q.**  Okay.

22            Does the C Team have periodic phone calls to

23    coordinate efforts and exchange reports concerning what is

24    happening with regard to the Organizing Committee?

25    **A.**  We've held almost weekly -- we try to hold them every week

 1    have done.

 2            MR. BERZON:  I'll lay a foundation.

 3    BY MR. BERZON:

 4    Q.  Have you received reports as part of your responsibilities

 5    as a member of the C Team from pilots concerning what happened

 6    when they have attempted to post ALPA materials on bulletin

 7    boards?

 8    A.  I have received reports from Organizing Committee members

 9    who have posted on the bulletin boards.  I have a posted on

10    bulletin boards myself.  The information that I have posted on

11    bulletin boards has been routinely and promptly removed.  And

12    I've received reports from other Organizing Committee members

13    who have been instructed by their chief pilots or from

14    administrative assistants not to post information on the

15    bulletin boards.

16            MR. QUANDT:  And I object --

17            THE WITNESS:  To clarify --

18            THE COURT:  We have to let the person answer.

19            Now, you object.

20            MR. QUANDT:  I object on hearsay, Your Honor.

21            THE COURT:  And you are objecting as to the portion

22    of the testimony as it relates to reports that he has received

23    of this happening to other people.

24            MR. QUANDT:  Thank you, Your Honor.  Well stated.

25            THE COURT:  Well, I don't know how well stated it

1  is, but that is my statement.

2          So my first question is, these reports that you have

3  received from other people, over what period of time and when

4  did that occur?

5          **THE WITNESS:**  Periodically over the course of the

6  campaign from October of 2005 until as recently as, I believe,

7  just a few months ago.  When Andy Bharath was instructed by

8  Jeff Curry not to post in crew rooms.

9          **THE COURT:**  So this can come in subject to a motion

10 to strike.

11         Go ahead, next.

12 **BY MR. BERZON:**

13 **Q.**  Have you ever seen or heard of anyone removing, taking

14 down, personal material from bulletin boards before they became

15 outdated?

16 **A.**  No.

17 **Q.**  Has there ever, to your knowledge, been any complaint from

18 the company about pilots posting personal material on bulletin

19 boards?

20 **A.**  No.  It's a common practice and it's -- stuff is posted on

21 bulletin boards throughout the system routinely, and it stays

22 up in Colorado Springs crew room, for example, there is one

23 bulletin board that has had information on there, such as

24 business cards that have been up there as long as I have a been

25 based in the Colorado Springs, the same business cards.

## Dow - Direct / Berzon

1    **Q.**  With regard to the general bulletin boards, does SAPA post

2    information on these bulletin boards?

3    **A.**  SAPA posts information on bulletin boards throughout the

4    system.  In fact, in a couple of domiciles, they have dedicated

5    bulletin boards.  And those areas where they are not dedicated

6    bulletin boards, they share them with common use bulletin

7    boards.  Sometimes they will just take out a corner of the

8    bulletin board or just post on the bulletin board.

9            But in Colorado Springs and Chicago, they have

10   dedicated SAPA bulletin boards.

11   **Q.**  Have you ever heard of any reports or personally seen SAPA

12   materials removed from bulletin boards?

13   **A.**  No.

14   **Q.**  Okay.

15           I would like to turn to Exhibit 7 and 8.

16           Would you look at Exhibit 7, please.

17   **A.**  Okay.

18   **Q.**  Do you recognize Exhibit 7?

19   **A.**  Yes, I do.  This is the dedicated SAPA bulletin board in

20   the Chicago crew lounges.

21   **Q.**  Have you seen that personally?

22   **A.**  Yes, I have.

23         **MR. BERZON:**  I move the admission of that into

24   evidence.

25         **THE COURT:**  Approximately when was Exhibit 7 taken?

Dow - Direct / Berzon

1              And after we did not get an answer, we decided to

2    call him and ask him in person for a meeting.  Andy Bharath

3    called and left a voicemail for Brad Holt and within a couple

4    of hours he had a return phone call from Todd Emerson saying

5    that he was calling on Brad's behalf, and we would not be

6    granted a meeting and not be granted any of the items that we

7    asked for in the letter.

8    *Q.*  When did you write the letter to Brad Holt?

9    *A.*  I believe that was March -- March of this year, not sure of

10   the date.

11   *Q.*  Okay.

12              *THE COURT:*  Exhibit 12?

13              *MR. BERZON:*  Yes.

14              *THE COURT:*  Admitted.

15                   **(Plaintiff's Exhibit 12 was received in**

16                   **evidence.)**

17   BY MR. BERZON:

18   *Q.*  Did the C Team meet on May 17th, 2007?

19   *A.*  Yes, we did.

20   *Q.*  Did you decide to have a carrier-wide action?

21   *A.*  Yes, we did.

22   *Q.*  What did you decide you wanted to do?

23   *A.*  We decided that we wanted to have a carrier-wide lanyard

24   campaign, in other words, pass lanyards out to the entire pilot

25   group and have a specific day where we publicized and asked all

Dow - Direct / Berzon

```
 1 │ pilots to wear their ALPA lanyard to show support for the
 2 │ campaign.
 3 │ Q.  Why did you feel it was important to do that at this time?
 4 │ A.  We are coming into the summer season, which is a very busy
 5 │ season for work, for flying.  All seasons are busy for flying
 6 │ but specifically seems like it gets busier in the summertime.
 7 │ And we know that we kind of go in doldrums because people are
 8 │ busy flying and that is also when pilots try to take family
 9 │ vacations and take time off.
10 │         We just wanted to stimulate the campaign going into
11 │ to summer.
12 │ Q.  Let me just return just for a moment to the new pilots, the
13 │ meetings at the training center that SAPA conducts.
14 │         How many pilots, approximately, have been hired of
15 │ the 2700 by SkyWest since the campaign began?
16 │ A.  Approximately a thousand pilots since the campaign began.
17 │ Q.  And in your --
18 │         THE COURT:  Since October of '05.
19 │         THE WITNESS:  Correct.
20 │ BY MR. BERZON
21 │ Q.  In your experience, has it been more difficult to get cards
22 │ signed from new pilots than from pilots who have been on the
23 │ premises a while?
24 │ A.  Very much so.
25 │ Q.  Okay.
```

1          Sorry, Your Honor.

2    **BY MR. BERZON:**

3    **Q.**   What was the impact of getting this E-mail from Captain

4    Faddis on you?

5    **A.**   Well, I was hurt, a little angry and disappointed.

6    **Q.**   How did it make you feel about wanting to have a union?

7    **A.**   Reconfirmed my beliefs in that area.

8    **Q.**   After getting this Dave Faddis E-mail that you weren't

9    getting promoted because of your politics and after the

10   incident --

11          **THE COURT:**   What was the question?

12   **BY MR. BERZON:**

13   **Q.**   Subsequent to your getting this E-mail from Captain Faddis

14   and subsequent to being told that the training center on the

15   sidewalk that you had to stop giving out literature, how did

16   you feel about continuing to participate in expressive

17   activities on behalf of the union?

18   **A.**   I -- a little resentful, fearful.

19   **Q.**   Since the TRO has been issued, have you seen pilots wearing

20   lanyards on the property?

21   **A.**   Yes, I have.   I have personally handed out four or five

22   since the TRO was in effect.

23   **Q.**   Have you worn a lanyard --

24   **A.**   Yes, I have.

25   **Q.**   Since the TRO, have you seen ALPA literature in crew rooms?

Alford - Direct / Berzon

1    **A.**  Yes, I have.

2    **Q.**  I want to turn to SAPA for some brief questioning.

3         Are you familiar with SAPA?

4    **A.**  Yes, I am.

5    **Q.**  For how long have you been familiar with SAPA?

6    **A.**  Since its inception in late '94, early '95.

7    **Q.**  What do you base that familiarity on?

8    **A.**  I know Captain Anthony Wood, nicknamed Woody.  He and I had

9    a conversation regarding this.

10        **MR. QUANDT:**  Objection.  Again hearsay, Your Honor.

11   **BY MR. BERZON:**

12   **Q.**  Was Captain Anthony Wood the pilot who founded SAPA?

13   **A.**  Yes, he was.

14   **Q.**  Okay.

15        Were you a SAPA representative?

16   **A.**  Briefly in 1998.

17   **Q.**  Have the pilots ever voted on whether to be represented by

18   SAPA?

19   **A.**  No, they have not.

20   **Q.**  Is SAPA independent of the company?

21        **MR. QUANDT:**  Objection, Your Honor, that is a legal

22   conclusion.

23        **THE COURT:**  Well, you are asking him is his view

24   that SAPA is independent of the company, that is the question.

25        **THE WITNESS:**  No, they are not.

1  *BY MR. BERZON:*

2  *Q.*  Okay.

3       Based on your knowledge of SAPA from being a

4  representative and being a member all these years, who controls

5  the SAPA budget?

6  *A.*  The company controls their budget.

7  *Q.*  Who funds SAPA?

8  *A.*  The company does.

9  *Q.*  Who pays the three SAPA officers?

10 *A.*  SkyWest pays them.

11 *Q.*  Do they make more than line pilots?

12 *A.*  Yes, they do.

13 *Q.*  Was the company involved in the formation of SAPA?

14      **MR. QUANDT:**  Objection.  We need foundation on this,

15 Your Honor.

16 *BY MR. BERZON:*

17 *Q.*  Did you have conversations with the pilots who founded

18 SAPA?

19 *A.*  Yes.

20      **MR. QUANDT:**  Objection.  This is hearsay, then.

21 *BY MR. BERZON:*

22 *Q.*  Did you do this --

23      **THE COURT:**  Okay.  Sustained.

24      **MR. BERZON:**  The Tenth Circuit case says the federal

25 Rules of Evidence don't apply --

1    **THE COURT:**  It's your choice.  You're in the Ninth

2  Circuit.  They want to actually be in the Tenth Circuit, do you

3  want me to transfer the case, so you get all the benefit of

4  those rules?

5    **MR. BERZON:**  I prefer to be in the Ninth Circuit.

6    **THE COURT:**  Then don't tell me what the Tenth

7  Circuit does.

8    **MR. BERZON:**  Sorry, Your Honor.

9  BY MR. BERZON:

10  **Q.**  Was -- did you have conversations in your capacity as a

11  SAPA representative with the person who founded SAPA to learn

12  about the organization you were becoming a representative of?

13  **A.**  Yes, I did.

14  **Q.**  Okay.

15    **THE COURT:**  I still think that would be hearsay.

16    **MR. QUANDT:**  Your Honor, I will withdraw my

17  objection to this hearsay.

18    **THE COURT:**  Okay.  Objection withdrawn.

19    Go ahead.

20  BY MR. BERZON:

21  **Q.**  Did -- in founding SAPA, did Woody, as you call him, go to

22  the company?

23  **A.**  Woody told me in '94 that he felt we needed something.  He

24  asked me to start an organizing campaign because he felt we

25  needed some representation on the property.  When I told him

**Alford - Direct / Berzon**

1    a letter explaining our action or wishes to the company.

2    Q.   And who authored the letter?

3    A.   A pilot by the name of Nathan Karaker *(phonetic)*.

4    Q.   Where is he?

5    A.   He is at American.

6    Q.   Why did he leave?

7    A.   I guess he felt --

8            MR. QUANDT:  Objection, Your Honor.

9            THE COURT:  Sustained.

10           MR. BERZON:  All right.

11   BY MR. BERZON:

12   Q.   Who took the letter to the company?

13   A.   Mike Eisenstadt and Todd Schmidke *(phonetic)*.

14   Q.   Were they officers of SAPA?

15   A.   Yes, they were.

16   Q.   Who did they present the letter to?

17   A.   To Brad Holt.

18   Q.   And what did Brad Holt do when he got the letter from them?

19           MR. QUANDT:  Your Honor, there is no foundation on

20   this again.  How do we know what happened?

21           MR. BERZON:  I'll lay a foundation.

22           THE COURT:  I'm a little -- okay.  You are not

23   objecting on hearsay ground, so you are objecting on

24   foundational grounds.

25           So lay a foundation.

1    *BY MR. BERZON:*

2    *Q.*  Did Mr. Schmidke and Eisenstadt report back to you and the

3    other SAPA representatives as to what happened?

4                *MR. QUANDT:*  Object to hearsay ground.

5                *THE COURT:*  Well, the problem is that you said let

6    this all come in.

7                *MR. QUANDT:*  Your Honor, seriously, I think I was

8    referring -- if I wasn't clear, Your Honor, I was referring to

9    the business with Woody because we are going to elicit the same

10   testimony on a hearsay basis and how it was created.

11               *THE COURT:*  So objection sustained.

12               *MR. BERZON:*  Well --

13               *THE COURT:*  He limited his hearsay objection to a

14   particular incident.

15               *MR. BERZON:*  Wait a minute.  But I'm asking him as a

16   SAPA rep, did the offices of SAPA report back to the board as

17   to what happened to them when they presented the letter to the

18   company.

19               *MR. QUANDT:*  Still hearsay.  Makes no difference.

20               *MR. BERZON:*  That would be an exception to the

21   hearsay rule in the course of his business activity.  This is

22   part of what an officer does when an officer reports back to

23   the board.  That is an exception to the hearsay rule.

24               *THE COURT:*  It's an exception for a foundational

25   purpose.  It's not an exception with respect to whether it's

1    hearsay or not.  It's hearsay if, in fact, it's introduced for

2    the truth of the matter asserted, that is hearsay.  This is

3    being offered for the truth of the matter asserted.  That is

4    that whoever it is said to him this is --

5              **MR. BERZON:**  I'll ask another question.  I'll ask a

6    different question.

7              **THE COURT:**  Great.

8    **BY MR. BERZON:**

9    **Q.**  Were Todd Schmidke and Mike Eisenstadt fired when they

10   presented the letter to Brad Holt?

11   **A.**  Yes, this was what Mike Eisenstadt told me.

12   **Q.**  Okay.

13             Did the company later relent and give them their

14   jobs back?

15   **A.**  Yes, they did.

16             **MR. QUANDT:**  Your Honor, again, I'm going to object

17   to this on the ground that it's not part of the pleadings in

18   the case.  They are going well beyond anything that has ever

19   been alleged.

20             **THE COURT:**  Well, wait a minute.

21             **MR. BERZON:**  It's company domination.

22             **THE COURT:**  They are saying -- it's not beyond the

23   pleadings.  They are saying that there is a hostile workplace

24   environment towards certain activities, certain organizational

25   activities.  That is the thrust of their complaint.  They may

**Shrier - Cross / Hall**

1  **A.**  Yes, he did.

2  **Q.**  And didn't you agree with him that the policy did, in fact,

3  on its face, prohibit nonstandard lanyards?

4  **A.**  It appeared that it did.

5  **Q.**  And didn't you also agree with him when he showed you the

6  policy regarding insubordination that you had been

7  insubordinate in refusing to take off the nonstandard lanyard?

8  **A.**  I disagreed with him on that.

9  **Q.**  Now, you were asked a question about whether you were aware

10  of anyone terminated for wearing other than ALPA lanyards; you

11  are not aware of anyone being terminated for wearing ALPA

12  lanyards, are you?

13  **A.**  I believe that was the question.  I'm not aware of people

14  being terminated for --

15  **Q.**  For wearing any lanyards whatsoever?

16  **A.**  No, I'm not aware of people being terminated for any

17  lanyard.

18  **Q.**  Or disciplined for wearing lanyards of any sort.

19  **A.**  I'm not aware of any actual discipline.

20  **Q.**  Now, with respect to the bulletin boards, sir, you said

21  that you would put materials down, or, I'm sorry, put materials

22  up on bulletin boards, how often did you do that?

23  **A.**  ALPA?

24  **Q.**  Yes, ALPA materials.

25  **A.**  Regularly.

Boehm - Direct / Lye

1    *Q.*   And what happens if you don't upgrade?

2    *A.*   If you don't complete the upgrade training, your employment

3    is terminated.

4    *Q.*   So I'm sorry, let's go back to the -- your experience in

5    upgrade training.  What happened?

6    *A.*   I was in -- I was in class.  We were -- our class was

7    visited by Dave Faddis, who is the director of -- I understood

8    it to be flight training, I think his title is now flight

9    standards.  He gave us a presentation of things going on at

10   SkyWest.

11             After the presentation was over, I was pulled aside

12   by my instructor, Jason Meister, and he instructed me to --

13   that Dave Faddis requested that I remove my lanyard and not

14   wear it in the training center.

15   *Q.*   Did he say specifically what Dave Faddis had said?

16   *A.*   Yes.  He said Dave Faddis wanted to --

17             *MR. QUANDT:*  Objection, Your Honor.  Again, hearsay.

18             *THE COURT:*  Overruled.

19   *BY MS. LYE:*

20   *Q.*   You can answer the question.

21   *A.*   Okay.

22             He said that Dave Faddis wanted me to know that if I

23   wanted to wear an ALPA lanyard that I need to go work for an

24   ALPA company and that it was a slap in the face of SkyWest.

25             *THE COURT:*  Who is telling you this?

 1   congregate in big groups that would allow us to communicate

 2   with them, so we come up with these creative ways to reach out

 3   to the pilots.  And we just keep hitting these roadblocks, and

 4   it's just a little frustrating.

 5   **Q.**  Did you set up an information table in that area again

 6   after your conversation with Captain Curry?

 7   **A.**  No, we did not.

 8   **Q.**  Now, there has been some testimony about the new hire

 9   presentations, and I just want to ask you a couple of questions

10   about that.

11        Do you recall whether a SAPA presentation was made

12   at your training -- your first training class?

13   **A.**  Yes.

14   **Q.**  Okay.  Can you recall what the substance of that

15   presentation was?

16   **A.**  It was basically that SAPA was a better alternative to

17   union representation.

18   **Q.**  And are you aware of the content of SAPA presentations

19   currently?

20   **A.**  Yes.

21   **Q.**  And what do you know about the content of those

22   presentations?

23   **A.**  Former ALPA members in our new hire classes called me to

24   complain that certain SAPA reps were providing inaccurate

25   information about ALPA to the new hire pilots.

1  *Q.*  Okay.  Were they comparing, as far as you know, ALPA and

2  SAPA?

3  *A.*  I'm not sure if there is a comparison made, but there was

4  some inaccurate information that was being presented to the new

5  hires regarding ALPA.

6  *Q.*  Okay.

7          I would like to turn your attention to Exhibit 12,

8  which has already been admitted into evidence, the letter from

9  the OC to Brad Holt.

10          There was testimony from Captain Dow about this

11  document; are you familiar with the document?

12  *A.*  Yes, ma'am.

13  *Q.*  And did you receive a response from management to this

14  document?

15  *A.*  Yes, ma'am, I did receive, eventually receive a response

16  from Todd Emerson.

17  *Q.*  And did Mr. Emerson refuse to agree to any of the requests

18  you had made in that letter?

19  *A.*  He indicated that the company politely declined all

20  requests.

21  *Q.*  Now, you are aware that there is a TRO issued in this case?

22  *A.*  Yes, ma'am.

23  *Q.*  Have you seen any effect at SkyWest since the TRO was

24  issued?

25  *A.*  Yes, ma'am.

1    Q.    And can you explain that.

2    A.    It was sometime last year in the Salt Lake crew lounge I

3    saw Lou Bodkin *(phonetic)* remove something off the wall and

4    throw it in the trash can.

5    Q.    And it was an Organizing Committee --

6    A.    I don't know if it was a meeting or just like a newsletter.

7                MR. BERZON:    And I move the admission of Exhibit 15.

8                THE COURT:    Admitted.

9                        **(Plaintiff's Exhibit 15 was received in**

10                        **evidence.)**

11               MR. BERZON:    Thank you, Your Honor.

12   BY MR. BERZON:

13   Q.    As a SAPA representative, we have heard a lot of discussion

14   about presentation by SAPA at the training center; as a SAPA

15   representative, do you know whether SAPA mentions ALPA as

16   presentations?

17   A.    Yes, I've been told so.

18   Q.    And who were you told that by?

19               MR. SPAGET:    Objection.    Hearsay.

20               MR. BERZON:    I'm laying a foundation.

21               THE COURT:    Why is --

22   BY MR. BERZON:

23   Q.    Was it a SAPA officer who told you so?

24               THE COURT:    Okay, fine.

25               MR. SPAGET:    Same objection.

Kanuch - Direct / Berzon

1           **THE COURT:**  Okay.

2    *BY MR. BERZON:*

3    *Q.*  What did they tell you?

4           **MR. SPAGET:**  Same objection.  Hearsay.

5           **THE COURT:**  Well, it's being offered for

6    essentially -- what is the -- state of mind and people who hear

7    these sorts of things.

8           **MR. SPAGET:**  For that purpose, it's irrelevant.  For

9    purposes of establishing what happens in a training class it's

10   hearsay and it's inadmissible.

11          **THE COURT:**  Well, why wouldn't it go to the state of

12   mind of people -- if, in fact, management got up and said the

13   one thing I don't want you to do is having anything to do with

14   ALPA, why wouldn't that be admissible?

15          **MR. SPAGET:**  There is no admissible evidence that is

16   what is being said.

17          **THE COURT:**  Because we haven't gotten there as to

18   what he is going to say.  You are objecting before we get

19   there.

20          I think I have to at least hear what he said.  It's

21   not being offered for the truth of the matter, it's being

22   offered to show what the state of mind would be of anybody who

23   would hear something like that.

24          **MR. BERZON:**  In fact, the truth of the matter,

25   plaintiffs would disagree with the truth of the matter, but,

Kanuch - Direct / Berzon

1    yes.

2    BY MR. BERZON:

3    Q.   Would you say that you were told by a SAPA officer as to

4    what was said at the presentation?

5    A.   I was told that Jim Black goes into these meetings and he

6    speaks negatively about ALPA saying that it will limit the

7    growth of SkyWest and basically tie their hands from further

8    growth.

9         And he said -- he compares it to SAPA, that SAPA has

10   the means to do it.  It's free, you don't pay any dues like you

11   have to pay with ALPA.  And then he offers a way to go about

12   utilizing SAPA, if you need any of SAPA's services, I guess you

13   would call it.

14        MR. SPAGET:   You know, I have to renew my objection.

15   We have an unidentified person saying what somebody else says

16   in a training program.

17        THE COURT:   Who said this to you?

18        THE WITNESS:   Mark Nolan.

19        MR. BERZON:   President of SAPA.

20        THE COURT:   All right, anyway, comes in subject to a

21   motion to strike.

22        MR. SPAGET:   For the record, he is in the courtroom

23   and is not testifying on this.

24        MR. BERZON:   Because we were limited.

25        If you would like to hear Mark Nolan --

Kanuch – Direct / Berzon

1    THE COURT:  You may have to for that one sentence.

2    MR. BERZON:  In rebuttal if we need to we will.

3    THE COURT:  Not rebuttal.

4    I'm granting the objection, so if you want to call

5    Mr. Nolan and ask him what was said, fine.

6    MR. BERZON:  Okay.

7    BY MR. BERZON:

8    Q.  Who pays the time of the SAPA representative making the

9    presentation?

10   A.  SkyWest.

11   Q.  Has any other group ever been permitted to make a

12   presentation to the trainees?

13   A.  No, not to my knowledge.

14   Q.  Okay.

15   At SAPA meetings you have attended, have there been

16   negative comments made by SAPA official about ALPA?

17   A.  Yes.

18   Q.  What is the position of Mike Eisenstadt and Jim Black, the

19   Jim Black who spoke at the training session?

20   A.  They seemed to be anti-ALPA to me.

21   Q.  Seemed to be, or what did they say?

22   A.  I've been to two meetings, and the meetings that we have,

23   it turns into an argument back and forth.  Everything is being

24   compared to ALPA.

25   Q.  We have already established ALPA doesn't have lawyers and

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing. The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

**Sahar McVickar, RPR, CSR No. 12963**

**June 8, 2007**