Pages 1 - 337

United States District Court

Northern District of California

Before The Honorable Charles R. Breyer

SkyWest Pilots ALPA          )
Organizing Committee,        )
et al.,                      )
                             )
          Plaintiff,         )
                             )
    vs.                      )          No. C07-2688 CRB
                             )
SkyWest Airlines,            )
Incorporated,                )
                             )
          Defendant.         )
_____)



San Francisco, California
Thursday, June 7, 2007

### Reporter's Transcript Of Proceedings

**Appearances:**

For Plaintiff:          Altshuler Berzon, LLP
                        177 Post Street, Suite 300
                        San Francisco, California   94108
                By:     **Stephen P. Berzon, Esquire**
                        **Linda Lye, Esquire**
                        **Claire P. Prestel, Esquire**

                        Air Line Pilots Association, Int'l.
                        1625 Massachusetts Avenue, N.W.
                        Washington, DC   20036
                By:     **Elizabeth Ginsburg, Esquire**


(Appearances continued on next page.)

Reported By:            *Sahar McVickar, RPR, CSR No. 12963*
                        *Official Reporter, U.S. District Court*
                        *For the Northern District of California*

                (Computerized Transcription By Eclipse)

```
For Defendant:              Winston & Strawn
                            101 California Street
                            San Francisco, California  94111
                   By:  Robert Spagat, Esquire

                            Ford & Harrison, LLP
                            1300 19th Street, N.W., Suite 700
                            Washington, DC  20036
                   By:  Norman A. Quandt, Esquire
                        Douglas W. Hall, Esquire

                            SkyWest Airlines
                            444 South River Road
                            St. George, Utah 84790
                   By:  Todd Emerson, General Counsel
                        Patricia T. Stambelos, General Counsel



                            ---o0o---
```

1    about reasons why we would like them, but if I had to narrow it

2    down to two, I would say that we would like to have a legally

3    binding contract and we would like to remove our At-will

4    employment status.

5    **Q.**  What about having a grievance procedure with a third party?

6           **MR. QUANDT:**  Your Honor, object to the relevance of

7    this.  The reasons why he wants to have ALPA as his

8    representative, what is the relevance of that?

9           **THE COURT:**  That is sustained.

10    **BY MR. BERZON:**

11    **Q.**  Have you taken steps to organize your fellow copilots for

12    the purpose of attempting to have a collective bargaining

13    representative?

14    **A.**  Yes, I have.

15    **Q.**  Are you a member of the organizing -- the SkyWest ALPA

16    Organizing Committee?

17    **A.**  SkyWest Pilots ALPA Organizing Committee.

18    **Q.**  Are you?

19    **A.**  Yes.

20    **Q.**  I'll call that the OC from time to time.

21           Are you a coordinating team member?

22    **A.**  Yes.

23    **Q.**  And is the coordinating team -- what is the euphemism for

24    the coordinating team?

25    **A.**  We call it the C Team.

Dow - Direct / Berzon

1  Q.  The C Team.

2        Have you played a major role in the organizing

3  campaign?

4  A.  Yes.

5  Q.  And what is the mission of the OC?

6  A.  Well, the mission of the Organizing Committee is to educate

7  the pilot group to the benefits of ALPA and representation.

8  And to bring us to a vote.

9  Q.  Does the OC itself seek to get recognized as a bargaining

10  representative?

11  A.  No, we do not.

12  Q.  And the OC has members?

13  A.  Yes.

14  Q.  How many approximately?

15  A.  Somewhere between 100 and 150.  My best guess would be 125.

16  Q.  And how many of them have permitted themselves to be

17  publicly identified?

18  A.  I believe my last count was 53 currently.

19  Q.  Why haven't the others gone public?

20  A.  Well, there are a lot of reasons why people choose not to

21  go public, several of them.  But I guess the main reasons --

22        MR. QUANDT:  Object to this.  How is he speculating,

23  what is the foundation, he is speculating as to why other

24  people choose not to go public?

25        THE COURT:  Well, let's see.  I don't know that he

1   is speculating.

2   **BY MR. BERZON:**

3   *Q.*   Do you know?

4          **THE COURT:**   The question is whether it's hearsay.

5   The question is -- I mean, he is going to testify against the

6   people that told him why they don't want to be identified, so

7   then the question is why isn't that hearsay, which it is.

8   And --

9          **MR. BERZON:**   He is a member.

10         **THE COURT:**   Well, I don't think that makes any

11  difference.   I think the difference is whether since I guess we

12  are going to get into the impact of certain actions.

13         **MR. BERZON:**   Yes.

14         **THE COURT:**   By alleged actions by the company, as to

15  whether or not that then -- that then has some impact on their

16  ability to organize.   So let's hear what the foundation is.

17  I'm going to let it in subject to a motion to strike.

18  **BY MR. BERZON:**

19  *Q.*   You had conversations with members of the Organizing

20  Committee who have not gone public as to why they have chosen

21  not to be public?

22  *A.*   Yes, I have.

23         **MR. QUANDT:**   That I object to on hearsay.

24         **THE COURT:**   It's going to come in subject to a

25  motion to strike.

1           Go ahead.

2    BY MR. BERZON

3    Q.   What have you found out from those conversations as to the

4    reason why pilots who are members of the Organizing Committee

5    has -- of not permitting their names to be released publicly?

6    A.   Several pilots have told me they are afraid to go public,

7    fearful of retribution, retaliation from the company if they

8    were to go public.  Several have told me that they are afraid

9    that if they were to apply for a job at another airline that

10   their application process may be sabotaged because of their

11   support of ALPA.

12           Others have told me that they're afraid that they

13   would not be granted check airmanship because if they were

14   known supporters of ALPA.

15           MR. QUANDT:  Your Honor, I renew my motion to

16   strike.  He is going --

17           THE COURT:  No, I understand the motion.  I

18   understand the motion, and I'm taking it under submission.

19           Go ahead.

20   BY MR. BERZON:

21   Q.   Has the company publicly expressed a view about whether it

22   wants the organizing campaign to succeed?

23   A.   Yes, it has.

24   Q.   Where has it done that?

25   A.   Well, there have been a couple of instances.  One is on our

1    **Q.**  Has anyone from those airlines ever told you that you have

2    to be able -- you have to be a union member in order to be

3    hired?

4                **MR. QUANDT:**  Objection, hearsay.  And objection,

5    relevance.

6                **THE COURT:**  I think sustained.  What would be the

7    relevance?

8                **MR. BERZON:**  The relevance is that this is a

9    statement, "It is not necessary for anyone to join a union in

10   order to get a job at SkyWest."  It's not necessary at any

11   carrier to join a union to get a job, whether they are union or

12   not.  And he can talk about the experience of ALPA carriers

13   from what he knows.

14               **THE COURT:**  I -- yeah, okay.  Sustained.  Objection

15   sustained.

16   **BY MR. BERZON:**

17   **Q.**  In addition to Exhibit 4, have you as a member -- as a

18   member of the C Team, learned about other anti-union -- about

19   hostility to the -- to the attempt by the Organizing Committee

20   to bring ALPA to the SkyWest premises?

21   **A.**  Yes.

22   **Q.**  Okay.

23               Can you give us some examples.

24   **A.**  There have been pilots who have reported to me --

25               **MR. QUANDT:**  Objection, hearsay.

```
 1              THE COURT:  I'm going to let it in subject to a

 2   motion to strike.

 3              Go ahead.

 4              MR. BERZON:  Your Honor, we can put on 20 witnesses.

 5   We are --

 6              THE COURT:  I'll let it in.

 7              MR. BERZON:  Thank you.

 8              THE COURT:  That means he can testify.

 9   BY MR. BERZON:

10   Q.  Please answer the question.

11   A.  Pilots have reported to me that they have been instructed

12   not to post information on bulletin boards and crew rooms.

13   There have been pilots who have been instructed to take their

14   ALPA lanyards off while wearing them on duty.

15   Q.  When did this occur?

16   A.  Over the course of the last year and a half.  Several

17   times.

18   Q.  Are there pilots --

19              MR. QUANDT:  Objection, Your Honor.  I'm going to

20   object on hearsay again, and I also ask you to strike this.

21   Among other things, we don't know, pilots have been asked by

22   who?

23              THE COURT:  There is -- this is called

24   cross-examination.

25              MR. BERZON:  And I'm about --
```

1      **THE COURT:**  You will be given latitude in

2    cross-examination.

3           Okay.  So the landyards about a year and a half.

4    What about the -- you said notices as well?

5      **THE WITNESS:**  Posting information notices on

6    bulletin boards.

7      **THE COURT:**  And has that taken place over the last

8    year and a half?

9      **THE WITNESS:**  Yes.

10     **THE COURT:**  In both cases, the lanyards and the

11   posting notices, approximately how many complaints have you

12   received?

13     **THE WITNESS:**  On the lanyard issue, I would guess

14   somewhere around 20 complaints, 20 different complaints.  And

15   on the bulletin board issue, two that I can recall clearly.

16     **THE COURT:**  Okay.  Thank you.

17          Go ahead.

18   **BY MR. BERZON:**

19   **Q.**  Have pilots talked to you about hostility they received

20   from Tony Fizer, chief pilot?

21   **A.**  Yes.

22   **Q.**  What about -- what about Chief Pilot Glassey?

23   **A.**  I wouldn't call it hostility, I've had reports of pilots

24   who have had conversations with Roy Glassey, for example, about

25   the bulletin boards.

1  Q.  And were those conversations directed to not put material

2  up on bulletin boards?

3        MR. QUANDT:  Objection, this is leading.

4  BY MR. BERZON:

5  Q.  What were those conversations?

6  A.  Roy Glassey instructed Marc Johnson not to post ALPA

7  information in the crew room.

8        MR. QUANDT:  Objection, hearsay.

9        THE COURT:  Okay.  And that will come in subject to

10  a motion to strike.

11  BY MR. BERZON:

12  Q.  Who is Roy Glassey?

13  A.  He is the Chicago chief pilot.

14  Q.  What about Jeff Curry?

15  A.  The Denver chief pilot.

16  Q.  And have there been any complaints about Curry?

17  A.  Curry had asked -- I wasn't there, other members of the

18  Organizing Committee were holding an informational meeting in

19  Denver in a common area near the crew room and Curry asked them

20  to leave.

21        MR. QUANDT:  Objection, hearsay.

22        THE COURT:  Come in subject to a motion to strike.

23        MR. BERZON:  Okay.

24  BY MR. BERZON:

25  Q.  Exhibit 4, which is in front of you, the letter from Brad

1    **A.**    Yes, I do.

2    **Q.**    Would you identify pilots you know who were terminated,

3    wanted to appeal and were denied an appeal by the company.

4    **A.**    Yes.  First one I'll mention is Mike Seymour, he was a

5    Chicago first office.

6           **THE COURT:**  Why is this relevant?  Let me ask this

7    question.

8           **MR. BERZON:**  I want to show there is no grievance

9    procedure at all, the works.

10          **THE COURT:**  Let's say you are right.  Let's say that

11   this is basically a pretty illusory grievance procedure or one

12   that is not -- doesn't protect, as we know grievance procedures

13   don't comport with certain acknowledged ways that grievance

14   procedures ought to proceed, to which I say, I understand that,

15   but why would that have some bearing on the issues that I have

16   to decide?

17          **MR. BERZON:**  Because I want to establish that SAPA

18   is not an RLA representative in any way, shape or form, and

19   therefore, this is not a representational issue even on the

20   broadest possible theory just to dot every I and cross every T.

21   This case does not involve in any way a dispute between

22   unions -- two unions -- an incumbent union in any way and

23   another union attempting to displace a union under the Railway

24   Labor Act.

25          **MR. QUANDT:**  May I be heard?

1     **THE COURT:**  Yes.

2     **MR. QUANDT:**  If the claim -- I mean, this is the

3     heart of the legal argument in the case, but if the claim is

4     actually being made that to have two rival unions warring with

5     one another in order to have a representation dispute, that

6     principle is absolutely unsupportable.

7          That representation dispute that exists with ALPA is

8     attempting to become the certified bargaining representative

9     for these employees, end of story.  It has nothing to do with

10    whether or not SAPA is an incumbent union within the meaning of

11    the Railway Labor Act.

12         The issue of representational dispute is established

13    simply by their placement which indicates that they are

14    attempting to represent the employees, the pilots at SkyWest

15    Airlines.  End of story.

16         Now, the only other question, and I certainly

17    understand that the issue of company domination of SAPA,

18    whether or not the company dominates SAPA in an illegal sense

19    or not, that is relevant to the case, I do understand that.

20    **MR. BERZON:**  That was my second point.

21    **MR. QUANDT:**  If it's being offered for that purpose,

22    I have no objection.

23    **MR. BERZON:**  That was my second point.  First, I

24    just want to establish that this -- I mean, because ALPA has

25    not gone to the NMB and is not seeking recommendation at this

1   stage what it's trying to organize to be in a position, but

2   what I wanted to do -- so I want to establish that, one, we

3   don't have someone who has some sort of protected status of any

4   kind.

5           But, secondly, we are trying to show this is a

6   company-denominated union in every regard.  And we are going to

7   deal with a number of aspects and one of them is that any

8   protection it provides is completely illusory.

9           And it's important, I think, in that regard that

10  there are pilots who requested assistance, specifically, and

11  because they were denied an appeal process.

12          **THE COURT:**  Well, then it's an issue of whether it's

13  a company dominated union or representative so forth, it would

14  be relevant to that issue.

15          **MR. BERZON:**  Yes.

16          **THE COURT:**  Yeah.  Okay.

17  **BY MR. BERZON:**

18  **Q.**  Okay.

19          So would you tell us about Mike Seymour and --

20  **A.**  Mike Seymour --

21          **MR. QUANDT:**  Again, we are getting into hearsay.

22  What is his basis of knowing the circumstances --

23          **THE COURT:**  You have to lay a foundation.

24  **BY MR. BERZON:**

25  **Q.**  Did you receive a phone call from -- from Mike Seymour?

1    **A.**   I received a phone call from Mike Seymour in approximately

2    October of 2005.

3    **Q.**   Why did he call you?

4    **A.**   He had been terminated.

5    **Q.**   And why did he call you?

6    **A.**   He was referred to me by a member on the Organizing

7    Committee because he was looking for help on how to get his job

8    back, how to save his job.

9    **Q.**   Did you try to help him?

10   **A.**   I did.

11   **Q.**   What did you do?

12   **A.**   I advised him to contact the people department -- I advised

13   him to read standard practice 325, and in standard practices

14   325 it outlines how to go about obtaining that appeals process.

15   I advised him to contact the people department, specifically

16   Kelly Jasmine and ask her -- request a review hearing.

17   **Q.**   And what happened?

18   **A.**   He was denied the review hearing.  Her office called the

19   day after the request.  And told him that his review hearing

20   had been denied.

21   **Q.**   So in other words, he was not allowed to appeal?

22   **A.**   That's correct.

23   **Q.**   All right.

24            Now, what about Farouk Hamid *(phonetic)*, did he call

25   you?

1  **A.**  Farouk Hamid called me approximately two months ago, maybe

2  three months ago, after he had been taken off-line.

3  He had flown a flight with a check airman and check

4  airman didn't feel that his performance was adequate, so they

5  took him off the trip.  He had been scheduled for a meeting

6  with the chief pilot the following day.  So Farouk called me

7  and asked me for advice on what he should do.

8  I advised him to go into the chief pilot's office

9  and be very humble and explain that he has not been on-line

10  very long, that he had not been flying very much.  He was a

11  reserve pilot, he only had 120 hours in the airport, and just

12  be very humble and ask for help.

13  I didn't expect he would be terminated.

14  **Q.**  What happened?

15  **A.**  He was terminated the next day.

16  **Q.**  Was he able to appeal?

17  **A.**  As Mike Seymour did, Farouk called me and he asked what he

18  should do.  Again, I advised him to contact Kelly Jasmine,

19  which he did via E-mail and request a review hearing.

20  He was denied the review hearing, and after that I

21  contacted our SAPA president to ask for help, as I did with

22  Mike Seymour's case.  I called the SAPA president and said,

23  "Hey, I've got a phone call from this guy that had just been

24  terminated.  He would like a review hearing pursuant to

25  standard practice 325, and he has been denied.  Can you help

Dow – Direct / Berzon

1    him get a review hearing?"

2    *Q.* Was he granted a review hearing?

3    *A.* He was not.

4    *Q.* I want to turn now to the activity of the --

5               *THE COURT:* Well, Exhibit 2 admitted.

6                    **(Plaintiff's Exhibit 2 was received in**

7                    **evidence.)**

8               *MR. BERZON:* Oh, I'm sorry, Your Honor.  Thank you.

9    *BY MR. BERZON:*

10   *Q.* Want to return now to the activity of the Organizing

11   Committee.

12              And I'll try to shorten this so I'm going to ask a

13   series of direct questions.  If there is objection, I can just

14   make it more general.

15              Did the committee try to distribute literature in

16   crew lounges?

17   *A.* Yes, we have.

18   *Q.* Are crew lounges work areas?

19   *A.* No.

20   *Q.* Did the committee try to distribute literature in pilot

21   mailboxes, in crew lounges, such as -- are those called B

22   mails, by the way?

23              *MR. QUANDT:* Your Honor, again, foundation or

24   objection, he is testifying.

25              *MR. BERZON:* I'll make it general.  I was trying to

1          What has been the company's response to the

2   Organizing --

3          **THE COURT:**  Well, I think you have to lay a

4   foundation.  What did he observe?  What did he see?

5   **BY MR. BERZON:**

6   **Q.**  As a leader of the organizing campaign, what did you learn

7   about the Organizing Committee?

8          **MR. QUANDT:**  Objection.  It's what he observed that

9   is relevant.

10         **THE COURT:**  Sustained.

11  **BY MR. BERZON:**

12  **Q.**  What have you observed?

13  **A.**  I have observed the company --

14  **Q.**  In general terms.  We'll get to the specifics.

15  **A.**  The company has instructed pilots not to post literature in

16  crew rooms.  They have instructed pilots not to leave

17  information in crew rooms, instructed pilots not to wear the

18  ALPA lanyards.  They've instructed pilots not to solicit in

19  crew rooms.  Instructed pilots not to hold informational

20  meetings in crew rooms.

21  **Q.**  Has the company's hostility had an effect on the organizing

22  campaign?

23  **A.**  Very much so.

24  **Q.**  What kind of effect?

25  **A.**  Well, it's stifled our ability to communicate and has put

1      **THE COURT:**  Is the ALPA lanyard the one that is

2    Exhibit 5 in the exhibit book?

3        **MR. BERZON:**  Five.

4        I was going to move the admission.

5        **THE COURT:**  Admitted.

6            **(Plaintiff's Exhibit 5 was received in**

7            **evidence.)**

8    **BY MR. BERZON:**

9    *Q.*  Do SkyWest pilots wear other kind of lanyards other than

10   ALPA lanyards?

11   *A.*  Yes, they do.

12   *Q.*  Can you describe some of the other kinds of lanyards that

13   are worn by pilots.

14   *A.*  I've seen many, many different examples of lanyards.  For

15   example, I've seen Navy lanyards, the Dodgers, the New York

16   Mets, United Airlines.

17        Roy Glassey, the chief pilot in Chicago used to wear

18   an Emery Air lanyard.  Emery Air is the manufacturer of the

19   Brazilia airplane that we fly.  Dave Faddis, I believe his

20   title is director of training, he used to wear a Bombardier

21   lanyard.  Bombardier is the manufacturer of another jet that we

22   fly.

23   *Q.*  What ski areas, colleges?

24   *A.*  Ski areas, I have a noticed many different ones, Heavenly

25   Valley, Snow Bird.  Colleges, in fact, I was in Chicago several

Dow - Direct / Berzon

1   Q.  Did there come a point when you stopped wearing the

2   lanyard?

3   A.  Yes.

4   Q.  Why specifically did you stop wearing the lanyard?

5   A.  I was checking in for a trip in my crew room, and Susan

6   Brown, the administrative assistant again, saw me wearing the

7   lanyard, and she said, "Steve, you need to take that off.

8   You'll get in trouble for wearing that."

9   Q.  Did you take that seriously?

10  A.  Very much so.

11  Q.  Why was that?

12  A.  Well, she was telling me I would get in trouble for wearing

13  the lanyard and I didn't want to get in trouble.  I like my

14  job, I love my job.

15  Q.  Are you also interested in being a check airman?

16  A.  Not today but at some point in the future of my career, I

17  would like to be, yes.

18  Q.  And Susan Brown works directly for the chief pilot?

19  A.  That's correct.

20  Q.  Okay.

21          Was your experience with regard to wearing your

22  lanyard unique?

23  A.  No, I've had many, many reports of pilots being told to

24  take the ALPA lanyard off.

25          MR. QUANDT:  Your Honor, just for the record, again,

**Dow - Direct / Berzon**

1    same objection.  This is hearsay.

2             **THE COURT:**  Right.  Come in subject to a motion to

3    strike.

4             Over what period of time have you received these

5    complaints?

6             **THE WITNESS:**  I would say we were wearing the

7    lanyards for approximately six months.

8             **THE COURT:**  When was the six-month period,

9    approximately?

10             **THE WITNESS:**  Approximately October of '05

11    through --

12             **MR. BERZON:**  You mean '06?

13             **THE WITNESS:**  No.

14             **MR. BERZON:**  '05?

15             **THE WITNESS:**  October of '05 through the spring of

16    '06.

17             **THE COURT:**  So the ALPA lanyard hadn't been worn

18    since the spring of '06?

19             **THE WITNESS:**  That's correct.  It was around the

20    spring of '06 that Ms. Brown asked me to take mine off.  And I

21    had phone calls from several other pilots telling me of them

22    being told to take theirs off.

23             One pilot was met at the gate, or several pilots

24    were met at the gate, one in particular was met at the gate by

25    Tony Fizer, he was waiting for him at the gate and actually

Dow – Direct / Berzon

1   took him off-line -- threaten to take him off-line, took him to

2   his office for wearing the ALPA lanyard.

3           There was another instance, David Boehm was in

4   upgrade training, upgrading from first officer to captain, and

5   he was in the training department, not in uniform.  You are not

6   required to be in uniform when you are in training.  He was

7   wearing his ALPA lanyard, and Jason Meister came to him and

8   instructed him that he had been told by Roy Glassey to tell

9   David that if he wanted to wear an ALPA lanyard, he should go

10  work for an ALPA carrier.

11          **MR. QUANDT:**  Your Honor, same objection.  It's

12  hearsay.

13          **THE COURT:**  It may come in subject to a motion to

14  strike.

15  **BY MR. BERZON:**

16  **Q.**  Let me ask a foundation question.

17          Did you receive all these reports because of your

18  position on the C Team?

19  **A.**  Yes.  I get phone calls on a daily basis from Organizing

20  Committee members.

21  **Q.**  Okay.

22          Does the C Team have periodic phone calls to

23  coordinate efforts and exchange reports concerning what is

24  happening with regard to the Organizing Committee?

25  **A.**  We've held almost weekly -- we try to hold them every week

Dow - Direct / Berzon

1    and we are presently successful at it.  We may have missed a

2    few phone calls, but we do hold weekly conference calls.  And

3    one of the subjects on the conference calls are issues that

4    have come up on-line, for example, people being instructed to

5    take off their lanyards or disciplined.

6    *Q.*  Do the coordinating team members take it upon themselves to

7    go out and obtain these reports?

8    *A.*  No, these reports are freely given to us.

9    *Q.*  And is it important to the C Team to be able to receive

10   these reports?

11   *A.*  Yes, it is.

12   *Q.*  Why is that?

13   *A.*  Well, it's important so that we understand what is going on

14   on the campaign.  We understand the concerns of pilots that are

15   volunteering for this organizing campaign.

16   *Q.*  Okay.

17          What impact did taking off the lanyards have on the

18   organizing campaign?

19   *A.*  Well, it had a huge impact.  Wearing the lanyards was a

20   great way, as I said earlier, to open the door for

21   conversation.  For example, when I would be flying and come

22   into a base where another crew is taking over my airplane,

23   pilots coming on the airplane would see me wearing my lanyard,

24   and it would just open the door for them to ask questions about

25   the campaign.

1    have done.

2              MR. BERZON:   I'll lay a foundation.

3    BY MR. BERZON:

4    Q.   Have you received reports as part of your responsibilities

5    as a member of the C Team from pilots concerning what happened

6    when they have attempted to post ALPA materials on bulletin

7    boards?

8    A.   I have received reports from Organizing Committee members

9    who have posted on the bulletin boards.  I have a posted on

10   bulletin boards myself.  The information that I have posted on

11   bulletin boards has been routinely and promptly removed.  And

12   I've received reports from other Organizing Committee members

13   who have been instructed by their chief pilots or from

14   administrative assistants not to post information on the

15   bulletin boards.

16             MR. QUANDT:   And I object --

17             THE WITNESS:   To clarify --

18             THE COURT:   We have to let the person answer.

19             Now, you object.

20             MR. QUANDT:   I object on hearsay, Your Honor.

21             THE COURT:   And you are objecting as to the portion

22   of the testimony as it relates to reports that he has received

23   of this happening to other people.

24             MR. QUANDT:   Thank you, Your Honor.  Well stated.

25             THE COURT:   Well, I don't know how well stated it

1   is, but that is my statement.

2          So my first question is, these reports that you have

3   received from other people, over what period of time and when

4   did that occur?

5          **THE WITNESS:**  Periodically over the course of the

6   campaign from October of 2005 until as recently as, I believe,

7   just a few months ago.  When Andy Bharath was instructed by

8   Jeff Curry not to post in crew rooms.

9          **THE COURT:**  So this can come in subject to a motion

10  to strike.

11         Go ahead, next.

12  **BY MR. BERZON:**

13  **Q.**  Have you ever seen or heard of anyone removing, taking

14  down, personal material from bulletin boards before they became

15  outdated?

16  **A.**  No.

17  **Q.**  Has there ever, to your knowledge, been any complaint from

18  the company about pilots posting personal material on bulletin

19  boards?

20  **A.**  No.  It's a common practice and it's -- stuff is posted on

21  bulletin boards throughout the system routinely, and it stays

22  up in Colorado Springs crew room, for example, there is one

23  bulletin board that has had information on there, such as

24  business cards that have been up there as long as I have a been

25  based in the Colorado Springs, the same business cards.

Dow - Direct / Berzon

1   Q.  With regard to the general bulletin boards, does SAPA post

2   information on these bulletin boards?

3   A.  SAPA posts information on bulletin boards throughout the

4   system.  In fact, in a couple of domiciles, they have dedicated

5   bulletin boards.  And those areas where they are not dedicated

6   bulletin boards, they share them with common use bulletin

7   boards.  Sometimes they will just take out a corner of the

8   bulletin board or just post on the bulletin board.

9           But in Colorado Springs and Chicago, they have

10  dedicated SAPA bulletin boards.

11  Q.  Have you ever heard of any reports or personally seen SAPA

12  materials removed from bulletin boards?

13  A.  No.

14  Q.  Okay.

15          I would like to turn to Exhibit 7 and 8.

16          Would you look at Exhibit 7, please.

17  A.  Okay.

18  Q.  Do you recognize Exhibit 7?

19  A.  Yes, I do.  This is the dedicated SAPA bulletin board in

20  the Chicago crew lounges.

21  Q.  Have you seen that personally?

22  A.  Yes, I have.

23          MR. BERZON:  I move the admission of that into

24  evidence.

25          THE COURT:  Approximately when was Exhibit 7 taken?

Dow - Direct / Berzon

1  Q.  Okay.

2      You mentioned that SAPA addressed you at the

3  beginning of the indoctrination program.  What is the impact of

4  SAPA doing that?

5  A.  It's a huge impact.  You have brand-new pilots, many of

6  them on their first airline job who are very impressionable at

7  this new job that they have, and so they come in and they hear

8  a presentation from SAPA describing all the benefits of SAPA

9  and the representation and whatnot.  So they believe that to be

10  the true story and the whole story.  They have heard nothing

11  else and they have no basis to form an opinion on it.

12  Q.  Are new pilots impressionable in your view?

13  A.  Very much so.  I know I was.

14  Q.  Is there a name within the airline for new pilots, the

15  syndrome that they have?

16  A.  We call it a Shiny New Jet Syndrome.

17  Q.  Did the company's actions, to your knowledge, pulling

18  literature off bulletin boards, out of mailboxes, stopping you

19  from wearing the lanyards, create a problem for the organizing

20  campaign?

21  A.  Well, it created several problems for the organizing

22  campaign.  Again, the problem has been our inability to

23  communicate with the group, and also instilled fear in

24  Organizing Committee members of talking publicly about the

25  organizing campaign or showing their support for the organizing

Dow – Direct / Berzon

1  campaign.

2  **Q.**  And why haven't you just defied what the company has done

3  and just done it anyway?

4  **A.**  I love my job and I would like to stay employed.  I have a

5  family to provide for.

6  **Q.**  Now, you mentioned previously that you someday might want

7  to be a check airman.  Do the chief pilots decide -- does

8  management decide who is going to be a check airman?

9  **A.**  Yes.

10  **Q.**  Now, you are a plaintiff in this lawsuit, right?

11  **A.**  Yes, I am.

12  **Q.**  Why did you decide to bring the lawsuit?

13  **A.**  Well, personally, and communication with the other

14  coordinating team members in our discussions, we felt like our

15  rights have been violated.  We have tried for a very long time

16  to work with the company to address these issues.  We have

17  tried many different avenues and made many attempts at

18  conversations, and we have basically just been stonewalled.

19  **Q.**  Did you write the company first and ask them to try to

20  solve the problem?

21  **A.**  Well, we started by verbal communications with chief pilots

22  throughout the system, and when we got nowhere with that, we

23  decided to send a formal written request to Brad Holt, the vice

24  president of flight operations, asking for a meeting to discuss

25  these issues.  And we did not get an answer from that letter.

**Alford - Direct / Berzon**

1    Q.   And were you on company time?

2    A.   No, I was not.

3    Q.   Who is Captain Shane Losse?

4    A.   Captain Shane Losse is the manager of training at the

5    facility in Salt Lake City.

6    Q.   So he is the manager of training at Salt Lake City, is that

7    management?

8    A.   Yes, it is.

9    Q.   And who is Captain David Faddis who told him to tell you to

10   stop, who is Captain David Faddis?

11   A.   Captain Faddis is the director of flight standards at

12   SkyWest Airlines.

13   Q.   Where is he located?

14   A.   St. George, Utah.

15   Q.   Company headquarters?

16   A.   Yes, it is.

17   Q.   And is he the boss of Captain Shane Losse?

18   A.   He is.

19   Q.   Okay.

20        At the dinner that night, what was attendance like?

21   A.   It was pretty high.  There were quite a few individuals,

22   probably 35 to 40 pilots.

23   Q.   And to what do you attribute the attendance you got?

24   A.   Our ability to hand out the flyers and talk to those pilots

25   that we did reach.

Alford - Direct / Berzon

1  Q.  Did you keep distributing the flyers after Captain Losse

2  told you to stop?

3  A.  No, we respected the company's wishes at that point and

4  left the property.

5  Q.  Prior to the temporary restraining order, did you ever do

6  so again?

7  A.  No, we did not.

8  Q.  Why not?

9  A.  For fear of retaliation, disciplinary action on the part of

10  the company.

11  Q.  Did you at any -- at one time wear ALPA lanyards?

12  A.  I did.

13  Q.  Why did you do that?

14  A.  I wanted to show support for the campaign, and as Captain

15  Dow has pointed out, it makes you approachable by other pilots.

16  Q.  And did you stop wearing them?

17  A.  Yes, I did.

18  Q.  Why?

19  A.  Because of the reports that we had had from other pilots

20  that had confrontations with chief pilots that were wearing the

21  lanyard.

22  Q.  Was that similar to what happened -- were these reports

23  similar to what happened to you personally distributing the

24  flyers at the training center?

25  A.  Yes, it was similar.

Alford - Direct / Berzon

1   *Q.*   And why didn't you wear the lanyards anyway?

2   *A.*   Again, for fear of disciplinary action on the part of the

3   company.

4   *Q.*   Did you apply for a check airman position earlier this

5   year?

6   *A.*   Yes, I did.

7   *Q.*   When?

8   *A.*   In the fall I submitted the application on-line.

9   *Q.*   And --

10  *A.*   Fall of '06.

11  *Q.*   What is a check airman position?

12  *A.*   A check airman provides additional training, initial

13  operating experience with the new hire pilots after

14  successfully completing training will fly with a check airman

15  on-line for line experience.

16  *Q.*   Do you spend more than 50 percent of your time training

17  pilots when you are a check airman?

18  *A.*   Yes, you would.

19  *Q.*   Is the check airman position considered a promotion?

20  *A.*   Yes.

21  *Q.*   Why is that?

22  *A.*   There is an override on your hourly rate, a little

23  prestigious and status comes with·that position.

24  *Q.*   When you say "override," you mean you make more money?

25  *A.*   A little more money, yes.

Alford – Direct / Berzon

1   Q.  And does the check airman position involve teaching?

2   A.  Yes, it does.

3   Q.  And what is your view about teaching?

4   A.  I like teaching, I like it very much.  It's an opportunity

5   to give back to the profession.

6   Q.  And you were previously a check airman from 2000 to 2002?

7   A.  Yes.

8   Q.  What happened to your application this year?

9   A.  It was denied.

10  Q.  Why was it denied?

11  A.  Because of the -- my union activity, my politics as they

12  call them.

13          MR. QUANDT:  Objection.

14          THE COURT:  Lay a foundation.

15          MR. BERZON:  I will lay a foundation.

16          I would like the Court and the witness to turn to

17  Exhibit number 10, please.

18  BY MR. BERZON:

19  Q.  This is an E-mail string and let's go to the bottom of the

20  page.

21          Captain Alford, did you send an E-mail on

22  January 11th, 2007 to Dave Faddis?

23  A.  Yes, I did.

24  Q.  Who is David Faddis?

25  A.  Captain Dave Faddis is the director of flight standards at

1  SkyWest.

2  **Q.**  And he is the same Dave Faddis who Captain Losse said told

3  him to tell you to stop distributing flyers?

4  **A.**  Yes, the same person.

5  **Q.**  He's in St. George?

6  **A.**  Yes, he is.

7  **Q.**  Would you read what you wrote Captain Losse -- Captain

8  Faddis?

9  **A.**  "Dave, anything I should know about being passed over again

10  for check airman?  Based on what you have told me, it is not

11  performance related, and you know that I keep politics out of

12  training, so can you enlighten me, please?"

13  **Q.**  What had he told you about why you were denied?

14  **A.**  I have always been told that the company was satisfied with

15  my performance as a pilot and a check airman, that I did a good

16  job at both.

17  **Q.**  Okay.

18       Would you read to the Court what -- turn next to the

19  return message from Captain Dave Faddis dated January 22nd,

20  2007.

21  **A.**  "Phil, I'm sorry that you are passed over again, but it

22  seems that your views in the past continue to follow you right

23  now.  I'm trying to be as honest with you as I can.  I know

24  that you keep your politics out of your check airman work, but

25  it always comes up in the comment section of my list.  My

**Alford - Direct / Berzon**

1  advice to you is to put your politics at rest and give yourself

2  an opportunity to become a check airman again if that is what

3  you want.  What I'm saying is you need to promote yourself with

4  the chiefs as being a SkyWest guy, and wanting to make SkyWest

5  as safe as it can through your check airman work.

6          "I don't know, Phil.  I'm just throwing out a few

7  ideas.  Even though our views on politics are not the same, I

8  feel that you have always been friends and that is why I am

9  responding to you in this manner.

10          "Phil, please don't take these comments as negative

11  because I don't mean them to be, take them as positives for the

12  future.

13          "Remember, time heals a lot of things.  That's what

14  they say.  So hang in there and please feel free to call me or

15  chat at any time."

16  Q.  Okay.

17          Now, we have established who Dave Faddis is.  How

18  long have you known Dave?

19  A.  I have known Dave for approximately 22 years.

20  Q.  Did you -- before he Boehm management, did you and he have

21  approximately comparable seniority?

22  A.  Yes, Dave is a little senior to me.  I don't recall how

23  much.

24  Q.  The E-mail -- let's break up this E-mail a little bit.

25          It says at one point, "your politics" and then it

1    goes on "but it always comes up in the comment section of my

2    list."  Who makes comments to the director of flight standards

3    with regard to someone becoming a check pilot?

4    **A.**    The chief pilots certainly weigh in and the other

5    departments.  Human resources would be one.

6    **Q.**    Are all of the people who do make comments, are they all

7    management?

8    **A.**    Yes.

9    **Q.**    Now, when he says that your politics always comes up in the

10   comment section of your list, the management comments on the

11   list, do you know what politics he is talking about?

12   **A.**    Yes.  I do.

13   **Q.**    What politics is he talking about?

14   **A.**    Organizing, union organizing.

15   **Q.**    Okay.

16              Have you ever discussed --

17              **MR. QUANDT:**  May I be heard on an objection?  I'm

18   objecting to this entire line of questioning at this point.

19   I've been trying to confirm.  There is nothing in any of the

20   papers in this case related to the allegations.  Apparently

21   there is an allegation here that the man is being denied what

22   some people would term as a promotion, which does have

23   financial consequences because of union activity.

24              Your Honor, that is not in the complaint, not in any

25   of the declarations, not been made part of the record in the

**Alford - Direct / Berzon**

1    case.  I would ask that this testimony be struck.

2                 *THE COURT:*  Overruled.

3                 Go ahead.

4    *BY MR. BERZON:*

5    *Q.*  Have you ever discussed other -- have you discussed your

6    union politics with Captain Faddis?

7    *A.*  Yes, I have.

8    *Q.*  Have you discussed ALPA with Captain Faddis?

9    *A.*  Yes, I have.

10   *Q.*  Have you ever discussed any other kind of politics with

11   Captain Faddis?

12   *A.*  No, we don't talk about that.

13   *Q.*  You ever talk about the mayor of Salt Lake?

14   *A.*  No.

15   *Q.*  The mayor of St. George?

16   *A.*  No.

17   *Q.*  How about any Governor races?

18   *A.*  No, we don't.

19   *Q.*  Senator?

20   *A.*  No.

21   *Q.*  What was the impact of --

22                 *THE COURT:*  Exhibit 10 admitted.

23                      **(Plaintiff's Exhibit 10 was received in**

24                      **evidence.)**

25                 *MR. BERZON:*  Thank you.

1              Sorry, Your Honor.

2    BY MR. BERZON:

3    Q.  What was the impact of getting this E-mail from Captain

4    Faddis on you?

5    A.  Well, I was hurt, a little angry and disappointed.

6    Q.  How did it make you feel about wanting to have a union?

7    A.  Reconfirmed my beliefs in that area.

8    Q.  After getting this Dave Faddis E-mail that you weren't

9    getting promoted because of your politics and after the

10   incident --

11              THE COURT:  What was the question?

12   BY MR. BERZON:

13   Q.  Subsequent to your getting this E-mail from Captain Faddis

14   and subsequent to being told that the training center on the

15   sidewalk that you had to stop giving out literature, how did

16   you feel about continuing to participate in expressive

17   activities on behalf of the union?

18   A.  I -- a little resentful, fearful.

19   Q.  Since the TRO has been issued, have you seen pilots wearing

20   lanyards on the property?

21   A.  Yes, I have.  I have personally handed out four or five

22   since the TRO was in effect.

23   Q.  Have you worn a lanyard --

24   A.  Yes, I have.

25   Q.  Since the TRO, have you seen ALPA literature in crew rooms?

Alford - Direct / Berzon

1   **A.**   Yes, I have.

2   **Q.**   I want to turn to SAPA for some brief questioning.

3         Are you familiar with SAPA?

4   **A.**   Yes, I am.

5   **Q.**   For how long have you been familiar with SAPA?

6   **A.**   Since its inception in late '94, early '95.

7   **Q.**   What do you base that familiarity on?

8   **A.**   I know Captain Anthony Wood, nicknamed Woody.  He and I had

9   a conversation regarding this.

10         **MR. QUANDT:**  Objection.  Again hearsay, Your Honor.

11   **BY MR. BERZON:**

12   **Q.**   Was Captain Anthony Wood the pilot who founded SAPA?

13   **A.**   Yes, he was.

14   **Q.**   Okay.

15         Were you a SAPA representative?

16   **A.**   Briefly in 1998.

17   **Q.**   Have the pilots ever voted on whether to be represented by

18   SAPA?

19   **A.**   No, they have not.

20   **Q.**   Is SAPA independent of the company?

21         **MR. QUANDT:**  Objection, Your Honor, that is a legal

22   conclusion.

23         **THE COURT:**  Well, you are asking him is his view

24   that SAPA is independent of the company, that is the question.

25         **THE WITNESS:**  No, they are not.

1    BY MR. BERZON:

2    Q.    Okay.

3                Based on your knowledge of SAPA from being a

4    representative and being a member all these years, who controls

5    the SAPA budget?

6    A.    The company controls their budget.

7    Q.    Who funds SAPA?

8    A.    The company does.

9    Q.    Who pays the three SAPA officers?

10   A.    SkyWest pays them.

11   Q.    Do they make more than line pilots?

12   A.    Yes, they do.

13   Q.    Was the company involved in the formation of SAPA?

14              MR. QUANDT:    Objection.    We need foundation on this,

15   Your Honor.

16   BY MR. BERZON:

17   Q.    Did you have conversations with the pilots who founded

18   SAPA?

19   A.    Yes.

20              MR. QUANDT:    Objection.    This is hearsay, then.

21   BY MR. BERZON:

22   Q.    Did you do this --

23              THE COURT:    Okay.    Sustained.

24              MR. BERZON:    The Tenth Circuit case says the federal

25   Rules of Evidence don't apply --

Alford - Cross / Quandt

1   **A.**   There were three of us.

2   **Q.**   Okay.

3         And somebody came out and asked you to not do that

4   on the sidewalk, correct, sir?

5   **A.**   That's correct.

6   **Q.**   Okay.

7         You weren't told, leave the sidewalk or you're going

8   to be discharged.  You were told -- you were asked to leave the

9   sidewalk; isn't that correct, sir?

10  **A.**   That's correct.  When an order comes from Captain Faddis,

11  it's like Santa's directory, you leave the property.

12  **Q.**   It was stated to you as a request, was it not?

13  **A.**   Actually, I believe his exact words were, "Dave Faddis says

14  you cannot be here."

15  **Q.**   Fair enough.

16        Do you happen to know whether the airport has rules

17  related to people handbilling on their property?

18        **MR. BERZON:**  Excuse me, Your Honor.  I have no

19  reason to know --

20        **THE COURT:**  He is asking him if he knows.

21        **THE WITNESS:**  No, I do not know what their rules

22  would be.

23  **BY MR. QUANDT:**

24  **Q.**   But you weren't told during that conversation that the

25  airport doesn't allow you to go on the sidewalk and conduct a

Shrier - Direct / Lye

1   **A.**   I was a geologist in the mining industry for 20 years and

2   left that.

3   **Q.**   And what is your relationship to the Organizing Committee?

4   **A.**   I am a member of the Organizing Committee and a member of

5   the coordination team.

6   **Q.**   Have you ever worn an ALPA lanyard while in uniform,

7   Captain Shrier?

8   **A.**   Yes, I have.

9   **Q.**   And is it important for you to be able to do so?

10  **A.**   Very important.

11  **Q.**   Why?

12  **A.**   Two things.  It advertises that I'm a member of the

13  Organizing Committee, and it also advertises our campaign for

14  other pilots.

15  **Q.**   And did you stop wearing your ALPA lanyard while in uniform

16  at some point?

17  **A.**   Yes, I did.

18  **Q.**   Why?

19  **A.**   I had a confrontation with management relative to that

20  lanyard.

21  **Q.**   Who in management?

22  **A.**   Captain Tony Fizer, chief pilot in Salt Lake.

23  **Q.**   And is chief pilot a management position?

24  **A.**   Yes, it is.

25  **Q.**   When did this incident happen?

1    **A.**   My recollection is July or August of last year, 2006.

2    **Q.**   Okay.  And can you describe what happened.

3    **A.**   I was reporting to my airport one morning walking out the

4    key concourse of the Salt Lake terminal, and Captain Fizer was

5    waiting at the concourse door in front of my airplane.

6    **Q.**   Is it normal for the chief pilot to be waiting for you at

7    the concourse door as you approach the airplane?

8    **A.**   No.

9    **Q.**   Had that ever happened to you before?

10   **A.**   Never happened to me before.

11   **Q.**   Then what happened when you approached?

12   **A.**   I exchanged greetings with Captain Fizer.  He dispensed

13   with greetings and immediately said, "take that off," pointing

14   at me.

15   **Q.**   What was he pointing at?

16   **A.**   My ALPA lanyard.

17   **Q.**   And then what happened?

18   **A.**   I said, "why do you want me to take that off?"

19   **Q.**   What was his response?

20   **A.**   His response was that it was a nonuniform standard lanyard.

21   **Q.**   And what was your response?

22   **A.**   My response was that I just come from the crew room where

23   the majority of pilots did not have a non -- or did not have a

24   standard uniform lanyard on, and, you know, did not understand

25   that the policy -- why was the policy being effected with me

1   there right then and there.

2   Q.  And then what happened after this?

3   A.  Well, then Captain Fizer commanded, or ordered, a very

4   military style command to me to take it off.

5   Q.  And did you at that point?

6   A.  Again, no.  I said, "Please put the applicable policy in my

7   V file, my mail file.  I do have to get out to the airplane and

8   get to work today," after which he said, "No.  Follow me now to

9   my office.  You are taken off your trip."

10  Q.  And did you follow him to his office?

11  A.  Yes, I did.

12  Q.  And then what happened.

13  A.  Initially, he had me wait outside while he closed the door.

14  He said he had a phone call to make.

15  Q.  And then when he was done with his phone call what

16  happened?

17  A.  He called me into his office.  He had two computer screens

18  up.

19  Q.  Did he do something with the computer screens?

20  A.  Yes, he had me read them.  One screen was our crewmember

21  policy section relating to uniform and lanyard, so I read he

22  lanyard policy.

23         The other section was our discipline and discharge

24  policy.  And he had me read a section on insubordination.  And

25  following down the discipline section on termination.

Shrier - Direct / Lye

1   Q.  And so what in your mind was the significance of him having

2   you read these paragraphs from the crewmember policy manual?

3           MR. QUANDT:  Objection.  Calls for speculation.

4           THE COURT:  Isn't it obvious?  First of all, that is

5   an improper objection, but overruled.

6           Go ahead.

7           What was your --

8           MS. LYE:  Understanding?

9           THE COURT:  Understanding.

10          THE WITNESS:  Your Honor, he was clearly connecting

11  my insubordination to termination and accusing me of

12  insubordination on the lanyard policy.

13  BY MS. LYE:

14  Q.  Have your ever heard of other pilots being terminated for

15  wearing a nonSkywest lanyard?

16  A.  No, never.

17  Q.  What in your experience are the normal sorts of offenses

18  that lead to termination at SkyWest?

19  A.  I am aware of some alcohol violations, gross training

20  failures or possibly safety issues.

21  Q.  And that day, had you seen any other pilots wearing

22  nonSkyWest lanyards?

23  A.  Yes.  It was very common.  The crew room was full of

24  nonstandard lanyards on pilots at that point in time.

25  Q.  And so what was the upshot of this interchange with Captain

1    Fizer?

2    **A.**  Well, ultimately I took my ALPA lanyard off.

3    **Q.**  Why?

4    **A.**  Well, because I had been clearly threatened with discipline

5    and potential discharge.

6    **Q.**  Prior to wearing your ALPA lanyard, had you ever worn any

7    other nonSkyWest lanyards?

8    **A.**  Yes, I had.  The only lanyard that I had ever worn in my

9    history in SkyWest was a blue snowbird lanyard.

10   **Q.**  And had you ever been approached for wearing that blue

11   snowbird lanyard?

12   **A.**  No, never have.

13   **Q.**  Thank you.

14         I would like to turn to a different topic.  Do crew

15   lounges have bulletin boards?

16   **A.**  Yes, they do.

17   **Q.**  What kinds?

18   **A.**  In the Salt Lake crew room where I'm domiciled, there are

19   several.  There is an operational bulletin board with company

20   operational information on it.  There is a swap board where

21   people post trips for swapping or exchange with other pilots.

22   And then there is a general bulletin board that has a title

23   across the top, "miscellaneous."

24   **Q.**  And have you ever posted nonALPA-related materials on the

25   general bulletin boards in a crew lounge?

1   Q.  Were you a relatively new pilot with SkyWest at the time?

2   A.  Yes, I was.

3   Q.  And so how did you feel in terms of your chief pilot

4   approaching you about the specific uniform issue?

5   A.  I didn't want to make any waves with the company, always

6   want to work and do the best job I can, so anytime your boss

7   comes to you like that, there is a concern.

8   Q.  If you could slow down just a little bit for the court

9   reporter that would be helpful.  Thank you.

10          Have you ever seen Captain Hecker ask anyone else to

11  remove a nonSkyWest lanyard?

12  A.  No.

13  Q.  After this incident, did you continue to wear your ALPA

14  lanyard while not in uniform?

15  A.  Yes.

16  Q.  And were you ever confronted by SkyWest management for

17  wearing it while not in uniform?

18  A.  Yes.

19  Q.  Can you please describe that incident.

20  A.  In December of 2006, I was in upgrade training in

21  Salt Lake City.

22  Q.  Can you tell us just what upgrade training means.

23  A.  I was a first officer before December, and then I was

24  awarded an upgrade to become a captain in December, and you

25  have to attend training, and I was in that class.

Boehm - Direct / Lye

1    *Q.* And what happens if you don't upgrade?

2    *A.* If you don't complete the upgrade training, your employment

3    is terminated.

4    *Q.* So I'm sorry, let's go back to the -- your experience in

5    upgrade training.  What happened?

6    *A.* I was in -- I was in class.  We were -- our class was

7    visited by Dave Faddis, who is the director of -- I understood

8    it to be flight training, I think his title is now flight

9    standards.  He gave us a presentation of things going on at

10   SkyWest.

11          After the presentation was over, I was pulled aside

12   by my instructor, Jason Meister, and he instructed me to --

13   that Dave Faddis requested that I remove my lanyard and not

14   wear it in the training center.

15   *Q.* Did he say specifically what Dave Faddis had said?

16   *A.* Yes.  He said Dave Faddis wanted to --

17          *MR. QUANDT:* Objection, Your Honor.  Again, hearsay.

18          *THE COURT:* Overruled.

19   *BY MS. LYE:*

20   *Q.* You can answer the question.

21   *A.* Okay.

22          He said that Dave Faddis wanted me to know that if I

23   wanted to wear an ALPA lanyard that I need to go work for an

24   ALPA company and that it was a slap in the face of SkyWest.

25          *THE COURT:* Who is telling you this?

1    **MS. LYE:**  Jason Meister.

2    **MR. BERZON:**  Jason Meister, Your Honor.

3    **THE COURT:**  That indicates on the exhibit -- I don't

4    know where this exhibit came from -- it indicates on the

5    exhibit he is management.

6    **MR. BERZON:**  Right.  We will do that with

7    Captain Kanuch.

8    **THE COURT:**  Okay, go ahead.

9    **BY MS. LYE:**

10   **Q.**  I don't remember where we left off.

11       What did Mr. Meister relay to you?

12   **A.**  Again, he told me to take off the -- that Dave Faddis

13   wanted me to remove the lanyard, and that if I wanted to work

14   for an ALPA company, I should go do that, and it was -- it was

15   a slap in the face of SkyWest to wear the lanyard.

16   **Q.**  To wear which lanyard?

17   **A.**  The ALPA lanyard.

18   **Q.**  And so how did you interpret this statement?  What did you

19   think would be the consequences if you continued to wear your

20   ALPA lanyard while in training?

21   **A.**  I thought I would be fired.  Considering I was in upgrade

22   training, if I didn't complete the training, I would be fired

23   anyway, and I didn't want anything to go wrong.

24   **Q.**  When you were told to take off your ALPA lanyard, were you

25   told that wearing the ALPA lanyard was a violation of any kind

Boehm - Direct / Lye

1       And what impact did this interaction with SkyWest

2  management at the training center have on you?

3  **A.**  I definitely felt stifled to discuss our campaign while I

4  was training.  And during training you have frequent breaks, so

5  there was ample opportunity to do that, but I definitely felt

6  like I probably shouldn't if I wanted to get through training.

7  **Q.**  Okay.

8       And are you aware that a TRO has been issued in this

9  case?

10  **A.**  Yes.

11  **Q.**  Has it had any effect on your behavior?

12  **A.**  Yes.

13  **Q.**  And what?

14  **A.**  Well, I'm wearing my lanyard now when I'm flying.  And I

15  feel a lot more open to discuss our campaign with fellow pilots

16  and to discuss it openly in crew lounges and any other time we

17  are on break.

18  **Q.**  Okay.  Thank you, Captain Boehm.  That's all I have for

19  you.

20                        **CROSS-EXAMINATION**

21  **BY MR. QUANDT:**

22  **Q.**  Good morning -- or, good afternoon, sir.

23       Very quickly here -- and I'm going to slow down --

24  the timing -- the first time you were told to remove the

25  lanyard occurred where?

Bharath - Direct / Ginsburg

1  congregate in big groups that would allow us to communicate

2  with them, so we come up with these creative ways to reach out

3  to the pilots.  And we just keep hitting these roadblocks, and

4  it's just a little frustrating.

5  Q.  Did you set up an information table in that area again

6  after your conversation with Captain Curry?

7  A.  No, we did not.

8  Q.  Now, there has been some testimony about the new hire

9  presentations, and I just want to ask you a couple of questions

10  about that.

11         Do you recall whether a SAPA presentation was made

12  at your training -- your first training class?

13  A.  Yes.

14  Q.  Okay.  Can you recall what the substance of that

15  presentation was?

16  A.  It was basically that SAPA was a better alternative to

17  union representation.

18  Q.  And are you aware of the content of SAPA presentations

19  currently?

20  A.  Yes.

21  Q.  And what do you know about the content of those

22  presentations?

23  A.  Former ALPA members in our new hire classes called me to

24  complain that certain SAPA reps were providing inaccurate

25  information about ALPA to the new hire pilots.

Bharath - Direct / Ginsburg

1  Q.  Okay.  Were they comparing, as far as you know, ALPA and

2  SAPA?

3  A.  I'm not sure if there is a comparison made, but there was

4  some inaccurate information that was being presented to the new

5  hires regarding ALPA.

6  Q.  Okay.

7       I would like to turn your attention to Exhibit 12,

8  which has already been admitted into evidence, the letter from

9  the OC to Brad Holt.

10      There was testimony from Captain Dow about this

11  document; are you familiar with the document?

12  A.  Yes, ma'am.

13  Q.  And did you receive a response from management to this

14  document?

15  A.  Yes, ma'am, I did receive, eventually receive a response

16  from Todd Emerson.

17  Q.  And did Mr. Emerson refuse to agree to any of the requests

18  you had made in that letter?

19  A.  He indicated that the company politely declined all

20  requests.

21  Q.  Now, you are aware that there is a TRO issued in this case?

22  A.  Yes, ma'am.

23  Q.  Have you seen any effect at SkyWest since the TRO was

24  issued?

25  A.  Yes, ma'am.

Kanuch - Direct / Berzon

1          I want to direct your attention to the bottom of

2    this sheet.  It says Michael Eisenstadt, and it says,

3    "management"; is that the Michael -- as far as you know, is

4    that the only Michael Eisenstadt who is an ALPA pilot -- I

5    mean, is a SAPA pilot -- excuse me, I mean a SkyWest pilot?

6          It's getting late.

7    A.   Yes.

8    Q.   Okay.

9          Who is Jason Meister?

10   A.   He is the chief CRJ ground instructor.

11   Q.   Is the chief COA ground instructor management?

12   A.   Yes, to my knowledge.

13   Q.   And what does this say here next to him?

14   A.   "Management."

15   Q.   Now, next to the other people on the list, are they

16   identified at all with the three letters, "MGT"?

17   A.   No.

18   Q.   Okay.

19          MR. BERZON:   I would like to introduce this into

20   evidence, Your Honor.

21          THE COURT:   Admitted.

22              (Plaintiff's Exhibit 16 was received in

23              evidence.)

24          MR. SPAGET:   Well, I'm going to object.

25          Lack of foundation.

1  Q.  And can you explain that.

2  A.  It was sometime last year in the Salt Lake crew lounge I

3  saw Lou Bodkin *(phonetic)* remove something off the wall and

4  throw it in the trash can.

5  Q.  And it was an Organizing Committee --

6  A.  I don't know if it was a meeting or just like a newsletter.

7      MR. BERZON:  And I move the admission of Exhibit 15.

8      THE COURT:  Admitted.

9          **(Plaintiff's Exhibit 15 was received in**

10         **evidence.)**

11     MR. BERZON:  Thank you, Your Honor.

12 BY MR. BERZON:

13 Q.  As a SAPA representative, we have heard a lot of discussion

14 about presentation by SAPA at the training center; as a SAPA

15 representative, do you know whether SAPA mentions ALPA as

16 presentations?

17 A.  Yes, I've been told so.

18 Q.  And who were you told that by?

19     MR. SPAGET:  Objection.  Hearsay.

20     MR. BERZON:  I'm laying a foundation.

21     THE COURT:  Why is --

22 BY MR. BERZON:

23 Q.  Was it a SAPA officer who told you so?

24     THE COURT:  Okay, fine.

25     MR. SPAGET:  Same objection.

1    THE COURT:  Okay.

2    BY MR. BERZON:

3    Q.  What did they tell you?

4        MR. SPAGET:  Same objection.  Hearsay.

5        THE COURT:  Well, it's being offered for

6    essentially -- what is the -- state of mind and people who hear

7    these sorts of things.

8        MR. SPAGET:  For that purpose, it's irrelevant.  For

9    purposes of establishing what happens in a training class it's

10   hearsay and it's inadmissible.

11       THE COURT:  Well, why wouldn't it go to the state of

12   mind of people -- if, in fact, management got up and said the

13   one thing I don't want you to do is having anything to do with

14   ALPA, why wouldn't that be admissible?

15       MR. SPAGET:  There is no admissible evidence that is

16   what is being said.

17       THE COURT:  Because we haven't gotten there as to

18   what he is going to say.  You are objecting before we get

19   there.

20       I think I have to at least hear what he said.  It's

21   not being offered for the truth of the matter, it's being

22   offered to show what the state of mind would be of anybody who

23   would hear something like that.

24       MR. BERZON:  In fact, the truth of the matter,

25   plaintiffs would disagree with the truth of the matter, but,

1    yes.

2    **BY MR. BERZON:**

3    *Q.*  Would you say that you were told by a SAPA officer as to

4    what was said at the presentation?

5    *A.*  I was told that Jim Black goes into these meetings and he

6    speaks negatively about ALPA saying that it will limit the

7    growth of SkyWest and basically tie their hands from further

8    growth.

9            And he said -- he compares it to SAPA, that SAPA has

10   the means to do it.  It's free, you don't pay any dues like you

11   have to pay with ALPA.  And then he offers a way to go about

12   utilizing SAPA, if you need any of SAPA's services, I guess you

13   would call it.

14           **MR. SPAGET:**  You know, I have to renew my objection.

15   We have an unidentified person saying what somebody else says

16   in a training program.

17           **THE COURT:**  Who said this to you?

18           **THE WITNESS:**  Mark Nolan.

19           **MR. BERZON:**  President of SAPA.

20           **THE COURT:**  All right, anyway, comes in subject to a

21   motion to strike.

22           **MR. SPAGET:**  For the record, he is in the courtroom

23   and is not testifying on this.

24           **MR. BERZON:**  Because we were limited.

25           If you would like to hear Mark Nolan --

1    entities that had the ability to do that, there was SAPA and

2    there was the company.  And then you said that is how I wrote

3    it down, we communicate.

4    **A.**  Yes.

5    **Q.**  Who did you mean by "we"?

6    **A.**  I'm sorry?

7    **Q.**  Who do you mean by "we"?

8    **A.**  When I said "we," I mean SkyWest management.

9    **Q.**  I see.  Okay.

10            When you are -- since there is -- can you explain to

11   us that -- assuming that if the testimony we heard today is

12   true, that, in fact, there are anti-ALPA statements or

13   discussions of ALPA in the material that SAPA presents to the

14   new hires at the training center during this short session that

15   they hold with them, can you explain how that material is

16   important in terms of your tight schedule that you have got to

17   fit into?

18   **A.**  It would be inappropriate and it wouldn't be part of the

19   schedule.

20   **Q.**  Okay.

21            I want to show you a letter that you wrote to

22   Ms. Linda Lye on May 23rd, 2007.

23            **MR. BERZON:**  And I would like to mark that as

24   Plaintiff's Exhibit 18.  It's not in the book.

25   **BY MR. BERZON:**