ROUGH DRAFT DISCLAIMER

UNPROOFREAD, UNCERTIFIED ROUGH DRAFT

This transcript of proceedings is of rough draft. There will be discrepancies in this form and the final form. This form has not been proofread, finalized, or certified, AND IS PROVIDED SIMPLY FOR YOUR CONVENIENCE.

***There will also be a discrepancy in page and line numbers in this form compared to the finalized and certified form.****

Upon receipt of the final, certified transcript, please destroy this rough draft.

Katherine A. Powell, CSR, CRR

THE CLERK: Calling civil case number C07-2688, SkyWest Pilots versus SkyWest Airlines.

Please state you're appearances, Counsel.

Q. And if you vote on an issue -- I take it, you need a quorum to vote on issues?

A. We need a quorum. That also includes two representatives of the executive board. So two of the three executive board members need to be present for a quorum to be present.

Q. So you need two of three executive members and two-thirds of the representatives?

A. Of the 19, yeah.

Q. And if there's a quorum, you can vote on issues; is that correct?

A. Yes.

Q. What is the vote you need in order to pass?

A. 50 percent. Excuse me. 50 percent on proposals. Two-thirds on bylaws changes.

Q. Okay. And the executives, you said there were three executives, correct?

A. Yes.

Q. What are the executive positions?

A. President, vice president and secretary.

Q. And you're the secretary?

A. I am.

Q. And are those offline, meaning these are full-time positions so you don't fly planes to do this work; is that correct?

A. We are full-time offline.

Q. And how --

MR. SPAGAT: Shall I avoid how they are paid?

THE COURT: Well, we know you're paid by the company.

BY MR. SPAGAT:

Q. How is the pay -- how is the amount of pay determined?

A. When Todd Schmidtke and I went offline, we went to our director of flight operations, then was Gary Overbaugh, and we realized that we had to figure out how we were going to be paid. We looked back six months, Todd and I respectfully, and the amount that -- we were doing quite a bit of flying back

then. We looked back six months and it came to about 104, 105 hours per month is what we were doing in that six-month period, and they agreed to pay us that to be offline.

Q. So when you became an offline full-time SAPA executive, did your pay change in any material way from what it had been as a pilot?

A. It didn't.

Q. Okay. And in your opinion, is -- are you doing a full-time amount of work?

A. Yeah. Yes.

Q. Would you explain what it is that you do that fills up your time?

A. I'm not sure we have that time here. I am in charge of correlating all meetings. There are at least three, four or five meetings per month out of town. I am in charge of minute-taking, minute-keeping, publishing the minute meetings. In charge of all logistics as far as hotels are concerned, crew scheduling for the scheduling of representatives, all though we have PBS now for preassignments.

I am in charge of, again, keeping those meetings and publishing. I'm in charge of creating the agendas for these meetings. For some reason by default this has happened in other meetings. For instance, in flight ops meetings that we have and PBS meetings and policy interpretation complaint meetings.

Black's ASAP information.

Q. It's not something that you are using?

A. No.

Q. Okay. SAPA has a website SAPAforums-dot-org; is that correct?

A. Yes.

Q. Does the company have access to the content of that website?

A. No.

Q. And are union issues, pro and against, addressed on the SAPA website?

A. Primarily.

Q. Okay. How many pilots are signed up for SAPAforums-dot-org?

A. I believe around 1300.

MR. SPAGAT: Okay. No further questions.

THE COURT: I have one. Let's say I issued an order

saying that the company can't pay for any more for SAPA. Got it? Okay. What would happen?

SAPA goes out of existence. Now you tell me what effect that would have, in your view, as to everything that you do within -- everything SAPA does in connection with the operation of the airlines. Now is your chance.

THE WITNESS: In my view, this -- this is too time consuming and too big to be doing this on our own time.

I have to make a living. So does Jim Black and Mark Nolin. We would go back to line flying, flying airplanes. And there would be no representation at SkyWest Airlines.

THE COURT: So in your view, whatever services you perform in connection with the operation of SAPA would come to

an end?

THE WITNESS: Yes.

THE COURT: Anything further?

MR. SPAGAT: Nothing further.

THE COURT: I mean, I guess the question is, well, one has to ask the question, so what? I think it's self-evident. What you're really saying, if I understand it, is that everything that you have been doing and do on a daily basis in connection with the duties you described, the services that you perform would, at least from your point of view, from what you can see, would come to an end.

Now, somebody could pick it up, if somebody were paid

for it and paid people to do it. I suppose that could happen. But you don't see that forthcoming. @words @@@.

As far as you know, nobody is willing to step up and -- do you know, are there people who are willing to step up at no pay and perform these services?

THE WITNESS: I don't know how they would do that and fly the line full-time either. I just don't know how that would be possible.

THE COURT: They'd have to have people who are familiar with the operation of the company, have the competence that to the extent that management feels comfortable in discussing any of these issues, some of which are very confidential and competitive, confidential from the personnel point of view, competitive from an industry point of view, those are real issues and they have to be careful of the person that they discuss it with in that there has to be some level of confidence that people have the ability and the integrity to carry on these tasks? That's your view?

hire classes?

A. We don't.

Q. Could anyone appear and talk to the new hire class without permission from the company?

A. I don't think so.

Q. But that's something that SAPA is permitted to do without permission?

A. Yes.

Q. In fact, you do have permission from the company, don't you?

THE COURT: I think -- I understand your point. The

point is that he doesn't have to go each time and say, By the way, are we going to be permitted to address this group? It's just if he wants to address the group, he asks somebody, What time can I come and address the group? They tell him, I guess.

BY MR. SPAGAT:

Q. And the company allows you to do that?

THE COURT: Yeah, I mean, it's not a big deal. This is SAPA. We know. There is their organization. Got that.

MS. GINSBURG: Thank you.

BY MS. GINSBURG

Q. Do you get paid for your time spent on those presentations or your fellow representatives when they appear before the new hire class?

A. Jim Black, who is the vice president of SAPA, presents presentation to the new hire classes. He is paid at 104 hours a month to be offline.

Q. That includes his time before the new hire class?

A. Yes.

Q. SAPA distributes SAPA pins at that presentation?

A. We do.
Q. And those are worn on the uniform?
A. The pilots who choose to do so, yes, they are lapel pins.
Q. Pilots are permitted to wear SAPA pins, correct?
A. Yes.
Q. Now, your testimony was that you have been able to

persuade the company to make some changes to the crew member policy manual that you've discussed various issues with them over time, correct?
A. Yes.
Q. The company retains the right to reverse itself at any time, correct?
A. Yes.
Q. And you can't enforce that agreement if the company decides to violate it, correct?
A. We can strongly oppose it, but we can't enforce it.
Q. And you can't negotiate with the company regarding the company policy manual, can you?
A. Strongly oppose it but not enforce it.
Q. Now, you referred to, I believe, the letter of agreement standard -- the crew member policy manual. And if you will turn to Exhibit 1, it's Union Exhibit 1. So it might be in a different binder than the one currently before you.
A. Okay.
Q. If you would turn to page 1, which is actually the second page of the document.
A. Yes.
Q. Draw your attention to the provision right above the signature lines, the paragraph that delineates the scope of this document. Do you see that?

Q. Can you give me an example?
A. A binding contract that's legally recognized.
Q. So does SAPA have an enforceable contract with SkyWest?
A. No.

MR. SPAGAT: Same objection, Your Honor.

THE COURT: Well, these things, I don't think to the extent that they are statements in the record, I understand that. To the extent they are opinions, I'm not sure I need them. After a few minutes of the witness's description of his views, I understand his -- well, the word "biases" in his testimony. I understand where he is coming from. They don't say you have a bias, they say where are you coming from? I understand where he is coming from. So let's get there.

BY MS. PRESTEL:
Q. As president of SAPA, have you ever had a conversation with Jim Black about his presentations on behalf of SAPA to new hire classes?
A. Yes, I have.
Q. How long has Captain Black been making those presentations?
A. For several years, as far as I know.
Q. How long ago did you have this conversation?
A. About five-and-a-half or six weeks ago.
Q. Can you briefly describe it?
A. Yes, I got a report --

MR. SPAGAT: Objection. Hearsay.

THE COURT: Wait. @words Who is this person that's talking?

THE WITNESS: I was talking to the vice --

THE COURT: To the management? You had a conversation with the person who was part of management?

MS. LYE: He had a conversation with Jim Black, who is the vice president of SAPA, who is permitted to give these presentations to new hire classes.

THE COURT: I see. Well, your view is that that would be -- that would be part of management, that's your view, anyway? I am going to allow it subject to a motion to strike. I will give you an extra page to respond in your brief.

Go ahead. Excuse me. What was said.

THE WITNESS: I had a report from a pilot saying that Mr. Black had been saying negative and false information about the Airline Pilots Association during a SAPA new hire briefing. I asked him if he had done that, and he indicated that he had said some things that were inappropriate.

BY MS. PRESTEL:

Q. Things that were inappropriate about ALPA?

A. Yes.

THE COURT: What did he say he said?

THE WITNESS: I didn't ask.

THE COURT: Okay. What did you say -- you said, "I heard you said some negative things or inappropriate things about ALPA?"

THE WITNESS: I asked him if he had been saying negative things about ALPA. And he said he had been saying

things that were inappropriate, and that he wouldn't -- my point was to get him to stop doing that. Whether or not he is doing that anymore, I don't know.

THE COURT: Okay. I understand that was your point. The question is, what's your recollection of this entire

conversation, and have you given it?

THE WITNESS: Yes.

THE COURT: Do you remember anything else he said or you said on this subject?

THE WITNESS: That's it.

THE COURT: Okay.

BY MS. PRESTEL:

Q. Have you ever had any conversation with Mike Eisenstat about why there was an increase from one to three in the number of SAPA officers who are paid full-time?

A. Yes, I have.

Q. When was that conversation?

A. About a year ago.

Q. Can you briefly describe the conversation? What was said?

MR. QUANDT: Same objection. Hearsay. @check speaker

THE COURT: Come in subject to a motion to strike.

THE WITNESS: I approached Mike. When I joined SAPA, I thought it was a mistake that the executive board members weren't flying the line. And was talking to Mike about that, he told me -- or he took me aside and said, Let me give you a

little bit about the history of SAPA. Before the '99 union drive, they had one full-time member. And after that union drive, he said that the union drive failed by just a few votes, I guess. And he said that Mr. Brad Holt approached him and said, Wow, that was really close. What can we do to prevent that from happening? And that's when Mike told him, I need three full-time guys to keep the union off the property.

THE COURT: I'm sorry, what did you say?

THE WITNESS: I need three full-time executive -- that's who we are now, three full-time SAPA positions to keep

the union off the property.

THE COURT: Okay.

MS. PRESTEL: I think that's it, Your Honor.

THE COURT: Cross?

CROSS EXAMINATION

BY MR. SPAGAT:

Q. Good afternoon, Mr. Nolin.

A. Good afternoon.

Q. You are an ALPA supporter; is that correct?

A. That's correct.

Q. And you were when you ran for president of SAPA?

A. That's correct.

Q. And you were elected president of SAPA, it being known that you were an ALPA supporter?

A. That was not public.

Q. It's known now; isn't that true?

A. It is now, yes, sir.

Q. As the SAPA president, even though you are an ALPA supporter, has SkyWest ever tried to remove you?

A. No, sir.

Q. I thought I heard you start to testify in your conversation with Jim Black, did he tell you that he wouldn't do it again?

A. Yes, sir.

MR. SPAGAT: Okay. No further questions.

THE COURT: Thank you, Captain. You are excused.

(Witness excused.)

THE COURT: Anything else from the plaintiffs?

MS. LYE: No, Your Honor.

THE COURT: Okay.