Norman A. Quandt (Admitted *Pro Hac Vice*)
Ford & Harrison LLP
1275 Peachtree Street, N.E., Suite 600
Atlanta, GA 30309
Telephone:    404.888.3845
Facsimile:    404.888.3863
Email:  nquandt@fordharrison.com

Douglas W. Hall (Admitted *Pro Hac Vice*)
Ford & Harrison LLP
1300 Nineteenth Street, N.W., Suite 700
Washington, DC 20036
Telephone:    202.719.2065
Facsimile:    202.719.2077
Email:  dhall@fordharrison.com

Robert Spagat (SBN:  157388)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA  94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email:  rspagat@winston.com

Attorneys for Defendant
SKYWEST AIRLINES, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>SKYWEST AIRLINES, INC.,<br><br>Defendant. | **Case No. C-07-2688 CRB**<br><br>**DEFENDANT'S BRIEF IN OPPOSITION TO "PLAINTIFFS' SUPPLEMENTAL BRIEF RE:  REMEDIES"** |

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

I.      PREFATORY STATEMENT:  PLAINTIFFS HAVE EXCEEDED THE SCOPE OF
        ISSUES THAT THIS COURT ALLOWED THEM TO BRIEF ...............................................1

II.     INTRODUCTION ..............................................................................................................2

III.    ARGUMENT .....................................................................................................................3

        A.    There Is No Case Law Under The Railway Labor Act Supporting The
              Unprecedented "Equal Access" Relief Sought By Plaintiffs In This Matter.................3

        B.    *Texas & N.O.* And *Virginia Ry.* Do Not Support The Imposition Of Paragraph
              3 Relief....................................................................................................................6

        C.    Plaintiffs' Reliance On NLRA Decisions Is Misplaced Given The Different
              Remedial Structures Of the NLRA And RLA ............................................................8

        D.    The NLRA "Access" Cases Cited By Plaintiffs Are Factually Distinguishable
              And Do Not Support The Granting Of Such Relief Here ...........................................11

        E.    Granting Paragraph 3 Relief Would Be Both Disruptive To SkyWest And
              Inequitable To The SkyWest Pilots ........................................................................14

        F.    Plaintiffs Also Misconstrue The Law Of Employer Domination Under The
              NLRA And Misrepresent The Evidence Regarding SAPA's Alleged
              Domination By SkyWest. .......................................................................................15

              1.    Plaintiffs Misconstrue The Law Under The NLRA Governing
                    Employer Domination Of Labor Unions .........................................................15

              2.    Plaintiffs' Mischaracterize The Evidence. ......................................................17

                    a.    Plaintiffs Ignore The Undisputed Evidence That Establishes
                          That SkyWest Has Not Exercised Actual Control Over SAPA...........17

                    b.    Plaintiffs Mischaracterize The Evidence Of SkyWest's
                          Potential Control Over SAPA. ........................................................19

IV.     CONCLUSION ................................................................................................................21

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

i

1

## TABLE OF AUTHORITIES

2

CASES

3

*Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*,
4    406 F. Supp. 492 (N.D. Cal. 1976) ............................................................. 7, 12-14

5    *Arcamuzi v. Continental Air Lines, Inc.*,
6    819 F.2d 935 (9th Cir. 1987) .............................................................................8

7    *Burke v. Compania Mexicana de Aviacion, S.A.*,
     433 F.2d 1031 (9th Cir. 1970) ...........................................................................8

8
     *Castaways Mgmt.*,
9    285 NLRB 954 (1987), *enf'd*, 870 F.2d 1539 (11th Cir. 1989) ..........................16-17

10   *Coppus Eng'g. Corp. v. NLRB*,
11   240 F.2d 564 (1st Cir. 1957) ............................................................................20

12   *Delta Airlines*,
     30 NMB 102 (2002) ..........................................................................................9

13
     *Duane Reade, Inc.*,
14   338 NLRB 943 (2003) ...................................................................................16-17

15   *Ella Indus., Inc.*,
     295 NLRB 976 (1989) ...................................................................................16-17
16

17   *Evergreen Int'l Airlines*,
     20 NMB 675 (1993)...........................................................................................7

18
     *Federal-Mogul Corp. v. NLRB*,
19   394 F.2d 915 (6th Cir. 1968) ...........................................................................20

20   *Fieldcrest Cannon, Inc. v. NLRB*,
     97 F.3d 65 (4th Cir. 1996) ...........................................................................15-16
21

22   *Hertzka & Knowles v. NLRB*,
     503 F.2d 625 (9th Cir. 1974) ...........................................................................20

23   *Int'l Ass'n of Machinists v. Street*,
24   367 U.S. 740 (1961) .........................................................................................10

25   *Katz's Deli*,
     316 NLRB 318 (1995), *enf'd*, 80 F.3d 755 (2d Cir. 1996) ...................................15
26

27   *Konop v. Hawaiian Airlines, Inc.*,
     302 F.3d 868 (9th Cir. 2002), *cert. denied*, 537 U.S. 1193 (2003)...........................8

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

*NLBR v. Pennsylvania Greyhound Lines,*
  303 U.S. 261 (1938)...................................................................................................17

*NLRB v. Northeastern University,*
  601 F.2d 1208 (1st Cir. 1979)..................................................................... 20, 22-23

*NLRB v. Prince Macaroni Mfg. Co.,*
  329 F.2d 803 (1st Cir. 1964)................................................................................20

*NLRB v. S.E. Nichols, Inc.,*
  862 F.2d 952 (2d Cir. 1988), *cert. denied,* 490 U.S. 1108 (1989)................................... 15-17

*Northwest Airlines,*
  19 NMB 94 (1991).................................................................................................7

*Northwest Airlines,*
  26 NMB 269 (1999)...............................................................................................7

*Pacific Southwest Airlines,*
  14 NMB 303 (1987)...............................................................................................7

*Petroleum Helicopters, Inc.,*
  25 NMB 197 (1998)...............................................................................................9

*Railroad Trainmen v. Jacksonville Terminal Co.,*
  394 U.S. 369 (1969).............................................................................................14

*Regal Recycling,*
  329 NLRB 355 (1999)...........................................................................................16

*San Miguel Indian Bingo & Casino,*
  345 NLRB No. 79 (2005), *enf'd,* 475 F.3d 1306 (D.C. Cir. 2007)................................... 16-17

*Simmons Indus., Inc.,*
  321 NLRB 228 (1996) ..........................................................................................15

*Sky Valet,*
  23 NMB 276 (1996).............................................................................................9

*Switchmen's Union of N. Am. v. NMB,*
  320 U.S. 297 (1943)..................................................................................... 11-12, 17

*Texas & N.O. R. Co.. v. Bhd. Of Ry. & Steamship Clerks,*
  281 U.S. 548 (1930).................................................................................... Passim

*Texidor v. Ceresa,*
  590 F.2d 357 (1st Cir. 1978)...................................................................................7

*Trump Shuttle,*
  17 NMB 192 (1990)...............................................................................................7

iii

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

*United Air Lines, Inc.,*
  22 NMB 288 (1995) .......................................................................................................... 7

*Virginia Ry. v. System Fed. No. 40,*
  300 U.S. 515 (1937) .................................................................................................... 9-12


**STATUTES**

29 U.S.C. § 151 *et seq.* ....................................................................................................... 19

29 U.S.C. § 158(a)(2) ..................................................................................................... 19-20

29 U.S.C. § 160(j) ............................................................................................................... 15

45 U.S.C. § 152 ............................................................................................................... 6, 10


**OTHER AUTHORITIES**

*Higgins,* The Developing Labor Law BNA Books, (5th ed. 2006) ................................. 15, 16, 17

*Abram,* The Railway Labor Act, BNA Books, 2nd ed. 2005) ................................................. 8

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

## I.    PREFATORY STATEMENT:  PLAINTIFFS HAVE EXCEEDED THE SCOPE OF ISSUES THAT THIS COURT ALLOWED THEM TO BRIEF

Paragraph 3 of the Temporary Restraining Order ("TRO") entered on May 24, 2007 required that SkyWest Airlines ("SkyWest") provide the SkyWest Pilots ALPA Organizing Committee (the "OC") with the same means of access to SkyWest pilots as the SkyWest Airline Pilots Association ("SAPA") had at any point during the previous year.  Specifically, Paragraph 3 obligated SkyWest to provide certain OC members "with access to the same channels of communication provided to SAPA at any point during the last year, including but not limited to a dedicated bulletin board in each crew lounge where SAPA had a dedicated bulletin board at any point in the last year, general bulletin boards in crew lounges, pilot mailboxes, SkyWest's email system, and newly-hired pilot classes."  (We shall refer to this as "Paragraph 3 Relief.")  At the conclusion of the preliminary injunction hearing on June 8, 2007, the Court announced that, pending a ruling on Plaintiffs' request for a preliminary injunction, it was continuing Paragraphs 1 and 2 of the TRO, but not Paragraph 3.  June 8, 2007 Rough Transcript, p. 125.  At Plaintiffs' request, the Court permitted the parties to submit briefing on whether Paragraph 3 Relief should be included should the Court issue a preliminary injunction.[1]

The supplemental briefing authorized by the Court was limited solely to the issue of whether Paragraph 3 Relief should be included in any preliminary injunction that might issue.  June 8, 2007 Rough Transcript, p. 129 ("what I'd like to do is hear from the plaintiffs as to the propriety of – including paragraph 3 in the injunctive relief order addressing that issue").  Indeed, it was the Plaintiffs who made the request for supplemental written argument, and they made it clear that it was strictly to address the Paragraph 3 issue.  *Id.*, pp. 125-26.  The Court also denied the Plaintiffs' request for further argument on the jurisdictional issue.  *Id.*, pp. 130-31.

---

[1]    For reasons stated before and at the hearing, SkyWest does not believe that any preliminary injunctive relief should issue in this matter.  Per the Court's request, this brief addresses some of the specific reasons why Paragraph 3 Relief would be inappropriate, and does not represent a concession by SkyWest that any preliminary injunctive relief should be ordered.

1

The Plaintiffs' brief goes far beyond the limited scope authorized by the Court. In the second sentence of their brief, Plaintiffs blatantly admit that it addresses the relief "sought in paragraphs 3 and 4 of Plaintiffs' Revised Proposed Preliminary Injunction." Brief at p. i (emphasis added). The brief also contains substantial argument on the issue of the Court's jurisdiction over this matter, despite the Court's denial of Plaintiffs' request for further argument on that issue. Plaintiffs have no justification for contumaciously ignoring the Court's clear instructions about the sole issue on which it was permitting supplemental briefing. Their tactics also have severely prejudiced SkyWest by forcing it to respond to these unauthorized issues within the tightly constrained timeframe established by the Court for addressing Paragraph 3 Relief. Therefore, SkyWest requests that the Court disregard and strike all of Plaintiffs' brief with the exception of Sections II.A. and II.B.2.[2]

## II.    INTRODUCTION

Despite the length and breadth of their brief, Plaintiffs failed to address the key issue relating to Paragraph 3 Relief: is there any case holding that a union engaged in an effort to represent employees under the Railway Labor Act ("RLA") is entitled to the same access to those employees that an existing organization has enjoyed? SkyWest, therefore, will answer that question: there is no such case. Throughout the entire 80-year history of the RLA, a court has never ordered a carrier to provide a union with "equal access" to its employees in order to publicize its organizing campaign. There is a reason for that. Allegations that a carrier interfered with employee organizing rights by providing "unequal" access should be – and have been – raised with the National Mediation Board ("NMB"), the agency that, since 1934, has had the authority to ensure that the employees' choice of representative is made "without interference, influence, or coercion exercised by the carrier." RLA Section 2, Ninth, 45 U.S.C. § 152, Ninth. That is where Plaintiffs' arguments in this case belong as well. At a bare minimum, Plaintiffs have not demonstrated any basis under the RLA for the Court to grant them the Paragraph 3 Relief.

---

[2]    Out of an abundance of caution, SkyWest has made some effort, in the brief time available to it, to address those portions of the Plaintiffs' brief that it seeks to have stricken. Should the Court strike those materials, then it would be appropriate to disregard Section G of this brief as well.

DEFENDANT'S BRIEF IN OPPOSITION TO "PLAINTIFFS' SUPPLEMENTAL BRIEF RE: REMEDIES"
CASE NO. C 07-2688 CRB

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

## III.    ARGUMENT

### A.    There Is No Case Law Under The Railway Labor Act Supporting The Unprecedented "Equal Access" Relief Sought By Plaintiffs In This Matter

Plaintiffs' brief demonstrates that the "equal access" relief they are seeking is unprecedented under the RLA. At hearing, the Court directly asked Plaintiffs' counsel to identify any case holding that ALPA supporters are entitled as a matter of law to the same access that SAPA has to SkyWest pilots. Plaintiffs were unable to do so, and have not done so in their brief, relying instead on inapposite decisions arising under the National Labor Relations Act ("NLRA"). None of the RLA cases cited by Plaintiff at any point throughout this proceeding involved a situation where a union seeking to represent employees was granted access to those employees prior to (or after) filing its representation application with the NMB at all, much less in the context of a preliminary injunction. In fact, there are precious few cases where such relief was even requested. The closest case, factually, is *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc. ("AMFA v. UAL")*, 406 F. Supp. 492, 494 (N.D. Cal. 1976), in which AMFA complained about, *inter alia*, the access that the incumbent union's supporters had to the employees AMFA sought to represent, and United's enforcement of its no-distribution policy. In that decision, which Plaintiffs do not even cite in their brief, this Court concluded that AMFA's allegations raised a representation dispute, and thus the Court lacked jurisdiction.

The total absence of any RLA precedent granting the "equal access" Plaintiffs seek is telling. Courts have not had to deal with these issues because, as this Court held in *AMFA v. UAL*, an adequate administrative remedy exists with the NMB. Contentions that a carrier has favored one side or the other in a representation election – or in a campaign leading to a representation election – by providing unequal access can and have been raised with the NMB as election interference allegations.[3] Congress vested the NMB with jurisdiction to determine whether an employer's actions constitute interference, and it would be inappropriate for a court to substitute its view for that of the NMB. *AMFA v. UAL*, 406 F. Supp. at 508 ("We do not feel compelled to expand, indeed we

---

[3]     *See, e.g.*, *Pacific Southwest Airlines*, 14 NMB 303 (1987); *Trump Shuttle*, 17 NMB 192 (1990); *Northwest Airlines*, 19 NMB 94 (1991); *Evergreen Int'l Airlines*, 20 NMB 675 (1993); *United Air Lines, Inc.*, 22 NMB 288 (1995); *Northwest Airlines*, 26 NMB 269 (1999).

3

1    feel prohibited from expanding, the limited scope of jurisdiction existing under the Railway Labor

2    Act by analogy to the National Labor Relations Act under which the scope of jurisdiction is much

3    greater."). *See also Texidor v. Ceresa*, 590 F.2d 357, 360 (1st Cir. 1978) ("we think it within the

4    NMB's discretion and indeed central to its role in settling representation disputes to decide what

5    level of employee interest in a rival union will cause it to give cognizance to charges of illegal

6    coercion").[4]

7         The RLA treatise that Plaintiffs cite does not support their "equal access" theory either. *See*

8    Brief at 2 n.3. Plaintiffs reference the treatise for the proposition that courts "generally" have

9    exercised jurisdiction over interference claims during union organizing drives. *Id.* But they do <u>not</u>

10   cite the section of the treatise listing the <u>remedies</u> courts have ordered in such cases –

11   "reinstatement, backpay, restored benefits and restored seniority" – a list that does <u>not</u> include access

12   to employees. *See* <u>The Railway Labor Act</u>, Ch. 5.III.F., p. 279.[5] Nor do Plaintiffs mention that the

13   cases cited by the treatise involve claims that employees were <u>discharged</u> for their union activities in

14   violation of Section 2, Third and Fourth. *Id*, Ch. 5.III.A., p. 257, n. 26. SkyWest already

15   acknowledged at hearing that the courts have jurisdiction over such cases because there is no remedy

16   available through the NMB. June 7 Transcript, p. 269. Finally, Plaintiffs neglect to provide the

17   Court with the <u>next</u> page of the treatise, on which the relevant footnote continues, which observes

18   that in "some situations, courts have <u>declined</u> to resolve union claims of interference because the

19   issues implicated representation disputes within the NMB's exclusive jurisdiction." *Id.* (citing

20   *AMFA v. UAL* and *Texidor*, among others) (emphasis added).

21

22   [4]    Plaintiffs continue to cite a trio of Ninth Circuit RLA cases – *Arcamuzi v. Continental Air
     Lines, Inc.*, 819 F.2d 935 (9th Cir. 1987), *Burke v. Compania Mexicana de Aviacion, S.A.*, 433 F.2d
23   1031 (9th Cir. 1970), and *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002), *cert.
     denied*, 537 U.S. 1193 (2003) – that have nothing to do with the propriety of the "equal access"
24   relief Plaintiffs seek. None of these cases involved a representation dispute or an alleged "company
     union," much less whether a challenging union is entitled to access to the employees it seeks to
25   represent. *Arcamuzi* involved a carrier's efforts to force certain union members to submit to
     polygraph tests to determine whether they were involved in damaging company property during a
26   strike. *Burke* concerned an employee who allegedly was discharged for supporting a union's
     <u>successful</u> organizing effort among other company employees; his suit was not brought until after
27   the union was certified by the NMB. *Konop* involved an employer allegedly disclosing the contents
     of a dissident ALPA member's website to the union.
28   [5]    The cited excerpts from <u>The Railway Labor Act</u> are attached as Exhibit A to the Declaration
     of Robert Spagat, filed herewith

                                                    4

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    Nor is there any merit to Plaintiffs' suggestion that their administrative remedy is illusory

2    because a union effectively would be forced to submit its dispute to the NMB when they have signed

3    authorization cards from 35% of the employee group, but would need 50% plus one to vote for

4    representation to prevail. *See* Corrected Reply Brief at pp. 15-16. A major flaw in this argument is

5    that it ignores the substantial authority the NMB has in determining how to run an election when

6    faced with carrier interference. As the NMB explained in *Petroleum Helicopters, Inc.*, 25 NMB 197,

7    226 (1998), it has "broad discretion to tailor its investigation to the facts and circumstances of each

8    case." This includes employing a "variety of special ballots and notices intended to eliminate the

9    taint of interference on the employees' freedom of choice of representative," with its choice of

10    remedy depending on the "extent of the carrier interference found," based on the totality of the

11    circumstances. *Id.* at 225-26. One of the methods that the NMB has employed is to use a "Laker"

12    ballot, which is a yes/no ballot; if a majority of those voting favor the applicant union, the union

13    wins. *Id.* at 227. Because union advocates tend to be better organized and more motivated to vote

14    the those opposed to representation, the possibility of a Laker ballot provides a strong disincentive to

15    interfere. In cases involving more egregious employer interference, the NMB has used a "Key"

16    ballot process, in which the applicant will be certified unless a majority of all eligible voters cast a

17    vote against it. *Id.* at 227-28. In other words, there is a presumption of representation that can be

18    overcome only if a majority affirmatively votes against representation. The possibility of a Key

19    ballot provides an even stronger disincentive for interfering with employees' choice of

20    representative; indeed, it virtually guarantees that the union will prevail. At the far end of the

21    continuum, where the employer's conduct is particularly pervasive and egregious, the NMB can

22    employ alternate means of gauging employee sentiment other than an election, such as a check of

23    authorization cards as it did in *Sky Valet*, 23 NMB 276 (1996). *See Petroleum Helicopters*, 25 NMB

24    at 228. When faced with "extraordinary circumstances," the NMB will even investigate allegations

25    of interference – and a union request for the use of an alternative ballot – before holding an initial

26    election. *See Delta Airlines*, 30 NMB 102 (2002) (union requested pre-election investigation by

27    NMB into interference allegations and use of Laker ballot). The NMB thus has ample ability – and

28    expertise – to remedy interference allegations of the sort raised by Plaintiffs here.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

5

**B.    *Texas & N.O.* And *Virginia Ry.* Do Not Support The Imposition Of Paragraph 3 Relief**

Plaintiffs base their claim to "equal access" on the theory that SAPA is a "company union." SkyWest contests Plaintiffs' contention that they have established, for preliminary injunction purposes, that SAPA is a "company union," and that such a finding would compel the conclusion that Plaintiffs are entitled to equal access.    In any event, Plaintiffs do not cite to any RLA "company union" cases supporting their position.    In their entire brief, Plaintiffs cite to just two RLA cases involving "company unions" at all – *Texas & N.O. R. Co.. v. Bhd. Of Ry. & Steamship Clerks*, 281 U.S. 548 (1930), and *Virginia Ry. v. System Fed. No. 40*, 300 U.S. 515 (1937) – neither of which implicated a representation dispute subject to the NMB's exclusive jurisdiction, or addressed the "equal access" issue in particular.[6]

Neither *Texas & N.O.* nor *Virginia Ry.* remotely supports the Plaintiffs' contention that a union seeking to become the certified representative of a group of employees under the RLA is entitled to "equal access" to those employees during its organizing drive.    First and foremost, in neither case was a union in the process of attempting to become the representative of the employees, thus requiring the Court to determine whether the matter raised a representation dispute subject to the NMB's exclusive jurisdiction.    Indeed, *Texas & N.O.* could not conceivably have addressed this issue because it was decided four years <u>before</u> the NMB was created and given the authority in Section 2, Ninth of the RLA to resolve such disputes.[7]    And in *Virginia Ry.*, the union was in fact certified by the NMB prior to the carrier's efforts to form a competing "company union," and prior

---

[6]    The lack of "company union" precedent under the RLA is not surprising.    As far back as 1951, Congress observed that company unions had "practically disappeared" after the 1934 amendments creating the NMB. S. Rep. No. 2262, 81st Cong., 2d Sess. 2-3 (cited in *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 812 (1961) (Frankfurter, J., dissenting)).

[7]    The district court's order in *Texas & N.O.* "disestablishing" the company union and reinstating the prior representative as a contempt sanction did so "until such time as these employees <u>by a secret ballot taken in accordance with the further direction of the Court</u>, and without the dictation or interference of the Railroad Company and its officers, should choose other representatives." 281 U.S. at 557 (emphasis added).    That language is strikingly similar to Section 2, Ninth, which authorizes the NMB "to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier." 45 U.S.C. § 152, Ninth.    The *Texas & N.O.* court had to insinuate itself into the representation process because there was no NMB process at the time; now, that would be a classic representation dispute subject to the NMB's jurisdiction.

6

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  to the institution of the lawsuit, thus demonstrating that there was no pending representation dispute

2  there, either. 300 U.S. at 539-40 & n.1.[8]

3      The cases are inapposite for other reasons as well. Factually, in both cases, the union that

4  brought suit had been recognized for years by the carrier as the employees' representative, yet the

5  carrier chose to ignore its obligation to bargain with the representative in favor of a recently-formed

6  "company union." *See Texas & N.O.*, 281 U.S. at 554 (union had represented employees since

7  1918); *Virginia Ry.*, 300 U.S. at 539 (union had represented employees since 1922). Thus, the facts

8  of those cases are directly opposite to those in the case at bar, where it is SAPA that has the

9  longstanding relationship with SkyWest, and a union that does not have <u>any</u> rights to represent the

10  employees (ALPA) is challenging that relationship. The *Texas & N.O.* and *Virginia Ry.* decisions

11  do not purport to address that scenario.

12      Regarding the legal context of these decisions, Plaintiffs continue to ignore the Supreme

13  Court's decision in *Switchmen's Union of N. Am. v. NMB*, 320 U.S. 297 (1943), which discussed the

14  significance of *Texas & N.O.* and *Virginia Ry.* at length. In *Switchmen's*, the Supreme Court made it

15  clear that the import of those decisions was that the role of the judiciary under the RLA is limited to

16  those circumstances where there otherwise would be no remedy to enforce the statute – and that such

17  intervention is not appropriate where Congress provided a remedy through the NMB's processes:

18      If the absence of jurisdiction of the federal courts meant a sacrifice or obliteration
        of a right which Congress had created, the inference would be strong that
19      Congress intended the statutory provisions governing the general jurisdiction of
        those courts to control. That was the purport of the decisions of this Court in
20      *Texas & New Orleans R. Co.* v. *Brotherhood of Clerks, 281 U.S. 548,* and
        *Virginian Ry. Co.* v. *System Federation, 300 U.S. 515.* <u>In those cases it was</u>
21      <u>apparent that but for the general jurisdiction of the federal courts there would be</u>
        <u>no remedy to enforce the statutory commands which Congress had written into</u>
22      <u>the Railway Labor Act.</u> The result would have been that the "right" of collective
        bargaining was unsupported by any legal sanction. That would have robbed the
23      Act of its vitality and thwarted its purpose. <u>Such considerations are not applicable</u>
        <u>here.</u> The Act in § 2, Fourth writes into law the "right" of the "majority of any
24      craft or class of employees" to "determine who shall be the representative of the
        craft or class for the purposes of this Act." <u>That "right" is protected by § 2, Ninth</u>
25

26  [8]    Plaintiffs misrepresent *Virginia Ry.* by claiming that "there is no support [in that case] for
27  limiting its holding or analysis to the post-certification context." Brief at p. 10, n.11. On the
    contrary, the fact that the union had been certified by the NMB was at the heart of the issue in
28  *Virginia Ry.*: whether RLA § 2, Ninth, which provides that a carrier shall "treat with" the
    representative certified by the NMB, is judicially enforceable. *See* 300 U.S. at 541, 544.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

7

which gives the Mediation Board the power to resolve controversies concerning it and as an incident thereto to determine what is the appropriate craft or class in which the election should be held. A review by the federal district courts of the Board's determination is not necessary to preserve or protect that "right." Congress for reasons of its own decided upon the method for the protection of the "right" which it created. It selected the precise machinery and fashioned the tool which it deemed suited to that end. Whether the imposition of judicial review on top of the Mediation Board's administrative determination would strengthen that protection is a considerable question. All constitutional questions aside, it is for Congress to determine how the rights which it creates shall be enforced. In such a case the specification of one remedy normally excludes another.

320 U.S. at 300-01 (emphasis added; footnote and other citations omitted).

In other words, *Switchmen's Union* establishes that *Texas & N.O.* and *Virginia Ry.* stand for the proposition that the judiciary's role under the RLA is to step in only when, if it were to stay its hand, there would be no remedy at all to enforce the statutory commands. Thus, as SkyWest acknowledged at hearing, there are circumstances under which courts may have jurisdiction in matters that concern representation disputes, such as where employees claim to have been terminated based on their union activities (for which the NMB provides no remedy), or where the carrier's actions make it impossible for the employees to invoke the services of the NMB, as discussed in *AMFA v. UAL.* That concern is not present here, however, as Plaintiffs have a remedy: submission of their dispute to the NMB.

### C. Plaintiffs' Reliance On NLRA Decisions Is Misplaced Given The Different Remedial Structures Of the NLRA And RLA

Left without any RLA precedent, Plaintiffs rely exclusively on cases arising under the NLRA, either decisions by the NLRB itself or Circuit Court decisions reviewing NLRB rulings. The fatal flaw in this approach is that it presumes that the courts can impose the NLRA's remedies, in the same fashion the NLRB would, when presented with carrier interference claims under the RLA. This precise argument was considered – and rejected – by this Court in *AMFA v. UAL* in light of the differences in the statutory schemes. Indeed, it is ironic that Plaintiffs cite numerous decisions of the NLRB – the agency designated by Congress for determining whether interference existed and how it should be remedied under the NLRA – while at the same time they are attempting to avoid the NMB, the agency with authority over such issues under the RLA.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

In *AMFA v. UAL*, AMFA made the argument, echoed by Plaintiffs here (Brief at p. 17), that because the NMB did not have authority to adjudicate "unfair labor practices" under the RLA, the federal courts must have such authority. 406 F. Supp. at 502. This Court found that AMFA's "major premise [was] faulty." *Id.* Although the NMB does not have the power to remedy "unfair labor practices" as such, "Congress has given the Board a great deal of power to regulate such practices indirectly." *Id.* at 503. The Court specifically noted the NMB's responsibility to ensure that the employees' choice of representative was made without interference, influence, or coercion by the carrier, and its authority to address such interference by "continu[ing] to set aside elections tainted by improper influence until such time as the offending practice ceases." *Id.* Even though the procedure under the NLRA could be considered "in some sense more direct," the Court held that "it cannot be said that the Board is powerless to act." *Id.*

The Court then addressed AMFA's additional argument, identical to that raised by Plaintiffs in this case, that the Court should analogize to the NLRA and "act as the [NLRB] would if this case arose under the legislation it is empowered to implement." 406 F. Supp. at 505-06. Specifically, AMFA pointed out that, under the NLRA, an employer's conduct in negotiating with an incumbent during an organizing campaign by another union would constitute impermissible "influence, coercion or domination," and it asked the Court to reach the conclusion that such conduct constituted a per se violation of the RLA. 406 F. Supp. at *Id.* The Court refused to do so, in light of the exclusive jurisdiction of each agency, and the different remedial schemes Congress created in the two statutes:

> We have a major objection to fulfilling this request: if the analogy is truly a good one, this court would be intruding on the jurisdictional soil upon which the National Mediation Board has been given the exclusive right by Congress to tread. We think the analogy is good insofar as the particular issue at bar is concerned. That is to say, at least where representation disputes are concerned, the National Mediation Board has been given complete jurisdiction under the Railway Labor Act, which is coextensive with that of the National Labor Relations Board under the National Labor Relations Act. The jurisdiction of both administrative bodies is exclusive, with no power in the federal district courts to intrude. Both bodies are empowered to make unit (term "craft or class" under the Railway Labor Act) determinations and to ascertain who is the true representative of the employees and to certify that representative. Certification entitles the

9

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  representative to exclusive status as bargaining agent, with whom the employer

2  must "treat" or "bargain." In the process of ascertaining who the true

3  representative is, each Board must insure against influence or coercion being

4  brought to bear on the employees' will. <u>The methods used and the remedies the</u>

   <u>respective boards are authorized to prescribe to mitigate against such unlawful</u>

   <u>influence or coercion differ significantly. But both Boards have "jurisdiction"</u>

   <u>over the total process by which bargaining representatives are selected.</u>

6  *Id.* at 506 (emphasis altered; footnotes omitted).

7        Given that the NMB "has jurisdiction in the area of representation disputes, and is directed to

8  insure that illegal influence does not bear on the outcome of such disputes," the Court concluded that

9  it would be "usurpation of power of the most flagrant sort" for it to create the rule urged by AMFA,

10  "and in effect force it on the Board, in light of the clear Congressional intendment that its carefully

11  fashioned administrative machinery was to operate in the area of representation disputes without

12  judicial interference." 406 F. Supp. at 506-07.[9]

13        *AMFA v. UAL* got it right. Both the NMB and the NLRB have exclusive jurisdiction over the

14  process of by which bargaining representatives are selected under their respective statutes, subject to

15  the very different standards of judicial review applied to those determinations. That jurisdiction

16  includes ensuring that representatives are selected without employer influence or coercion.

17  Although the methods that the agencies use to carry out this obligation, as well as the remedies that

18  they can impose, differ, that does not affect the fact that it is the agencies, not the courts, that are

19  vested with jurisdiction to resolve such matters. It is no more appropriate to ignore the NMB's

20  jurisdiction and ask a federal court to impose a remedy for alleged carrier interference than it would

21  be for a party to bypass the NLRB and seek such relief directly from a court. Plaintiffs' reliance on

22  NLRB case law as a basis for seeking relief from this Court is badly misplaced. *See Railroad*

23  *Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383 (1969) (the NLRA "cannot be imported

24  wholesale into the railway labor area. Even rough analogies must be drawn circumspectly with due

25  regard for the many differences between the statutory schemes.").

26

27  ───────────────

   [9]    Nor was it of any moment to the Court that the NMB does not have the NLRB's authority to

   "issue orders directing carriers to stop negotiating, [because] the NMB does have a rule-making

28  power under which it can regulate the conduct of representation elections." 406 F. Supp. at 507

   n.22.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1

2

### D.    The NLRA "Access" Cases Cited By Plaintiffs Are Factually Distinguishable And Do Not Support The Granting Of Such Relief Here

Even if the NLRB cases cited by Plaintiffs were relevant under the RLA – and, as established above, they are not – they still would not support the extraordinary relief sought by Plaintiffs here. Tellingly, not one of the NLRA "access" cases cited by Plaintiffs arose in the context of preliminary injunctive relief, even though the NLRB is authorized by section 10(j) of the NLRA to seek such relief pending the conclusion of the administrative process. *See* 29 U.S.C. § 160(j). On the contrary, section 10(j) relief was <u>denied</u> in at least one of the cases cited by Plaintiffs. *See NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 955 (2d Cir. 1988), *cert. denied*, 490 U.S. 1108 (1989). Rather than the preliminary relief sought by Plaintiffs here on an abbreviated record, with its attendant risk of irreparable harm to SkyWest and its pilots, the relief ordered by the NLRB in the cases cited by Plaintiff followed a full and thorough hearing on the merits. *See, e.g., Fieldcrest Cannon, Inc. v. NLRB*, 97 F.3d 65, 68 (4th Cir. 1996) (administrative hearing involved 256 witnesses over 36 hearing days).

In addition, none of the NLRA cases cited by Plaintiffs supports their proposition that the remedy for employer support of a "company union" is to "requir[e] the employer to provide the independent union with the same access to employees that the employer has already unlawfully provided to its preferred entity." Brief at 9-10. Plaintiffs cite some NLRA cases involving "company unions," and others involving access to employees, but none that link the two, or that hold that a union seeking to represent employees was entitled to the same access that the "company union" had to the employees. *See, e.g., Simmons Indus., Inc.*, 321 NLRB 228, 254, 229 (1996) (company committees held to be "labor organizations" that were "unlawfully dominated," but access element of order barred only "[s]electively and disparately enforcing a rule regulating public access to its . . . employees breakroom by prohibiting access to that breakroom by union representatives"; union not provided same access to employees that committees enjoyed).

Plaintiffs cite *Katz's Deli*, 316 NLRB 318 (1995), *enf'd*, 80 F.3d 755 (2d Cir. 1996), for the proposition that ALPA must be given the same access to SkyWest's pilots as SAPA. Plaintiffs' reliance upon *Katz* could not be more misplaced. There, the employer had a preexisting relationship

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

11

---

1    and collective bargaining agreement (albeit an expired one) with Local 100. Outside the window

2    allowed under the NLRA for a rival union to petition for an election or otherwise seek to displace in

3    incumbent, Local 131 presented authorization cards from a majority of Katz's employees. Katz

4    recognized, and reached an agreement with, Local 131. While a representative of Local 131 was

5    discussing the agreement with Katz employees, a representative of Local 100 was evicted from the

6    employer's premises. The NLRB Administrative Law Judge found that "Katz violated [the NLRA]

7    by evicting representatives of Local 100 from its premises, while at the same time permitting

8    representatives of Local 131 to remain on the premises and speak to its employees." 316 NLRB at

9    333. What Katz had done was to evict an agent of the legal, NLRB-recognized representative, and

10   allowed an agent of an unlawful representative to remain on the property and speak with employees.

11   If ALPA were the NMB-certified representative of SkyWest's employees, *Katz* might have some

12   significance; it is not, and the case could not be less apposite. *Katz* certainly does not stand for the

13   proposition that a union seeking to become a collective bargaining representative has equal access

14   rights to those of a rival representative it seeks to displace.

15       The NLRA cases cited by Plaintiffs also demonstrate that access to employees it not a run-of-

16   the-mill remedy issued by the NLRB as a matter of course, but is reserved for situations involving

17   truly egregious and widespread unfair labor practices. *Fieldcrest Cannon*, for example, involved

18   what the NLRB found were unfair labor practices that were "numerous," "pervasive," "outrageous,"

19   "egregious," and "notorious," and included threats of lost benefits, of discipline, of termination, of

20   plant closure, and of deportation; surveillance; harassment; disparate treatment; and virtually

21   everything in between. 97 F.3d at 72. The court described the company's approach to the

22   unionization effort as a "scorched earth, take-no-prisoners" campaign. *Id.* at 73. *S.E. Nichols* is on

23   the same footing. 862 F.2d at 961 ("Nichols has a long history of illegal anti-union activity. . . .In

24   the case before us, the Board found that the company's long history of violations [(over a 15-year

25   period the company had 'uniformly committed unlawful acts in response to attempts to organize [its]

26   stores')] justified imposition of extraordinary access and notice remedies." *See also Regal*

27   *Recycling*, 329 NLRB 355 (1999) (termination of seven employees, interrogation of employees,

28   threats to close the facility, and threats to require employees to prove that they legally could work in

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

12

1    the United States). Those are not the facts of this case.[10]

2        Plaintiffs cite *NLBR v. Pennsylvania Greyhound Lines*, 303 U.S. 261 (1938), for the

3    proposition that disestablishment of a "company union" is an appropriate remedy that the Court

4    could, in theory, provide. While it is true that *Pennsylvania Greyhound* cites to *Texas & N.O.* for the

5    idea that "disestablishment" is an appropriate remedy, there are two flaws to the Plaintiffs' argument

6    that it applies here. First, in *Pennsylvania Greyhound*, it was the <u>NLRB</u>, not a federal court, that

7    directed disestablishment; the courts were asked only to enforce the NLRB's order. Second, as

8    noted previously, *Texas & N.O.* predated the 1934 amendments to the RLA that gave the NMB,

9    pursuant to Section 2, Ninth, exclusive jurisdiction over representation disputes. *See Switchmen's*

10   *Union,* 320 U.S. at 302-03 (discussing 1934 amendments, including Section 2, Ninth, and the

11   increased authority it gave to the NMB to resolve representation disputes). The NMB would

12   certainly have authority to conduct an investigation – which may or may not include an election –

13   and certify ALPA; which would necessarily bar further collective bargaining with SAPA. But

14   neither *Pennsylvania Greyhound* nor *Texas & N.O.* stand for the proposition that this Court, or any

15   court, can order "disestablishment" of SAPA.

16       Indeed, while the *Greyhound* court does state that a conclusion could be reached that

17   "continued recognition of the Association would serve as a means of thwarting the policy of

18   collective bargaining [embodied in the NLRA]," the Court went on to say that the "inferences to be

19   drawn were for the Board and not the courts." 303 U.S. at 271. In other words, that was not the

20   Court's conclusion; it was a conclusion of the NLRB to which the Court merely deferred. If any

21   entity has jurisdiction to consider the propriety of SAPA as the representative of SkyWest's pilots,

22   and whether SkyWest's relationship with SAPA interferes with the SkyWest pilots' rights under the

23   RLA, it is the NMB, not the Court. Whether under all the facts and the law the NMB would reach

---

10    *Duane Reade, Inc.*, 338 NLRB 943 (2003), *Ella Indus., Inc.*, 295 NLRB 976 (1989),
*Castaways Mgmt.*, 285 NLRB 954 (1987), *enf'd*, 870 F.2d 1539 (11th Cir. 1989), and *San Miguel
Indian Bingo & Casino*, 345 NLRB No. 79 (2005), *enf'd*, 475 F.3d 1306 (D.C. Cir. 2007), are not on
point either. Those cases pertained to discriminatory access provided to one union over another
while both were engaged in organizing campaigns. *Duane Reade*, 338 NLRB at 943; *Ella Indus.*,
295 NLRB at 977; *Castaways*, 285 NLRB at 959; *San Miguel*, Order, ¶¶ 1(a), 2(a). Those cases do
not require equal access to an incumbent representative and a rival union seeking to displace the
incumbent. Indeed, the order in *San Miguel* makes a point of noting that it pertains to "initial
representation." *San Miguel*, Order, ¶¶ 1(a), 2(a).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

13

1    the same conclusion as the NLRB did in *Greyhound* can only be learned one way:  by Plaintiffs'

2    submission of their representation dispute to the body that has jurisdiction hear it – the NMB.

3    **E.    Granting Paragraph 3 Relief Would Be Both Disruptive To SkyWest And Inequitable To The SkyWest Pilots**

4

5    Even apart from the fact that the Paragraph 3 Relief is unprecedented as a matter of law,

     there are several reasons why it would not be appropriate to grant Plaintiffs such relief in this case.

6

7    First, as Todd Emerson testified, granting the Plaintiffs "equal access" to new hire classes,

8    pilot mailboxes, and the Company email system would be highly disruptive to SkyWest's

9    operations.  The purpose of the pilot mailboxes and the Company internal email system is to

10   communicate company-related information:  FAA advisories, weather circulars, memoranda from

11   the Chief Pilot's office, information from SAPA regarding pay packages, etc.  The email system in

12   particular is intended to communicate a manageable number of important messages to the pilots, and

13   the pilots are required to clear out all of the messages they have received each time they check in for

14   work.  Flooding the system with messages about the ALPA organizing drive would create a real risk

15   that pilots would simply clear all their messages without reading them, thus causing them to miss

16   important business-related communications. *See* June 7, 2007 Transcript, pp. 309-11.  Permitting

17   ALPA supporters access to SkyWest pilots during their new hire training also would be disruptive

18   given the expense associated with the new hire training process – $30,000 per pilot – and the "tight

     schedule" within which the training occurs. *Id.*, pp. 311-12.

19

20   The other troubling aspect of granting Plaintiffs the Paragraph 3 Relief is that the members of

21   the OC would enjoy special access to the SkyWest pilots for purposes of spreading their message

22   about the ALPA organizing drive – a right that no other SkyWest pilot has ever had.[11]  Other

23   ---

     [11]    Plaintiffs argue that SAPA has used its access to "campaign." It has not prevented any

24   admissible evidence of that, however.  At hearing, the only allegation of this sort was the hearsay
     testimony of current SAPA President – and ALPA supporter – Mark Nolin that SAPA Vice

25   President Jim Black purportedly had said something "inappropriate" about ALPA to a new hire
     class.  What that alleged statement was, to whom it was made, and under what circumstances – none

26   of that detail was provided, and SkyWest already has moved to strike that testimony.  Plaintiffs try to
     fill this evidentiary gap in their case by submitting a declaration from one of the Plaintiffs <u>after</u> the

27   factual record was closed, attaching a SAPA email responding to an ALPA communication
     regarding the ASAP program.  That declaration is inappropriate and will be the subject of a motion

28   to strike by SkyWest.  Moreover, the email clearly does not represent "campaigning" by SAPA
     against ALPA; rather, it simply responds to what it felt were misleading statements by ALPA about

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

14

1    SkyWest pilots undoubtedly have strong feelings about unionization generally and the ALPA

2    organizing drive in particular.  Different pilots may have different views; they may support another

3    "outside" union, an in-house alternative, or keeping the status quo.  Under Plaintiffs' theory,

4    however, only the members of the OC would be permitted access to new hire classes, Company

5    email, "dedicated" bulletin boards and pilot V-files for purposes of spreading their views.  There is

6    no principled basis for granting the OC members access to SkyWest pilots to campaign, while

7    denying it to all others, yet to open up the email system and new hire classes to all would multiply

8    the problems about which Mr. Emerson testified.

**F.    Plaintiffs Also Misconstrue The Law Of Employer Domination Under The NLRA And Misrepresent The Evidence Regarding SAPA's Alleged Domination By SkyWest.**

Even if Plaintiffs were justified in relying upon NLRA precedent as an analogy to the law of

the RLA – and they are not – their contentions still would fail because they misconstrue the

applicable law under the NLRA and mischaracterize the evidence.

**1.    Plaintiffs Misconstrue The Law Under The NLRA Governing Employer Domination Of Labor Unions**

Plaintiffs' brief suggests that there is something illicit about being a "company union," yet

that is not the case under the NLRA.  Higgins, *The Developing Labor Law,* (5th ed. 2006), at 431

("*Higgins*"), *citing* H.R. Rep. No. 972, 74th Cong., 1st Sess. 15-16 (1935).[12]  The NLRA does not

prohibit "company unions"; it prohibits "employer dominated unions."  29 U.S.C. § 158(a)(2).  As

stated by Senator Wagner himself:

> The erroneous impression that the bill expresses a bias for some
> particular form of union organization probably arises because it
> outlaws the company-dominated union.  *Let me emphasize that
> nothing in the measure discourages employees from uniting on an
> independent -- or company-union basis, if by these terms we mean
> simply an organization confined to the limits of one plant or one
> employer.*  Nothing in the bill prevents employers from maintaining
> free and direct relations with their workers . . . .  *The only prohibition
> is against the sham or dummy union which is dominated by the
> employer*, which is supported by the employer, which cannot change

the ASAP program – a wholly appropriate action for SAPA to take, given its recognized role in the
ASAP program.  *See* June 8, 2007 Rough Transcript, pp. 40-43; Def. Exh. 12.
[12]  The pertinent excerpts from *Higgins* are attached as Exhibit B to the Declaration of Robert
Spagat, filed herewith.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

15

1    its rules and regulations without his consent, and which cannot live

2    except by the grace of the employer's whims.

3    Statutory History of the United States: Labor Organization 278-79 (R. Koretz, ed. 1970) (remarks of

4    Senator Wagner, February 21, 1935) (emphasis added). *See also Hertzka & Knowles v. NLRB*, 503

5    F.2d 625, 630 (9th Cir. 1974) (the NLRA does not require approval of a purely adversarial model of

6    labor relations). Indeed, as noted in Higgins, almost all Japanese unions are "company unions."

7    *Higgins,* at 431, fn. 63. Plaintiffs attempt to bury this distinction because, to the extent that their

8    analogy to the NLRA is apt, it proves that the analogy favors SkyWest, not Plaintiffs.

9        Since the enactment of the prohibition on employer dominated unions (29 U.S.C.

10   § 158(a)(2)), the Board and the Courts have distinguished between employer "cooperation" with a

11   ("company" or outside) union, which the NLRA permits, and employer "domination" of a union,

12   which the NLRA prohibits. *Higgins,* at 432-33. The Courts consistently have held that "potential

13   power" to dominate is insufficient to establish employer domination, and have refused enforcement

14   to Board decisions finding otherwise. *See Hertzka & Knowles*, 503 F.2d at 630, denying

15   enforcement to 206 NLRB 191 (1973), *cert. denied,* 423 U.S. 875 (1975) ("a section 8(a)(2) finding

16   must rest on a showing that the employees' free choice, either in type of organization or in the

17   assertion of demand, is stifled by the degree of employer involvement at issue"); *NLRB v.*

18   *Northeastern University*, 601 F.2d 1208, 1214 (1st Cir. 1979); *Federal-Mogul Corp. v. NLRB*, 394

19   F.2d 915, 918 (6th Cir. 1968); *NLRB v. Prince Macaroni Mfg. Co.,* 329 F.2d 803, 809-12 (1st Cir.

20   1964); *Coppus Eng'g. Corp. v. NLRB*, 240 F.2d 564 (1st Cir. 1957). *See also Higgins*, at 433-34.

21       To establish unlawful domination of a labor union, the Courts require evidence of *actual*

22   *control* of the union by the employer. *Higgins,* at 434. For example, in *Northeastern University,*

23   601 F.2d at 1214, the First Circuit denied enforcement of a Board determination of employer

24   domination based solely on evidence of the employer's *potential* power to dominate, which was

25   manifested, *inter alia,* through financial support, the provision of company services, and the use of

26   company time for the union to hold meetings. The Court held that such employer cooperation

27   assisted the employees or their bargaining representative in expressing their interests, and did not

28   violate Section 8(a)(2). *Id.* As stated in *Higgins*, at 434-35:

16

The courts have recognized that the potential means for domination are always present to some degree in any employer-employee relationship [footnoted citations omitted]; however, there is no basis for a finding of a Section 8(a)(2) violation without evidence of its realization. "Words and actions which might dominate the employees in their choice of a bargaining agent do not constitute domination proscribed by the Act unless the employees are actually dominated." [Footnoted citations omitted.]

Courts also have held that employer cooperation that assists the employees or their bargaining representative in expressing their interests does not violate Section 8(a)(2). [Footnoted citations omitted.] Indeed, such assistance may be needed where the bargaining representative is "a feeble instrument." [Footnoted citations omitted.] *Several court decisions have insisted that an organization is not per se dominated simply because it has no formal membership, no dues, no mass meetings, and no written collective bargaining agreement.* [Footnoted citations omitted.] In one case, the appellate court found insufficient evidence of actual domination where the employer had permitted meetings on company time, had controlled the length of meetings, and had advised an employee representative not to concern himself with a particular safety problem. [Footnoted citations omitted.]

The Board and the courts are in general agreement, however, that domination exists where the employer creates an employee committee, selects the employee representatives, requires that committee membership be on a rotating basis, and determines when meetings will be held and also presides over them. [Footnoted citations omitted] The same standards apply equally to labor organizations acting as employers. [Footnoted citations omitted].[13] (Emphasis added.)

### 2. Plaintiffs' Mischaracterize The Evidence.

Plaintiffs' attempt to analogize to the NLRA fails because, even under their mischaracterization of the evidence, they cannot show that SkyWest exercises "actual control" over SAPA. The undisputed evidence, which Plaintiffs plainly are too afraid to confront, establishes that SAPA has represented the SkyWest pilots vigorously and independent of SkyWest management for more than twelve years.

### a. Plaintiffs Ignore The Undisputed Evidence That Establishes That SkyWest Has Not Exercised Actual Control Over SAPA.

Three SAPA witnesses testified: Mike Eisenstat, SAPA's long-time secretary, Marc Nolin, its newly-elected President, and Stephen Kanuch, a newly-elected SAPA representative. Even

---

[13] There is *no evidence whatsoever* that any of these indicia of company domination are present in this case.

17

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    though two of the three witnesses testified on behalf of Plaintiffs, the evidence was undisputed that

2    SkyWest Management has never told any SAPA representative: (1) what they should do in

3    representing SAPA, (2) how they should vote on any issue; (3) how they should allocate their time,

4    or (4) how they should prioritize issues. (June 8, 2007, Rough Transcript, 21:10-22:16.) SkyWest

5    management has never disciplined, threatened to discipline, refused to pay or threatened not to pay

6    anyone in SAPA for their SAPA work. (*Id.*, 21:10-22:19:7.) The SAPA Board is elected by the

7    pilots. (*Id.* 10:9-11:7.) Management has no say in who runs or who is elected. (*Id.*) Management

8    cannot remove, and never has sought to remove, any member of SAPA.[14] (*Id.*, 23:9-15; 62:7-12.)

9    The fact that SkyWest has never attempted to remove any SAPA representative, including Kanuch,

10   who is a member of the OC, and Nolin who openly supports ALPA as SAPA's President, clearly

11   undermines any contention that SkyWest dominates SAPA. In fact, there is no evidence of "actual

12   control" by SkyWest management over SAPA.

13       Plaintiffs also fail to address the pervasive evidence of SAPA's long history of diligent work

14   on behalf of the SkyWest pilots. This evidence establishes:

16   • SAPA negotiated the Crewmember Policy Manual ("CPM") and has negotiated numerous amendments to it benefiting pilots. SAPA successfully has negotiated changes to the CPM on issues of importance to the pilot group, including pairing
17   extensions, pilot displacements, and the preferential bidding system. (RT, 27:23-28:14; 29:15-33:1, 34:13-39:19, and Defendant's Exh. 5) SAPA repeatedly has
18   negotiated increases in compensation for pilots. During the most recent round of negotiations over pay, the pilots refused to ratify the agreement reached by
19   management and SAPA; then ratified a more favorable subsequent agreement in a vote in which 70 percent or more of the pilots participated. (*Id.*, 43:11-52:18.)
20   SkyWest's pilot compensation is close to the top of the industry. (*Id.*, 52:19-53:3.

21   • SAPA resolves approximately 300 pilot complaints per year about the interpretation and application of the CPM to them. (*Id.*, 56:19-:58:19, 59:4-6.) Such complaints are
22   resolved within 60 days. Seventy to seventy-five percent of them are resolved favorably to the pilots.[15] (*Id.*, 58:20-59:3.)

24   • SAPA has appointed, and its representatives have served, on numerous disciplinary review committees (*Id.*, 53:456:18). Despite Plaintiffs' attempt to undermine the

---

25   [14] Plaintiffs have abandoned their unsupported claim that Eisenstat was "fired" when he met with
26   management to discuss the then-desire of the SAPA Board – but, as it turns out, not the pilots they represented – to become NMB certified. (*See* RT, 24:10-27:11.)

27   [15] Plaintiffs have withdrawn their contention that the shift cancellation pay complaints were
28   resolved after the lawsuit was filed because the undisputed evidence established that these complaints were resolved on May 8 and 9, 2007 – *in favor of the pilots.* (RT, 61:2-11.)

18

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    legitimacy of these efforts by pointing to the potential for management not to follow
2    the recommendation of the disciplinary review committee, the undisputed evidence is
     that management never has done so during SAPA's 13 year existence. (*Id.*, 56:12-
     18.)

3

4    •    SAPA acts as employee representative under the ASAP safety program administered
          by the Federal Aviation Administration. (RT, 40:4-32:10, and Defendant's Exh. 12.)

5

6        For years before ALPA took this position in this lawsuit that SAPA was an abominable

7    "company union" reminiscent of exploitation of the working class last seen during the Great

8    Depression, ALPA itself *recognized*, and repeatedly worked shoulder to shoulder with, SAPA. (*Id.*,

9    62:65:14.) ALPA negotiated with SAPA over how United pilots would integrate into SkyWest as

10   part of a deal in which United provided equipment to SkyWest following September 11, 2001. *Id.*

11   ALPA also has invited SAPA to numerous conferences of labor representatives of the United and

12   Delta partner airlines. (*Id.*, 65:9-14.) Nor did ALPA object to SAPA's status as an illegal employer

13   representative after it lost in an NMB-supervised election in 1999. Only now, a year into an

14   organizing drive that by ALPA's own admission is failing, has ALPA apparently discovered that

15   SAPA is a "company union" whose mere presence is so egregious as to require immediate injunctive

16   relief from this Court, without even attempting to address the issue with the NMB.

17       The overwhelming evidence establishes that, for more than a decade, SAPA vigorously has

18   represented the SkyWest pilots group, and in all that time, SkyWest management never has engaged

19   in conduct that would constitute actual control of SAPA by SkyWest management.

20                     b.    **Plaintiffs Mischaracterize The Evidence Of SkyWest's Potential
                             Control Over SAPA.**
21

22       Plaintiffs' evidence, overstated though it is, shows at most *potential* control that never has

23   resulted in actual control. Without attempting to respond to each of Plaintiffs' points, some

     inaccuracies in Plaintiffs' characterization of the evidence should be clarified.
24

25       (1)    SAPA executive members earn the same amount that they would earn if they were
                flying. They do not receive additional compensation for serving on the SAPA Board.
26              If they earn more than some pilots, it is by virtue of the fact that their seniority would
                allow them to bid into more hours than a more junior pilot. (*Id.*, 18:20-19:10.)
27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

19

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

(2)     SAPA does not use SkyWest's e-mail system for the purpose of campaigning. The only purported evidence to the contrary is an inadmissible declaration offered *after* the close of evidence. Plaintiffs had, but chose not to introduce, this purported evidence at the hearing, at live testimony as presented as required by the Norris LaGuardia Act. Had they done so, Eisenstat would have testified that the letter responds to false and misleading information disseminated by the OC about the ASAP program which SAPA in part administers. The letter thus addresses an issue that SAPA administers, and nothing in it expresses an opinion about whether pilots should or should not support ALPA. The issue itself is an obvious set-up: ALPA spreads misinformation about the ASAP safety program, and when SAPA responds, they say "this shows SAPA is campaigning." That, presumably, is why Plaintiffs waited until after the close of evidence to attempt introduce the letter into these proceedings. SkyWest requests that the Court strike this evidence.

(3)     Mr. Eisenstat is not a member of SkyWest management. He testified unequivocally that he is not management, and in fact has been eligible to vote in every union election, even those that have occurred after he was taken off-line to carry out his SAPA obligations full-time. (*Id.*, 24:23:16-24:9.) Plaintiffs made no showing as to the meaning or significance of the "NST" code next to Mr. Eisenstat's name on the "Medical Due" document; it certainly cannot refute Mr. Eisenstat's own testimony regarding his status. Nor did plaintiffs offer evidence that Mr. Eisenstat "cannot fly;" only that he is not currently certified medically to fly. If SAPA was disbanded, Mr. Eisenstat could and would go back to flying. (*Id.*, 66:25-67:11.) Nor is there evidence to support Plaintiffs' assertion that Eisenstat "reports to management."

(4)     There is no evidence in the record that any SAPA representative ever campaigned or expressed anti-union views at a new hire training class; only that he made "inappropriate" comments, the content of which was unknown to the witness who testified, and that he agreed not to do so again. (*Id.*, 120:11-121:20; 124:6-9.)

(5)     Plaintiffs' assertion that SAPA has no right to money without the company's permission overstates their case, and at the same time, belies their assertion that they do not seek to disestablish SAPA. There was no evidence that SAPA has "no right" to money without the company's position. The evidence was that SAPA could not survive if SkyWest did not cover the executives' wages to enable them to devote their full-time efforts to SAPA. (*Id.*, 66:25-68:25.) It bears emphasis that SAPA is no different in this regard than other ALPA-represented unions. The undisputed evidence established that ALPA receives comparable amounts of money from other carriers to enable their representatives to spend their full time efforts representing employees, and ALPA had a $1.25 Million debt repaid by one carrier. *Id.*, 112-13; Defendants' Exhs. 11, 13, 15.)

(6)     There was no testimony that SkyWest pilots are "required" to join SAPA; only that they automatically are represented by SAPA. (*Id.*, 224:20-22.) Whether membership is "required" is a red herring because SAPA, unlike ALPA, does not charge dues and does not engage in political activities which its members may not wish to support.

(7)     The purported "evidence" that SAPA changed its organizational structure "for the express purposes of defeating independent union campaigns" is the inadmissible hearsay statement of Kanuch, who joined SAPA eight years after the purported decision was made. (*Id.*, 230:6-15.)

In the final analysis, none of Plaintiffs' evidence shows that SkyWest has actual control, or

1  that it has dominated or interfered with SAPA. At the very worst, Plaintiffs' have shown that

2  SkyWest has potential control, but that SkyWest never has exercised such potential control in the 13

3  years of SAPA's existence. Therefore, even if it would be proper to import the law of the NLRA

4  lock, stock and barrel into this dispute under the RLA, Plaintiffs have failed to establish any

5  entitlement to relief arising out of the relationship between SkyWest and SAPA.

6  **IV.    CONCLUSION**

7      For all of the reasons set forth herein, SkyWest does not believe it would be appropriate to

8  include Paragraph 3 Relief should the Court decide to issue a preliminary injunction in this matter.

9

10  Dated: June 14, 2007                         WINSTON & STRAWN LLP

11

12                                          By:    /s/ Robert Spagat

13                                                 Robert Spagat
                                                   Attorneys for Defendant
14                                                 SKYWEST AIRLINES, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SF:174991.1 DEFENDANT'S BRIEF IN OPPOSITION TO "PLAINTIFFS' SUPPLEMENTAL BRIEF RE:  REMEDIES"
CASE NO.  C 07-2688 CRB

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894