1
2
3
4
5
6
7
8               IN THE UNITED STATES DISTRICT COURT

9               FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  SKYWEST PILOTS ALPA ORGANIZING              No. C-07-2688 CRB
    COMMITTEE, et al.,

12                                              **MEMORANDUM AND ORDER**
                Plaintiffs,                     **GRANTING IN PART AND DENYING IN**
13                                              **PART MOTION FOR PRELIMINARY**
         v.                                     **INJUNCTION**
14
    SKYWEST AIRLINES, INC.,
15
                Defendant.
16  _____/

17

18          This lawsuit involves an effort by certain SkyWest Airlines pilots to obtain relief from

19  what they perceive as their employer's interference with their union organizing efforts.  The

20  plaintiff pilots have organized a committee (the "Organizing Committee") to elect the Air

21  Line Pilots' Association, International ("ALPA") as their official bargaining representative.

22  Plaintiffs bring their claims under the Railway Labor Act (RLA), and contend that SkyWest

23  has violated RLA section 2, Third and Fourth by interfering with their organizing campaign.

24  45 U.S.C. §152, Third; 45 U.S.C. §152, Fourth.

25          The employer's alleged misconduct falls into two categories: (1) discriminatory

26  interference with the pilots' expressive rights in organizing, and (2) support for an allegedly

27  sham pilots' union, SkyWest Airline Pilots' Association ("SAPA").  As to the first category,

28  Plaintiffs seek a preliminary injunction ordering SkyWest: (1) to cease and desist from

    interfering with any pilot's expression of support for ALPA through lanyards and pins, and

United States District Court
For the Northern District of California

(2) to cease and desist from interfering with the distribution of ALPA-related material in non-work areas such as bulletin boards and crew lounges. As to the second category, Plaintiffs seek a preliminary injunction: (1) granting Plaintiffs equal access to the same channels of communication (particularly group email and new pilot training sessions) that SkyWest provides SAPA, and (2) ordering SkyWest to cease funding SAPA.

## FACTUAL BACKGROUND

SkyWest is a regional air carrier serving 140 cities and employing approximately 10,000 employees, including 2,651 pilots. Plaintiffs are SkyWest pilots who formed the Organizing Committee to campaign to elect ALPA as the pilots' official bargaining representative. SkyWest has expressed opposition to unions through a Union Free Statement that is in the handbook provided to all new hires and through a 2006 letter Brad Holt, the Vice President of Flight Operations, distributed to all SkyWest pilots. Despite such opposition, the Organizing Committee has collected the requisite 35 percent support among pilots necessary to call for an election overseen by the National Mediation Board ("NMB"), but it has not yet applied to the NMB for certification and does not presently wish to seek an election.

### A. Interference Claims

#### 1. Lanyards

One of multiple ways the Organizing Committee seeks to communicate with pilots is by wearing ALPA lanyards, dark blue lanyards with the ALPA logo printed in white letters. Lanyards are cotton straps used to hang identification cards from a pilot's neck. All or most pilots wear some lanyard during work. The Organizing Committee and other ALPA supporters seek to wear ALPA lanyards to outwardly express their support for the Organizing Committee, build solidarity among supporters, and spark conversations among pilots about the merits of electing ALPA as the representative group. Plaintiffs allege that SkyWest has discriminatorily applied its uniform policy prohibiting non-company lanyards by prohibiting ALPA lanyards while allowing pilots to wear other lanyards with non-company logos.

SkyWest's Personal Appearance, Grooming and Uniforms Standard Practice Policy states that "the passenger's choice of an airline is greatly influenced by the crewmembers'

level of professionalism and appearance." The policy contains twenty pages of detailed instructions regarding crewmembers' required appearance. With regards to lanyards, the policy states that "[l]ogo neck chains are not acceptable unless they say SkyWest Airlines." The policy also states that "[c]rewmembers that fall below the basic appearance standards or violate the uniform policy will be removed from their schedule until they meet the basic following requirements and/or face disciplinary action . . . ."

SkyWest management has repeatedly ordered pilots to remove ALPA lanyards at the threat of discipline. For example, a chief pilot's administrative assistant told Captain Steven Dow that he needed to remove his ALPA lanyard or he would "get in trouble." Captain Tracy Shrier was pulled from a flight by Chief Pilot Pfizer for refusing to remove his ALPA lanyard. Both Captain Bharath and Captain Kanuch stopped wearing ALPA lanyards after Chief Pilot Pfizer directed them not to wear the lanyards. The chief pilot in Palm Springs ordered Captain Boehm not to wear his ALPA lanyard.

SkyWest has not regularly enforced the lanyard policy against other lanyards with non-company logos. Captain Dow has seen lanyards with sports team logos, airplane manufacturer logos, ski area logos, and college logos as well as various non-company pins, including SAPA pins. He observed one pilot wearing a Dixie College lanyard while talking to two chief pilots who never asked the pilot to remove the lanyard. Captain Dow observed a chief pilot regularly wear such a non-standard lanyard as did a director of training. When Captain Shrier was pulled from his flight he had just come from the crew room where "the majority of pilots" did not have on the "standard uniform lanyard." In fact, prior to wearing his ALPA lanyard, Captain Shrier had only ever worn a Snowbird lanyard which SkyWest management had never asked him to remove. Captain Bharath sees noncompliant lanyards everyday.

After Todd Emerson, SkyWest's General Counsel, learned of complaints about the discriminatory enforcement of the lanyard policy, an email was sent to the chief pilot at each airport reminding them to enforce the policy against all non-standard lanyards. The email, sent from the Director of Flight Operations/Standards, highlights the "ALPA issue regarding ID lanyards" and states that all non standard lanyards, including ski area logos, sports teams,

3

etc. "need to be purged from the system." Chief Pilot Pfizer has enforced the policy against ALPA and other non-conforming lanyards: since he joined management three years ago he has removed fifty lanyards, ten of which were ALPA lanyards. Pilots nonetheless continue to wear non-company lanyards; indeed the week prior to the preliminary injunction hearing Captain Bharath saw a pilot wearing a lanyard with various flag logos.

**2. Distribution of ALPA-Related Material**

Plaintiffs also allege that SkyWest has interfered with their ability to organize by prohibiting distribution of ALPA-related material in non-work areas such as in crew lounges and other areas of airports, on crew lounge bulletin boards, and in crew mailboxes. SkyWest's written policy does not prohibit distribution of ALPA literature in crew rooms and other non-work areas. Nonetheless, a member of management suggested that Captain Bharath's distribution of ALPA-related material in the crew lounge violated the company solicitation policy and the same member of management also indicated that the company did not want Captain Bharath to provide ALPA information in a common area shared by SkyWest and Mesa pilots. Management also prohibited Captain Alford from distributing ALPA fliers to new pilots outside of a training session on publicly accessible property during non-work time.

The crew lounge bulletin boards are a "Turkish bazaar" of personal announcements and management generally does not remove such materials. When ALPA supporters post ALPA-related material on the bulletin boards, however, the material is nearly always removed soon after posting. The information Captain Dow has posted has been "routinely and promptly removed." Captain Alford posted ALPA flyers which came down "within a matter of a couple of days, maybe sometimes shorter time periods," while at the same time other non-work items remained on the board "for a very long time." Chief Pilot Glassey refused to give Captain Bharath permission to post ALPA material and another member of management, Chief Pilot Curry, admitted to Captain Bharath that he removed ALPA postings from crew longue bulletin boards.

Captain Dow has also stuffed pilot work mailboxes with ALPA-related material only to find that the material has been removed before the pilots could review it. Although pilot

4

**United States District Court**
For the Northern District of California

1   mailboxes are primarily for company communications and the company has a policy and

2   practice of limiting pilot mailboxes to work communications, pilots sometimes use the boxes

3   for personal communications such as birthday cards or birth announcements.

4   **B. SAPA Claims**

5         Plaintiffs' remaining claims all involve SkyWest assistance to SAPA by granting

6   access to certain communication channels or through company funding.  SAPA was founded

7   by SkyWest pilots in the mid-1990s, but has never been certified by the NMB as the

8   SkyWest pilots' official representative.  All SkyWest pilots are considered SAPA members.

9   SAPA currently consists of three full-time officers who no longer fly commercial flights for

10  SkyWest and are paid by SkyWest, as well as sixteen members of a Board of

11  Representatives.  SAPA also sponsors numerous committees of Board members and other

12  pilots to address various pilot issues.  SAPA operates according to the SkyWest Airlines

13  Association bylaws, which the Board approved.  The bylaws can be modified by a Board

14  vote.

15        The Board of Representatives, as well as the three full time officers, are all elected by

16  SkyWest pilots through secret balloting.  The number of full time officers was increased to

17  three from one in 1999 following an unsuccessful ALPA drive.

18        SAPA purports to negotiate with SkyWest over rates of pay, rules, and working

19  conditions upon which it reaches agreements which are then presented to the pilots for a vote.

20  SAPA works with management in maintaining the crew member policy manual; the manual

21  covers areas such as vacation time, compensation, training issues, employee discipline and

22  more.  It is not, however, binding on SkyWest as it includes a clause which states that no

    policy in the manual will remain in effect if it violates the company policy manual.

23        SAPA performs other routine tasks such as administering "PIC," which allows pilots

24  to make complaints if they are not paid properly.  SAPA also administers the ASAP program

25  in partnership with the Federal Aviation Administration ("FAA"); ASAP allows pilots to

26  self-report violations of air regulations, thus avoiding serious sanctions for such violations.

27  An officer of SAPA meets with the FAA once every two weeks to "go over twenty to thirty

28  of these reports."

**United States District Court**
For the Northern District of California

1  SkyWest assists SAPA by granting SAPA access to certain channels of company

2  communication to enable SAPA to advise the pilots regarding the results of its negotiations

3  as well as to complete its more routine tasks. SAPA uses pilots' physical mailboxes as well

4  as the company email system to email all pilots at once. Also, a SAPA representative makes

5  an approximately thirty minute presentation at all new pilot training sessions. Finally,

6  SkyWest allows pilots to wear SAPA insignia on their uniforms. ALPA does not have access

7  to any of these forms of communication.

8  SkyWest provides SAPA with 100 percent of its funding, including the salaries of all

9  three SAPA officers and all SAPA expenses. As a result, SAPA does not collect any dues

10  from its members.

**PROCEDURAL HISTORY**

12  Plaintiffs filed this RLA action in May 2007 to enjoin SkyWest's alleged interference

13  with their organizing efforts. Plaintiffs sought a temporary restraining order ("TRO"), as

14  well as a preliminary injunction, on the ground that they are ramping up their organizational

15  efforts in anticipation of the summer months. The Court granted, in part, Plaintiffs'

16  application for a TRO and issued an amended TRO ordering SkyWest:

17  (1) To cease and desist from interfering in any way with Plaintiffs, their
18  members, and their supporters' outward expression of support for ALPA
    and the ALPA organizing campaign and association with like-minded pilots
19  through, inter alia, the wearing of ALPA insignia on lanyards or pins, while
    in uniform or off duty.
20

21  (2) To cease and desist from interfering in any way with Plaintiffs, their
22  members, and their supporters' communication with fellow SkyWest pilots
    regarding ALPA and the ALPA organizing campaign through distribution
23  of ALPA-related materials in non-work areas such as bulletin boards and
    crew lounges.
24

25  (3) To cease and desist from discriminating in any way against Plaintiffs,
    their members, and their supporters with respect to the channels of
26  communication they may use to communicate with fellow pilots, and to
    provide Plaintiffs and their members with access to the same channels of
27  communication provided to SAPA at any point during the last year,
    including but not limited to a dedicated bulletin board in each crew lounge
28  where SAPA had a dedicated bulletin board at any point in the last year,

6

**United States District Court**
For the Northern District of California

general bulletin boards in crew lounges, pilot mailboxes, SkyWest's email system, and newly-hired pilot classes.

The Court declined, however, to provide all of the injunctive relief requested by the pilots and struck a provision from the proposed TRO that would have required SkyWest:

(4) To cease and desist from funding, recognizing, bargaining or purporting to bargain with, or otherwise supporting in any fashion SAPA.

After denying a motion to transfer venue, the Court heard two days of live testimony for the purpose of deciding the motion for preliminary injunction. At the conclusion of the hearing, the Court modified the TRO pending the resolution of the motion for preliminary injunction by removing the paragraph granting Plaintiffs access to the same channels of communication as SkyWest provides SAPA.

## LEGAL STANDARD

A preliminary injunction is appropriate when a plaintiff demonstrates "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor." *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007) (internal citation and quotation marks omitted). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.,* 204 F.3d 867, 874 (9th Cir. 2000).

The Norris LaGuardia Act ("NLGA") mandates further requirements before the Court can issue a preliminary injunction in the context of labor disputes. Though the NLGA does not strip the district courts of jurisdiction in the RLA context, *see Brotherhood of R.R. Trainmen v. Howard*, 343 U.S. 768, 774 (1952), it does place specific procedural requirements on the courts and requires specific findings. 29 U.S.C. § 107 ("Section 7"); *see also Air Line Pilots Ass'n, Int'l v. Guilford Transp. Industries, Inc.*, 399 F.3d 89, 105 (1st Cir. 2005) (holding that NLGA Section 7 "applies in connection with injunctions issued under the RLA").

United States District Court
For the Northern District of California

The NLGA states that before issuing a preliminary injunction in any case involving a labor dispute the district court must hear testimony of witnesses in open court and must make findings to the effect:

> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, . . . ;
> (b) That substantial and irreparable injury to complainant's property will follow;
> (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;
> (d) That complainant has no adequate remedy at law; and
> (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107.  These requirements apply equally when employees seek an injunction against the employer as when an employer seeks an injunction against employees.  *Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. LaSalle Machine Tool, Inc.*, 696 F.2d 452, 457 (6th Cir. 1982).  The Court has heard testimony in open court and the other NLGA requirements do not substantially change the Court's analysis.  To grant Plaintiffs' motion, the Court must find that Plaintiffs have shown a substantial likelihood that they can prevail on their RLA claims and must also find that without a preliminary injunction Plaintiffs will suffer irreparable harm which outweighs any harm caused to SkyWest.

## DISCUSSION

### I. Jurisdiction

Defendant first argues that the Court must deny the motion for preliminary injunction because the National Mediation Board ("NMB") has exclusive jurisdiction over this case pursuant to RLA section 2, Ninth.  That section, entitled "Disputes as to identity of representatives; designation by Mediation Board; secret elections," provides in part:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. . . .

45 U.S.C. §152, Ninth.  Defendant argues that Plaintiffs' claims must be categorized as representation disputes falling within the exclusive jurisdiction of the NMB.  *General Comm. of Adjustment v. Missouri-Kansas-Texas R. Co.*, 320 U.S. 323, 337 (1943) ("If the present dispute falls within s 2, Ninth, the administrative remedy is exclusive.").

Plaintiffs, however, purport to bring their claims under RLA section 2, Third and Fourth.  45 U.S.C. §152, Third; 45 U.S.C. §152, Fourth.  Those sections provide in part:

> Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. . . .

45 U.S.C. §152, Third.

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining . . . .

45 U.S.C. §152, Fourth (emphasis added).  In particular, Plaintiffs contend that SkyWest's discriminatory enforcement of its uniform policy and its interference with Plaintiffs' distribution of ALPA-related material in non-work space constitutes interference with the employees' choice of representative.  They also contend that SkyWest's funding of SAPA

**United States District Court**
For the Northern District of California

constitutes the use of "funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining . . . ." 45 U.S.C. §152, Fourth.

District courts have jurisdiction of claims under RLA section 2, Third and Fourth. *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 881-82 (9th Cir. 2002) (holding that the district court had jurisdiction when Hawaiian Airlines interfered with the plaintiff's attempts to organize a rival to a preexisting union); *Fennessy v. Southwest Airlines*, 91 F.3d 1359, 1363-64 (9th Cir. 1996) (holding that "because [plaintiff's] claim is based on [45 U.S.C. § 152, Fourth] rather than on the collective bargaining contract . . . it is a statutory claim that he may bring directly in district court."); *America West Airlines v. National Mediation Bd.*, 986 F.2d 1252, 1258 (9th Cir. 1993) (holding that the district courts, not the NMB, have jurisdiction over unfair labor practices claims); *Burke v. Compania Mexicana de Aviacion, S.A.*, 433 F.2d 1031, 1032-34 (9th Cir. 1970) (holding that 45 U.S.C. § 152 Fourth creates a private right of action).

The pivotal question, then, is regardless of how Plaintiffs characterize their claims, must they nonetheless be considered representational disputes within the exclusive jurisdiction of the NMB.

## A. The Interference Claims

Plaintiffs' claims concerning SkyWest's interference with the pilots' expressive rights do not fall within RLA section 2, Ninth. Plaintiffs do not ask this Court to declare that ALPA represents the pilots, nor do they contend that ALPA represents the pilots. *See America West*, 986 F.2d at 1256 ("[S]o long as the [NMB] is acting with the purpose of 'find[ing] the fact' as to who is the employees' representative, the courts are deprived of jurisdiction to review Board decisions."). Instead, they seek an order enjoining SkyWest from interfering with their organizing efforts; such a claim falls squarely within this Court's jurisdiction.

In *Fennessy*, for example, the plaintiff alleged that his employer fired him to stop him from organizing the labor union of his choice. 91 F.3d at 1360-61. The employer, Southwest Airlines, argued that the plaintiff's claims fell under the collective bargaining agreement with

**United States District Court**
For the Northern District of California

the established union and thus did not come within the jurisdiction of the district court. *Id.* at 1361. The Ninth Circuit, however, held that since the plaintiff's termination constituted an effort to interfere with organization efforts "it is a statutory claim that he may bring directly in district court." *Id.* at 1362; *see also Burke*, 433 F.2d at 1034 (holding that an employee claiming discharge for union organization efforts has a right of action in federal court). Plaintiffs here similarly allege that Defendant applied its policies in a discriminatory manner in an effort to interfere with Plaintiffs' organization campaign; such an allegation is a statutory claim that may be brought directly in federal court.

Defendant's attempt to distinguish *Fennessy* and *Burke* on the ground that they are wrongful termination cases is unpersuasive. There is nothing in the language of the RLA–or the case law–that suggests that a RLA section 2, Third or Fourth interference claim for wrongful termination can be heard in the federal courts, whereas any interference less than termination cannot. Nor does SAPA's presence convert Plaintiffs' claims into a representational dispute. In *Fennessy,* the existence of an incumbent union did not somehow transform the interference claim into a representational dispute.

### B. The SAPA Claims

The SAPA-related claims also do not necessarily fall within the exclusive jurisdiction of the NMB. When Plaintiffs first filed this lawsuit, they sought an order that SkyWest could not fund nor bargain with, nor otherwise recognize SAPA as the representative of the pilots. In other words, while they did not seek an order declaring that ALPA represents the pilots, they did seek an order declaring that SAPA did not represent the pilots and that SkyWest could not treat SAPA as though it did. Such a claim appears to involve a representation dispute; that is, a dispute over who represents the pilots.

Plaintiffs, however, have since dropped their challenge to SkyWest's bargaining with and recognizing SAPA. The issue, then, is whether their claim that SkyWest has violated RLA section 2, Fourth by funding SAPA is a representational dispute under the Ninth. To the extent Plaintiffs challenge only the support SkyWest provides to SAPA, and not SkyWest's recognition and treatment of SAPA as the pilots' representative, the claim does not fall within section 2, Ninth. Again, Plaintiffs do not contend that ALPA represents the pilots, or

1   even that SAPA does not; rather, they challenge only SkyWest's use of SkyWest funds "in

2   maintaining or assisting or contributing" to SAPA.

3       In *Barthelemey v. Air Lines Pilots Ass'n*, 897 F.2d 999 (9th Cir. 1990), for example,

4   the plaintiff airline employees filed suit in district court alleging that an agreement between

5   the employees' union and a financier violated the prohibition in RLA section 2, Fourth as an

6   employer assistance or contribution to a labor organization.  The agreement required the

7   financier to pay the fees of an investment banker hired by the union if the financier gained

8   control of the airline. *Id.* at 1002.  The Ninth Circuit ultimately decided that the payment did

9   not violate the RLA.  *Id.* at 1015.  Importantly, the Ninth Circuit never suggested that the

10  claim implicated RLA section 2, Ninth and the exclusive jurisdiction of the NMB; to the

11  contrary, the Ninth Circuit accepted jurisdiction of the issue and decided it on the merits.

12  Thus, district courts have jurisdiction of claims that a carrier violated the prohibition in RLA

13  section 2, Fourth on employer support and assistance to labor organizations.

14      **C.  Defendant's Citations are Unpersuasive**

15      The cases upon which Defendant relies are distinguishable.  None involves claims that

16  an employer was interfering with the employees right to organize before the employees had

17  applied for NMB certification.  Rather, all of Defendant's cases involve NMB-certified

18  unions which contend that they represent certain employees.  Several of the cases arise either

19  in the context of a merger of two companies, *Air Lines Employees Ass'n., Int'l v. Republic

20  Airlines Inc.*, 798 F.2d 967 (7th Cir. 1986)*; Int'l Bhd. of Teamsters v. Texas Int'l Airlines

    Inc.*, 717 F.2d 157 (5th Cir. 1983), or in the context of a newly created company, *United

21  Transp. Union v. Gateway Western R. Co.*, 78 F.3d 1208 (7th Cir. 1996)*; Air Line Pilots

22  Ass'n., Int'l v. Texas Int'l Airlines, Inc.*, 656 F.2d 16 (2d Cir. 1981); *see also United Transp.

23  Union v. United States*, 987 F.2d 784 (D.C. Cir. 1993) (plaintiffs challenged the

24  Congressional designation of a rival union as the exclusive representative of employees).

25      Other cases were brought concurrent with a NMB certification proceeding.  *Int'l Fed.

26  of Flight Attendants v. Cooper*, involved a dispute between two unions, the IFFA and IAM,

27  who sought to represent employees at Trans World Airlines.  One of the unions, IAM, filed

28  for a representation election with the NMB.  141 F.3d 900, 902 (8th Cir. 1998).  During the

**United States District Court**
For the Northern District of California

course of that election, the IFFA filed "allegations of election interference" with the NMB. The NMB rejected the claims, counted the ballots, and certified the IAM as the employees' representative.  *Id.*  IFFA then brought suit against the IAM in a federal district court.  Of the two remedies sought by IFFA, the court held that one "would be the functional equivalent of judicial review of [a NMB] conclusion, which is clearly prohibited," and the other, granting reimbursement to IFFA for its costs in defending against IAM's membership raid, "would reach into the exclusive power of National Mediation Board over the labor disputes of common carriers."  *Id.* at 903.  Another case, *Miller v. Norfolk S. R. Co.*, involved alleged misrepresentations during a decertification vote. 183 F. Supp. 2d 996, 997-98 (N.D. Ohio 2002).  In both cases, then, the NMB already had significant involvement in the proceedings before the district court ruled that the NMB had exclusive jurisdiction.

The case emphasized by Defendant at oral argument, *Delta Airlines Inc.*, 30 NMB 102 (2002), supports the conclusion that the Court has jurisdiction of Plaintiffs' claims.  Upon the application of the Association of Flight Attendants ("AFA"), the NMB found that there was a representational dispute and ordered an election.  The NMB  a preliminary investigation of pre-election interference, but deferred future investigation until after the election.  *Id.* at 103.  The AFA did not prevail in the election and, as a result, the NMB continued its interference investigation.  *Id.* at 104.  One issue the NMB had to consider was whether it could consider allegations of interference that occurred before the AFA applied to the NMB for certification as the bargaining representative.  Delta argued that the NMB could not consider pre-application conduct because the "AFA could have availed itself of the rights afforded employees through the federal courts, under 45 U.S.C. § 152, Third and Fourth, (Section 2, Third and Fourth) but failed to do so."  *Id.* at 107.  The NMB agreed because the "AFA could have sought the judicial relief available under Section Third and Fourth but failed to do so." *Id.* at 113.  *Delta* thus holds that federal courts have jurisdiction of interference claims that arise before a party makes a NMB certification application.  This holding is consistent with the Ninth Circuit's observation that "Section 152, Fourth has been viewed as addressing primarily the precertification rights and freedoms of unorganized employees." *Fennessy,* 91 F.3d at 1362 (internal quotation marks and citation omitted).  "The reason is that, once a

**United States District Court**
For the Northern District of California

bargaining representative is certified, the RLA dispute-resolution system is put in place and judicial intervention is generally unnecessary and undesirable." *Id.* at 1363.

Defendant responds that since Plaintiffs *could* register with the NMB for an election, the Court must treat this as a representation dispute. Unlike *Konop*, *Fennessy*, and *Burke*, the Plaintiffs here already have the requisite 35 percent pilot support necessary to call for a NMB-monitored election where the employees are currently unrepresented. 29 C.F.R. §1206.2(b). Once the NMB has been enlisted to determine the true representative of employees, it has broad power to address employer interference in union campaigning. *Horizon Airlines*, 24 NMB 458, 498 (1997) ("When the Board has found carrier interference, it has employed a variety of special ballots and notices intended to eliminate the taint of interference on the employees' freedom of choice of representative.").

However, just because Plaintiffs *could* call for an election does not mean they *must* request an election to gain relief from alleged interference. The district court's statement in dicta in *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F. Supp. 492, 501-02 (N.D. Cal. 1976)--that federal courts should only exercise jurisdiction where "the employer had so completely dominated the labor relations scene" such that "there might well be no recourse to the National Mediation Board"--does not persuade the Court otherwise. First, the district court's statement was unsupported by citation to any case law and has never been followed by any court. Second, that case clearly did fall under the NMB's exclusive jurisdiction since the plaintiffs had already brought the dispute before the NMB; even the plaintiffs agreed there was an existing representation dispute. The holding in *Summit Airlines, Inc. v. Teamsters Local Union No. 295*, 628 F.2d 787, 794 (2d Cir. 1980)--that the union had an obligation to invoke the NMB process--does not apply in this case. *Summit Airlines* involved a union's attempt to force an airline to recognize it as the employees' representative through picketing rather than through the NMB process. *Id.* at 788. Here, the Organizing Committee does not currently seek recognition from SkyWest and thus has no obligation to invoke the NMB process.

In fact, such a requirement could cause irreparable harm to employees since it would force organizing groups with at least 35 percent support to call elections at potentially

1   disadvantageous times to obtain protection from employer interference.  Nothing in the RLA

2   suggests that the federal courts cannot protect Plaintiffs' statutory rights simply because they

3   have collected a certain amount of support from employees.  Accordingly, the Court

4   concludes that it has jurisdiction of the claims at issue on Plaintiffs' preliminary injunction

5   motion.

6   **II.  Interference with Pilots' Expressive Rights**

7       Plaintiffs allege that SkyWest has interfered with their expressive and associational

8   rights by: (1) applying its uniform policy in a discriminatory way so as to prohibit only

9   ALPA lanyards, and (2) prohibiting Plaintiffs from distributing ALPA-related material in

10  non-work areas.

11          **A.  Right to Wear ALPA Lanyards**.

12              **1.  The RLA Protects Employees' Right to Wear Union Insignia**

13      To demonstrate a likelihood of success on the merits of their claim that SkyWest has

14  interfered with Plaintiffs' wearing of ALPA lanyards, Plaintiffs must first establish that the

15  RLA gives them the right to wear union insignia while at work.  *INS v. Federal Labor*

16  *Relations Authority*, 855 F.2d 1454, 1456, 1462 (9th Cir. 1988) (holding that the INS did not

17  violate the Federal Service Labor-Management Relations Act ("FSLMRA") by prohibiting

18  union insignia while at times allowing other insignia because the FSLMRA does not protect

    the right to wear union insignia at work).

19      Plaintiffs argue that the language of RLA section 2, Third and Fourth, giving

20  employees the right to organize and to engage in union activity without carrier interference,

21  gives them the right to wear union insignia.  *See Adams v. Fed. Express Corp.*, 470 F. Supp.

22  1356, 1362-63 (1979) (holding that under the RLA an employee has the right to wear a union

23  button), *aff'd*, 654 F.2d 452 (6th Cir. 1981).  While the Supreme Court has never addressed

24  the issue under the RLA, it is well established that the National Labor Relations Act, 29

25  U.S.C. §§ 151 ("NLRA"), gives employees such a right absent "special considerations"

26  stemming from the employees' contact with the public.  *Pay'n Save Corp. v. NLRB*, 641 F.2d

27  697, 700 (9th Cir. 1981).  Courts regularly rely on NLRA case law in interpreting and

28  applying the RLA.  *See, e.g.*, *Konop*, 302 F.3d at 882 n.10.

**United States District Court**
For the Northern District of California

Defendant contends that the RLA does not provide a right to wear union insignia because it does not contain the "other concerted activities" language of the NLRA. In other words, it argues that the NLRA's right to wear union insignia derives from the statute's guarantee of employees' right to "engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157, language that is missing from the RLA. As support for its assertion Defendant relies on *INS*, 855 F.2d at 1454.

In *INS*, the plaintiffs argued that the INS had violated the FSLMRA by ordering its employees to remove union insignia while allowing other employees to occasionally wear non-union insignia in violation of its strict uniform policy prohibiting all pins. Plaintiffs argued that the language of the FLSMRA "granting employees the 'right to form, join, or assist any labor organization' g[ave] the INS employees the right to wear" the insignia.[1] 855 F.2d at 1458.

The Ninth Circuit disagreed. It observed that an earlier Ninth Circuit case, *NLRB v. Harrah's Club*, 337 F.2d 177, 179 (9th Cir. 1964), held that the NLRA's right to wear union insignia emanates from its "other converted activities" language, and thus *Harrah's* implicitly rejected the assertion that the "to assist any labor organization" language in the NLRA gave rise to such a right. *INS*, 855 F.2d at 1459 (citing *Harrah's*, 337 F.2d at 179). It makes no sense, the court reasoned, for the "to assist labor organizations" language in the FSLMRA to create a right to wear union insignia, but for the same language in the NLRA to not give rise to such a right. *Id.* at 1459-60. As a result, the court reviewed the legislative history behind Congress' decision not to include the "other concerted activities" language in the FLSMRA, and concluded that in light of Congress's decision not to give FSLMRA

---

[1] The FLSMRA, 5 U.S.C. § 7102, provides that: "Each employee shall have the right to form, join, or assist any labor organization, or to refrain from such activity, freely and without fear of penalty or reprisal, and each employee shall be protected in the exercise of such right. Except as otherwise provided under this chapter, such right includes the right- (1) to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities, and (2) to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter."

employees the right to picket, Congress intended "to regulate the location or form of employee speech to a somewhat greater extent than under the NLRA." *Id.* at 1461. The court did not hold that the right to wear union insignia exists only if a statute gives an employee the right to engage in "other concerted activities."

Defendant does not point to anything in the RLA or its legislative history that suggests that by omitting the words "other concerted activities" from the RLA Congress intended the RLA to provide less protection of free speech than the NLRA. Unlike federal employees, RLA employees, like their NLRA counterparts, have the right to picket and strike. *See, e.g.*, *Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 429-31 (1987). Moreover, the RLA includes language that neither the NLRA nor the FSLMRA contain, language which suggests the protection of employees' right to wear union insignia. 45 U.S.C. § 152, Fourth (making it "unlawful for any carrier to interfere in any way with the organization of its employees" and protecting employees right to "assist in organizing the labor organization of their choice"). Though the Ninth Circuit held that the "assist any labor organization" language in the FSLMRA and NLRA does not include the right to wear union insignia, the RLA protects the right to "assist *in organizing* the labor organization" which implies the right to campaign and thus must protect the free expression of support through union insignia. Accordingly, the Court concludes that the RLA does not offer any *less* protection than the NLRA for employees attempting to organize a union; thus, it must offer at least the same protection.

## 2. Special Considerations

Having determined that the pilots have a right to wear union insignia absent special considerations, the Court must next determine whether such considerations exist here. In *Harrah's*, the Ninth Circuit found "special considerations" because "evidence shows that respondent has paid close attention to its public image by a uniform policy of long standing against the wearing of jewelry of any kind on the uniform." *Harrah's*, 337 F.2d at 180. As with Harrah's, SkyWest has a longstanding uniform policy it has endeavored to enforce as to

United States District Court
For the Northern District of California

1   its pilots. Plaintiffs nonetheless argue that this case is closer to *Pay'n Save Corp.*, 641 F.2d

2   697, where the Ninth Circuit held special considerations did not exist. In *Pay'n Save*, the

3   court distinguished *Harrah's* on the ground that the Pay'n Save had a significantly smaller

4   interest in the appearance of its employees than Harrah's and because the plaintiffs had a

5   greater interest in wearing their insignia because "an organizing drive was under way." *Id.* at

6   701 & n.10.

7         The Court need not decide whether this case more closely resembles *Harrah's* or

8   *Pay'n Save* because the parties agree that if SkyWest's lanyard policy is applied in a

9   discriminatory fashion it does not warrant special considerations. *Id*. at 701. Infrequent

10  instances of non-enforcement of the uniform policy against non-union insignia does not alone

11  prove discrimination. If the Court finds that non-enforcement was merely a result of

12  "problems in attempting to carry out its uniform policy effectively," it should not find

13  discriminatory enforcement to defeat "special considerations." *Hertz Corp.*, 305 NLRB 487,

14  488 (1991). If, on the other hand, "the incidents, while few in number, involved more than

15  isolated and chance remarks" then the Court should find discriminatory enforcement that

16  negates any "special considerations." *NLRB v. Essex Wire Corp.*, 245 F.2d 589, 594 (9th Cir.

17  1957).

18        Based on the non-hearsay testimony in the record, the Court finds that SkyWest has

19  enforced its lanyard policy in a discriminatory manner. While SkyWest has rigidly enforced

20  its uniform policy against ALPA lanyards, pilots have consistently worn and continue to

21  wear lanyards with other non-company logos without any negative consequences. And,

22  although at least one member of management, Chief Pilot Pfizer, has attempted to enforce the

23  policy equally for all non-company lanyards, the Court finds that the policy has not been

24  enforced evenly. The incidents related by Plaintiffs' witnesses involve "more than isolated

25  and chance remarks" by management.

26        The Court's finding that SkyWest applies its lanyard policy against ALPA lanyards in

27  a discriminatory manner is supported by the undisputed fact that SkyWest permits its pilots

28  to wear SAPA insignia pins; indeed, the pins are distributed to pilots at the new pilot training

    sessions. This discriminatory enforcement dispels any inference that SkyWest's uniform

United States District Court
For the Northern District of California

1   policy entitles it to "special considerations" that allow it to curtail its pilots' right to wear

2   union insignia.

3       **B.  Right to Distribute ALPA Material**

4       Plaintiffs also contend that Defendant interferes with their organizing efforts by

5   preventing them from distributing ALPA material in non-work areas such as crew rooms,

6   crew lounge bulletin boards, and pilot mailboxes.  The law regarding union literature in non-

7   work areas is not in dispute.  Employers may not prohibit employees from distributing union

8   literature on non-work time and in non-work areas.  *See, e.g.*, *Consolidated Diesel Co. v.*

9   *NLRB*, 263 F.3d 345, 354 (4th Cir. 2001);  *NLRB v. Lummus Indus.*, 679 F.2d 229, 233 (11th

10  Cir. 1982).  With regard to bulletin boards, "there is no statutory right of employees or a

11  union to use an employer's bulletin board," however, if the employer allows any non-work

12  related postings on the board it must also permit union-related postings and the employer's

13  motivation in denying such postings is "irrelevant."  *Honeywell, Inc.*, 262 NLRB 1402

14  (1982) (internal quotation marks omitted).

15      Defendant's General Counsel, Todd Emerson, candidly conceded that the crew room

16  bulletin boards are a "Turkish bazaar;" that is, SkyWest allows non-work related postings on

17  the boards.  Defendant must therefore allow Plaintiffs to place ALPA material on the boards.

18  The Court finds that Defendant has nonetheless removed ALPA material from the bulletin

19  boards.  Captain Bharath's testimony about a chief pilot admitting to have removed such

20  material, together with the evidence of ALPA material disappearing from the bulletin boards

21  within days or even hours of being placed, while non-ALPA material remains on the board,

22  plus SkyWest's discriminatory enforcement of its lanyard policy, supports the finding that

    Defendant has likewise enforced its bulletin board policy in a discriminatory manner.

23      Defendant has also, at times, prohibited Plaintiffs from distributing ALPA material in

24  crew rooms and other non-work areas, as testified to by Captain Bharath and Captain Alford.

25  Defendant does not contend that such conduct is lawful; such prohibition violates its own

26  policy which provides that "distribution of literature or goods of any type is restricted to

27  cafeterias, lunch/break/crew rooms, restrooms and parking lots."

28

United States District Court
For the Northern District of California

The Court also finds, however, that Plaintiffs have not shown a likelihood of success on their claim that Defendant has applied its mailbox policy in a discriminatory manner.  The Court finds that Defendant has a policy of allowing only work-related material to be distributed in the pilots' mailboxes.  The only exception is that it does allow pilots to place greeting cards, and similar sentiments, into the boxes.  This minor, innocuous exception is not sufficient to show discriminatory enforcement, especially in light of the absence of any evidence that Defendant allows mass distribution of solicitation materials of any kind in the boxes.

### C. Balance of Harms

Having concluded that Plaintiffs have demonstrated a likelihood of success on many of their interference claims, the Court must next consider the balance of harms.  The Court finds that the balance of harms favors the Plaintiffs.  Defendant's discriminatory enforcement of its lanyard policy has inhibited Plaintiffs' organizing efforts.  Such interference constitutes irreparable harm.  *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987) (holding that the firing of an employee for organization activities had "coercive and inhibitory effects upon the employees' organizational rights secured by the RLA" which were "irreparable").  The harm from the discriminatory enforcement is demonstrated by the testimony as to the effect of the TRO; its issuance has "made a huge difference," allowing pilots to have open conversations about ALPA and leading to "a large spike in the request for cards" to authorize ALPA as the bargaining representative.  As Captain Bharath testified, there has been "a renewed feeling of empowerment" since pilots are now "able to freely express [their] support for ALPA."

In contrast to the irreparable harm to Plaintiffs from not issuing an injunction, the Court finds that granting Plaintiffs a preliminary injunction on the above claims on which Plaintiffs have demonstrated a likelihood of success will not cause any harm to SkyWest.  Although Defendant claims a strong interest in enforcing its uniform policy, allowing ALPA lanyards will not impact that interest since Defendant has allowed, and continues to allow, all manner of non-company lanyards.  Indeed, SkyWest offers no evidence that at any time during the last two years it has reminded the pilots as a group of its lanyard policy, and it has

United States District Court
For the Northern District of California

1   not identified any harm from the wearing of ALPA lanyards; this is especially so given that
2   to this day it allows pilots to wear SAPA pins.  Moreover, the ALPA lanyards are similar to
3   SkyWest lanyards: dark blue with white lettering.  They are far more innocuous and
4   professional appearing than many of the lanyards Defendant has allowed pilots to wear.  In
5   addition, Defendant admits that allowing ALPA-related material on non-work bulletin boards
6   and in non-work areas causes it no harm; its written policy allows for such distribution.

7         Accordingly, the Court will grant the preliminary injunction with respect to ALPA
8   lanyards, distribution of ALPA-related material in non-work areas, and posting of ALPA
9   material on crew lounge bulletin boards.  However, the Court denies the injunction as to
10  access to pilot mailboxes.

## III.  SAPA Claims

11        As the Court understands it, Plaintiffs make two claims against SkyWest regarding the
12  airline's relationship with SAPA: (1) that SkyWest discriminates against Plaintiffs'
13  organization effort by making some channels of communication with pilots available to
14  SAPA but not to the Organizing Committee, and (2) that by supplying 100 percent of
15  SAPA's funding, SkyWest violates RLA section 2, Fourth which prohibits using "the funds
16  of the carrier in maintaining or assisting or contributing to any labor organization, labor
17  representative, or other agency of collective bargaining."  45 U.S.C. § 152, Fourth.

### A.  Access to the Same Channels of Communications

18        The RLA does not require airlines to allow distribution of union-related material
19  through company channels of communication such as email, training sessions, and dedicated
20  bulletin boards.  *See, e.g.*, *Lummus Indus.*, 679 F.2d at 233 (stating that "employers may
21  lawfully regulate distribution of literature or solicitation of opinion concerning working
22  conditions in work areas or during work time").  Plaintiffs argue, though, that by allowing
23  SAPA access to these channels of communication, SkyWest has discriminatorily advantaged
24  one representative group, SAPA, over another, ALPA, and thus must grant the same access
25  to the Organizing Committee.  The law, however, does not support this assertion.

26        A carrier may provide an incumbent labor representative greater access to channels of
27  communication than a competitor, so long as those channels are not used for campaign

28

purposes. *See, e.g.*, *United Air Lines*, 1995 NMB LEXIS 111 (1995) (finding that the incumbent representative inevitably would have greater access to employees); *Northwest Airlines*, *Inc.,* 19 NMB 94 (1991) (finding no violation where the incumbent representative had "distinctly greater access"); *see also Webco Indus. v. NLRB*, 217 F.3d 1306, 1311-12 (10th Cir. 2000) (holding that employer violated the NLRA by allowing one representative group to campaign on work property while prohibiting another from campaigning).

The Court finds that SAPA has not routinely used any of the above forms of communication to campaign against ALPA or for SAPA. There is no evidence in the record that SAPA has ever used the group email function to campaign.[2] Similarly, there is no evidence that dedicated bulletin boards–to the extent there are any–are used for campaigning.

Plaintiffs' evidence as to the SAPA training sessions is not persuasive. While the Court has considered Plaintiffs' hearsay testimony, it finds that it is not entitled to much weight. Rumors as to what was said at particular meetings are highly unreliable, as is demonstrated by Captain Alford's testimony as to the alleged firing of Mike Eisenstat. Captain Nolin's testimony is similarly unpersuasive. He merely testified that the SAPA representative, Captain Black, admitted to "saying things that were inappropriate," but Captain Nolin did not inquire as to what Captain Black had said. Moreover, in response to Captain Nolin's order, Captain Black agreed to stop making any inappropriate comments, whatever they were.

Plaintiffs argue in the alternative that SkyWest must grant Plaintiffs access to company communication channels regardless of whether SAPA has actively campaigned through those channels because SAPA is a "company union." Plaintiffs do not cite any case in which a court has granted equal access to channels of communication in such circumstances. All of Plaintiffs' cases involve competing unions granted unequal access to communications for campaigning. *See, e.g.*, *In re Duane Reade, Inc.*, 338 NLRB 943 (2003) (finding unequal access where an employer denied one union access to employees, while facilitating meetings between employees and another union for the purposes of organizing);

---

[2]   The Court has not and will not consider the declaration of Diletta Martirano, filed without permission after the close of evidence since Plaintiffs could have submitted the evidence during the hearing. Moreover, the Court is not persuaded that the email constitutes campaigning.

1    *Katz's Deli*, 316 NLRB 318, 333 (1995) (finding unequal access where an employer evicted

2    a representative of the incumbent union from the premises while allowing a rival union to

3    hold organization meetings with employees during work hours).

4         Moreover, Plaintiffs have not demonstrated that the Court has jurisdiction of this

5    claim. Plaintiffs' argument can be characterized as a challenge to SkyWest's authority to

6    treat SAPA as the pilots' representative, a claim that may fall within RLA section 2, Ninth.

7    Accordingly, even if this Court found that SAPA is a "company union," which it does not do

8    at this stage, granting Plaintiffs equal access to company channels of communication is not

9    an appropriate remedy.

         **B. SkyWest Funding of SAPA**

10        Plaintiffs also contend that SkyWest's 100 percent funding of SAPA violates the

11   RLA's prohibition on using "the funds of the carrier in maintaining or assisting or

12   contributing to any labor organization, labor representative, or other agency of collective

13   bargaining . . . ." 45 U.S.C. §152, Fourth. In *Barthelemy*, the Ninth Circuit explained the

14   prohibition:

15        > Obviously, the line between cooperation and support is not an obvious one.
         > Permissible cooperation becomes prohibited support once the union's
16       > independence is compromised. This is a subjective inquiry: the question is
         > whether the assistance provided the union is in fact depriving employees
17       > their freedom of choice. It is not the potential for but the reality of
         > domination that these statutes are intended to prevent.
18

19

20   *Barthelemy*, 897 F.2d at 1016. The Ninth Circuit identified four factors relevant to deciding

21   whether company financial support has stifled employee free choice: (1) whether the

22   employer assistance occurred in response to an outside effort to organize, (2) evidence of the

23   union becoming beholden to the employer, (3) employee approval of agreements between the

24   union and employer, and (4) whether the employer assistance is sustained or simply a one-

25   time payment. 897 F.2d at 1017.

26        Plaintiffs have not subjectively demonstrated that SkyWest's 100 percent funding of

27   SAPA has deprived the pilots of their freedom of choice. First, SAPA was not created in

28   response to any outside effort to organize. Even if the Court does accept the hearsay

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

evidence that SAPA was altered in direct response to a previous ALPA campaign, a modification of a group's practices in response to employees' desires *after* a failed campaign does not raise the same concerns as creating an entirely new organization to quell support for a union *during* a campaign. Second, Plaintiffs ask the Court to infer that SAPA must be beholden to SkyWest because of its funding without producing any evidence that SAPA actually has altered its practices or demands in response to management influence. Finally, pilots vote on and approve the agreements SAPA enters into with SkyWest, and the pilots even refused to ratify one agreement without certain modification. Moreover, the President of SAPA is an ALPA supporter and the record reflects that the relative merits of ALPA versus SAPA are actively debated at SAPA Board meetings.

On the other hand, SkyWest's unlimited funding of SAPA appears, on its face, to violate the RLA and SkyWest does not contend that there are any cases in the courts or even the NMB that have placed their blessing on such unfettered financial support.

In any event, assuming, without deciding, that SkyWest's complete and unlimited funding of SAPA violates RLA section 2, Fourth, the Court finds that the balance of hardships strongly counsels in favor of denying a preliminary injunction prohibiting such funding. SAPA has represented the pilots and been fully funded by SkyWest for over ten years without legal challenge. Though the length of SAPA's existence is not relevant to whether the funding is lawful, it does speak to the amount of "irreparable" harm Plaintiffs will suffer without a preliminary injunction. Plaintiffs' challenge could have been brought at any time during these past ten years; nothing of significance has changed. Also, given that the Organizing Committee had been campaigning for well over a year before seeking a preliminary injunction, it is unreasonable to grant the requested relief without the benefit of a full record. Moreover, SAPA serves several important administrative functions for SkyWest and its pilots, such as facilitating the FAA amnesty program and addressing employee complaints about pay errors and other issues. By prohibiting all SkyWest funding of SAPA, a preliminary injunction would threaten the completion of these activities which would harm both the airline and its pilots.

## CONCLUSION

**United States District Court**
For the Northern District of California

1      For the reasons explained above, Plaintiffs' motion for a preliminary injunction is

2  GRANTED in part and DENIED in part.  SkyWest, its officers, agents, servants, employees,

3  and attorneys, and all persons acting by, through, under, or in concert with Defendant,

4  pending a final ruling by the Court on the merits:

5      1) Are enjoined from prohibiting SkyWest pilots from wearing the dark blue ALPA

6  lanyard with white lettering, and

7      2) Are enjoined from interfering with SkyWest pilots' oral communications with

8  fellow SkyWest pilots regarding ALPA and the ALPA organizing campaign in non-work

9  areas and on non-work time, and from interfering with SkyWest pilots' communication with

10 fellow SkyWest pilots regarding ALPA and the ALPA organizing campaign through

11 distribution of ALPA-related materials in non-work areas such as bulletin boards and crew

12 lounges.

    All other claims for preliminary injunction are denied.  The parties are directed to

13 appear for a case management conference on Friday, August 3 at 8:30 a.m. and shall meet

14 and confer on the need, if any, for a bond and the amount of such bond.  The hearing on

15 Defendant's motion to dismiss is VACATED pending the Case Management Conference.

16

17     **IT IS SO ORDERED.**

18

19 Dated: June 27, 2007     _____

20     CHARLES R. BREYER
    UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28